## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DAVONTAE SANFORD,

        Plaintiff,

v.

CITY OF DETROIT, a Municipal
Corporation, MICHAEL RUSSELL
and JAMES TOLBERT in their
official and/or individual capacities,
jointly and severally,

        Defendants.

CIVIL ACTION NO.

**COMPLAINT AND JURY
DEMAND**

_____/

| | |
|---|---|
| Barry C. Scheck | William H. Goodman (P14173) |
| Nick Brustin | Julie H.  Hurwitz (P34720) |
| Emma Freudenberger | Kathryn Bruner James (P71374) |
| Vishal Agraharkar | Huwaida Arraf (NY 4707220) |
| Neufeld Scheck & Brustin, LLP | Goodman Hurwitz  & James, P.C. |
| 99 Hudson Street | 1394 E Jefferson Ave |
| New York, New York 10013 | Detroit, MI 48207 |
| (212) 965 9081 | (313) 567 6170 |

        *Attorneys for Plaintiff*

_____/

## COMPLAINT AND JURY DEMAND

    NOW COMES Plaintiff DAVONTAE SANFORD, by and through his
attorneys, the law firms of Neufeld Scheck & Brustin, LLP, and Goodman
Hurwitz & James, P.C., and for his Complaint in this matter, states as follows:

## **INTRODUCTION**

1.     At just fourteen years old, Plaintiff Davontae Sanford was wrongfully prosecuted for a quadruple homicide of which he was completely innocent. Davontae was convicted and spent nearly nine (9) years—from the ages of 14 to 23—wrongly imprisoned for these crimes.

2.     Davontae's nightmare was no accident; rather it was the direct result of serious misconduct by Defendant Detroit Police Department (DPD) detectives, who railroaded an easy and vulnerable target rather than do the hard work necessary to identify the true killer.

3.     Worse, once the true murderer came forward independently to confess and proclaim Davontae's innocence, Defendants affirmatively covered this up in order to preserve Davontae's wrongful conviction and to cover up their own misconduct.

4.     Late on the night of September 17, 2007, two professional hit men in their mid-to-late 20s—Vincent Smothers and Ernest Davis—murdered four people in a house on Runyon Street, on the East Side of Detroit, as part of a drug gang war.

5.     In the early morning hours of September 18, 2007—within the hours after the killings—investigating DPD officers, Defendant Sgt. Michael Russell and

Investigator Dale Collins, encountered 14-year-old Davontae Sanford, who lived nearby and had wandered out in his pajamas to ask the police what was going on.

6.     Defendant Russell and DPD Officer Collins took young Davontae, who was learning disabled—functionally illiterate and blind in one eye—to the police station where Russell and Homicide Commander, Defendant James Tolbert (Tolbert and Russell hereinafter, collectively "Defendant Officers") repeatedly and relentlessly interrogated the 14-year-old over the next two days, without an attorney or guardian present.

7.     Defendant Officers threatened Davontae and made false promises to try to induce him to confess.

8.     After hours of interrogation, Defendant Officers presented Davontae with a false typewritten confession, typed and authored by Defendant Russell, which mirrored the detectives' fabricated theory of the case.

9.     To make this false confession appear reliable, Defendant Officers inserted non-public details about the crimes that only the true perpetrator or police would know.

10.     Worn down by Defendant Officers' coercive interrogation, the young, disabled teen finally acquiesced and signed the purported "confession".

11.    Defendant Officers then misrepresented to prosecutors that the confession was obtained through a lawful, professional and reliable interrogation and that the non-public details about the crimes had originated with Davontae.

12.    Defendant Officers also falsely and deliberately asserted that Davontae had prepared and drawn a diagram of the murder scene, when in fact it had been prepared by Defendant Tolbert, who then gave it to Davontae to fill in the location of the victims to match the photographs he had been shown earlier, and then to sign.

13.    At no time did any reliable evidence, untainted by Defendant Officers' misconduct, ever originate with or connect Davontae to the Runyon Street murders. But, because of Defendant Officers' egregious unconstitutional misconduct, Davontae was convicted of four homicides and sentenced to 37–90 years in adult prison for these brutal crimes that he did not commit.

14.    Less than one month after Davontae's conviction and sentencing, professional hit man, Vincent Smothers, was arrested as the prime suspect in another murder, and volunteered to DPD officers, including DPD Officer Gerald Williams and Defendant Russell, that he had committed the Runyon Street murders.

15.    Smothers provided numerous non-public facts about the crime that only the true perpetrator would know, including details that were previously

4

unknown to the police and later independently verified. Smothers also told Defendant Officers that he had only one accomplice for these murders—his longtime friend and colleague, Ernest Davis—with whom he had partnered to commit other contract killings.

16.     Smothers' unequivocal confession was corroborated by multiple witnesses who described seeing only two gunmen fleeing the scene. Smothers and Davis fit the physical descriptions given by those witnesses; Davontae did not fit the witnesses' description of either of the two gunmen.

17.     Smothers has repeatedly asserted that he did not use, and never would have used, an adolescent as an accomplice to a contract killing—especially one, like Davontae, who is blind in one eye—because it would have jeopardized Smothers' own safety.

18.     Defendant officers never informed Davontae or his counsel about Smothers' confession; rather, they allowed Davontae—an innocent, disabled, teenaged boy—to remain locked up in an adult prison.

19.     Indeed, Defendant Russell instructed Smothers to conceal his involvement in the Runyon Street murders. This attempted concealment was a part of Defendants' effort to hide their misconduct in the investigation, wrongful arrest, and wrongful conviction of Davontae Sanford.

20.     Even after Smothers' confession finally became known to Davontae and his counsel, Defendant Officers continued to lie about the circumstances of Davontae's interrogation, which prolonged Davontae's wrongful incarceration for nearly eight additional years.

21.     On June 8, 2016, after nine years of torturous wrongful imprisonment and after the truth of Defendants' misconduct was more fully exposed, the Wayne County Circuit Court finally released 23-year old Davontae Sanford from prison, and on July 19, 2016, all charges were dismissed against him.

