UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

        Plaintiff,

v.

CITY OF DETROIT, MICHAEL
RUSSELL, and JAMES TOLBERT,

        Defendants.

Case No. 17-CV-13062-DML-RSW
Hon. David M. Lawson
Magistrate Judge Stephen R. Whalen

---

Emma Freudenberger
Nick Brustin
Bettina K. Roberts
Meghna Philip
*Attorneys for Plaintiff*
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081


William H. Goodman (P-14173)
Julie H. Hurwitz (P-34720)
Kathryn Bruner James (P-71374)
Huwaida Arraf (NY 4707220)
*Attorneys for Plaintiff*
Goodman Hurwitz & James, P.C.
1394 E. Jefferson Avenue
Detroit, Michigan 48207
(313) 567-6170

Jerry L. Ashford (P-47402)
Krystal A. Crittendon (P-49981)
Brandon McNeal (P-81300)
*Attorneys for Defendants*
City of Detroit Law Department
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 237-3089


T. Joseph Seward (P-35095)
Michael T. Berger (P-77143)
*Attorneys for Defendants*
Seward Peck & Henderson PLLC
210 East 3rd Street, Suite 212
Royal Oak, Michigan 48067
(248) 733-3580

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

i

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES PRESENTED ................................................... iii

MOST APPROPRIATE AUTHORITIES ............................................... iv

TABLE OF AUTHORITIES ...................................................... v

I.    INTRODUCTION ................................................................... 1

II.   STATEMENT OF FACTS ....................................................... 3

III.  STANDARD OF REVIEW ..................................................... 8

IV.   ARGUMENT ...................................................................... 9

   1.  Mr. Sanford's Now-Vacated Guilty Plea Does Not Preclude His Wrongful
   Conviction Claims ............................................................... 10

      a.   Mr. Sanford's Guilty Plea Is Not a Superseding Cause of His Conviction
      and Incarceration ............................................................ 10

      b.   Mr. Sanford's Malicious Prosecution, Fabrication, and Coercion Claims
      Are Not Collaterally Estopped by His Guilty Plea ............................................. 13

   2.  Mr. Sanford's Suppression Claims Are Well-Pled ....................................... 15

   3.  Judicial Estoppel Does Not Operate to Bar Mr. Sanford's ADA Claim ........ 19

   4.  The Statute of Limitations Does Not Bar Any of Mr. Sanford's Claims ....... 21

      a.   Mr. Sanford's Section 1983 Claims Did Not Accrue Until His Conviction
      Was Vacated ................................................................... 22

      b.   Mr. Sanford's ADA Claim Also Did Not Accrue Until His Conviction Was
      Vacated ....................................................................... 23

   5.  Defendant City of Detroit's Bankruptcy Proceedings Do Not Deprive This
   Court of Jurisdiction to Hear Mr. Sanford's Claims Against the City ................. 26

V.   CONCLUSION ................................................................... 32

## <u>STATEMENT OF THE ISSUES PRESENTED</u>

Whether Plaintiff's guilty plea precludes his Section 1983 claims.

     Plaintiff answers:  No

Whether Plaintiff's claims based on the Defendant Officers' suppression of evidence are well-pled.

     Plaintiff answers:  Yes

Whether judicial estoppel bars Plaintiff's ADA claim.

     Plaintiff answers:  No

Whether the statute of limitations bars any of Plaintiff's claims in this lawsuit.

     Plaintiff answers:  No

Whether the City of Detroit's bankruptcy proceedings deprive this Court of jurisdiction to hear Plaintiff's claims.

     Plaintiff answers:  No

## <u>MOST APPROPRIATE AUTHORITIES</u>

*Blase v. Appicelli*, 489 N.W.2d 129 (Mich. Ct. App. 1992).....................................14

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*,
557 U.S. 52 (2009)............................................................................. 17, 18

*Heck v. Humphrey*, 512 U.S. 477 (1994)…………………………….....  22, 27, 28

*In re City of Detroit, Michigan*, 548 B.R. 748 (E.D. Mich. 2016)……27, 29, 30, 31

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988)…………………………..11

*New Hampshire v. Maine*, 532 U.S. 742 (2001)………………………………19, 20

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ...................................................11

*Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214 (6th Cir. 1990)………...19, 20, 21

*Wallace v. Kato*, 549 U.S. 384 (2007) ............................................................ 22, 27

*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012)…………………………………11

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...................................................9

*Barmapov v. Barry*, No. 09 Civ. 3390 (RRM) (RML),
2011 WL 32371 (E.D.N.Y. Jan. 5, 2011) ......................................... 12, 13

*Barton v. Warden, Southern Ohio Corr. Facility*, 786 F.3d 450 (6th Cir. 2015)....16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)................................................9

*Blase v. Appicelli*, 489 N.W.2d 129 (Mich. Ct. App. 1992)....................................14

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015).........................................22

*Browdy v. Karpe*, No. 00 Civ. 1866 (CED),
2004 WL 2203464 (D. Conn. Sept. 20, 2004).........................................25

*Brown v. City of Detroit*, 47 Fed. App'x 339 (6th Cir. 2002) .................................15

*Burgess v. Baltimore Police Dep't*, No. 15 Civ. 834 (RDB),
2016 WL 795975 (D. Md. Mar. 1, 2016) ................................................18

*Bynum v. City of Oklahoma City*, No. 05 Civ. 165 (R),
2005 WL 1241893 (W.D. Okla. May 19, 2005)......................................15

*Clemons v. Williams*, No. 14 Civ. 2195 (APG) (NJK),
2016 WL 1238229 (D. Nev. Mar. 29, 2016) ...........................................24

*Cristini v. City of Warren*, No. 07 Civ. 11141,
2012 WL 5508369 (E.D. Mich. Nov. 14, 2012)......................................23

*Curran v. City of Dearborn*, 957 F. Supp. 2d 877 (E.D. Mich. 2013) ...................22

*D'Ambrosio v. Marino*, 747 F.3d 378 (6th Cir. 2014)............................................22

*Daniel v. Fields,* No. 95 Civ. 6132, 1995 WL 539008 (10th Cir. Aug. 31, 1995)..25

*Davila v. Pennsylvania*, No. 11 Civ. 1092,

2014 WL 1321010 (M.D. Pa. Mar. 28, 2014) .........................................................24

*Davis v. Muncy*, 976 F.2d 733 (6th Cir. 1992) ......................................................15

*Deatherage v. Stice*, No. 05 Civ. 91 (F),
2006 WL 249664 (W.D. Okla. Feb. 1, 2006) .........................................................25

*Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*,
557 U.S. 52 (2009) ............................................................................... 17, 18

*Dodrill v. Ludt*, 764 F.2d 442 (6th Cir. 1985) ......................................................14

*Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212 (6th Cir. 1989)...............14

*Fox v. Michigan State Police Dept.*, 173 Fed. App'x 372 (6th Cir. 2006)..............15

*Gilles v. Garland*, 281 Fed. App'x 501 (6th Cir. 2008) ...........................................9

*Harrison v. Michigan*, 722 F.3d 768 (6th Cir. 2013) .............................................28

*Hendricks v. Richards*, No. 10 Civ. 11 (Y),
2010 WL 3911432 (N.D. Tex. Oct. 6, 2010).........................................................24

