UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

        Plaintiff,                              Case Number 17-13062

v.                                         Honorable David M. Lawson

CITY OF DETROIT, MICHAEL
RUSSELL, and JAMES TOLBERT,

        Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Fourteen-year-old Davontae Sanford was convicted of murdering four people upon his plea of guilty in a Detroit, Michigan court in 2008. After another person confessed to the crimes and confirmed that Sanford was not involved, a state police investigation uncovered evidence that Sanford's confession and ensuing guilty plea were the product of Detroit police misconduct. His conviction was set aside and all charges against him were dismissed in 2016, but not before he had spent over eight years in prison. He filed this lawsuit against the City of Detroit and the officers who constructed the case against him to recover damages for the violations of his civil rights that led to his wrongful conviction and confinement. The defendants moved to dismiss the complaint on various theories. One has merit: Detroit's intervening bankruptcy bars Sanford's claim against the City in this Court, because the final plan of adjustment discharged prepetition claims and the plaintiff is enjoined from pursuing his claim against the City except as the plan allows. Therefore, the Court will grant the motion to dismiss in part and dismiss the case against the City. The case will proceed, however, against the City's police officers.

I.  Facts

The City's motion is based in part on Federal Rule of Civil Procedure 12(b)(1); it contends that the Court does not have subject-matter jurisdiction over Sanford's claim against it.  The defendant police officers' motion is based on Federal Rule of Civil Procedure 12(b)(6).  Because the defendants have challenged the adequacy of the complaint under that rule, the following facts as stated in the complaint are summarized below.

Around 11:25 p.m. on September 17, 2007, two professional hit men, Vincent Smothers and Ernest Davis, executed Michael Robinson, a low level drug dealer, and three other people who were present in Robinson's home on Runyon Street, on Detroit's East Side.  The killings were provoked by a drug war.  Smothers also found a woman and her young child in the house, hiding in a back bedroom.  The woman and her child had been hit when Smothers and Davis first fired their weapons into the house, but they had survived.  Smothers told them to hide and then left the house.  Once outside, he exchanged gunfire with police chaplain Jesse King, who had happened upon the scene.  Smothers and Davis then ran through a vacant lot to their getaway car.

Police soon responded and began to canvas the neighborhood of the crime scene.  Among the officers on scene were the defendants, Detroit Police Department (DPD) Sergeant Michael Russell and Homicide Commander James Tolbert, and non-party Investigator Dale Collins.  Witnesses at the scene told the police that the shooters were two black men, 30 to 35 years old, with brown skin and slim to medium builds.  One was just over six feet tall, and the other just under six feet.  Both men were wearing dark clothes and masks, and the taller man (Smothers), was wearing a coat and carrying a rifle.

From their survey of the scene, the police observed that the perpetrators began their shooting rampage outside, firing into the house through the front door and windows.  Then they

went inside and continued shooting at the persons they found inside. The four victims all were killed in the living room, and a handgun and assault rifle were used during the attack. A seven-year-old boy was found hiding under a bed in the back room with his mother, Valerie Glover. Glover told police that one of the attackers had spoken to her briefly, then left the house. Several marijuana plants were found growing in the basement, and neighbors told police that they thought Robinson had been selling drugs out of the home. The police also spoke to King, who told them that he had exchanged fire with one of the shooters as the men ran away from the house.

Plaintiff Davontae Sanford was 14 years old at the time and lived nearby on Beland Street. He was blind in one eye, functionally illiterate, and had a learning disability. When the police showed up, Sanford went outside, still in his pajamas, to ask them what was going on. Defendant Russell approached Sanford and asked him some questions about the shooting, which Sanford could not answer, since he did not know anything about the crime. Nearby, a K-9 officer was standing with his dog, who had been searching the scene, but the dog did not react to or show any interest in Sanford. Sanford also had no trace of blood on his clothes or person, despite the abundance of blood at the gory scene where multiple victims had been executed. Russell told Investigator Collins to take Sanford to his home and obtain parental consent to question the boy, and Collins secured a signed consent form from Sanford's grandmother. The defendants then transported Sanford to the police station, where they performed a gunshot residue test on his hands, and then interrogated him. The residue test eventually came back with a negative result.

Over the next two days, Sanford was interrogated twice by Russell and Tolbert. During one of those interrogations (it is unclear which), Sanford told the defendants that he recently had smoked marijuana and was still feeling the effect of it. The defendants also were aware of Sanford's learning disability. Nevertheless, and despite his young age, Russell and Tolbert

questioned Sanford without an attorney or guardian present, contrary to DPD policy. The first interrogation ran for several hours into the morning of September 18th, and at the end of that first session Sanford signed a confession. Sanford's purported written confession, which was composed and typed up by Russell, stated that Sanford was present during the planning of the crime, but not during the shooting, and that the executions were carried out by three persons named as "Tone," "Tone-Tone," and "Carrie." The only accurate details in the statement were inserted by the defendants when it was composed, which were (1) that a handgun and assault rifle were used, (2) that the name of the intended victim was Michael or Mike, and (3) that there was a red car in the driveway of the home.