22.     Beyond compensating Davontae for the over nine years that he needlessly spent as a prisoner, the loss of his entire adolescence, and his continuing suffering, this action seeks to remedy Defendant City of Detroit's unlawful policies, practices, and/or customs of routinely conducting unlawful interrogations, and of failing to adequately train, supervise, and/or discipline its officers that led Defendant Officers to violate Davontae Sanford's constitutional rights as secured by the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution, and the laws of the State of Michigan.

## **THE PARTIES**

23.     Plaintiff Davontae Sanford, at all times material to this complaint, was a resident of the State of Michigan.

24.     Defendant City of Detroit is, and at all times relevant herein was, a municipal corporation, authorized under and created by the laws of the State of Michigan. It is, and has been at all times relevant hereto, authorized by law to maintain and operate a Police Department. By and through its agents, including but not limited to the Chief of Police, its supervisors, operating officers, Boards, Commissions, and Committees and its final policymakers, Defendant City of Detroit, at all times relevant hereto, established, promulgated and implemented the policies, written and unwritten, of the DPD, with regard to hiring, training, supervision, and discipline of the employees of said department, as well as the investigative practices and procedures of its Major Crimes Unit and the officers who worked within that Unit.

25.     At all times relevant to this action, DPD is and was an official department of Defendant City of Detroit.

26.     Further, at all times herein, both Defendant City of Detroit and its Police Department failed to accommodate the obvious learning disability from which Davontae Sanford was afflicted, and instead exploited and intentionally discriminated against Davontae on the basis of that disability. They did so in their detention, interrogation, and suggestion to Davontae as to what he was required and expected to say, and in their manipulation of Davontae to get him to "sign" confessions and incriminating evidence.

27.     Upon information and belief, Defendant Michael Russell is a resident of the State of Michigan.

28.     At all times relevant to this complaint, Defendant Russell was a Sergeant in the Major Crimes Unit at the DPD acting under color of law, pursuant to the statutes, ordinances, regulations, policies, customs and usage of Defendant City of Detroit.

29.     Upon information and belief, Defendant James Tolbert is a resident of the State of Michigan.

30.     At all times relevant to this complaint, Defendant Tolbert was the Commander of the Major Crimes Unit, which included the Homicide Unit, at the DPD during the investigation of the Runyon Street homicides and was subsequently promoted to Deputy Chief of Police.

31.     At all times relevant to this complaint, Defendant Tolbert was acting under color of law pursuant to the statutes, ordinances, regulations, policies, customs and/or practices of Defendant City of Detroit.

## JURISDICTION

32.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, and the laws and Constitution of the State of Michigan.

33.     Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202. Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate state law claims pursuant to 28 U.S.C. § 1367.

34.     Venue is proper under 28 U.S.C. § 1391(b), as the claims arose in Wayne County.

## FACTUAL BACKGROUND

### Runyon Street Homicides

35.     At approximately 11:25 p.m. on September 17, 2007, Vincent Smothers and Ernest Davis approached the Runyon Street home of low-level drug dealer Michael Robinson, whom they had been hired to kill. The two hit men were in the mid-to-late 20s and wearing dark clothes. Smothers carried an AK-47 rifle, and Davis carried a .45 caliber semi-automatic pistol.

36.     While the pair were surveying the house, a man inside unexpectedly opened the door and saw Smothers with his gun. Smothers and Davis began shooting at the individual from outside the house and then came in and continued to shoot inside to the living room. Smothers and Davis shot and killed Robinson, two other men, and one woman who were present in the living room.

37.     At some point Smothers entered the back bedroom and found Mr. Robinson's 7-year old son and a 30-year old woman named Valerie Glover, who had been shot but had managed to flee and hide under the bed.  Smothers told Ms.

Glover and the child to be quiet and pretend to be dead. He then exited the room. When Smothers left the home he took with him a .40 caliber gun that he had found there.

38.    Out in the street, Smothers exchanged gunfire with Jessie King, a Detroit police chaplain who had heard and seen the shooting from his home across the street.

39.    Smothers and Davis then ran down Runyon Street and across a vacant field to their getaway vehicle.

### City of Detroit Police Officers Respond to Runyon Street Homicides

40.    DPD officers established a crime scene at 19741 Runyon Street and canvassed the area for evidence and witnesses. Defendant Officers—Russell and Tolbert—along with Investigator Dale Collins, were among those who responded to the Runyon Street crime scene and assisted in the homicide investigation.

41.    DPD officers learned, from two eyewitnesses, that the shooting had been committed by two black men—about 30 or 35 years old, with brown skin and slim-to-medium builds, one of whom was approximately six feet tall, and the other slightly shorter.

42.    Both of the perpetrators were reportedly wearing dark clothes and masks, and the taller of the gunmen (Smothers) was reportedly also wearing a coat and carrying a long rifle.

43.    As part of their initial investigation, Defendant Officers with Investigator Collins, learned a number of details relating to the crime from surveying the crime scene and speaking to witnesses, including:

a)    That the two perpetrators first fired rounds through the front door and window from outside the house;

b)    That additional shots were fired in the living room after the assailants entered the house;

c)    That three men and one woman were killed in the living room;

d)    The positions of the crime victims' bodies;

e)    That the two perpetrators used an assault rifle and a handgun to commit the murders;

f)    That one of the assailants encountered Valerie Glover in the bedroom under a bed, and briefly spoke to her;

g)    That a seven-year-old boy was also in the room, on the bed under the covers;

h)    That several marijuana plants were growing in the basement of the house, and neighbors were suspicious that Robinson had been selling drugs from the house;

i)    The escape route of the perpetrators: north on Runyon Street then across a vacant field to the west, toward Teppert and Beland Streets; and

j)    That while fleeing, the assailant with the assault weapon fired two rounds at a witness across the street, and that the witness had fired back.

## Davontae's First Encounter with DPD Officers

44.     At the time Smothers and Davis committed the Runyon Street homicides, Davontae Sanford was fourteen years old and was blind in one eye. Davontae had never met Smothers or Davis and did not participate in the crime in any way. He had no knowledge as to why or how it was committed.