*Heck v. Humphrey*, 512 U.S. 477 (1994)…………………………………... 22, 27, 28

*Howard v. City of Durham*, No. 17 Civ. 477,
2018 WL 1621823 (M.D.N.C. Mar. 31, 2018).....................................................17

*Hughes v. Prator*, No. 17 Civ. 711, 2017 WL 6030047 (W.D. La. Oct. 27, 2017) 23

*In re City of Detroit, Michigan*, 548 B.R. 748 (E.D. Mich. 2016) ....... 27, 29, 30, 31

*In re Ohio Execution Protocol*, 860 F.3d 881 (6th Cir. 2017) ...............................20

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988).........................................11

*Kosinski v. C.I.R.*, 541 F.3d 671 (6th Cir. 2008) ...................................................14

*Kostrzewa v. City of Troy*, 247 F.3d 633 (6th Cir. 2001) .......................................15

*Malipurathu v. Jones*, No. 11 Civ. 646 (W),
2013 WL 3821009 (W.D. Okla. July 23, 2013) .......................................................24

*Maxson v. Dwyer*, No. 16 Civ. 9417,
 2017 WL 1493712 (N.D. Ill. Apr. 26, 2017) .......................................................16

*Miller v. Ghee*, 22 Fed. App'x 388 (6th Cir. 2001) .................................................25

*Miller v. Wayback House*, No. 05 Civ. 1838 (L),
2006 WL 297769 (N.D. Tex. Feb. 1, 2006)...........................................................25

*Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978) .............................................27

*Morris v. City of Detroit*, 211 Fed App'x 409 (6th Cir. 2006) ...............................23

*Mott v. Mayer*, 524 Fed. App'x 179 (6th Cir. 2013) ...............................................12

*Murphy v. City of Tulsa*, --- F. Supp. 3d ----, No. 15 Civ. 528 (GKF) (FHM),
2018 WL 1308946 (N.D. Okla. Mar. 13, 2018) ...................................................14

*New Hampshire v. Maine*, 532 U.S. 742 (2001)............................................... 19, 20

*Orange v. Burge*, No. 04 Civ. 168, 2005 WL 742641 (N.D. Ill. Mar. 30, 2005)....16

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014)...22

*Patterson v. Burge*, 328 F. Supp. 2d 878 (N.D. Ill. 2004).......................................16

*Payne v. Novartis Pharm. Corp.*, 767 F.3d 526 (6th Cir. 2014) .............................10

*Peterson v. Heymes*, 277 F. Supp. 3d 913 (W.D. Mich. 2017) ...............................14

*Rayfield v. Am. Reliable Ins. Co.*, 641 Fed. App'x 533 (6th Cir. 2016).................14

*Reyes v. City of New York*, 992 F. Supp. 2d 290 (S.D.N.Y. 2014).................. 12, 13

*Riddle v. Chase Home Fin.*, No. 09 Civ. 11182,
2010 WL 3504020 (E.D. Mich. Sept. 2, 2010)......................................................21

*Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014).................................................27

*Scheuer v. Rhodes*, 416 U.S. 232 (1974) ....................................................9

*Scott v. Ambani*, 577 F.3d 642 (6th Cir. 2009) .........................................22

*Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028
(W.D. Tenn. 2003) .........................................................................................27

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ......................................11

*Sykes v. Anderson*, 625 F.3d 294 (6th Cir. 2010) .....................................11

*Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214 (6th Cir. 1990) ............. 19, 20, 21

*United States v. Hammon*, 277 Fed. App'x 560 (6th Cir. 2008) ...........................20

*Villanueva v. Barcroft*, 822 F. Supp. 2d 726 (N.D. Ohio 2011)..............................20

*Walker v. Schaeffer*, 854 F.2d 138 (6th Cir. 1988).................................................15

*Wallace v. Kato*, 549 U.S. 384 (2007) .............................................. 22, 27

*Winslow v. Smith*, 696 F.3d 716 (8th Cir. 2012)......................................11

*Wolfe v. Perry*, 412 F.3d 707 (6th Cir. 2005) .........................................22

*Word v. City of Detroit*, No. 05 Civ. 74501,
2006 WL 1704205 (E.D. Mich. June 16, 2006) ......................................23

*Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509 (6th Cir. 2001) ....................................8

**Statutes**
11 U.S.C. § 101(5)(A)................................................................................27

42 U.S.C. § 12132.........................................................................................2

42 U.S.C. § 1983......................................................................................2, 27

Mich. Comp. Laws § 600.5805(10)............................................................22

**Rules**

Federal Rules of Civil Procedure 12(b)(1) ...............................................................2

Federal Rule of Civil Procedure Rule 12(b)(6) ......................................................8

Federal Rule of Civil Procedure Rule 12(c) .......................................................2, 8

## I.   INTRODUCTION

On the night of September 17, 2007, two professional hit men in their mid-to-late 20s—Vincent Smothers and Ernest Davis—murdered four people in a house on Runyon Street on the East Side of Detroit. Plaintiff Davontae Sanford—who was just 14 years old at the time, severely learning disabled, and blind in one eye—is actually innocent of these murders; he had nothing to do with this horrific crime. Yet, as a proximate result of the gross misconduct and unconstitutional actions of Defendants City of Detroit and Detroit Police Department ("DPD") officers Sergeant Michael Russell and Commander James Tolbert (together, the "Defendant Officers"), Mr. Sanford was wrongfully and maliciously targeted, arrested, charged, tried, convicted, and sentenced for the murders, for which he ultimately spent nearly nine years wrongly imprisoned.

In April 2008, barely two weeks after Mr. Sanford was sentenced, Smothers confessed to having committed the Runyon Street quadruple homicide and was able to lead police to one of the murder weapons. After learning of Smothers' confession in the fall of 2008, Mr. Sanford's post-conviction counsel moved to withdraw his guilty plea on the basis of this new evidence. Despite extensive efforts, Mr. Sanford nonetheless served more than another eight years in prison before, finally, on June 8, 2016, he was released from custody and, on July 19, 2016, all charges against him were dismissed.

1

In this action, Mr. Sanford seeks relief pursuant to 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et seq.*, for the following violations of his constitutional rights: (1) the Defendant Officers' fabrication of inculpatory evidence, coercion of a false confession, suppression of material exculpatory evidence, and malicious prosecution of Mr. Sanford; (2) Defendant City of Detroit's policy, custom, and/or practice of enabling, ratifying, condoning, tolerating, and/or approving actions that constituted improper, flawed, erroneous, and inappropriate police investigative methods—as well as the City's failure to supervise, train, and/or discipline DPD officers in order to prevent these abuses; and (3) Defendant City of Detroit's denial of reasonable accommodations to Mr. Sanford—who could not fully comprehend what was said, read, and told to him. (*See* Dkt. #1 ¶¶ 130-67.)