Sanford was released and went home after he signed the first statement. However, around 8:40 p.m. on September 18th, Russell and Tolbert went to Sanford's home and spoke to Sanford and his mother, Taminko Sanford. The officers did not inform Ms. Sanford that they already had obtained a statement from Davontae in which he implicated himself. But they did obtain another signed parental consent to further question the boy. Sanford was taken to the police station, where Russell began to interrogate him a second time around 9:30 p.m. The defendants lied to Sanford during the interrogation, telling him that he would be free to go afterwards, also falsely telling him that blood from the scene had been found on his shoes. When Sanford asked for an attorney, Russell responded by calling him a "dumbass," and he told Sanford that no attorneys were available at that hour. Russell and Tolbert concocted another written confession, which included additional details police had learned about the crime, including that the shooting had started outside, there were two gunmen involved who used a handgun and a rifle, the specific positions of bodies found at the scene, the survivors found hiding in a back room, and the fact that the shooters had traded shots with a witness after they left the house. The description of the clothing Sanford

was wearing when he first was encountered by police also differed in the second statement and better matched the description of clothing witnesses had seen the gunmen wearing.

Russell and Tolbert reported, and later testified, that Sanford also had drawn a diagram of the crime scene that was attached to the second written confession. However, Tolbert had drawn that diagram and given it to Sanford, with instructions to sketch in the locations of bodies to match photographs of the scene that were shown to Sanford during the interrogation. During a 2015 investigation, Tolbert confessed to Michigan State Police investigators that he had drawn the sketch and that he falsely had testified that it was drawn by Sanford.

The interrogation facilities had audio and video recording features, but those were not active during most of the interrogation. Instead they only were turned on at the end, when police directed Sanford to "proofread" his confession (which he, however, could neither read nor understand, due to his illiteracy).

In the second statement, the perpetrators of the shooting were identified as "Los, Tone-Tone, PBI Tone, and Carrie," but police later learned that none of those persons were involved. In particular, on September 29, 2007, DPD officers learned that Angelo Gardner, a.k.a. "Los," and Antonio Langston, a.k.a. "PBI Tone," both had solid alibis, and Gardner and Langston never were charged for the Runyon Street shooting. DPD officers later arrested Santo Green, a.k.a. "Tone-Tone," but he never was charged either.

Sanford was charged with four counts of first-degree murder, based solely on the purported written confession and the sketch that he supposedly had drawn. During a psychiatric exam ordered after his arraignment, Sanford insisted he was innocent and that the police had fabricated and coerced his confession. The written statements and sketch were used as evidence at Sanford's preliminary examination, and at a bench trial in March 2008. The defendants also testified that all

of the facts in the written statements were volunteered by Sanford with no prompting from his interrogators, and that many of them would have been known only by the shooters.

Sanford entered a mid-trial guilty plea to the four murder charges (reduced to second-degree murder) and one firearm count. On April 4, 2008, the state court sentenced him to four concurrent terms of 37 to 90 years for the murder counts and an additional two-year term for the gun count.

On April 19, 2008, two weeks after Davontae went to prison, Vincent Smothers was arrested outside his home in Shelby Township and taken in for questioning by police. Smothers was interviewed by police over the course of two days, and he confessed that he had committed multiple murders in the Detroit area in 2006 and 2007, including the Runyon Street shootings.

Smothers told police that Sanford was not involved in the Runyon Street murders, and he volunteered several facts about the crimes that previously were unknown to police, including that his accomplice and the other shooter was Ernest Davis, that Davis had used a .45 caliber pistol and Smothers used an AK-47, that Davis had fired from outside the house, that Smothers found a woman and child hiding under a bed in the back room, and spoke briefly to them before leaving, that he had taken a .40 caliber pistol from the scene which he later used in another contract killing, and that when he learned there was a warrant out for his arrest, he told his wife to hide the guns used at Runyon Street in a house that belonged to Davis's cousin.

One of the officers who questioned Smothers was defendant Russell. During an intermission, when Russell took Smothers to the bathroom, he instructed Smothers to stop making statements about the Runyon Street shooting. In May 2008, Smothers was interviewed again by DPD Investigator Ira Todd, and he again confessed to the Runyon Street shootings. Smothers

eventually was charged with eight of the twelve murders in which he had confessed his involvement — every one *except* the four shootings on Runyon Street.

In 2008, Sanford's appellate lawyer learned about Smothers' confession from news reports. Sanford filed a post-conviction motion asserting his innocence, supported in part by an affidavit supplied by Smothers. In 2015, the Michigan State Police began an investigation into alleged police misconduct surrounding the Runyon Street murder investigation. As noted above, Tolbert finally confessed to state police investigators then that he had fabricated the sketch supposedly drawn by Sanford. The evidence collected by the state police also included the contents of victim Michael Robinson's cell phone, which included a photograph of a .40 caliber pistol that resembled the gun used by Smothers in one of the murders to which he confessed (the same gun that Smothers told police he had taken away from the Runyon Street scene).