45.     After the murders, which occurred past midnight on September 18, 2007, there was substantial noise and heavy police activity in the neighborhood. As a result, several residents came outside to look around, including Davontae, who lived on Beland Street near the area where Defendant Russell was canvassing.

46.     Upon leaving his house in his pajamas, Davontae walked towards the police to inquire about the commotion.

47.     Defendant Russell approached Davontae and spoke with him in an accusatory manner, eventually asking him several questions about the crimes.

48.     Davontae, who had no knowledge about the crimes, could not answer Russell's questions.

49.     DPD K-9 Detective Chris Salisbury and his police dog were near Defendant Russell while Russell spoke with Davontae on the street.

50.     Detective Salisbury's dog had just been tracking the scent of the perpetrators and did not react to Davontae's presence or otherwise show any indication that Davontae was connected to the Runyon Street crime.

51.     Given that four people had been shot repeatedly with assault weapons, the crime scene was extremely bloody; yet Davontae had no blood on him whatsoever.

52.     Nonetheless, Russell treated Davontae as a suspect. Because Davontae was only fourteen years of age, Russell instructed Investigator Collins to bring Davontae home and obtain parental consent to have him taken to police headquarters.

53.     Defendant Officers somehow obtained a signed consent from Davontae's grandmother for the officers to transport Davontae to the police station.

54.     After transporting Davontae to the precinct, Defendant Officers administered a gunshot residue test on his face and hands, which proved negative, and then interrogated him for several hours.

55.     The gunshot residue test came back negative two days later.

### The 1st  Statement DPD Officers Attributed to Davontae

56.     While in custody, Davontae disclosed that he had smoked marijuana and was under its influence during the interrogation; Davontae's learning disabilities were also known to Russell and the other officers.

57.     Despite their knowledge of Davontae's youth, disability, and intoxication—and indeed because of that knowledge—Russell and other officers interrogated Davontae without a parent, attorney or guardian present, in violation

of DPD written protocol. The officers continued the interrogation for several hours, well into the early morning hours of September 18, 2007, until they finally succeeded in coercing Davontae to make a statement about the crime.

58.    That statement—composed and typewritten by Detective Russell, only later signed by Davontae, and never recorded—purports to state that Davontae was present for the planning, but not the commission, of the murder. The statement also purports to state that the murder was carried out by three individuals named Tone, Tone-Tone, and Carrie.

59.    In fact, Davontae did not participate, in any way, in the planning or commission of the Runyon Street murders. He did not know the real perpetrators, Smothers and Davis, or otherwise have any information about how the crimes were committed.

60.    The only accurate details about the crimes in this statement were those inserted by the police investigators.

61.    Specifically, the "statement" includes the following accurate facts about the crime:

- That the guns the perpetrators intended to use included a chopper (an AK-47) and a .45 (a handgun);

- That the real name of the intended target on Runyon Street was Michael or Mike; and

- That there was a red car in the driveway of the victim's home.

62.     Because Davontae was not involved in the planning or commission of the Runyon Street murders, he did not know these facts about the crime. Defendant Officers improperly inserted these facts into Davontae's "statement," and later misrepresented to prosecutors, both orally and in writing, that the facts were volunteered by Davontae.

### The 2nd False Statement from Davontae: A "Confession"

63.     After Davontae signed his first "statement," purportedly implicating himself in the planning of the crimes, but failing to mention his participation in the murders themselves, Defendant Russell allowed him to return home.

64.     That evening at around 8:40 pm, several hours after Davontae was dropped off, Defendant Russell and DPD Officer Carlisle returned to his home and spoke with Davontae and his mother, Taminko Sanford.

65.     Neither Defendant Russell nor Officer Carlisle informed Ms. Sanford that Defendant Officers had already used improper interrogation tactics to extract a statement from Davontae that connected him to the crime; they also did not inform her that it was their intention to implicate Davontae yet more directly in the commission of the crime.

66.     As DPD officers had done the previous night with Davontae's grandmother, Defendant Russell and Officer Carlisle obtained a signed consent from Davontae's mother, Ms. Sanford, to again take Davontae into their custody

and transport him back to the police station.

67.     Although Davontae quickly asked to return home, Russell refused. Instead, Defendant Russell began to interrogate Davontae for the second time in less than twenty-four hours, starting at 9:30 p.m.

68.     Fourteen-year old Davontae, who had not slept for many hours and did not have a parent, attorney, or guardian present, was anxious to leave the station and return home. He so advised the officers, including Defendant Officers, but they would not allow him to leave.

69.     Defendant Officers then engaged in a systematic deliberate effort to coerce Davontae to make a false confession.

70.     For example, they falsely promised Davontae that he could go home once he admitted to committing the quadruple homicide.

71.     Defendant Officers also lied to Davontae and told him, "we know you did it now," claiming that blood from the crime scene had been found on Davontae's shoes.

72.     This was false; no blood was ever found on Davontae's shoes, nor on any of his clothes or body.

73.     Defendant Officers also ridiculed Davontae when he asked for an attorney; Defendant Russell called him a "dumbass," and lied, telling him that no attorneys were available at that hour.

74.     Furthermore, as they had the night before, Defendant Officers provided Davontae with more details about the crimes, including showing him photographs of the crime scene in order to manipulate him so as to make the coerced false confession appear to be credible and reliable.

75.     Because of their deceptive, dishonest, and coercive tactics, Defendant Russell, with the help of Defendant Tolbert, created a false and fabricated confession purportedly from Davontae, which Defendant Russell typed and then read to Davontae.

76.     This fabricated confession included new and different information than was contained in the first statement, crafted by Russell and attributed to Davontae the night before. However, like the first statement, this "confession" also included non-public facts about the crimes that only the police and the true perpetrators could have known. Those facts included:

    a.     The number of victims in the house;

    b.     Where the body of each victim was located when he or she was killed;

    c.     That the house was "sprayed" with bullets from the outside;

    d.     That a surviving victim of the shooting had been in the back room of the house on the floor, and had an encounter with one of the gunmen as that gunman walked through the house;

    e.     That multiple gunmen had committed the Runyon Street homicides;

      f.     That the gunmen used an assault rifle and a handgun;

      g.    That while fleeing the crime scene, two of the gunmen went up Runyon street towards State Fair; and

      h.    That while fleeing the crime scene, one of the gunmen shot at another person using a long rifle.