Defendants have now filed a Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(c) and 12(b)(1). (*See* Dkt. #36.) In it, Defendants claim that, even accepting as true—as the Court must at this stage and Defendants do not dispute— that the Defendant Officers fabricated evidence and coerced a confession, causing an innocent 14-year-old boy to spend nearly nine years wrongfully imprisoned, they are nonetheless entitled to dismissal on legal and equitable grounds. Defendants' motion, however, not only raises no serious arguments, but also betrays a

fundamental misunderstanding of the mechanics of civil rights claims. For the reasons discussed below, Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS[1]

On the evening of September 17, 2007, professional hit men Vincent Smothers and Ernest Davis shot and killed four people in a house on Runyon Street on the East Side of Detroit. (Dkt. #1 ¶¶ 35–36.)  Smothers used an AK-47 rifle, and Davis a .45-caliber pistol. (*Id.* ¶ 35.) When Smothers left the house, he also took with him a .40-caliber pistol that he had found inside. (*Id.* ¶ 37.)

Shortly thereafter, Detroit Police Department ("DPD") officers, including Defendants Michael Russell and James Tolbert (the "Defendant Officers"), responded to the scene to assist in the homicide investigation. (*Id.* ¶ 40.) As part of their initial investigation, the Defendant Officers learned a number of details relating to the crime from surveying the scene and speaking to witnesses, including the positions of the victims' bodies and the types of guns used to commit the murders. (*Id.* ¶ 43.)

After midnight on September 18, Defendant Russell encountered Plaintiff Davontae Sanford, who lived on Beland Street, near the crime scene and the area

---

[1] The complete recitation of the facts of this case are set forth in detail in Mr. Sanford's Complaint. (*See* Dkt. #1 ¶¶ 1–123.) In the interest of brevity, Mr. Sanford presents here only those facts necessary to understand his theories of liability and Defendants' motion in their proper context.

DPD officers were canvassing. (*Id.* ¶¶ 45, 47.) At the time, Mr. Sanford was only 14 years old, and had left his house in his pajamas. (*Id.* ¶¶ 44, 46.) Almost immediately, and for no apparent reason, Defendant Russell decided Mr. Sanford was a suspect and instructed another DPD officer to obtain parental consent so that he could be taken to police headquarters for questioning. (*Id.* ¶ 52.) DPD officers were aware of Mr. Sanford's age and the fact that he suffered from learning disabilities. (*Id.* ¶¶ 56–57.) Nonetheless, once he had been brought to the station, Defendant Russell and others interrogated Mr. Sanford without a parent, attorney, or guardian present well into the early morning house of September 18, until finally, Defendant Russell succeeded in coercing Mr. Sanford to make a statement about the crime. (*Id.* ¶ 57.)

That "statement"—composed and typewritten by Defendant Russell and only signed after the fact by Mr. Sanford—purported to state that Mr. Sanford was present for the planning but not the commission of the crime. (*Id.* ¶ 58.) However, in fact, Mr. Sanford knew nothing about the crime or how it was committed, and the handful of accurate details in this "statement" were inserted by DPD officers. (*Id.* ¶¶ 59–62.) After Mr. Sanford signed the purported "statement," Defendant Russell allowed him to return home. (*Id.* ¶ 63.)

Several hours later, on the evening of September 18, Defendant Russell returned to Mr. Sanford's home and again obtained parental consent to take him into custody for questioning. (*Id.* ¶¶ 64–66.) Not satisfied with Mr. Sanford's earlier

4

statement, this time, the Defendant Officers engaged in a systematic deliberate effort to coerce Mr. Sanford into making a false confession. (*Id.* ¶ 69.) For example, the Defendant Officers falsely promised Mr. Sanford he could go home if he admitted to committing the murders, falsely claimed that blood had been found on his shoes, and ridiculed him for asking for an attorney. (*Id.* ¶¶ 70–73.) In addition, the Defendant Officers fed Mr. Sanford details of the crime to make their coerced false confession seem more reliable, including showing him photographs of the crime scene. (*Id.* ¶ 74.)

Finally, as a result of their deceptive, dishonest, and coercive tactics, the Defendant Officers were able to coerce a false "confession" to the crime from Mr. Sanford, which Defendant Russell typed out for him to sign. (*Id.* ¶ 75.) This "confession" contained new and different facts than Mr. Sanford's statement from the night before, but once again was replete with non-public facts that the Defendant Officers were aware of at the time, including some that reflected their improved understanding of events since the first statement. (*Id.* ¶¶ 78, 80.) Ultimately, however, many of the facts in the "confession" were later determined to be false or inconsistent with the crime scene. (*Id.* ¶¶ 77–79.)

In addition, Defendant Tolbert drew a sketch of the room in which the victims had been found, and then had Mr. Sanford draw the locations of the bodies on that sketch. (*Id.* ¶ 82.) Mr. Sanford was able to do so *only* because the Defendant Officers

5

had showed him photographs of the crime scene indicating the location of the bodies, which were never disclosed. (*Id.* ¶¶ 74, 82.) The Defendant Officers then pressured Mr. Sanford to sign the sketch and attributed the entire drawing to him, after which he was arrested and charged with the Runyon Street quadruple homicide. (*Id.* ¶¶ 83, 88.)

Thereafter, the Defendant Officers repeatedly reported and testified under oath that Mr. Sanford had volunteered the entire "confession" and drawn all the components of the sketch himself, without any suggestion or assistance from DPD officers. (*Id.* ¶¶ 81, 92–94.) Although the false "confession" and the fabricated sketch were the only two pieces of evidence *ever* directly implicating Mr. Sanford—when faced with such powerful, albeit false, evidence of his alleged guilt, Mr. Sanford believed his only recourse was to plead guilty. (*Id.* ¶¶ 91, 96–97.)

On April 19 and 20, 2008—barely two weeks after the Defendant Officers' misconduct had directly caused Mr. Sanford to be sentenced for a crime he did not commit—Smothers, one of the true perpetrators of the Runyon Street quadruple homicide, was arrested in connection with a separate murder-for-hire and interviewed by multiple DPD officers. (*Id.* ¶¶ 100–01.) During those interviews, Smothers confessed to multiple murders-for-hire, including the Runyon Street quadruple homicide. (*Id.* ¶¶ 101–04.) Smothers admitted his involvement in the Runyon Street quadruple homicide directly to Defendant Russell, who accompanied

6

him to the bathroom during a break in the questioning. (*Id.* ¶¶ 103–04.) Smothers also told DPD officers that Mr. Sanford had *not* been his accomplice and volunteered several non-public facts about the crime that only the true perpetrator would have known. (*Id.* ¶¶ 101–03.) Smothers' confession was corroborated further when, later during the day on April 20, a warrant was executed on a house associated with Smothers' accomplice Davis and both the .45-caliber pistol used during the Runyon Street quadruple homicide and the .40-caliber pistol Smothers had taken from the scene were recovered. (*Id.* ¶ 105.)

Smothers was eventually charged with and convicted of all the murders-for-hire he confessed to on April 19 and 20, 2008—except for the Runyon Street quadruple homicide. (*Id.* ¶¶ 107–09.) Despite their knowledge of Smothers' confession, rather than coming clean about the misconduct that led to Mr. Sanford's conviction or seeking to correct the injustice that had befallen Mr. Sanford, Defendants doubled down on their lies. (*Id.* ¶¶ 109–15.) As a result of the Defendants' continuing lies, the prosecutors remained skeptical of Smothers' confession to the Runyon Street quadruple homicide, and neither Smothers nor Davis were ever arrested or charged for their involvement. (*Id.* ¶¶ 114–15, 119.) Nor did Defendants inform Mr. Sanford or his counsel of this critical new evidence. (*Id.* ¶ 113.)