On May 20, 2016, the state police submitted a report of the investigation to the Wayne County Prosecutor's office. On June 8, 2016, Sanford's attorneys and the Wayne County Prosecutor's Office submitted a joint stipulation asking the trial court to set aside Sanford's conviction, and Sanford was released from custody. Finally, on July 19, 2016, the state court dismissed all of the charges against him.

The plaintiff filed his complaint in this case on September 18, 2017. The defendants filed a motion to dismiss in lieu of an answer. The complaint pleads four counts alleging violations of various constitutional amendments via 42 U.S.C. § 1983 and the Americans With Disabilities Act (ADA), and a separate claim against the City of Detroit. In Count I, the complaint alleges that the police violated the plaintiff's right to due process under the Fifth and Fourteenth Amendments by (1) fabricating inculpatory evidence, (2) withholding exculpatory evidence that they were required to disclose under *Brady v. Maryland*, and (3) compelling, manipulating, and coercing the plaintiff

to make a false confession. In Count II Sanford alleges that the police violated his rights under the Fourth Amendment by instigating a malicious prosecution against him based on fabricated evidence and without probable cause.

In Count III, Sanford alleges that the City of Detroit endorsed the illegal conduct by the defendants through customs, policies, and practices of pursuing rushed, shoddy investigations of high profile cases in order to secure quick arrests and convictions of any available suspect, while deliberately ignoring and suppressing evidence that pointed to anyone other than the designated suspect, and, subsequently, bestowing commendations and promotions on officers who secured rapid arrests and convictions, even when supervisors knew about dishonest and illegal conduct during their investigations. Sanford alleges in the complaint that defendant Tolbert was promoted to Commander of the Detroit Police Department's Major Crimes Unit in 2005, the same year when he was accused by Southfield police of filing a false police report (a felony).

In Count IV, Sanford alleges that when he was arrested and interrogated, he had intellectual and learning disabilities, was a minor (age 14), and was illiterate, and that he therefore was subject to a disability under the ADA, but instead of reasonably accommodating the plaintiff's disability and ensuring that he understood what was happening during his interrogation, the police instead intentionally exploited his diminished mental capacity by subjecting him to extended interrogation sessions, telling him to sign documents including a confession that he could not read or understand, and leading him to believe that he would be allowed to go free if he confessed, although that obviously was false.

In their motion, the defendants challenge each of these counts.

## II. Post-Bankruptcy Claim Against Detroit

In 2013, the City of Detroit filed for protection under Chapter 9 of the Bankruptcy Code. The bankruptcy court set a date of February 21, 2014 for filing a proof of claim against the City. The City argues that Sanford's claims against it are barred by the discharge that resulted from the approval of the City's final plan of adjustment, which occurred on November 12, 2014. Sanford responds that none of the claims are barred by the bankruptcy, because they did not accrue, and he could not have asserted them by the exercise of reasonable diligence, before his conviction was vacated in 2016.

It is undisputed that Sanford never filed a proof of claim in the bankruptcy proceeding. The critical question is whether Sanford's claims raised against the City in this lawsuit are prepetition "claims." The City's liability on prepetition claims "was discharged when the Plan [of Adjustment] was confirmed on November 12, 2014, and became effective on December 10, 2014." *In re City of Detroit, Michigan*, 548 B.R. 748, 751 (Bankr. E.D. Mich. 2016). Claimants seeking damages from the City based on claims that can be characterized as prepetition claims "are enjoined from pursuing a recovery beyond what is provided for in the Plan." *Ibid.* (citing 11 U.S.C. §§ 524(a)(2), 901(a), 944).

"The Bankruptcy Code defines 'claim' as a 'right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured.'" *Id.* at 761 (quoting 11 U.S.C. § 101(5)). "'Congress intended by this language to adopt the broadest available definition of "claim,"'" which includes 'all legal obligations of the debtor, no matter how remote or contingent.'" *Ibid.* (quoting *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991); *In re Huffy Corp.*, 424 B.R. 295, 301 (Bankr. S.D. Ohio 2010) (quotations marks omitted)).

"'[F]ederal law determines when a claim arises under the Bankruptcy Code.'"  *In re Castellino Villas, AKF, LLC*, 836 F.3d 1028, 1034 (9th Cir. 2016) (quoting *In re SNTL Corp.*, 571 F.3d 826, 839 (9th Cir. 2009)).   When determining whether a creditor's claim arose before a bankruptcy petition was filed, most federal courts, including bankruptcy courts within the Sixth Circuit, "use the 'fair contemplation' test.   Under this test, 'a claim arises when a claimant can fairly or reasonably contemplate the claim's existence even if a cause of action has not yet accrued under nonbankruptcy law.'"  *Ibid.* (quoting *SNTL Corp.*, 571 F.3d at 839); *see also In re City of Detroit, Michigan*, 548 B.R. at 761 (collecting cases).  "'It is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has not yet accrued.'"  *SNTL Corp.*, 571 F.3d at 839 (quoting *VillCool Fuel, Inc. v. Board of Equalization (In re Cool Fuel, Inc.)*, 210 F.3d 999, 1007 (9th Cir. 2000)).