77.    Also, as with the "statement" taken from Davontae the night before, the fabricated "confession" contained information that the police later determined was false or inconsistent with the crime scene. For example, although the fabricated confession, like the first statement, falsely identifies the other perpetrators as Los, Tone-Tone, PBI Tone and Carrie, police later confirmed none of those individuals were involved in the murder.

78.    On September 19, 2007, the day after Defendants had extracted the coerced and fabricated confession, DPD officers determined that Angelo Gardner, a.k.a. Los, and Antonio Langston, a.k.a. PBI Tone, both had verifiable alibis for the time of the murder.  Neither Gardner nor Langston were ever charged or prosecuted for the Runyon Street murders.

79.    Officers also arrested Santo Green, a.k.a. Tone-Tone, but similarly declined to charge or prosecute him for the Runyon Street murders.

80.    This newly fabricated "confession" also differed from the first fabricated "statement" in ways that reflected Defendant Officers' updated understanding of the evidence. For example, the first statement stated that on the night of the murders Davontae was wearing "[t]the brown shirt I have on, black

'fat farm' hoodie, blue/white Jordan, blue jeans." However, after the first statement had been created, Valerie Glover—the lone surviving adult victim of the attack—told the police that the gunman she saw was wearing all black. Thus the newly fabricated (second) confession contradicted the first statement and accounted for this new information by stating: "I had on some black dickie pants, black t-shirt that said 'Payday' (it was inside out) and some blue and white Jordans."

81.     Defendant Officers also falsely reported and testified that a sketch of the crime scene, including the positions of the victims' bodies after their murders, was drawn entirely by Davontae.

82.     In fact, Defendant Tolbert drew the sketch of the inside of the Runyon Street house. Defendant Officers then had Davontae draw the locations of the bodies on the sketch, based on information that Tolbert and Russell had improperly provided to him, while instructing him to fill in the blanks. Specifically, Defendant Officers showed Davontae photos of the scene with the bodies located where they had been shot and killed.

83.     Defendant Officers then pressured Davontae to sign the sketch and subsequently attributed the drawing solely to him. Tolbert falsely reported to prosecutors and then falsely testified under oath that:

> a.     Davontae had drawn the entire sketch other than Defendant Russell's signature; and

      b.   The sketch was based on information that originated with Davontae, not the police.

84.    Eight years later, in 2015—during an interview with investigators from the Michigan State Police (MSP) who were conducting an investigation into the DPD's investigation of the Runyon Street homicides—Defendant Tolbert admitted that he had in fact drawn the sketch he had attributed to Davontae.

85.    Tolbert further admitted that he had falsely testified under oath, contrary to the true facts, that Davontae had drawn the sketch in question.

86.    Although the City of Detroit Police Department had the capability to audio record and videotape confessions at that time, Defendant Officers deliberately did not record any part of the interrogation that led to Davontae's allegedly incriminating statements.

87.    Instead, Defendant Officers claimed that Davontae needed to proofread his confession for "accuracy"—despite their knowledge that Davontae could barely read and was not able to comprehend what little he could read. They deliberately decided to videotape only that phase of their interrogation.

88.    In early September 2007, Davontae was arrested and falsely charged with the multiple murders without any probable cause other than the false and fabricated "statements" and "confessions" referenced above.

89.    Consequently, at the age of fourteen, Plaintiff Davontae Sanford was placed in jail and would remain incarcerated for the next eight-and-a-half years.

## **Davontae's Preliminary Examination and Trial Proceedings**

90.     At Davontae's arraignment on October 9, 2007, Judge Brian Sullivan ordered Davontae to undergo a psychiatric examination for an evaluation. During this evaluation, Davontae vehemently maintained his innocence and described in detail how officers had fabricated and coerced his confession.

91.     The only pieces of evidence ever directly implicating Davontae were: 1) the "confession" that Defendant Officers had fabricated, coerced and extracted; and, 2) the fabricated sketch of the crime scene.

92.     Defendant Officers falsely reported and wrote reports and statements to the prosecution, both before the pretrial hearings and at the trial, that Davontae volunteered many of the facts in his confession without any prompting or suggestion whatsoever.

93.     Defendant Officers further falsely reported that these facts could only be known by the original perpetrator and were therefore incriminating.

94.     These statements were cynical distortions and outright lies.

95.     Davontae's coerced statements—falsities fabricated by Defendant Officers—and the fabricated sketch of the crime scene were introduced into evidence both at Davontae's preliminary examination on October 1, 2007, and at his bench trial held on March 17-18, 2008.

96.     Because Defendant Officers had fabricated powerful evidence of Davontae's alleged guilt, by the middle of trial and on advice of counsel, Davontae believed that his only recourse was to plead guilty.

97.     At age 15, Davontae entered his guilty plea to four murders and a felony firearm—all crimes that he did not commit.

98.     On April 4, 2008, the court sentenced 15-year-old Davontae to four concurrent terms of thirty-seven (37) years to ninety (90) years for the murder charges and an additional two (2) years for the firearm charge.

99.     Davontae Sanford was immediately transported to the custody of the Michigan Department of Corrections, where he started the next phase of his nine-year nightmare, being a child locked in the dangerous and terrifying environment of an adult prison.

### Vincent Smothers Confesses Repeatedly to the Runyon Street Murders

100.    On April 19, 2008, two weeks after Davontae began serving his sentence, Vincent Smothers—a suspect in multiple homicides in the Detroit area—was arrested outside his home in Shelby Township, and eventually brought to a DPD police station. Smothers, who, at that point, had a wife and newborn daughter, voluntarily confessed to the police the many crimes he had committed in order to keep his family safe and out of trouble.

101.   Over the next two days, Smothers was interviewed by several DPD officers and confessed to having committed several murders for hire between 2006 and 2007. Notably, included among those confessions were the Runyon Street murders of which Davontae had just been convicted.