In the fall of 2008, Mr. Sanford's first post-conviction attorney learned of Smothers' confession from a journalist. (*Id.* ¶ 117.) But the DPD and prosecutors continued to assert Mr. Sanford's guilt and fight his release in reliance on the Defendant Officers' misrepresentations about the source of the false "confession" and fabricated sketch. (*Id.* ¶ 119.) It was not until years later, in 2015, that Defendant Tolbert admitted under oath that he had in fact drawn much of the sketch he had attributed to Mr. Sanford, and that he had falsely testified to the contrary. (*Id.* ¶¶ 84–85, 120.) Finally, on June 8, 2016, Mr. Sanford's attorneys and prosecutors submitted a joint stipulation asking the court to set aside Mr. Sanford's conviction, and he was released from custody. (*Id.* ¶ 123.) On July 19, 2016, after Mr. Sanford had spent nearly nine years wrongfully incarcerated, the court granted the stipulation and dismissed all charges. (*Id.*)

## III.   STANDARD OF REVIEW

In reviewing motions for judgment on the pleadings pursuant to Federal Rule of Procedure 12(c), courts apply the same standard applicable to motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6). *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511–12 (6th Cir. 2001). It is well established that in ruling on a motion to dismiss under Rule 12(b)(6), this Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." (citation omitted). In order "[t]o survive a motion

to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Ashcroft*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556); *see also Twombly*, 550 U.S. at 555–56 (although plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level," Rule 8 "does not impose a probability requirement at the pleading stage"). Instead, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly*, 550 U.S. at 556 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)); *see also, e.g.*, *Gilles v. Garland*, 281 Fed. App'x 501, 512 (6th Cir. 2008)\ ("Notwithstanding our impression that proof of plaintiff's . . . claim is improbable and recovery unlikely, the claim is well-enough pled to withstand scrutiny under Rule 12(b)(6).").

## IV.   ARGUMENT

Defendants' motion misconstrues Mr. Sanford's well-pled factual allegations, the law governing liability under Section 1983, the rules regarding the accrual of claims under Section 1983 and the ADA, and the relevance of the City of Detroit's bankruptcy proceedings. As a result, Defendants' motion should be denied in its entirety.

### 1.     Mr. Sanford's Now-Vacated Guilty Plea Does Not Preclude His Wrongful Conviction Claims

Defendants' motion is largely predicated on the fact that Mr. Sanford's wrongful conviction—*which has since been vacated*—was the result of a guilty plea. But Defendants cite no authority holding, as they argue, that a vacated guilty plea is a *per se* bar to a wrongful conviction claim. Nor is that the law. Rather, so long as a plaintiff can establish that a defendant's unconstitutional conduct caused his plea, his wrongful conviction claims may proceed.

### a.     Mr. Sanford's Guilty Plea Is Not a Superseding Cause of His Conviction and Incarceration

First, Defendants argue that "where a plaintiff claims that his confession was fabricated and that the confession was coerced, his guilty plea precludes his § 1983 claim" because it is "an independent, superseding cause of his conviction and incarceration," which "break[s] the causal chain between the purportedly unlawful activity and the subsequent incarceration." (Dkt. #36 at 23–25.) Causation is ordinarily a jury question, *see Payne v. Novartis Pharm. Corp.*, 767 F.3d 526, 528 (6th Cir. 2014), and may not be resolved at the motion-to-dismiss stage unless, taking all of the plaintiff's allegations as true, he could not establish causation as a matter of law. But the well-pleaded facts here, which Defendants ignore, are that the then-14-year-old Mr. Sanford's plea to a quadruple homicide he did not commit was

in no way "independent" from the Defendant Officers' misconduct of fabricating and coercing his false confession.

As Mr. Sanford pleads (and the Court must accept as true at this stage), the Defendant Officers' misconduct was the driving force behind his guilty plea. Courts have consistently recognized that this is sufficient to establish causation in a wrongful conviction suit. *See, e.g.*, *Spencer v. Peters*, 857 F.3d 789, 800–01 (9th Cir. 2017) (reinstating jury verdict in wrongful conviction suit where jury found the defendants' fabrication of evidence caused the plaintiff to enter *Alford* plea); *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012) (reversing district court's dismissal of claim where "Plaintiffs assert[ed] that their substantive due process rights were violated when Defendants conducted a conscience-shocking reckless investigation and amassed false evidence that was used to box Plaintiffs into entering guilty pleas").

Similarly, it is clear that, for example, a prosecutor's ultimate decision to pursue charges is not an intervening "cause" of conviction that will "shield a police officer who deliberately supplied misleading information that influenced the decision." *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988); *see also, e.g.*, *Sykes v. Anderson*, 625 F.3d 294, 317 (6th Cir. 2010) (holding that defendant police officer could be held liable for causing proceedings to be brought where "the record contains ample evidence that [he] influenced or participated in the ultimate decision

11

to prosecute the [p]laintiffs by way of his knowing misstatements to the prosecutor."). And, where police officers' misconduct leads to an indictment, the grand jury's decision to indict does not break the causal chain. *See Mott v. Mayer*, 524 Fed. App'x 179, 187 (6th Cir. 2013) (general rule that indictment establishes probable cause does not apply "where the indictment was obtained wrongfully by defendant police officers who knowingly presented false testimony to the grand jury") (internal quotation marks and citation omitted).

Here, taking Mr. Sanford's well-pleaded allegations as true, a reasonable jury could find that the Defendant Officers' coercion of a false, uncorroborated "confession" from Mr. Sanford and the fabricated sketch of the crime scene—as well as their repeated misrepresentations to the court and prosecutors about the origin of the "confession" and sketch—were the *only* evidence which led to Mr. Sanford's prosecution and, ultimately, his decision to plead guilty. (*See* Dkt. #1 ¶¶ 91–97.) No other evidence corroborated the "confession" and sketch, and the Defendant Officers cannot avoid the effects of their misconduct by hiding behind the prosecutors' decision to charge Mr. Sanford or his guilty plea itself.

In the face of this clear authority, Defendants' proffered cases—*Barmapov v. Barry*, No. 09 Civ. 3390 (RRM) (RML), 2011 WL 32371 (E.D.N.Y. Jan. 5, 2011), and *Reyes v. City of New York*, 992 F. Supp. 2d 290 (S.D.N.Y. 2014)—are completely inapposite. In neither had the plaintiff's conviction based on the guilty

plea in question been overturned or otherwise invalidated. Indeed, in *Barmapov*, a *pro se* case in which the plaintiff did not even file any opposition to the defendants' motion to dismiss, the court dismissed the plaintiff's malicious prosecution claim precisely *because* there had been no favorable termination. *See* 2011 WL 32371, at *4 ("Here, Plaintiff cannot demonstrate a favorable termination of his case because his conviction by guilty plea remains unchallenged."). And in *Reyes*, not only was the plaintiff's conviction based on his guilty plea still valid, but also the purportedly fabricated evidence had led, at most, to a charge that was dropped and not part of the plaintiff's guilty plea. *See* 992 F. Supp. 2d at 298.