It must be said here that all Sanford's claims against the City were within his "fair contemplation" before the City declared bankruptcy.   He certainly contemplated the factual bases underlying the claims raised in the complaint, since he attempted repeatedly to argue actual innocence before the state courts since at least 2008, insisting that his confession was falsely obtained, concocted, and coerced.   Sanford correctly points out that he could not have sued the City until his convictions were set aside, which did not happen until after the bankruptcy.   But the courts that have considered the question uniformly have concluded that claims based on prepetition malicious prosecutions were barred, notwithstanding that the plaintiff could not file suit on his claims until his criminal conviction was overturned.

For instance, in *In re Motors Liquidation Co.*, 576 B.R. 761 (Bankr. S.D.N.Y. 2017), the court, confronting similar facts, concluded that the claims based on prepetition misconduct were barred, notwithstanding that the plaintiff could not file suit until after the criminal case against him

was dismissed, which occurred post-petition. The plaintiff, Gillispie, brought a claim alleging that certain General Motors employees were complicit in causing his wrongful conviction for rape, kidnapping and robbery. The employees' conduct predated the automaker's bankruptcy filing, but Gillispie's convictions were not vacated until after the bankruptcy filing. In finding the claims barred, the court found "irrelevant" the fact that non-bankruptcy law prevented Gillispie from bringing his claim against GM until his convictions were set aside, because "the 'accrued state law claim theory' does not apply to the determination whether a creditor has a 'claim' under section 101(5)(A) of the Bankruptcy Code." *Id.* at 777. The court explained:

> The occurrence of the contingency event that would trigger Old GM's potential liability, namely the vacation of the conviction, was within the actual or presumed contemplation of Gillispie at the time he was convicted allegedly as a result of the conduct of GM employees. Gillispie surely knew (and believed) that his conviction was not warranted based on Old GM's employees' testimony, and as a result[,] Gillispie "has steadfastly maintained his innocence and labored tirelessly for over 20 years to clear his name." Gillispie initiated proceedings to vacate or reverse his conviction as soon as he was convicted. For example, as soon as February 26, 1991 — two weeks after his conviction — Gillispie filed a motion in state court seeking a new trial.

*Ibid.* Because Gillispie's claims were contingent on the successful termination of his criminal case, and were disputed and unliquidated, they were "contingent claims within the meaning of section 101(5)(A) of the Bankruptcy Code. To preserve the claims in this bankruptcy case, Gillispie had to file a proof of claim before the Bar Date." *Ibid.*; *see also Stone v. Kmart Corp.*, No. 06-302, 2007 WL 1034959, at *3 (M.D. Ala. Mar. 30, 2007) ("The accrual time for Plaintiff's malicious prosecution claim under Alabama law does not control this action. The relevant inquiry is whether a claim has accrued under bankruptcy law based upon the statutory definition of a claim. The court finds that Plaintiff's claim accrued for purposes of bankruptcy law prior to the Bar Date. Applying the broad definition of claim to the facts of this case, Plaintiff, at the time of her arrest, had an arguably remote claim for malicious prosecution against Kmart. The scope of the term

claim, as determined through the legislative history of the Bankruptcy Code, is more than broad enough to accommodate a malicious prosecution action, although the action has not accrued for purposes of state law.").

For the same reasons, Sanford's claims against the City must be considered prepetition claims. As such, it is barred by the City's bankruptcy. 11 U.S.C. §§ 524(a)(2) ("A discharge in a case under this title . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived . . . .").

### III. Claims Against the Officers

Sanford brings his claims against the individual defendants under 42 U.S.C. § 1983 and Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132.

Defendants Russell and Tolbert argue that (1) the plaintiff is estopped from proceeding with any claims against them for his wrongful conviction because his guilty pleas, and the subsequent affirmance of his convictions by the state courts, were "superseding causes" of his damages; (2) the *Brady* claims are barred because (a) the State had no obligation to disclose any information about the other person who confessed to the crimes of conviction, after the plaintiff pleaded guilty and was convicted, (b) the information about the falsity of the plaintiff's confession and the fabrication of the sketch was equally available to the plaintiff, and the State therefore had no obligation to disclose any such information to him, and (c) fabricated information in police reports that were not disclosed was inadmissible hearsay, and the State has no obligation to disclose any information that does not constitute evidence; (3) the plaintiff is judicially estopped from asserting that he was unable to read or write, because he testified under oath at his plea hearing that he could read and write English; and (4) the plaintiff's ADA claim for failure to provide

reasonable accommodations during his interrogation accrued 10 years ago when he was interrogated, his *Brady* claims accrued nine years ago when he became aware of the allegedly falsified and withheld information, his claims based on a coerced confession accrued when his confession was used against him during the trial proceedings, and the limitations period was not tolled due to the plaintiff's incarceration and expired after any period of tolling due to the plaintiff's minority, so all of those claims are time barred under Michigan's three-year statute of limitations.