102.   Smothers told DPD Investigator Gerald Williams, unprompted, that the police had the wrong guy for the Runyon Street murders and volunteered several non-public facts about the crime that only the real perpetrator would have known, including:

      a.      That he had committed the murders together with his friend Ernest Davis, a.k.a. "Nemo," as part of a contract killing commissioned by a man named Leroy Payne;

      b.      That Davis had used a .45 caliber pistol and had fired from outside the house, and Smothers had used an AK-47;

      c.      That Smothers went into the back bedroom and saw a woman hiding under a bed, as well as a young boy, briefly speaking to them both before leaving them alive;

      d.      That Smothers took a .40-caliber gun from the scene, which he later used in a different murder for hire; and

      e.      That when Smothers learned there was a warrant out for his arrest, he asked his wife to hide firearms used in the Runyon murders in a house belonging to Davis' cousin.

103.   Smothers also admitted his involvement and Davontae's non-involvement in the Runyon Street murders to Defendant Russell.

104.   Defendant Russell accompanied Smothers to the bathroom during one of the interrogations, at which time he asked Smothers several questions about the murders. Smothers told Russell that they had the wrong guy because Smothers had committed the murders. Russell instructed Smothers to cease making statements that implicated himself and that exculpated Davontae.

105.   Later that day, police executed a warrant on Davis' cousin's house and recovered the .45-caliber pistol that had been used in the Runyon Street murders, as well as the .40-caliber pistol Smothers had taken from the scene of the Runyon murders and later used in another murder for hire, further corroborating Smothers' confession.

106.   In May of 2008, Smothers was re-interviewed by DPD Investigator Ira Todd and once again confessed to the Runyon Street murders. During this interview, Smothers also relayed an additional non-public detail about the Runyon Street homicides and reported that he had exchanged gunfire with another individual while fleeing the crime scene.

107.   Smothers was eventually charged with eight murders of the twelve to which he had confessed; that is, he was charged for every murder to which he had confessed except for the four committed on Runyon Street.

108.   During plea negotiations, the prosecutor offered Smothers a plea deal of 50-100 years for all eight murders if he promised not to testify on behalf of Davontae—a deal Smothers refused.

109.   Smothers eventually pleaded guilty to eight murders. At his sentencing, the judge referred to his presentence report, which included his confession to the Runyon Street murders, and urged him to "correct wrongs for those who were wrongfully convicted for killing people that you killed."

110.   Smothers replied, "If that's a question, then the Police Department knows of any crimes that have been committed."

111.   Despite Smothers' detailed confession to the Runyon Street murders to Defendants herein, among others, and his leading police to the location of firearms connected to the murders, Defendants repeatedly and affirmatively took steps to prevent the truth from coming to light.

112.   Defendants thus knowingly both caused and then prolonged the wrongful imprisonment of an innocent child.

113.   Defendants did not inform Davontae or his counsel of Smothers' statements, or otherwise follow up on Smothers' statements, or seek to correct the injustice that they knew—and now had confirmation—had befallen Davontae.

114.   Instead, Defendants either deliberately failed to investigate details that incriminated Smothers and undermined Davontae's conviction, or did investigate such details and deliberately suppressed information that exculpated Davontae.

115.   Neither Davis (Smothers' accomplice) nor Payne (who ordered the hit) was ever arrested for their involvement in the Runyon Street murders.

### Davontae Seeks Release from Jail Based on his Innocence of the Runyon Street Homicides

116.   From 2008 until his exoneration in 2016, Davontae sought repeatedly to withdraw his guilty plea or obtain relief from his conviction based on his actual innocence of the crime.

117.   In the fall of 2008, Davontae's first post-conviction attorney learned about Vincent Smothers' confession to the Runyon Street murders—not from the state police or the prosecutor, but from a journalist.

118.   In subsequent proceedings, Smothers repeatedly acknowledged his guilt in the Runyon Street murders, going so far as submitting an affidavit attesting to Davontae's innocence and seeking to attest to the same in court.

119.  However, these efforts to prove Davontae's innocence were repeatedly stymied by continued misrepresentations by Defendant Officers to Wayne County Prosecutors, who continued to assert Davontae's guilt and fight his release in reliance on Defendant Officers' misrepresentations that Davontae had voluntarily confessed and voluntarily reported non-public information about the

crimes that only the police and true perpetrator could have known.

120.   Finally, in 2015, Michigan State Police conducted an independent investigation of the Runyon Street homicides. As part of their investigation, MSP officers interviewed Defendant Tolbert on October 2, 2015, and discussed the sketch of the crime scene that Davontae purportedly made in Tolbert's presence. During that interview, Tolbert admitted for the first time that he had drawn the crime scene sketch at the precinct on September 18, 2007.

121.   During their investigation, MSP officers also retrieved the cell phone contents of Michael Robinson—the deceased target of the Runyon Street hit. The contents of the cell phone contained a picture of a .40 caliber gun that closely resembled the .40 caliber gun retrieved by the police that Vincent Smothers had confessed to taking from the Runyon Street crime scene and using to commit a subsequent homicide.

122.   The MSP submitted the report of its independent investigation to the Wayne County Prosecutor's Office on May 20, 2016.

123.   Due to the strong, irrefutable evidence of Davontae's innocence, on June 8, 2016, after Davontae's attorneys and the Wayne County Prosecutor's Office submitted a joint stipulation asking the court to set aside Davontae's conviction, Davontae was released from custody. The parties in that action then supplemented the stipulation on June 24, 2016 and, on July 19, 2016, the court

granted the stipulation and dismissed all charges against Davontae.

## DAMAGES

124.  Defendants' actions deprived Davontae Sanford of his civil rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

125.  This action seeks damages for the period from September 17, 2007 through each and every year to the present and into the future.

126.  Davontae's liberty was curtailed upon his arrest on September 20, 2007 and continued for the duration of his incarceration until his release on June 8, 2016.

127.  Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Davontae to be falsely arrested, tried, wrongfully convicted and incarcerated for over eight years for crimes he did not commit.