> **b.**   **Mr. Sanford's Malicious Prosecution, Fabrication, and Coercion Claims Are Not Collaterally Estopped by His Guilty Plea**

Next, Defendants argue that the fact of Mr. Sanford's now-vacated conviction—solely because it happened to be based on a guilty plea—somehow collaterally estops him from arguing that the Defendant Officers maliciously prosecuted him, fabricated evidence, or coerced his confession. (*See* Dkt. #36 at 25–28.) Again, they misstate or ignore the governing law.

It is well-settled in this Circuit that a "judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel." *Erebia v. Chrysler Plastic Prods. Corp.*, 891 F.2d 1212, 1215 (6th Cir. 1989) (citation omitted); *see also Rayfield v. Am. Reliable*

13

*Ins. Co.*, 641 Fed. App'x 533, 538 (6th Cir. 2016) (quoting *Erebia*); *Kosinski v. C.I.R.*, 541 F.3d 671, 676 (6th Cir. 2008) (same); *Dodrill v. Ludt*, 764 F.2d 442, 444 (6th Cir. 1985) ("If a judgment could be entirely vacated yet preclusive effect still given to issues determined at trial but not specifically appealed, appellants generally would feel compelled to appeal every contrary factual determination. Such inefficiency neither lawyers nor judges ought to court."); *Peterson v. Heymes*, 277 F. Supp. 3d 913, 921 (W.D. Mich. 2017) (finding in wrongful conviction suit that "[b]ecause no valid and final judgment exists in [the plaintiff]'s criminal case, collateral estoppel cannot preclude him from relitigating the issues raised in his criminal case"); *cf. Murphy v. City of Tulsa*, --- F. Supp. 3d ----, No. 15 Civ. 528 (GKF) (FHM), 2018 WL 1308946, at *10 (N.D. Okla. Mar. 13, 2018) (agreeing with interpretation in *Peterson*). Thus, the fact that Mr. Sanford's conviction and guilty plea have been vacated disposes of Defendants' collateral estoppel argument.

Moreover, under Michigan law, even an *intact* conviction can be deprived of its preclusive effect if it is the result of official misconduct. *See Blase v. Appicelli*, 489 N.W.2d 129, 132 (Mich. Ct. App. 1992) ("It is well established that a conviction, *unless procured by fraud or unfair means*, is conclusive evidence of probable cause.") (emphasis added). Where, as here, the plaintiff's decision to plead guilty is the direct result of official misconduct, this rule applies to prevent police from hiding behind the voluntariness of the plea. *See Kostrzewa v. City of Troy*, 247

14

F.3d 633, 644 n.6 (6th Cir. 2001) ("Thus, if the state threatened to prosecute [the plaintiff] on a charge not supported by probable cause and promised to drop that charge if he pleaded guilty to another offense, the resulting plea bargain should not serve as a shield for an officer later charged with malicious prosecution.").

And finally, once again, Defendants exclusively cite cases in which there is absolutely no indication that the plaintiff's conviction based on the guilty plea in question had been overturned or otherwise invalidated. *See Fox v. Michigan State Police Dept.*, 173 Fed. App'x 372 (6th Cir. 2006); *Walker v. Schaeffer*, 854 F.2d 138 (6th Cir. 1988); *Davis v. Muncy*, 976 F.2d 733 (6th Cir. 1992) (unpublished table decision); *Bynum v. City of Oklahoma City*, No. 05 Civ. 165 (R), 2005 WL 1241893 (W.D. Okla. May 19, 2005), *aff'd* 204 Fed. App'x 767 (10th Cir. 2006); *Brown v. City of Detroit*, 47 Fed. App'x 339 (6th Cir. 2002). Such cases are irrelevant here.

### 2. Mr. Sanford's Suppression Claims Are Well-Pled

Next, all of Defendants' arguments for dismissal of Mr. Sanford's claims for suppression of exculpatory evidence are similarly baseless, especially at the motion-to-dismiss stage. (*See* Dkt. #36 at 28–30.)

First, Defendants' assertion that a *Brady* claim cannot be based on the suppression of a police report (or, apparently, any evidence that is not independently admissible at trial) is flat wrong. *See, e.g.*, *Barton v. Warden, Southern Ohio Corr. Facility*, 786 F.3d 450, 465 (6th Cir. 2015) ("[I]inadmissible material might

15

nonetheless be considered material under *Brady* if it would lead directly to admissible evidence.") (internal quotation marks and citation omitted).

Second, courts have recognized that where, as here, officers coerce a confession and/or fabricate evidence and thereafter lie about or conceal evidence of their misconduct, a *Brady* claim may exist even though the plaintiff was obviously present at the interrogation itself. *See, e.g.*, *Maxson v. Dwyer*, No. 16 Civ. 9417, 2017 WL 1493712, at *4 (N.D. Ill. Apr. 26, 2017) (noting that courts have "distinguished between events that happened in the interrogation room, of which the plaintiff had actual knowledge, and events that transpired outside the interrogation room"); *Orange v. Burge*, No. 04 Civ. 168, 2005 WL 742641, at *11 (N.D. Ill. Mar. 30, 2005) ("The defendants allegedly caused [the plaintiff] to experience an unfair trial through their false testimony and other acts taken to cover up the torture obtained confession from [the plaintiff]. They would have had an obligation under *Brady* to disclose their other alleged acts of deceit to [the plaintiff] in order to ensure him a fair trial. The fact that [the plaintiff] was present for the alleged torture has no impact on the defendants['] duty to disclose other exculpatory evidence."); *Patterson v. Burge*, 328 F. Supp. 2d 878, 889–90 (N.D. Ill. 2004) (finding that the plaintiff's allegations that "defendants tortured him, fabricated his 'confession,' gave perjured testimony at his suppression hearing and trial, and knowingly used the

power of the state to bring charges against him and obtain his conviction for murders they knew he did not commit" could state a claim under *Brady*).

And third, with respect to Mr. Sanford's claim that the Defendant Officers suppressed evidence of the true perpetrator's confession, Defendants mischaracterize the Supreme Court's holding in *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). In fact, in *Osborne*, the Supreme Court held that although a convicted defendant's right to post-conviction due process was "not parallel to a trial right," he did "have a liberty interest in demonstrating his innocence with new evidence under state law" and that conduct which "transgresses any recognized principle of fundamental fairness in operation" can cause a violation of that right. 557 U.S. at 68–69. Since *Osborne*, courts have repeatedly recognized that post-conviction suppression of exculpatory evidence can violate constitutional rights. *See, e.g.*, *Howard v. City of Durham*, No. 17 Civ. 477, 2018 WL 1621823, at *5 (M.D.N.C. Mar. 31, 2018) ("[A]t this stage of the litigation, [given] the fact that a convicted person enjoys a liberty interest in pursuing relief under North Carolina's post-conviction remedies law, and the plausible allegations that [the defendants] intentionally violated a court order in failing to disclose key exculpatory evidence, the court finds that [the plaintiff] has plausibly stated a claim that a constitutional violation has occurred in violation of his clearly established right to pursue a statutory post-conviction remedy to demonstrate his innocence."); *Burgess v.*

17

*Baltimore Police Dep't*, No. 15 Civ. 834 (RDB), 2016 WL 795975, at *8 (D. Md. Mar. 1, 2016) (recognizing that allegation "that the Officer Defendants knew of an alternate perpetrator, but concealed this knowledge even after [the plaintiff] was convicted" would violate plaintiff's "post-conviction due process rights, as articulated by the *Osborne* Court").