To state a claim under section 1983, the plaintiff must plead facts showing that a defendant acting "under color of state law" deprived him of a right established by the Constitution or the laws of the United States. *Baynes v. Cleland*, 799 F.3d 600, 607 (6th Cir. 2015) (citing *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The plaintiff must establish the liability of each individual defendant by that person's own conduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Sanford contends that the conduct of both Russell and Tolbert deprived him of rights guaranteed by the Fourth, Fifth, and Fourteenth Amendments and the ADA.

### A. Claims Relating to Police Misconduct

#### 1. Coerced Confession

Sanford contends that his confession, and later his guilty plea, were coerced by the defendants' misconduct. The misconduct consisted of fabricating evidence, deception, refusing a request for a lawyer, and exploiting the plaintiff's illiteracy and mental deficiencies. The complaint plainly states a claim under the Fifth and Fourteenth Amendments.

It is true that extracting an involuntary confession by itself does not establish the civil liability of the interrogator under section 1983. *Chavez v. Martinez*, 538 U.S. 760, 766-67 (2003).

However, "[u]sing a coerced confession against the accused at trial may give rise to a claim for violation of the accused's Fifth Amendment right not to be a witness against himself." *Avery v. City of Milwaukee*, 847 F.3d 433, 439 n.2 (7th Cir. 2017) (citing *Chavez*, 538 U.S. at 767).

A confession is involuntary when "'(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements.'" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

The plaintiff plausibly has alleged sufficient facts establishing each of these elements. He has outlined how the conduct of Tolbert and Russell was objectively coercive, when these defendants, knowing of his minority and his learning disability, induced Sanford to endorse a written confession and purported accompanying sketch of the crime scene which, due to his mental condition and illiteracy, he had no reasonable capacity knowingly or intelligently to comprehend or adopt. Moreover, the complaint also alleges that, during the second interrogation, at the end of which Sanford purportedly signed a second and more detailed written confession, the defendants refused the plaintiff's request for an attorney and assured the plaintiff that he would be free to go if he confessed. Promises by police that a suspect would not be prosecuted may be illusory and suffice to show coercion where the police had no authority control whether the defendant would be charged or not based on the evidence collected by them. *United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013).

The plaintiff also alleges that the confession played a major role in his midtrial guilty plea, thereby connecting the defendants' misconduct as a "crucial motivating factor" in his decision to plead guilty. Sanford has stated a viable claim for violation of his rights under the Fifth

Amendment's self-incrimination and due process clauses. *See Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1025 (7th Cir. 2006) ("[W]here, as here, a suspect's criminal prosecution was not only initiated, but was commenced because of her allegedly un-warned confession, the 'criminal case' contemplated by the Self–Incrimination Clause has begun."); *Avery*, 847 F.3d at 439.

## 2. Malicious Prosecution

The plaintiff also amply has made out viable claims for malicious prosecution under the Fourth and Fourteenth Amendments. The complaint states facts establishing these elements: "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted).

The plaintiff charges that the defendants induced a fraudulent prosecution that resulted in the defendant's guilty plea to four murders that he did not commit. Those allegations track "[t]he prototypical case of malicious prosecution[, which] involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Ibid.* So it is here. The Sixth Circuit readily has recognized malicious prosecution claims where the police instigate a fraudulent prosecution by presenting false evidence and lying under oath. *Sykes v. Anderson*, 625 F.3d 294, 313-14 (6th Cir. 2010) ("[W]e have no trouble concluding that a reasonable jury could have found that Sgt. Nichols influenced or participated in the decision to prosecute and that her

false testimony was thus one cause of the commencement of the criminal proceedings against the Plaintiffs." (rejecting argument that police officers did not "make the decision" to prosecute)).

### B. Superseding Cause

The defendants take the curious position that the plaintiff's guilty plea, and state court appellate rulings upholding his conviction, were "superseding causes" of his damages that bar him from recovering for the defendants' misconduct. But the two cases that they cite to support that theory readily are distinguishable because in those cases the plaintiffs' convictions had not been overturned, and in one case the allegedly fabricated evidence supported a single charge that had been dismissed. *Reyes v. City of New York*, 992 F. Supp. 2d 290, 298 (S.D.N.Y. 2014) ("Plaintiff did not plead guilty to the tampering with evidence charge that the purportedly fabricated evidence [a packet of heroin] created (as it was dropped) — thus, the charge formed no part of his criminal sentence."); *Barmapov v. Barry*, No. 09-03390, 2011 WL 32371, at *4 (E.D.N.Y. Jan. 5, 2011) ("Plaintiff was convicted by guilty plea on September 8, 2009, and sentenced to ninety days imprisonment. As ninety days after September 8, 2009 have long since elapsed, and there is no evidence that Plaintiff is currently incarcerated, this Court can only conclude that Plaintiff is no longer 'in custody.'").