128.  Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions caused Davontae Sanford the following severe injuries and damages, which continue to date and will continue into the future, for all of which he is entitled monetary relief:

a.   Seizure and loss of liberty, resulting in:

i.   Restrictions on all forms of personal freedom including, but not limited to diet, sleep, personal contact, movement, educational opportunies, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

b.   Personal and physical injuries, including assaults, illness and inadequate medical care;

c.   Pain and suffering;

d.   Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

e.   Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

f.   Loss of family relationships;

g.   Damage to business and property;

h.   Legal expenses; and

i.   Loss of earnings and earning potential.

129.   The conduct of Defendants was reckless and outrageous, entitling Plaintiff to an award of punitive damages, as well as costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

## CLAIMS FOR RELIEF
## FEDERAL CAUSES OF ACTION

## <u>COUNT I</u>

**42 U.S.C. § 1983 FOURTEENTH AMENDMENT VIOLATIONS: FABRICATION OF INCULPATORY EVIDENCE, SUPPRESSION OF MATERIAL EXCULPATORY EVIDENCE, AND COERCION**

### A.   Fabricating False Inculpatory Evidence

130.   Plaintiff hereby incorporates by reference all of the foregoing allegations of fact as though set forth herein word for word.

131.   Defendants Tolbert and Russell, both acting deliberately, recklessly, and/or intentionally, and at all times under color of law, fabricated inculpatory statements, including, without limitation, admissions attributable to Plaintiff Davontae Sanford and others, in police reports and in testimony during pretrial and at trial.

132.   As a direct and proximate result of Defendant Officers' fabrication of this false inculpatory evidence, violating Davontae Sanford's clearly established Fourteenth Amendment due process rights, including the right to a fair trial, along with his Fourth Amendment right to be free from unreasonable seizures, Davontae was wrongfully convicted and suffered the injuries and damages described above.

### B.   Failure to Disclose Exculpatory and Impeachment Evidence to the Prosecution

133.   Defendants Tolbert and Russell, both state actors, acting deliberately, recklessly and/or intentionally, and at all times under color of law, failed to

document or disclose to the Wayne County Prosecutor's Office and/or to the Wayne County Circuit Court, material exculpatory and impeachment information including but not limited to:

a.    That said Defendant Officers fabricated admissions and evidence attributable to Plaintiff Davontae Sanford, in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime;

b.    That Vincent Smothers had confessed to being the true perpetrator of the Runyon Street homicides; and

c.    That the confession of Vincent Smothers to the Runyon Street murders was corroborated by the facts and evidence in the possession of and/or later obtained by Defendants.

134.    By both fabricating evidence and failing to disclose the aforementioned, among other exculpatory information, Defendant Officers, acting pursuant to the customs, policies and/or practices of Defendant City of Detroit, violated Plaintiff's clearly established due process rights under the Fourteenth Amendment, , which imposed a clear duty on these Defendants not to conceal or suppress obviously exculpatory evidence, but rather to report all material exculpatory and impeachment information to prosecutors.

135.    Acting with recklessness, deliberate indifference and/or intent, by withholding this material exculpatory and impeachment evidence prior to, during, and after trial, Defendant Officers, acting pursuant to the customs, policies and/or practices of Defendant City of Detroit, violated Davontae Sanford's clearly

established Fourteenth Amendment right to due process of law as announced by the United States Supreme Court in *Brady v. Maryland* and its progeny, undermining confidence in the outcome of the trial, and directly and proximately causing Plaintiff Davontae Sanford to be wrongfully arrested, prosecuted, convicted and imprisoned, and to suffer the constitutional violations, injuries and damages described above.

## C.   Coercion

136.   Defendant Officers deliberately, recklessly and/or intentionally, and under color of law further violated Davontae Sanford's Fourteenth Amendment right to a fair trial by compelling, manipulating and coercing him to make false inculpatory statements that repeated details of the crime that they had fed him, and that were then used against him during his criminal trial.

137.   By wrongly concealing the compulsion, concealment and coercion through which these statements were obtained, and by falsely testifying as to the circumstances surrounding the extraction of said statements, Defendants' actions led to the introduction into evidence of those statements, in violation of Davontae's clearly established Fourteenth Amendment right to a fair trial, which right bars introduction of statements obtained by means that violate Davontae's Fifth Amendment right to be free from compelled self-incrimination.

138. The actions of these Defendants violated Davontae's clearly established rights under the procedural due process clause of the Fourteenth Amendment and caused his wrongful arrest, prosecution, conviction and imprisonment and the injuries and damages set forth above.

139. As a direct and proximate result of the foregoing actions, Plaintiff Sanford has suffered the following injuries, among others:

    a.    Seizure and loss of liberty, resulting in;

        i.    Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

    b.    Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.    Pain and suffering;

    d.    Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.    Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f.    Loss of family relationships;

    g.    Damage to business and property;

    h.    Legal expenses; and

    i.    Loss of earnings and earning potential.

## COUNT II

## 42 U.S.C. § 1983 FOURTH AND FOURTEENTH AMENDMENT VIOLATION:
## MALICIOUS PROSECUTION

140. Plaintiff hereby incorporates by reference all of the foregoing allegations of fact as though set forth herein word for word.

141. Defendants acting deliberately, recklessly and under color of law, falsely arrested and imprisoned Plaintiff, without probable cause or other legal justification, knowing that there was no evidence connecting Plaintiff with the crime.

142. Defendants further fabricated statements, including admissions attributed to Plaintiff, in police reports and in testimony, pretrial and at trial, concerning the precise details of the crime, although Plaintiff was innocent of any crime.

143. Thus, there was not even arguable probable cause to arrest or prosecute Plaintiff and no reasonable officer would have believed probable cause existed.

144. Defendants, acting under color of law, commenced and caused to be continued a criminal prosecution against Plaintiff that was lacking in probable cause, unreasonably instituted, by suppressing exculpatory evidence, fabricating and coercing a false confession, and failing adequately to investigate the crime and

disregarding evidence, including the true perpetrator's confession establishing that Plaintiff was innocent.

145.   The prosecution of Plaintiff ultimately terminated in his favor when his indictment was dismissed in post-conviction proceedings.