Here, the Defendant Officers were aware of Smothers' confession to the Runyon Street quadruple homicide almost as soon as it happened on April 20, 2008. (*See* Dkt. #1 ¶¶ 100–04.) Smothers' confession contained several non-public facts about the crime that only the real perpetrator would have known, (*see id.* ¶ 102), and further investigation corroborated his account further, (*see id.* ¶ 105.) Although Smothers' confession occurred shortly after Mr. Sanford had been convicted and sentenced, his right to appeal was far from having been exhausted and he clearly maintained a liberty interest in demonstrating his innocence with new evidence under state law, which he ultimately successfully pursued. (*See id.* ¶¶ 116–23.) By not disclosing Smothers' confession to Mr. Sanford's counsel in a timely fashion, particularly while its import was repeatedly the subject of litigation, the Defendant Officers "transgresse[d] a[] recognized principle of fundamental fairness." *Osborne*, 557 U.S. at 69.

In sum, Mr. Sanford's suppression claims are well-pled, which is all this Court must decide at this point. Furthermore, Defendants do not deny that Mr. Sanford has

*substantively* pled sound fabrication and coercion claims, nor could they. Because Mr. Sanford's suppression claims arise out of the exact same set of alleged facts and circumstances, their dismissal at this stage of the litigation would serve no practical purpose—indeed, discovery would not be simplified, and no defendants would be eliminated.

### 3. Judicial Estoppel Does Not Operate to Bar Mr. Sanford's ADA Claim

Next, Defendants again seek to invoke estoppel—this time by arguing that Mr. Sanford's statement during his plea colloquy that he was able to read and write judicially estops his ADA claim that he was denied reasonable accommodations during his interrogations. (Dkt. #36 at 30–32.) "[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001) (internal quotation marks and citation omitted). The audacity of Defendants' claim—that the equities lie with the parties who (as the Court must take as true at this stage) fabricated and coerced a false confession from a learning-disabled 14-year-old boy, causing him to spend nearly nine years wrongly imprisoned for a crime he did not commit—should not be lost on the Court.

In any event, the defense fails on the merits. "The doctrine of judicial estoppel forbids a party from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding." *Teledyne Indus., Inc. v. N.L.R.B.*, 911 F.2d 1214, 1217 (6th Cir. 1990) (internal quotation marks and

citation omitted). "The doctrine's purpose is to prevent a party from abusing the judicial process through cynical gamesmanship by changing positions to suit an exigency of the moment." *In re Ohio Execution Protocol*, 860 F.3d 881, 891 (6th Cir. 2017) (internal quotation marks and citation omitted). Judicial estoppel is therefore generally limited to circumstances "where a party asserts a position in litigation that is adopted by the court, *gains an advantage through that assertion*, and then attempts to assert a clearly opposite position in a later proceeding." *Villanueva v. Barcroft*, 822 F. Supp. 2d 726, 740 (N.D. Ohio 2011) (quoting *United States v. Hammon*, 277 Fed. App'x 560, 566 (6th Cir. 2008)) (emphasis added).

The one isolated acquiescence by Mr. Sanford in his plea colloquy that he could read and write[2] does not come close to meeting this test. First, this one-word response is neither necessarily "unequivocal" nor "inconsistent" with his allegations in the current lawsuit—namely, that Mr. Sanford suffered from learning and intellectual disabilities that limited his ability to comprehend what was said, read, and told to him, and therefore was denied reasonable accommodation when he was not interrogated in a manner taking into account these limitations. (*See* Dkt. #1 ¶¶ 162–67); *see also New Hampshire*, 532 U.S. at 750; *Teledyne*, 911 F.2d at 1217. Second, it is far from clear from Mr. Sanford's colloquy whether his one-word

---

[2] Q: "You can you [sic] read and write the English language without trouble?" A: "Yes." (Dkt. #36-6 at 5:23–25.)

answer to the trial court's cursory question "succeeded in persuading" the court that he could read and write. *See Teledyne*, 911 F.2d at 1217 n.3 ("[J]udicial estoppel does not bar a party from contradicting itself, but from contradicting a court's determination that was based on that party's position."). And Defendants do not even attempt to identify what advantage Mr. Sanford gained through pleading guilty to a quadruple homicide he did not commit.

"Finally, [c]ourts must use caution in applying the doctrine 'to avoid impinging on the truth-seeking function of the court because the doctrine precludes a contradictory position without examining the truth of either statement.'" *Riddle v. Chase Home Fin.*, No. 09 Civ. 11182, 2010 WL 3504020, at *4 (E.D. Mich. Sept. 2, 2010) (Lawson, J.) (quoting *Teledyne*, 911 F.2d at 1218). Defendants have not come close to establishing their entitlement to dismissal on that basis now.

### 4.   The Statute of Limitations Does Not Bar Any of Mr. Sanford's Claims

Next, Defendants argue that Mr. Sanford's suppression, coercion, fabrication, and ADA claims are barred by Michigan's three-year personal injury statute of limitations because the events giving rise to his claims occurred in 2007 and 2008. (Dkt. #36 at 32–36.)

21

### a. Mr. Sanford's Section 1983 Claims Did Not Accrue Until His Conviction Was Vacated

Although Defendants are correct that "[i]n Michigan, a three-year statute of limitations applies to federal claims brought under 42 U.S.C. § 1983," *Curran v. City of Dearborn*, 957 F. Supp. 2d 877, 882 (E.D. Mich. 2013) (Lawson, J.) (citing Mich. Comp. Laws § 600.5805(10); *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009)), "[t]he date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles," *id.* (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Incredibly, in arguing that Mr. Sanford's suppression, coercion, and fabrication claims accrued in 2007 or 2008, Defendants completely fail to mention *Heck v. Humphrey*, the seminal case which held that "a § 1983 cause of action for damages attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." 512 U.S. 477, 489–90 (1994); *see also, e.g.*, *D'Ambrosio v. Marino*, 747 F.3d 378, 385–86 (6th Cir. 2014) ("Until the vacatur of [the plaintiff]'s state conviction became final, *Heck* barred his § 1983 claims, which clearly implied the invalidity of his conviction. . . . Because [the plaintiff]'s civil rights claims did not accrue until his state conviction was vacated and the *Heck* bar was lifted, the two-year statute of limitations does not bar his current claims.") (citing *Wallace*, 549 U.S. at 393; *Wolfe v. Perry*, 412 F.3d 707, 714 (6th Cir. 2005)); *see also*

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379 (4th Cir. 2014).