All the other cases that might illuminate the argument involved claims of alleged Fourth Amendment violations for unreasonable searches or seizures without probable cause, which the courts uniformly held were barred by subsequent guilty pleas or admissions that resulted in still-intact convictions. *Brown v. Morales*, No. 13-1056, 2017 WL 6949522, at *5 (W.D.N.Y. Oct. 10, 2017), *report and recommendation adopted*, No. 13-1056, 2018 WL 451823 (W.D.N.Y. Jan. 17, 2018) ("Because Plaintiff pled guilty to multiple counts in the superseding indictment, there is conclusive evidence that probable cause existed for his arrest, and his false arrest claim should be

barred."); *Masetta v. Town of Irondequoit*, No. 06-6143, 2010 WL 4823684, at *4 (W.D.N.Y. Nov. 29, 2010) ("[A] guilty plea on an underlying charge establishes probable cause as a matter of law."); *Padilla v. Miller*, 143 F. Supp. 2d 453, 477 (M.D. Pa. 1999) ("At trial, Fayne Padilla admitted that the firearms found in his trunk were not owned by him and that he was carrying the concealed weapons and ammunition without a license to do so. Under these circumstances, Trooper Miller's violation of Padilla's Fourth Amendment rights cannot be regarded as the proximate cause of Fayne Padilla's incarceration.").

In this case, Sanford is not attempting to recover merely for an unlawful initial arrest or an unreasonable search — violations which are complete when they occur, regardless of the ultimate outcome of the criminal proceeding. Instead, he is seeking damages arising from a wrongful prosecution and conviction — which, the plaintiff alleges, inevitably compelled his fateful decision to plead guilty in the face of substantial false evidence manufactured by the police and presented to the court at his bench trial. The defendants' position that they should be *absolved* of liability for stacking the deck against the plaintiff because their efforts to corner him into a guilty plea *succeeded* is nonsense, and they cite no authority to support it. Instead, the Supreme Court has stated that "§ 1983 'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" *Malley v. Briggs,* 475 U.S. 335, 345 (1986) (quoting *Monroe v. Pape,* 365 U.S. 167, 187 (1961)).

Sanford unquestionably has pleaded facts that demonstrate the defendants' wrongful conduct caused his damages. "Traditional tort concepts of causation inform the causation inquiry on a § 1983 claim." *Powers v. Hamilton Cty. Pub. Def. Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007) (citing *McKinley v. City of Mansfield,* 404 F.3d 418, 438 (6th Cir. 2005)). Sanford has alleged that Tolbert's and Russell's conduct was both a cause-in-fact and the proximate cause of

his injuries. He has alleged that his prosecution and incarceration for a crime he did not commit "would not have occurred but for the[ir] conduct." *Ibid.* (citing *Butler v. Dowd,* 979 F.2d 661, 669 (8th Cir. 1992)). And he has plausibly alleged that his damages were the foreseeable result of their misconduct in fabricating a case against him. *Id.* at 609 (noting that "courts have framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct").

The defendants' attempt to foist responsibility on the state courts fares no better, because judicial action does not "supersede" the defendants' liability where the instigation and progress of the trial and appellate process was tainted by the defendants' deception. *Cf. Geronimo-Dominguez v. Vill. of Albion*, No. 07-406C, 2009 WL 3128311, at *3 (W.D.N.Y. Sept. 29, 2009) ("A *valid* prosecution resulting in conviction is conclusive evidence that probable cause existed for an arrest."); *Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) ("*In the absence of evidence that Officer Weller misled or pressured the prosecution or trial judge*, we cannot conclude that his conduct caused the violation of Wray's constitutional rights; rather, the violation was caused by the ill-considered acts and decisions of the prosecutor and trial judge.") (emphases added).

Nothing about Sanford's guilty plea sensibly can be regarded as an intervening or superseding cause that isolated the defendants' misconduct and prevented it from visiting damages for the constitutional violations Sanford alleged. Sanford has pleaded viable claims for these violations of his rights.

## C. *Brady v. Maryland* Claims

Sanford also plausibly has alleged violations of his Fourteenth Amendment due process rights based on the defendants' unconscionable conduct in falsifying evidence against him and

suppressing evidence that would have prompted his exoneration (and eventually did). It is well established that "'the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *Wearry v. Cain*, --- U.S. ---, 136 S. Ct. 1002, 1006 (2016) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

The defendants persistently fixate on the plaintiff's knowledge of his own innocence. But they ignore the crucial evidence that was so stubbornly suppressed by them, *namely their admissions that they made up evidence and concocted a written confession out of whole cloth, and then lied under oath to the prosecutor and the state trial court to procure a conviction*. However, courts have "'[c]onsistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery*, 847 F.3d at 439 (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[T]he presentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.")).