146.   The actions of these Defendants violated Plaintiff's clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable seizure and thereby caused his wrongful conviction and the injuries and damages set forth above.

147.   As a direct and proximate result of the foregoing actions, Plaintiff Sanford has suffered the following injuries, among others:

    a.    Seizure and loss of liberty, resulting in;

        i.    Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

    b.    Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.    Pain and suffering;

    d.    Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.     Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f.     Loss of family relationships;

    g.     Damage to business and property;

    h.     Legal expenses; and

    i.     Loss of earnings and earning potential.

## COUNT III

### MONELL CLAIM AS TO THE CITY OF DETROIT

148.  Plaintiff hereby incorporates by reference all of the foregoing allegations of fact as though set forth herein word for word.

149.  Defendant City of Detroit, acting through its top officials, policymakers and the Detroit Police Department (DPD), authorized, sponsored, and approved actions by Detroit Police Department officers, supervisors and investigators during the course of their law enforcement actions conducted within the scope of their respective authority and under color of law.

150.  At all relevant times hereto, Defendant City, acting through its top officials, policymakers and the Detroit Police Department (DPD), did enable, ratify, condone, tolerate and approve actions that constituted improper, flawed, erroneous and inappropriate police investigative methods, which were a moving force in the violation of the constitutional rights of citizens, including Plaintiff Davontae Sanford.

151. Those improper, flawed, erroneous and inappropriate police investigative methods constituted customs, policies and practices, which included but were not limited to the following:

a.  Prematurely focusing criminal investigations on persons in the neighborhood who were turned into early suspects by the DPD investigators, including Defendant Officers herein, to the exclusion of other, often far more plausible, suspects, who were excluded, ignored and/or rejected;

b.  With regard to early and premature suspects, intentionally and/or deliberately ignoring, overlooking, disregarding, contorting and/or burying exculpatory evidence as well as evidence that tended to inculpate others;

c.  Conducting inadequate, slipshod, hurried, and rushed investigations of high profile crimes to rapid conclusion, before it was either necessary or appropriate to conclude the investigation, resulting in improper, flawed, erroneous and inappropriate police investigative methods such as making arbitrary arrests in order to close cases quickly so as to burnish the DPD's record for rapid crime solution and apprehension, at the expense of truth, justice, and the legitimate apprehension of real criminals;

d.  Affirmatively choosing not to investigate, let alone develop or pursue, serious leads and evidence so as to close files quickly;

e.  Using unreliable, discredited and improper interrogation techniques such as consistently disregarding the DPD written policy against interrogating juveniles outside the presence of their parents and/or guardians, thereby rendering the written policy meaningless;

f.  Threatening dire consequences to juveniles who do not confess to crimes regarding which they are being

interrogated, even if they are innocent of and uninvolved in those crimes;

g.    Engaging in premature, aggressive and improper interrogations of early suspects, in particular juveniles, whereby improper methods described above were often employed;

h.    Engaging in unduly suggestive tactics in the course of interrogations so as to provide critical information to "suspects," otherwise unavailable to said suspects, in order to import credibility into extracted confessions, thereby contaminating any confession derived from such interrogations;

i.    Concealing the aforementioned tactics by failing to document, record, discipline, and/or report the events and interactions with suspects and/or witnesses that would reveal the aforementioned inadequate, slipshod, sloppy, hurried and lazy investigations of serious crimes; and/or disclose exculpatory and inculpatory evidence;

j.    Grossly negligently and/or deliberately failing to investigate and reconcile contradictions and inconsistencies between the different and conflicting versions of multiple confessions; and/or

k.    Pursuing and/or failing to pursue suspects in criminal investigations for reasons other than valid law enforcement purposes, such as political expediency.

152.  It was also the custom, policy, and practice of Defendant City of Detroit, authorized, sponsored, and approved by its final policymaker(s), including the Chief of Police of the City of Detroit, to enable, ratify, condone, tolerate, approve and promote major supervisors in critical units, such as Defendant Tolbert, notwithstanding a known history of false reports and repeated criminal violence, as

set forth below.

153.   Those customs, policies and practices—i.e. improper, flawed, erroneous and inappropriate police investigative methods and practices—included the failure to supervise, train and discipline DPD officers so as to prevent those particular abuses, as identified above.

154.   Those customs, policies and practices further included condoning, commending, rewarding and/or promoting DPD officers who were known by their supervisors to have engaged in wrongful misconduct, including criminal violence and dishonesty in the writing and filing of official reports, wherein such dishonesty and criminality was a moving force in promoting dishonesty and misconduct regarding the investigation of serious crimes.

155.   In 2007, Defendant City of Detroit—through its chief policymaker, Mayor Kwame Kilpatrick—as a matter of policy, maintained a culture of fear within the Detroit Police Department regarding the Mayor and his associates—in particular Ernest Davis (referenced above)—whereby Police officers were threatened, punitively reassigned, or suffered other job-related consequences, even if it resulted in the wrongful prosecution and conviction of truly innocent persons such as Plaintiff Davontae Sanford.

156.   As a corollary, Defendant City of Detroit maintained a policy of lawlessness whereby the Mayor, his friends, relatives and associates, including

Ernest Davis, were "off-limits" to legitimate law enforcement activities.

157.    Defendant City of Detroit, acting through the DPD, also maintained a policy, custom and/or practice of retaining, condoning and/or promoting as top level supervisors, administrators and officers, persons who have demonstrated a likelihood of violating, disregarding and/or disrespecting the constraints of the law.

158.    As a result, officers within the DPD, in particular homicide investigators, were likely to violate the constitutional rights of those with whom they engaged in the course of their investigations, thereby acquiescing in said unconstitutional conduct.

159.    For example, for well over at least a decade, Defendant Tolbert, with the knowledge of Defendant City of Detroit and its Police Department, has been involved in the following incidents, among others:

  a. In **1999**, the Southfield Police Department, investigated and found evidence that Tolbert had engaged in criminal domestic violence;

  b. In **2000,** Tolbert was arrested for domestic assault. At the time of the incident and of his arrest, Tolbert was intoxicated while in possession of an open firearm;

  c. In **2005**, Tolbert was accused by a Southfield police of a felony, filing a false police report;

  d. In **2006**, Tolbert was arrested for domestic assault; and

  e. In **2011**, Tolbert was arrested and locked up for domestic assault.