Here, Mr. Sanford's suppression, coercion, and fabrication claims clearly and unequivocally imply the invalidity of his conviction. Courts routinely find the same in comparable circumstances. *See, e.g.*, *Cristini v. City of Warren*, No. 07 Civ. 11141, 2012 WL 5508369, at *18 (E.D. Mich. Nov. 14, 2012) (Lawson, J.) (*Brady* claim barred by *Heck* until conviction no longer subject to reinstatement); *Morris v. City of Detroit*, 211 Fed App'x 409, 410–11 (6th Cir. 2006) (Section 1983 coercion claim was barred under the *Heck* doctrine); *Word v. City of Detroit*, No. 05 Civ. 74501, 2006 WL 1704205, at *3 (E.D. Mich. June 16, 2006) ("The [*Heck*] doctrine is easily applied to [the plaintiff]'s claims that [the defendant officer] . . . fabricated evidence . . . in order to secure his conviction."). Accordingly, Mr. Sanford's Section 1983 claims did not accrue until his conviction was vacated in 2016, and thus were timely brought in 2017, well within the three-year statute of limitations.[3]

### b.   Mr. Sanford's ADA Claim Also Did Not Accrue Until His Conviction Was Vacated

Similarly, federal courts around the country have found that ADA claims implying the invalidity of a plaintiff's conviction are subject to *Heck* and cannot be

---

[3] By not arguing that Mr. Sanford's malicious prosecution claim is barred by the statute of limitations, Defendants apparently implicitly accept that this claim did not accrue until Mr. Sanford's conviction was vacated.

brought until that conviction is vacated or otherwise overturned. *See, e.g.*, *Hughes v. Prator*, No. 17 Civ. 711, 2017 WL 6030047, at *3 (W.D. La. Oct. 27, 2017), *adopted by* 2017 WL 6029634 (W.D. La. Dec. 5, 2017) ("[T]he principles that guided the [Supreme] Court to reach its holding in *Heck*: limiting collateral attacks and that a civil tort action is not an appropriate means for challenging a criminal conviction, are equally relevant to claims under the ADA."); *Clemons v. Williams*, No. 14 Civ. 2195 (APG) (NJK), 2016 WL 1238229, at *3 (D. Nev. Mar. 29, 2016) ("Here, establishing his ADA claim would require proving that [the plaintiff] was denied the opportunity to receive work/study credits that would reduce his sentence because of his disability. Such a judgment would "necessarily imply" the invalidity of his current sentence, which *Heck* prohibits."); *Davila v. Pennsylvania*, No. 11 Civ. 1092, 2014 WL 1321010, at *8 (M.D. Pa. Mar. 28, 2014) (plaintiff who alleged in the context of failure-to-accommodate claim under the ADA that he was coerced into entering a plea of guilty necessarily called into question the validity of his guilty plea in light of his alleged disability, bringing case "directly into *Heck's* realm"); *Malipurathu v. Jones*, No. 11 Civ. 646 (W), 2013 WL 3821009, at *11 (W.D. Okla. July 23, 2013) (plaintiff who argued that he was "denied the benefits and opportunities of successful treatment, education, and rehabilitation because of [his] disabilities" was subject to *Heck*'s favorable termination rule); *Hendricks v. Richards*, No. 10 Civ. 11 (Y), 2010 WL 3911432, at *3 (N.D. Tex. Oct. 6, 2010)

("Both [the plaintiff]'s claims under § 1983 and under the ADA are not cognizable unless he has satisfied the conditions set by *Heck.*"); *Miller v. Wayback House*, No. 05 Civ. 1838 (L), 2006 WL 297769, at *3 (N.D. Tex. Feb. 1, 2006), *aff'd*, 253 Fed. App'x 399 (5th Cir. 2007) ("The Court finds the above decisions persuasive and holds that *Heck* applies to Plaintiff's § 1983 claims as well as to his ADA claims."); *Deatherage v. Stice*, No. 05 Civ. 91 (F), 2006 WL 249664, at *9 (W.D. Okla. Feb. 1, 2006) ("Plaintiff's claim for damages under the ADA will necessarily imply the invalidity of his underlying convictions . . . [because] [t]he success of Plaintiff in this action clearly rises and falls with his proof that [his attorney] rendered constitutionally ineffective assistance of counsel. . . . While not every ADA claim will fall within rule of *Heck,* the instant one certainly does, and the undersigned can find no reasoned basis for precluding a civil damages action under § 1983 but allowing one under the ADA when the effect will be exactly the same."); *Browdy v. Karpe*, No. 00 Civ. 1866 (CED), 2004 WL 2203464, at *5 (D. Conn. Sept. 20, 2004) (plaintiff who alleged that his attorney should have requested a competency hearing, thereby attacking the voluntariness of his plea, "necessarily would call into question the validity of [his] conviction and sentence"); *Daniel v. Fields,* No. 95 Civ. 6132, 1995 WL 539008, at *3 n.2 (10th Cir. Aug. 31, 1995) ("[E]ven if [the plaintiff] had properly asserted an ADA claim, *Heck*'s reasoning would preclude a reduction in his sentence through an ADA claim."); *but cf. Miller v. Ghee*, 22 Fed. App'x 388,

25

390 (6th Cir. 2001) (dismissing ADA claim for different reason than district court, which had relied on *Heck*).

Here, Mr. Sanford alleges that he suffered from learning and intellectual disabilities that limited his ability to comprehend what was said, read, and told to him, and therefore was denied reasonable accommodation when he was not interrogated in a manner taking into account these limitations. (*See* Dkt. #1 ¶¶ 162–67.) If successful, this claim would necessarily imply the invalidity of the conviction and incarceration that followed Mr. Sanford's interrogation—which yielded the sole evidence against him. Accordingly, Mr. Sanford's ADA claim, like his Section 1983 claims, was timely brought well within the three-year statute of limitations.

### 5.   Defendant City of Detroit's Bankruptcy Proceedings Do Not Deprive This Court of Jurisdiction to Hear Mr. Sanford's Claims Against the City

Finally, Defendants argue that this Court lacks jurisdiction to hear Mr. Sanford's *Monell* and ADA claims against Defendant City of Detroit because the underlying wrongful acts occurred before July 18, 2013—the date the City petitioned for bankruptcy—and Mr. Sanford failed to preserve his claims prior to the December 10, 2014 claim bar date by filing a proof of claim or interest in the City's bankruptcy proceedings. (*See* Dkt. #36 at 37–48.) Defendants again rely solely on a purported legal basis for dismissal—implicitly conceding that these claims are substantively well-pled. Once again, however, Defendants are wrong.

Under the United States Bankruptcy Code, a claim is defined as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). However, "[t]here are limits to how remote or contingent a claim can be, consistent with creditors' rights to due process." *In re City of Detroit, Michigan*, 548 B.R. 748, 762 (E.D. Mich. 2016). In this District, the Bankruptcy Court applies what is known as the "fair contemplation test" in order to ascertain whether a claim is too remote or contingent prior to the bar date. *See id.* at 763. Under this test, "a claim is considered to have arisen pre-petition if the creditor 'could have ascertained through the exercise of reasonable due diligence that it *had* a claim' at the time the petition [for bankruptcy] [wa]s filed." *Id.* (quoting *Signature Combs, Inc. v. United States*, 253 F. Supp. 2d 1028, 1037 (W.D. Tenn. 2003)) (emphasis added).

As discussed in Section IV.4.a, *supra*, Mr. Sanford's individual liability claims against the Defendant Officers all clearly and unequivocally imply the invalidity of his conviction, and thus did not accrue until that conviction was vacated in 2016. *See Heck*, 512 U.S. at 489–90; *Wallace*, 549 U.S. at 393. It is well-established that a municipal liability claim brought pursuant to Section 1983 and *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658 (1978), is derivative of and dependent upon the underlying constitutional violation(s) committed by individual government

agents. *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("*Monell* holds that municipalities may be held liable for the constitutional violations of their employees only where the municipality's policy or custom led to the violation. There can be no liability under *Monell* without an underlying constitutional violation.") (citations omitted). Accordingly, Mr. Sanford's *Monell* claim against Defendant City of Detroit also accrued after his conviction was vacated in 2016—well after the City's bankruptcy claim bar date. In addition, for substantially the same reasons, Mr. Sanford's ADA claim against the City also did not accrue until that time. *See* Section IV.4.b, *supra*.