The defendants' confessions of their own lies certainly would have been admissible in any court proceeding. And their admissions would have lent decisive weight to the plaintiff's claims that he was innocent — likely, as it did nearly a decade later, promptly leading to his exoneration and the dismissal of the case against him. Those facts certainly suffice to sustain a substantive due process claim. *Winslow v. Smith*, 696 F.3d 716, 736 (8th Cir. 2012) ("Plaintiffs assert that their substantive due process rights were violated when Defendants conducted a conscience-shocking reckless investigation and amassed false evidence that was used to box Plaintiffs into entering

guilty pleas. . . .   Accordingly, we find Plaintiffs have pointed to sufficient evidence to support their claims based on a conscience-shocking, reckless investigation and manufactured false evidence.").

The plaintiff also plausibly has alleged violations of his post-conviction due process rights caused by the defendants' continued efforts to obscure and conceal the evidence that another person had confessed to the murders.  According to the complaint, defendant Russell went as far as brazenly coaching the confessed true killer to "keep quiet" about his guilt and Sanford's innocence.  "In 2009, the Supreme Court acknowledged that convicted individuals 'have a liberty interest in demonstrating [their] innocence with new evidence under state law.'"  *Howard v. City of Durham*, No. 17-477, 2018 WL 1621823, at *4 (M.D.N.C. Mar. 31, 2018) (quoting *District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009)).  "While *Osborne* recognizes that a 'criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man,' it also makes clear that conduct that 'transgresses any recognized principle of fundamental fairness in operation' can cause a violation of a convicted individual's right to demonstrate his innocence with new evidence." *Ibid.* (quoting 557 U.S. at 68-69).  The *Howard* court had little difficulty when facing similar facts finding a viable claim for denial of post-conviction due process:

> Howard represents, and the officers do not dispute, that the 2011 court order directed the DPD to "immediately share with counsel for Mr. Howard any information it possesses about the man whose DNA was detected in Doris W.'s sexual assault kit."  Howard further alleges that Soucie and Pennica intentionally suppressed the recording of Jones and its contents, despite that order.  The recording was plausibly key evidence, as Howard was exonerated at the hearing when it was presented to the state court.  As such, the court finds that a reasonable person in the position of Soucie and Pennica should have known that suppression of the recording would violate the court's disclosure order and Howard's right to post-conviction relief, pursuant to his liberty interest.  Moreover, that Soucie and Pennica acted intentionally in violation of the order is plausibly alleged, given the detailed allegations regarding their involvement in the case and that they provided

a written report that allegedly misrepresented their interactions with Jones and omitted the fact that Jones made incriminating, contradictory, and inconsistent statements.

*Howard*, 2018 WL 1621823, at *5 (citations omitted).

Similarly, Sanford has stated a viable claim for violation of his rights under the Fourteenth Amendment's Due Process Clause.

### D. Americans with Disabilities Act

The plaintiff alleges that the defendants violated the ADA by their failure to account for his mental limitations during his interrogation, and, moreover, their apparent cynical and deliberate exploitation of those limitations, of which they allegedly were aware. Title II of the ADA "provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" *Roell v. Hamilton County*, 870 F.3d 471, 488 (6th Cir. 2017) (quoting 42 U.S.C. § 12132). "Neither the Supreme Court nor [the Sixth Circuit] has squarely addressed whether Title II of the ADA applies in the context of an arrest." *Id.* at 489. However, "several [other] circuits [] have found Title II applicable to law-enforcement activities, including arrests." *Ibid.*

Two types of claims can be brought under Title II: "claims for intentional discrimination and claims for a reasonable accommodation." *Ibid.* (citing *Ability Center of Greater Toledo v. City of Sandusky*, 385 F.3d 901, 907 (6th Cir. 2004)). The Eighth Circuit has held that both types of ADA claims may arise from exploitative police conduct in the course of a custodial interrogation, on facts that pale against the stark allegations in the complaint in this case. *See Folkerts v. City of Waverly*, 707 F.3d 975, 983-84 (8th Cir. 2013).

The defendants contend that the plaintiff is "judicially estopped" from claiming that he cannot read or write (or could not in 2007), based on his monosyllabic response to the trial judge's

question on that point during the plea colloquy.  Defs.' Reply, Ex. 7, Plea Tr. at 71 ("Q. You can read and write the English language without trouble? A. Yes.") (Pg ID 1780).

"Judicial estoppel is an 'equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment.'"  *United States v. Bates*, 730 F. App's 281, 283 (6th Cir. 2017) (quoting *Mirando v. United States Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014)).  "While declining to establish 'inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel,' the Supreme Court identified three factors that often guide a court in deciding whether to apply the doctrine: 'First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Ibid.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).  However, "it is 'well-settled that judicial estoppel does not apply where the prior inconsistent position occurred because of mistake or inadvertence.'"  *Ibid.* (quoting *Lewis v. Weyerhaeuser Co.*, 141 F. App'x 420, 425 (6th Cir. 2005)); *see also New Hampshire v. Maine*, 532 U.S. at 753 ("We do not question that it may be appropriate to resist application of judicial estoppel when a party's prior position was based on inadvertence or mistake." (quotations omitted)).