160. During this same period of time, Tolbert was rewarded and promoted for his consistent criminal, violent, and dishonest activity. For example:

    a.    In **1999** Tolbert was promoted to sergeant;

    b.    Thereafter, in 2003 Tolbert was promoted to lieutenant;

    c.    In 2005, he was promoted to Commander of the DPD's Major Crimes Unit, where he was situated when he participated in the investigation of the Runyon Street murders; and

    d.    In 2009, notwithstanding his notorious and unacceptable involvement in the interrogation of Davontae Sanford and, in spite of his false testimony therein, and, notwithstanding his history of criminal activity, he was promoted to Deputy Chief, one of the highest positions within the Detroit Police Department.

161. As a direct and proximate result of the foregoing customs, policies and practices by Defendant City of Detroit, Plaintiff  Sanford has suffered the following injuries, among others:

    a.    Seizure and loss of liberty, resulting in;

        i.    Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

    b.    Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.    Pain and suffering;

    d.      Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.      Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f.      Loss of family relationships;

    g.      Damage to business and property;

    h.      Legal expenses; and

    i.      Loss of earnings and earning potential.

## COUNT IV
### Americans with Disabilities Act ["ADA"]
### [42 U.S.C. § 12132, *et seq.*]
### (Against Defendant City of Detroit)

162. Plaintiff hereby incorporates by reference all of the foregoing allegations of fact as though set forth herein word for word.

163. During all times relevant hereto, Plaintiff Davontae Sanford had intellectual and learning disabilities that limited and disabled him from comprehending what was being said, read, and told to him. At the time of these events, he was unable, at the age of 14, to read. He was thus a qualified individual with a disability under Title II of the Americans with Disabilities Act, 42 U.S.C. §12131(2).

164. Due to his disability, Plaintiff was excluded from participation in and/or was denied the benefits of an honest, valid, legitimate, and honorable law

enforcement investigation designed to apprehend true and actual criminals by Defendant City of Detroit's Police Department through its employees and officers, including Defendants Russell and Tolbert, for whom Defendant City of Detroit is vicariously liable.

165.    Defendant City of Detroit denied Plaintiff reasonable accommodation by failing to ensure that he was not interrogated in a  manner whereby he was incapable of understanding the following:

a.    The nature and circumstances of the investigation;

b.    That he was a target of the investigation;

c.    That he was told to sign, and did indeed sign, a document that constituted a confession of crime;

d.    That he had a right to have a parent and/or guardian present during the interrogation;

e.    That when he was shown photos of the bodies of victims of the Runyon Street murders and then told to draw those bodies onto a diagram drawn by Defendant Tolbert and then told to initial the drawing, as he was told to do, that he would not be allowed to leave even though he was lied to and promised that he could go home after the questioning was done;

166.    Nonetheless, although Defendant Officers knew Plaintiff was mentally impaired, they intentionally exploited his mental illness by, among other things, coercing and/or manipulating him to be interrogated over long periods of time; to sign and initial documents he could neither read nor understand; to believe that he would be allowed to go home when this was evidently not the case; and, to

confess to a crime that he never committed.

167.   As a direct and proximate result of the foregoing actions, Plaintiff Sanford has suffered the following injuries, among others:

    a.    Seizure and loss of liberty, resulting in;

        i.    Restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, movement, educational opportunities, vocational opportunities, athletic opportunities, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression;

    b.    Personal and physical injuries, including assaults, illness and inadequate medical care;

    c.    Pain and suffering;

    d.    Severe mental anguish, emotional and psychological distress, humiliation, indignities, embarrassment and degradation;

    e.    Permanent loss of natural psychological development including the loss of the adolescent years of his childhood and his early manhood, past and future;

    f.    Loss of family relationships;

    g.    Damage to business and property;

    h.    Legal expenses; and

    i.    Loss of earnings and earning potential.

**RELIEF REQUESTED**

**WHEREFORE**, Plaintiff demands

    a)    A declaration that Defendants violated the federal constitutional rights of Plaintiff;

    b)    Compensatory damages for the aforementioned physical, emotional, and economic injuries suffered by Plaintiff— including the loss of the adolescent years of his childhood, as well as his early manhood—by reason of Defendants' unlawful and unjustified conduct, in an amount fair, just and reasonable and in conformity with the evidence;

    c)    Punitive and exemplary damages against individual Defendant Officers to the extent allowable by law;

    d)    Attorney fees, as allowed, pursuant to 42 U.S.C. §1988;

    e)    The costs and disbursements of this action; and

    f)    Such other and further relief as appears just and proper.

Respectfully submitted,

**Goodman Hurwitz & James, P.C.**

/s/ William H. Goodman
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James  (P71374)
Huwaida Arraf (NY 4707220)
1394 E. Jefferson Ave,
Detroit, Michigan 48207; (313) 567-6170
**Neufeld Scheck & Brustin, LLP**

Barry C. Scheck
Nick Brustin
Emma Freudenberger
Vishal Agraharkar
99 Hudson Street
New York, New York 10013
(212) 965-9081

*Attorneys for Plaintiff*

Dated:  September 18, 2017

## DEMAND FOR JURY TRIAL

Plaintiff, by and through his attorneys, the law firms of Neufeld Scheck & Brustin, LLP, and Goodman  Hurwitz & James, P.C., hereby demands a trial by jury on all issues of this cause.

Respectfully submitted,

**Goodman Hurwitz & James, P.C.**

/s/ William H. Goodman
William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James  (P71374)
Huwaida Arraf (NY 4707220)
1394 E. Jefferson Ave,
Detroit, Michigan 48207; (313) 567-6170
**Neufeld Scheck & Brustin, LLP**

Barry C. Scheck
Nick Brustin
Emma Freudenberger
Vishal Agraharkar
99 Hudson Street
New York, New York 10013
(212) 965-9081

*Attorneys for Plaintiff*

Dated:  September 18, 2017