Despite the fact that his claims against the City had clearly not yet accrued prior to the claim bar date,[4] Defendants argue that Mr. Sanford somehow "could have and should have ascertained that he had a viable claim against Detroit" under the "fair contemplation test" and that his claims against the City were thus discharged when he failed to file a proof of claim during the bankruptcy proceedings. (Dkt. #36 at 45–47.) However, it is incredibly onerous—indeed, impossible—for a

---

[4] The Supreme Court in *Heck* equated the act of a claim "arising" with its "accrual." *See* 512 U.S. at 489 ("[T]he §1983 claim has not yet *arisen*. Just as a cause of action for malicious prosecution does not *accrue* until the criminal proceedings have terminated in the plaintiff's favor . . .") (emphasis added); *see also Harrison v. Michigan*, 722 F.3d 768 (6th Cir. 2013) (quoting *Heck*). Defendants have not even attempted to reconcile this interpretation with the language of the order setting the claim bar date on which they rely—which refers to "[c]laims *arising* on or before" the bar date. (Dkt. #36 at 37) (emphasis added).

convicted and imprisoned defendant to fairly contemplate whether his underlying criminal conviction will be overturned. And it would be patently unreasonable to require every defendant who simply *hopes* to overturn his conviction someday to file a proof of claim in bankruptcy before such proceedings conclude as to any potential future claims against a municipality that imply the invalidity of his conviction—at a time when actually *bringing* such claim would be frivolous and result in dismissal pursuant to *Heck*'s accrual rule.[5]

Nor do Defendants' attempts to analogize Mr. Sanford's claims against the City to the examples discussed in *In re City of Detroit, Michigan* help their position. In the first of these, former DPD officer Tanya Hughes was suspended (with pay) after she refused to remove medically-prescribed compression hose in order to provide a routine urine sample. 548 B.R. at 754. Although the incident occurred in 2012, Hughes' civilian appeal of the police trial board's initial finding against her was still under review at the time of the bankruptcy claim bar date and she did not timely file a proof of claim. *Id.* at 755. When Hughes subsequently brought federal

---

[5] Many criminal defendants maintain their innocence and find the circumstances of their convictions unjust; indeed, there were nearly 3,000 criminal appeals in the State of Michigan in 2014. (*See* Excerpt from Michigan Court of Appeals 2014 Annual Report, attached hereto as **Exhibit A**.) If all criminal appellees who maintained their innocence and disputed the legitimacy and justice of their prosecutions and subsequent convictions in the City of Detroit were required to file a proof of claim prior to the claim bar date, the Bankruptcy Court would have been flooded with such claims and would have had to spend most of its time unburdening its docket.

discrimination claims against the City of Detroit in 2015, they were dismissed because they were within her fair contemplation prior to the claim bar date and thus barred. *Id.* at 767.

Defendants' attempt to equate Hughes' failed argument that she had "no way of knowing whether the arbitrator would affirm the recommendation of dismissal by the police trial board," 548 B.R. at 765, with the fact that Mr. Sanford "no way of knowing whether the criminal court would allow his guilty plea to be withdrawn until it ordered the same," (Dkt. #36 at 45), fails because Hughes did not dispute that the act underlying her claim occurred in 2012 when the DPD ordered her to remove her clothing for a drug screening. *See In re City of Detroit, Michigan*, 548 B.R. at 767 ("Because the 'underlying act' occurred pre-petition, . . . the Court concludes that a bankruptcy claim was within Ms. Hughes's fair contemplation."). By contrast, here, the "underlying act" of Mr. Sanford's claims—*i.e.* the invalidation of his conviction—did not occur until the charges against him were dismissed in mid-2016, more than two years after the claim bar date. It was certainly not within Mr. Sanford's fair contemplation in 2014 that the criminal charges against him would *ever* be dismissed; indeed, at that time his post-conviction requests for relief based on Smothers' confession had been unsuccessful. In fact, it was only after Defendant Tolbert's surprise revelation in 2015 that he had committed perjury at Mr. Sanford's preliminary examination, (*see* Dkt. #1 ¶¶ 84–85, 120), that Mr. Sanford's conviction

was vacated. Even if Mr. Sanford could arguably have contemplated that his conviction would eventually be vacated after Defendant Tolbert's change of heart, this also occurred well after the claim bar date. Allowing the City to evade liability based on the delayed nature of Defendant Tolbert's confession to wrongdoing would be patently unfair.[6]

Defendants' proffered comparison to the no-fault claim in *In re City of Detroit, Michigan*, in which "claimants were injured pre-petition [in a bus accident] but require[d] post-petition medical treatment," 548 B.R. at 752, fares no better. An accident victim's ability to foresee the potential need for medical care after an accident is again a far cry from Mr. Sanford's ability to foresee the highly unlikely outcome—however desired it may have been—of the vacatur of his quadruple homicide conviction.

Finally, because Mr. Sanford's *Monell* and ADA claims against Defendant City of Detroit are clearly not pre-petition claims, Defendants' jurisdictional argument, (*see* Dkt. #36 at 46–48), also fails.

---

[6] Similarly, although Hughes' alleged loss of material benefits—an element of her discrimination claims—did not occur until her appeal of the police trial board's decision was denied, after the claim bar date, it was clearly within her fair contemplation because she eventually sought in federal court essentially the same relief she had previously sought through arbitration. Here, by contrast, Mr. Sanford sought for more than eight years to have his criminal conviction set aside—patently different relief from the monetary compensation he now seeks.

## V. CONCLUSION

As set forth above, Defendants' arguments by and large do not dispute that Mr. Sanford's claims are substantively well-pled and instead request dismissal on legal and equitable grounds. However, these creative attempts to avoid the consequences of Mr. Sanford's well-pleaded allegations regarding Defendants' misconduct lack a basis in well-settled law, misconstrue the relevant facts, or both.

Accordingly, for all of the foregoing reasons, Plaintiff Davontae Sanford respectfully requests that Defendants' Motion to Dismiss (Dkt. #36) be denied in its entirety and that the Court grant whatever other relief it deems appropriate and just under the circumstances.

Dated: May 4, 2018

Goodman & Hurwitz, P.C.

**/s/ William H. Goodman**
William H. Goodman (P-14173)
Julie H. Hurwitz (P-34720)
Kathryn Bruner James (P-71374)
1394 E. Jefferson Avenue
Detroit, Michigan 48207
(313) 567-6170

Neufeld Scheck & Brustin, LLP

**/s/ Emma Freudenberger**
Nick Brustin
Emma Freudenberger

Bettina K. Roberts
Meghna Philip
99 Hudson Street
New York, New York 10013
(212) 965-9081

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 4, 2018, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notification of such filing to all attorneys of record.


<u>*/s/ Oscar Hurtado*</u>
Oscar Hurtado, paralegal