The balance of equities does not favor the application of judicial estoppel here, because (1) the plaintiff does not stand to procure any "unfair advantage" by his supposed contradictory

positions; and (2) in any event, he plausibly has alleged that his mental condition was such that he reasonably could have given his answer in the criminal proceeding inadvertently or by mistake — i.e., because he did not fully understand the nature or consequences of the question posed to him.

The complaint states cognizable claims for intentional discrimination and denial of reasonable accommodations under Title II of the ADA.

### E.  Statute of Limitations

Finally, the defendants contend that the plaintiff's claims are time-barred.  "Although the statute of limitations is an affirmative defense, a claim may be dismissed under Rule 12(b)(6) if the complaint affirmatively shows that the claim is time-barred."  *Lambert v. Sessions*, No. 17-5324, 2017 WL 8217699, at *2 (6th Cir. Oct. 4, 2017) (citing *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) ("The statute of limitations is an affirmative defense, and a plaintiff generally need not plead the lack of affirmative defenses to state a valid claim.") (citing Fed. R. Civ. P. 8(a), (c))).  The defendants argue that Sanford did not file his complaint within three years of when his claims accrued.  They contend that the plaintiff's claims accrued either when he was interrogated or confessed, or when he was convicted.

In Michigan, a three-year statute of limitations applies to federal claims brought under 42 U.S.C. § 1983.  *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009).  The date on which a section 1983 claim accrues is determined by reference to federal law and in accordance with common-law tort principles. *Wallace v. Kato,* 549 U.S. 384, 388 (2007).  "Under those principles, it is the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief."  *Ibid.* (internal citations, quotations marks, and brackets omitted).  That rule was complicated, however, by the Court's earlier decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), which held that "a § 1983 cause of action for damages

attributable to an unconstitutional conviction or sentence does not accrue until the conviction or sentence has been invalidated." *Id.* at 489–90. The conviction is invalidated when it "has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487.

Sanford's claims are timely because it is undisputed that they were filed within three years after the criminal proceedings against the plaintiff terminated in his favor, by the trial court's order of dismissal. *See King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017). "Because an 'element that must be alleged and proved in a malicious prosecution action is termination of the prior criminal proceeding in favor of the accused,' the statute of limitations in such an action does not begin to run until 'the plaintiff knows or has reason to know of' such favorable termination." *Ibid.* (quoting *Heck v. Humphrey*, 512 U.S. 477, 484 (1994); *Eidson v. State of Tenn. Dept. of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007)). The same can be said of Sanford's other claims, since he was convicted and success on his claims would imply the invalidity of the convictions. *See Kucharski v. Leveille*, 526 F. Supp. 2d 768, 774 (E.D. Mich. 2007).

Curiously, the defendants argue that *Heck* does not apply to prolong the accrual date of Sanford's claims because the criminal proceedings have not terminated in the plaintiff's favor, since the dismissal was "without prejudice." But the record is unclear on the precise nature of the trial court's order, since no copy of that order was attached to the pleadings, and none is evident from the portions of the trial court record so far submitted to the Court. In any event, the Sixth Circuit readily has found that the third element under *Heck* is satisfied where the prosecution has been "abandoned" by the State, without regard to whether the dismissal was "with" or "without" prejudice. *E.g.*, *Mills*, 869 F.3d at 479-480 ("In 2014, Mills filed a motion to dismiss the

indictment, and the State responded with a *nolle prosequi* motion. The Marshall County Circuit Court entered a *nolle prosequi* order on April 4, 2014. . . . There appears to be no dispute that Mills suffered a deprivation of liberty and that the proceeding was eventually resolved in his favor . . . ."); Black's Law Dictionary (10th ed. 2014) ("Nolle Prosequi: 1. A legal notice that a lawsuit or prosecution *has been abandoned*. 2. A docket entry showing that the plaintiff or the prosecution *has abandoned the action*."); *King*, 852 F.3d at 576 ("On October 9, 2014, the Spencer Circuit Court entered an order dismissing the charges against King, *thereby terminating the criminal prosecution against her*. King now seeks to bring claims under both 42 U.S.C. § 1983 and Kentucky tort law against Defendants, chiefly arising from her prosecution and confinement.") (emphases added).

Sanford's claims are not time-barred.

## IV.  Conclusion

Plaintiff Davontae Sanford's claims against the City of Detroit must be considered prepetition claims that are barred by the approval of the City's final plan of adjustment, which was approved by the bankruptcy court on November 12, 2014.  However, he has stated viable claims against defendants Michael Russell and James Tolbert.  Their challenges to those claims in their motion to dismiss have no merit.

Accordingly, it is **ORDERED** that the defendants' motion to dismiss (ECF No. 36) is **GRANTED IN PART AND DENIED IN PART**.

It is further **ORDERED** that the complaint is **DISMISSED WITHOUT PREJUDICE** against defendant City of Detroit **only**.  The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   December 4, 2018

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on December 4, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI