Exhibit 47

# Criminal Case Review & Consulting

1639 Potomac Avenue SE
Washington, D.C.  20003

Emma Freudenberger                                July 30, 2018
Neufeld Scheck & Brustin, LLP
99 Hudson Street, 8th Floor
New York, New York 10013

**RE: Davontae Sanford - Report of James Trainum**

**Summary of Findings**

- Based on my review of the materials listed in Appendix A, it is clear that the Detroit Police Department (DPD) investigation into the quadruple homicide on Runyon Street and Davontae Sanford suffered from a series of serious failures. First, even the undisputed evidence reveals blatant deviations from the most basic minimally acceptable police procedures. These include Sergeant Russell's failure to document the circumstances surrounding the interrogations of Davontae Sanford and the crime scene sketch later attributed to him, the failure to re-interview and/or document interviews with Davontae Sanford concerning the murder weapons and identities of his accomplices, the failure to conduct and/or document any investigation into the individuals named by Davontae Sanford during his plea, and, most egregiously, the failure to conduct any investigation into Vincent Smothers and Ernest Davis as perpetrators of the quadruple homicide following Vincent Smothers's confession. Additionally, disputed evidence suggests far worse: misrepresenting the circumstances surrounding Sanford's confession, and the crime scene sketch falsely attributed to him, and intentionally not investigating Smothers and Davis for this crime to cover-up misconduct during the police investigation into Sanford.
- Sgt. Michael Russell of the Detroit Police Department's Homicide Unit, and other members of the department, exhibited tunnel vision and verification bias in their investigation into the Runyon Street murders. This resulted in their arresting Davontae Sanford, and then closing off the investigation to alternative suspects by ignoring overwhelming evidence both that Sanford's confession was unreliable and that Vincent Smothers' confessions were reliable.
- There is a high probability that during his interrogation of Davontae Sanford, Sgt. Michael Russell used tactics, including violating departmental policy by interrogating a juvenile suspect without the presence of a parent or a guardian, that have been found to increase the probability of false confessions by juvenile suspects.
- There is a high probability that Davontae Sanford was provided the details that he gave in his confession from outside sources, including Sgt. Michael Russell, thus calling into question the reliability of the confession. I reach this conclusion because all of the verified details found in Sanford's confession were facts known to Sgt. Russell and the

police at the time of the confession, while none of the details provided by Sanford regarding facts not known to Sgt. Russell and the police were confirmed by investigation and many of those details provided by Sanford (such as the types of guns used by the killers and the identity of the accomplices) have proven to be false. Furthermore, based on my experience reviewing old homicide cases, the fact that it is now undisputed that Davontae Sanford's account of the way the crime scene sketch came about is correct, and Sergeant Russell and Commander Tolbert's accounts under oath were false, makes Davontae Sanford's allegation that Sergeant Russell showed him crime scene photos during the interrogation more plausible. Sanford's allegation that he was shown crime scene photos is bolstered by Russell's statements that he owned a digital camera at the time of the interrogation, and that he has in the past shown multiple suspects crime scene photos in a manner similar to what Davontae Sanford describes.

- Based on my experience as a supervisor and my experience reviewing homicide and other cases, the fact that Sergeant Russell and Commander Tolbert both gave very similar, false accounts under oath of how the crime scene sketch was created that strengthened the case against Davontae Sanford raises major red flags about their deposition testimony that they each inadvertently made the same mistake. The timing of those false accounts---Sgt. Russell gave false testimony two weeks after the sketch and Commander Tolbert gave extremely similar false testimony over two-and-one-half years later, and after Davontae Sanford sought to withdraw his plea based on Vincent Smothers's confession---further calls them into question from a supervisor's perspective.

- In the aftermath of Davontae Sanford's confession, Sgt. Michael Russell and others ignored numerous red flags that should have created serious doubt regarding the reliability of the confession and the guilt of Davontae Sanford.  These red flags include, but are not limited to: the fact that Davontae Sanford was not able to provide any independently corroborated information about the crimes, the fact that the murder weapons were not in the location he described, the fact that the perpetrators named in the confession were investigated and cleared, and the fact that Vincent Smothers' confessions to the Runyon Street murders, in contrast to Sanford's confession, were detailed, consistent over time and, crucially, provided details not known to the police that were proven to be true. In particular, Smothers correctly identified the kinds of guns used in the killings, and testing has shown that one of the guns used in the Runyon Street killings was used in another murder Smothers committed.

- In spite of the above red flags, Sgt. Michael Russell and other police officers ignored the implications of the confession of Vincent Smothers, and failed to conduct any meaningful investigation into its reliability.  In addition, after being aware of Vincent Smother's confession, Sgt. Michael Russell and Commander James Tolbert offered false testimony in an effort to continue to link Davontae Sanford to the crime.

- Though Sgt. Michael Russell performed the overwhelming majority of the critical investigative work during the case he failed to properly document his activities through investigative reports as is considered minimally-accepted practice in general, and which Commander James Tolbert testified was the practice in the department.  The fact that this lapse was not caught and corrected reflects a lack of adequate supervision and oversight by the department.  Based on my experience, my knowledge of widely-accepted police practices standards at the time, and my knowledge of Sergeant Russell's training, I would expect Sergeant Russell to have known that his failure to properly document his activities

2

in this case would hinder the defense attorney's ability to challenge the testimony of Sgt. Michael Russell and Commander James Tolbert, including with regard to how the confession came about and the creation of the crime scene sketch by Davontae Sanford.

- Even after being made aware of the problems with the investigation, including the allegations of perjury against Commander James Tolbert, no evidence has been presented that indicates that the Detroit Police Department took it upon themselves to conduct an independent investigation into those allegations of wrongdoing and/or the quality of the investigation into the Runyon Street murders. There are several points in this investigation and the post-conviction proceedings at which a full internal affairs investigation should have taken place---most glaringly, at the point at which it came out that Tolbert and Russell testified had falsely about Sanford drawing the crime scene sketch. The failure by the Detroit Police Department to conduct *any* internal investigation into misconduct by Sergeant Russell and Commander Tolbert in this case is an egregious departure from minimally accepted police practices. It suggests, at best, ongoing, complete indifference to fabrication of evidence and perjury by officers in a homicide case, and, at worst, a deliberate and pervasive effort to cover up misconduct within the department.

**Consultation Request**

The attorneys representing Davontae Sanford requested that I review and evaluate the Detroit Police Department investigation into the September 17, 2007, quadruple homicide on Runyon Street and Davontae Sanford as a suspect in those homicides, including the interrogation of Sanford, among other things. The purpose of the review was to determine whether or not DPD officers, including Officers Michael Russell and James Tolbert, deviated from their training and accepted police practices in the court of their investigation into the Runyon Street homicides.

To assist in my review I have relied on the list of materials attached as Appendix A.

It is my understanding that even as this report is being completed, more documentation is coming to light. I reserve the right to change and/or modify my observations and conclusions based on the review of any new information that is made available to me.

**Content of the Report**

Section One will outline my background and qualifications.  Section Two will discuss the phenomena of false confessions. It will include investigative and interrogation tactics and situations that have been identified by both researchers and law enforcement as problematic. Section Three will be an overview of the investigation, including the interrogation of Davontae Sanford, the evidence obtained during the subsequent confession, and the police's investigative response to his statements. Section Four will contain my analysis of the investigation, interrogations and the resulting confession evidence.  Section Five will contain a brief overview of the case and my findings.

**Section One:  Qualifications**

I am a retired law enforcement officer from the Washington, D.C. Metropolitan Police Department ("MPD") where I served twenty-seven years, including seventeen years as a homicide detective.  In that time, I was personally involved in dozens of homicide and death investigations. From 1997 to 2010, I was assigned to the MPD Major Case/Cold Case Unit.  In that role, I investigated unsolved murders and multiple-victim murders, much of the time as part of a joint MPD and FBI task force.  In 2000, I created what became the MPD's Violent Crime Case Review Project and was its director until I retired.  In addition, I also oversaw the MPD Violent Criminal Apprehension Program (ViCAP) database. In those roles, I was responsible for the comprehensive review of all homicide cases over three years old, including the forensic investigation into those cases. As an MPD detective, I also completed the basic and advanced interview and interrogation course taught by the Reid Institute (commonly referred to as "The Reid Technique," considered the standard for interrogations by U. S. law enforcement).

In addition to my experience and training as a detective and investigator, I have taught numerous courses in investigation procedures for the MPD homicide school, the Richmond Police Department homicide school, the United States Attorney's Office for the District of Columbia, the Mid-Atlantic Cold Case Homicide Investigators' Association, the Nevada Sheriffs' and Chiefs' Association, Suffolk County (Massachusetts) Prosecutor's Office, and the Institute for Law Enforcement Administration in Plano, Texas.  These courses, which I have taught since 2008, instruct law enforcement officers, prosecutors, and judges on proper interrogation practices and train them to evaluate the reliability of confession evidence, witness statements, and other evidence.   My professional experience also includes serving on the Board of Directors of the Mid-Atlantic Cold Case Homicide Investigator's Association between 2009 and 2016. In 2008, I was elected by my peers to the Vidocq Society, an elite organization that reviews cold case files for law enforcement agencies throughout the United States.  In addition, I have served as chairperson of the FBI's National Violent Criminal Apprehension Project Advisory Board.

Since retiring from the MPD in 2010, I have continued to pursue my interest in interrogation and police practices by serving as a private consultant for law enforcement organizations, attorneys, and other groups. In that capacity, I have been qualified as an expert witness on interrogation and police practice in state courts in Delaware, Wisconsin, Oklahoma, the District of Columbia and Florida, in Federal Court in the Western District of Virginia, and the Navy-Marine Corps Southern Judicial Court.   In addition, I am a trained volunteer case consultant for the National Organization of Parents of Murdered Children and the National Center for Missing and Exploited Children.  Also, in 2011, I consulted with the Police Executive Research Forum on a national survey of eyewitness identification procedures in law enforcement agencies, the results of which were submitted to the National Institute of Justice (NIJ) in 2013.

I have recently worked as a consultant for the University of Pennsylvania Law School's Quattrone Center for the Fair Administration of Justice and for Texas State University.  I am participating in NIJ funded research into the development of methodology by which law enforcement may conduct "sentinel event reviews."  These are reviews of wrongful convictions, wrongful arrests, unsolved cases, and other investigative errors with the goal of identifying the root causes of problems and suggesting preventive measures.

Additionally I am currently working for the Police Executive Research Forum (PERF) as a subject matter expert in the Bureau of Justice Assistance (BJA) funded program titled Homicide Investigations Enhancement Training and Technical Assistant Project. As part of an assessment team, I assist in making recommendations for changes designed to increase homicide clearance and conviction rates and improve investigative efficiency and effectiveness.

I have continued my training and research in the areas of interview, interrogation, and investigations as well. In addition to attending various seminars and conferences, including an advanced homicide school in 2010, I have received training in the PEACE investigative interviewing process used by the police in the United Kingdom. I co-authored an article in the book *Criminal Investigative Failures* in which I discussed a false confession I obtained in a murder case in 1994[1], and I authored a peer-reviewed article for *The Police Chief* magazine that discussed the contamination and evaluation of confession evidence.[2] My book, *How Police Generate False Confessions: An inside look in the interrogation room* not only discusses the causes behind false confessions, but also ways to prevent them.

My evaluation of the investigation, interrogation, and subsequent confession was based on the materials listed in Appendix A, my training and experience as described in section one of this report and Appendix B, my knowledge of policies and practices of police agencies around the country, as well as a review of the research and training materials regarding interviews, interrogations and investigations.

**Section Two: The Phenomenon of False Confessions**

**2.1    The Frequency of False Confessions**

The conventional wisdom for decades has been that false confessions were a rare phenomenon, one that was brought about only through torture or the mental illness of the suspect. After all, why would someone ever confess to a crime that they did not commit? That belief was shaken with the advent of forensic DNA testing. Numerous cases of confirmed false confessions resulting from police interrogation practices were and continue to be uncovered.

A research paper published in 2009 reported that a disproportionate number of false confessions were are provided by juveniles. The paper said that "in a database of 125 proven false confessions, 33% involved confessions, most of whom confessed to brutal murders." The paper said that researchers discovered that "42% of the exoneration cases that involved juvenile exonerees involved false confessions, compared to 13% of cases of adult exonerees."[3] Many

---

[1] James Trainum and Diana Havlin, "A False Confession to Murder in Washington, D.C.", D. Kim Rossmo, *Criminal Investigative Failures,* CRC Press (2008).

[2] James L. Trainum, " 'I Did It' – Confession Contamination and Evaluation," *The Police Chief* 81 (June 2014), Web-only.

[3] Jessica O. Kostelniik and N. Dickon Reppucci, "Reid Training and Sensitivity to Developmental Maturity in Interrogation: Results from a National Survey of Police," *Behavioral Sciences and the Law*, 27: John Wiley & Sons, Ltd., April, 2009, pg. 363

believe that this is only the "tip of the iceberg" as the power of a confession often overwhelms all exculpatory evidence, making exonerations extremely difficult.

In their research on false confessions, The Innocence Project also includes data on false guilty pleas. False confessions generated by the police and false guilty pleas share many of the same dynamics and root causes that are discussed below.[4] The National Registry of Exonerations reports that of the total number of cases cited above involving false confessions, 11% of the convictions were the result of false guilty pleas.[5]

Research into police interrogation training and the tactics leading to both reliable and false confessions has identified several problems – not only concerning specific tactics but also in how investigations are conducted and the mindset of the investigator. Since the mindset of the investigator impacts all aspects of the investigation, that will be discussed first, followed by the steps required to obtain a false confession and then the corroboration of confession evidence.

### 2.1    Tunnel Vision and its Impact on the Investigation.

Tunnel vision is a catch-all term that encompasses several cognitive biases including confirmation bias. It is a recognized psychological/psychosocial phenomenon in which an investigator unintentionally focuses an interrogation on one particular outcome he believes to be true, and filters the evidence in a case to fit that outcome.  Through confirmation bias, all information supporting the particular outcome takes on an elevated significance, while information that does not support it is ignored or dismissed as extraneous.  The investigator ends up molding the evidence to fit his personal theory, rather than objectively following the evidence in an effort to obtain the truth.

To prevent tunnel vision, it is crucial that investigations be conducted in an objective manner. An investigator must be neutral and impartial throughout the course of any interrogation, or he risks contaminating the questions he asks of suspects and witnesses and his interpretation of the witness or suspect's responses with his own preconceived theory.  Individual pieces of evidence and/or specific theories of the crime should not become the focus of an investigation to the exclusion of other credible evidence or explanations

### 2.3    Other Factors that can Adversely Impact an Investigation

#### A.    Rush to Judgement

While "tunnel vision and confirmation bias are amongst the most problematic thinking errors that can be made by detectives…the initiating problem is often a rush to judgement."  There are many reasons why detectives may jump to conclusions prematurely during an investigation. "Community fear, media and political pressure, organizational stresses, personal ego, and a

---

[4] Allison D. Redlich, "False Confessions, False Guilty Pleas: Similarities and Differences," G. Daniel Lassiter & Christian A. Meissner, *Police Interrogations and False Confessions: Current Research, Practice, and Policy Recommendations,* APA (2010).

[5] www.law.umich.edu/special/exoneration

compelling desire to apprehend a dangerous criminal can all result in a pre-mature arrest.  The pressures are exacerbated if the crime is particularly heinous…." [6]

### B.     Personal and Organizational Egos

As discussed above, once an investigator commits to a theory or a suspect, tunnel vision make it extremely difficult for the investigator to change course.  This problem is exacerbated when such a change requires a public admission of the initial error.  An example of how this may occur is when there has been extensive media coverage touting the investigator's theory and/or the arrest of a suspect.  Both the personal ego of the investigator as well as the ego of the organization can prevent the admission of an error and the exploration of alternative theories or suspects. [7]

### C.     Noble Cause Corruption and Self-Perseveration

Noble cause corruption is described as "a phenomenon where police think it is justifiable to fabricate or artificially improve evidence, or in some other fashion bend the rules to secure the conviction of a person they believe is guilty…it is conduct that masks itself as legitimate on the basis that the guilty must be brought to justice, despite evidentiary, substantive, or constitutional considerations that might 'get in the way.'" [8]  Examples of noble cause corruption are highlighted in the recent New York Times article "'Testilying' by Police: A Stubborn Problem." [9]

Noble cause corruptions is not only an issue with individual investigators, it can also infect larger groups as a whole.  Groupthink is the reluctance to think critically and challenge the dominate theory or culture. [10]   If the attitudes behind noble cause corruption are adopted by the group, especially its higher ranking members like more senior people or supervisors, others are more likely to follow suit.

Similar issues can arise if the investigator and/or organization feels that it is under attack and/or exposed to criminal or civil liabilities.  Self-preservation kicks in and the investigator and/or organization may take improper measures to conceal real or what may be perceived as wrongdoing or improper procedures.

### 2.4     The Steps to a False Confession

The research into confirmed false confession cases resulting from police interrogation has identified the three separate steps necessary to obtain a false confession: 1) Interrogating an innocent person, 2) Use of coercive interrogation tactics, and 3) Contamination of the confession evidence. [11]   A fourth step, the failure of law enforcement to properly evaluate and corroborate

---

[6] D. Kim Rossmo, "Case rethinking: a protocol for reviewing criminal investigation," *Police Practice and Research*, 2014

[7] D. Kim Rossmo, *Criminal Investigative Failures*, CRC Press (2008), pg. 27

[8] Id., pg. 289

[9] Joseph Goldstein, "'Testilying by Police: A Stubborn Problem," New York Times, March 18. 2018

[10] D. Kim Rossmo, *Criminal Investigative Failures*, CRC Press (2008), pgs. 28-29

[11] Leo, Richard A. and Drizin, Steven A., The Three Errors: Pathways to False Confession and Wrongful Conviction (2010). G. Daniel Lassiter & Christian Meissner, eds., Police Interrogations and False Confessions: Current Research,

the confession evidence is what moves the confession from the interrogation room to the courtroom.

### A.      The Interrogation of an Innocent Person

Especially in the early stages of an investigation, law enforcement is often faced with a surplus of suspects and motives.  Persons are often identified as suspects based on what turns out to be incomplete and/or inaccurate information. Even when the evidence appears substantial, a good investigator must be open to the potential for alternative interpretations and even mistakes.

Investigators will often rely on their training in what is commonly known as "behavioral analysis" to identify deception and determine guilt. They are taught that by careful observation of the suspect's behavior and responses, along with the use of specific behavior provoking questions, they can identify truthful and deceptive suspects, with over 80% accuracy."[12]

Numerous controlled studies have shown that this is not the case. The accuracy rate is only just above chance.  One impact of the training is that it increases the investigator's confidence in a non-existent skill.[13]

Though the Reid Institute[14] teaches behavioral analysis techniques in its interview and interrogation school, it acknowledges that the techniques must be used with caution with juveniles because ". . . the behavior symptoms displayed by a youthful suspect may be unreliable."[15]

When an innocent person is misidentified as a suspect and undergoes interrogation, he or she is subjected to a guilt-presumptive process.  This process is designed to obtain a confession to what the investigator believes is "the truth."  If the detective is wrong, and is blinded by tunnel vision, the beginning stage for a false confession is set.

### B.      Use of Coercive Interrogation Tactics

Though there are several schools that teach interrogation tactics to law enforcement in the United States, researchers have identified common themes and approaches among them.  These themes and approaches are basically minor variations of The Reid Technique.  Developed and taught by the Reid Institute, The Reid Technique is considered by interrogation researchers, law enforcement, and the courts as the industry standard.  Even if an investigator has never received any formal training in interrogation, it is highly likely that Reid-style tactics will be found in his interrogations.

---

Practice, and Policy Recommendations (American Psychological Association, 2010); Univ. of San Francisco Law Research Paper No. 2012-04. Available at SSRN: http://ssrn.com/abstract=1542901.

[12] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions  (4th ed. 2007), at  123.

[13] Richard A. Leo, *Police Interrogation and American Justice,* Harvard University Press (2008), at 93-99.

[14] The Reid Institute is the largest training school for law enforcement in interview and interrogation tactics. Its training is discussed in detail below.

[15] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions (5th ed. 2013), at 93-99.

According to The Reid Technique, the interrogation should begin with the investigator confronting the suspect with his belief in the certainty of the suspect's guilt. The investigator should tell the suspect that there is no doubt that he committed the crime, that the investigator has the evidence to prove it, and there is nothing that he can say that will convince him otherwise. All the investigator wants to know is the why.

The investigator will then present the suspect with a justification for why he committed the crime. This justification or "theme" is supposed to provide the suspect with a psychological or moral excuse for his actions. If the suspect does not accept the offered theme, the investigator suggests another and another.

Any denials of guilt by the suspect are blocked and rejected by the investigator, who emphasizes his confidence in the suspect's guilt and continues to offer themes justifying the suspect's behavior. The investigator may present the suspect with real or fictitious evidence to further convince the suspect of the certainty of his guilt.

At some point, the investigator offers what The Reid Technique calls the "alternative question". This is an "either/or" question where either answer is an admission of guilt, but one alternative is more acceptable than the other. A time constraint is often included to increase the pressure on the suspect to accept one of the alternatives.

Once an admission is made, the investigator then seeks the details about the case that would be known only by the true perpetrator.

The Reid Technique is designed to obtain a confession by offering the suspect a psychological or moral justification for their actions. According to the Reid Institute, the proper use of its technique will not induce an innocent person to confess, but it warns that it should not be used unless the investigator is convinced in the guilt of the suspect (thus contributing to confirmation bias during the interrogation process). As discussed in more detail below, the Reid Institute also warns that special care must be used when using the technique on a juvenile, even if the investigator is convinced of his or her guilt.

While there is disagreement as to the allegedly benign nature of The Reid Technique, the Reid Institute and the interrogation researchers are in agreement over several tactics and situations that can potentially cause an innocent person to confess. These include:

- Any real or implied threats of physical harm
- Any real or implied threat of inevitable consequences
- Any real or implied promise of leniency
- The interrogation of juveniles and those with cognitive or mental health issues.
- The interrogation of persons who are intoxicated, under the influence of drugs, or sleep-deprived.
- Presenting false evidence in conjunction with the above tactics or situations.
- Interrogations lasting a long period of time

- Denial of human needs (e.g., food, sleep)[16]

An admission and subsequent confession occurs when the suspect reaches one of the following states (or a combination of the two):

- The suspect believes that the short-term benefit of confessing outweighs the long-term consequences.
- The suspect is seeking to escape a real or perceived inevitable consequence and/or receive a real or perceived benefit.

### 1.     Special Cautions Regarding Juveniles and those with a Mental or Psychological Disability.

Prior to 2007, The Reid Institute began teaching investigators special cautions regarding juvenile confessions.  In their book *The Essentials of the Reid Technique: Criminal Interrogation and Confessions* the authors wrote:

> Every interrogator must exercise extreme caution and care when interviewing or interrogating a juvenile or a person who is mentally or psychologically impaired… when a juvenile who is mentally or psychologically impaired confesses, the investigator should exercise extreme diligence in establishing the accuracy of such a statement through subsequent corroboration.  In these situations it is imperative that interrogators do not reveal details of the crime so that they can use the disclosure of such information by the suspect as verification of the confession's authenticity.[17]

In 2007 many police departments recognized the vulnerably of juveniles when subjected to police interrogation tactics.  Many departments implemented policies and procedures mandating that either a parent or guardian be present or have the option of being present during the interrogation of a juvenile.  The Detroit Police Department reportedly had such a policy in place which stated that "A member wishing to interview and question a juvenile with respect to the juvenile's part in the commission of a crime must do so in the presence of a parent or legal guardian of the juvenile." [18]

### C.     Contamination of the Confession Evidence

A law enforcement best practice in an investigation is to create "hold back information."  This is information about a crime that is kept from the general public and is known only to those in the inner circle of the investigation.  Investigators use this information to judge not only the reliability of a confession, but the reliability of witness and informant information as well.  The

---

[16] "False Confession Cases in the Issues," *Investigator' Tips*, John E. Reid & Associates, April 2004 (http://www.reid.com/educational_info/r_tips.html?serial=1080839438473936), and "Maintaining the Integrity of the Confession," *The Reid Technique of Interviewing and Interrogation*, 2006, 2007, Appendix C.

[17] Fred E. Inbau, John E. Reid, Joseph P. Buckley, Brian C. Jayne, *Essentials of the Reid Technique: Criminal Interrogation and Confession*, Jones and Barlett Publisher2005, pg. 235

[18] Detroit Police Department Manual, Directive Number 203.5, part 8, Interviewing Juveniles, effective date, 7/1/08. See the discussion of the policy that was in place in 2007 later on in this report.

presumption is that if the person in question is unable to accurately provide this information, then he or she must not have been at the scene of the crime.

However, knowledge of 'hold-back information has been found to be a less-than-perfect indicator of a suspect's guilt. In 2014, Professor Brandon Garrett concluded a study of sixty-three (63) DNA exoneration cases involving false confessions made to the police. In twenty-two (22) of those cases, the suspect was a juvenile. Twenty (20) involved a suspect who had an intellectual disability or mental illness.  After providing a false confession, 18% of the suspects went on to plead guilty in court.[19]

When Professor Garrett studied the details contained within the confession evidence provided by the suspect, he found that 94% of those confessions contained numerous specific "hold back" details.[20]  And in their testimony, the investigators all said that there was no way that the suspect could have known those details unless they were there, and that the detective certainly did not provide them during the interrogation.[21]

While the necessity to take specific steps (such as wearing gloves and packaging the victim's clothing separate from the suspect's clothing) to avoid contamination of *physical* evidence is well known to law enforcement and the public generally, the fact that similar precautions are necessary to prevent the contamination of confession evidence is not.  To be useful in an investigation, a suspect's confession should be based solely on his own personal knowledge. Contamination occurs when an investigator provides a suspect with information which the suspect has not himself already shared, and which the suspect then includes in his statements. Because the investigator provided the suspect with the information, it is impossible to verify that the suspect's statements are based on his own personal knowledge, as opposed to a regurgitation of the investigator's own comments.  Confession evidence that has been contaminated in this way is like any other evidence that is contaminated through improper collection and handling—regardless of its veracity, it becomes unreliable and unverifiable.[22]

To avoid contamination, it is important that the investigator identify and withhold certain information to ensure some details about the crime are known only by the investigators and those with personal knowledge.  It is equally important that the investigator avoid revealing the withheld details during an interrogation, such as by asking leading questions, describing the details to the witness, allowing the suspect to view detailed photographs of the crime scene, or sharing information provided by other witnesses.  Critically, the investigator *must* document any withheld details provided to the suspect so that if those details are then incorporated into a statement, their presence is not seen as an indication that admissions by the suspect are reliable. As described below, only by avoiding contamination can a statement be adequately corroborated. Failure to avoid contamination can destroy the reliability of a confession.

---

[19] Brandon Garrett, Contaminated Confessions Revisited,  forthcoming 101 Virginia Law Review_(2015)
[20] The rest contained only simple admissions, such as "I did it".
[21] Brandon Garrett, Contaminated Confessions Revisited,  forthcoming 101 Virginia Law Review (2015).
[22] Investigators usually do not contaminate statements intentionally, but the result is the same, regardless of intent: the reliability of any subsequent statements is severely compromised.

### D.    Failure to Corroborate the Confession Evidence

Corroboration is an important tool to verify the trustworthiness of a confession statement and ensure it has not been contaminated.  An investigator should corroborate all confessions by verifying independently that facts support the confession.  The corroborating facts should be facts which the investigator has not provided to the suspect and which the suspect could not know unless his statement was true.  Investigators should ask open-ended questions to allow the suspect to provide the corroborating information.  In each case, investigators should attempt to obtain investigative information from a suspect that has the potential for independent corroboration, and that was not known to the investigator.  Investigators should be particularly careful to corroborate statements and be alert for potential contamination when a suspect has given multiple accounts of the same event that vary substantially.  Such variations, especially when coupled with tunnel vision and problematic interrogation techniques, are red flags of an unreliable statement.

Regarding confessions from juveniles, The Reid Institute teaches that the investigator should take great care in obtaining corroborative evidence to verify the trustworthiness of the statement.[23]

Finally, best practices dictate that everything in the investigation, including all events and statements made during any interrogation, be recorded in full by audio or video tape, to ensure that the problematic interrogation practices described above are not used in a way that induces a suspect to give a false confession or facilitates his doing so.  To record an interrogation in full means to start the recording when questioning begins. Whether a full interrogation is video or audio recorded or not, minimally accepted police practices demand that every significant even that occurs during an interrogation be carefully documented and placed in the file so that an accurate written record of the interrogation exists. This is particularly important if coercive interrogation tactics are used, or if withheld information is provided to a suspect. There is no excuse for an investigator's failure to document either of the above.

In cases where the investigator decides to video or audiotape only the end result of the confession, the majority of the contamination often takes place off tape as the investigator and suspect jointly construct the story.  However, clues to such contamination can often be found in the final written or electronically recorded confession.

### Section Three:  Overview of the Investigation into the Runyon Street Murders

The purpose of this section is to provide an overview of the Detroit Police Department's investigation into the Runyon Street Murders and Davontae Sanford as a participant in those murders. The information in this section will consist of details taken from the original police records, laboratory reports, and testimony.  Additionally it will also include information uncovered during the 2015 review of the case by the Michigan State Police (MSP) as well as during the recent depositions of Sgt. Michael Russell and Commander James Tolbert.

---

[23] Fred E. Inbau, John E. Reid, Joseph P. Buckley, Brian C. Jayne, *Essentials of the Reid Technique: Criminal Interrogation and Confession*, Jones and Barlett Publisher2005, pg. 235

This section will also include some of my observations and analysis of specific aspects of the investigation.  Some of these observations will be elaborated upon in the following section, and they will assist in forming my final conclusions.

### 3.1.    Initial Investigation by the Police

#### A.    Crime Scene

On September 17, 2007, at approximately 11:30 p.m., officers of the Detroit Police Department were dispatched to 19741 Runyon Street, Detroit, Michigan to investigative a shooting.  When they arrived they discovered that the owner of the residence, Michael Robinson, and three others in the living room, were dead from multiple gunshot wounds.  In a back bedroom they found Valerie Glover, also suffering from gunshot wounds but alive, and Robinson's 7-year old son, Michael Jr., uninjured.

A total of twelve (12) 762 x 39 caliber spent shell casings were found in front of the house, along with three (3) .45 spent shell casings.  Multiple bullet holes were observed in the front door and front window of the house.[24]  Inside the house in the living room an additional five (5) 762 x 39 caliber spent shell casings were located, along with three (3) .45 spent shell casings.[25]

Three houses to the north and on the same side of the street as 19741 Runyon Street, two (2) additional 762 x 39 caliber spent shell casings were found in the street and on the sidewalk.

In the basement of the house, officers found several marijuana plants and the equipment for growing them.[26]  Neighbors reported to the police their suspicions that Robinson was selling drugs from the house.[27]

#### B.    Critical Witness Accounts

##### 1.    Valerie Glover

Ms. Glover was interviewed by multiple officers in the hours after the shooting.  Although she provided some conflicting information, she consistently reported that she was shot in the front of the house and then fled to a back bedroom where she remained until the perpetrators left the house. At one point prior to the perpetrators' departure, she had a verbal exchange with one of them, who entered the back bedroom but left Glover and the child unharmed.

Glover described the gunman as an African American male no more than thirty (30) to thirty-five (35) years old with a soft voice.  He was 6' to 6'1" tall, had a slim build. The subject was wearing what Glover described as a "raid mask."[28]

---

[24] Detroit Police Department Evidence Technician Report, Incident 07-09180002.
[25] Id.
[26] Police Report of Terry Cross-Nelson.
[27] Written statements of Jessie King and John Matyn.
[28] Id.

In her statements, Glover never said she heard gunshots in any of the back rooms which was supported by the physical evidence.

### a.       MSP Investigation

On October 27, 2015 investigators with the MSP interviewed Glover.  Glover said that she had known Michael Robinson (also known to her as "Big Mike") for approximately two years. Glover said that she had seen Robinson sell small amounts of marijuana from his home, mostly to people his own age (he was thirty-three at the time of his death) and that she had not seen younger kids coming to the house to buy.  Glover said that she had seen Robinson with a black semi-automatic handgun which he kept in his "general area" when he was in the house.[29]

Nowhere in her interview with the MSP did Glover say that Robinson went by any other nickname other than Big Mike.

There is no record that the Detroit Police Department recovered a handgun from the Robinson residence at the time of the murder.  The MSP investigators were later able to gain access and download the contents of Robinson's cell phone.  On the phone they discovered a picture of a semi-automatic pistol that closely matches a .40 pistol that was recovered later on in this investigation.[30]

### 2.       Jessie King

A witness named Jessie King was located. Jessie King, who lived at 19764 Runyon Street (located across the street and a few houses north of Robinson's), reported that he was watching TV when he heard multiple gunshots, a pause, and then more gunshots.  King said that he looked outside but did not see anyone on the street.[31]

Approximately five to ten minutes after the first shots were heard, King looked out of his door. He saw that the storm door of the Robinson residence was open and two subjects were walking out, going northbound (away from the house).  One of the subjects looked back at King, pointed a long gun, and fired.  King returned fire from his own handgun.  The two subjects then fled, running northbound and then westbound in the field between 19781 Runyon Street and State Fair Street.[32]

King described the subject who shot at him as being an African American male, 5'11" to 6' tall, medium build, dark clothes, and wearing "…something like that they wear in the winter with the center out, but they had it up on their heads."[33]  He described the second subject as an African American, a little shorter than the first subject, same build and complexion as the first subject, and carrying a handgun.

---

[29] MSP Investigation, pgs. 85-86
[30] MSP investigation, pg. 113
[31] Written statement of Jessie King
[32] Written statement of Jessie King and police report of Ofc. Scott MacKenzie.
[33] Written statement of Jessie King

King later testified that he did not see any cars leaving from around the victim's house.  He could not say if he had heard any cars leaving the neighborhood.[34]

King also testified that he knew Davontae Sanford from seeing him in the neighborhood and prior contacts with him at the local school where King used to work.[35]

### a.        MSP Investigation

On May 13, 2015, MSP investigators interviewed King. King told the investigators that he did not believe either of the two subjects that he saw was Davontae Sanford. King reported that he used to volunteer at the local school where Sanford was a student, that he was familiar with the way Sanford walked, and that neither subject walked like Sanford.[36]

### 3.        Sonya Gaskin

A witness named Sonya Gaskin also reported hearing several gunshots, and later observing two subjects walking past her house coming from Manning Way and going towards State Fair.  Both were wearing dark clothing and ski masks and both were carrying guns.  Gaskin described one of the guns as a long gun that the subject was holding down by his side.  Gaskins got down on the floor and then reported hearing a couple more shots.[37]

### 4.        John Matyn

A witness named John Matyn of 19717 Runyon Street said that he heard about five (5) shots, then a pause and then five (5) to ten (10) more shots. From the sound, he believed that there were two different guns involved.  Matyn looked out his door and saw "…the shadow of a figure go inside the screen door [sic]" of the victim's house and more shots come from inside.  Matyn stated that he didn't see anyone leave the house nor did he see any cars drive away from the residence.[38] In his written statement Matyn referred to the occupant of the house as "Big Mike."[39]

### 5.        Wallace Kelly

A witness named Wallace Kelly was located and interviewed.  Kelly said that he had seen people drive by the house in an "old school" Buick sometime prior to the shooting. It was occupied by two (2) to three (3) subjects.  After driving past Robinson's house, the Buick went and parked down by Sturgis Street.[40]

---

[34] Testimony of Jessie King, December 11, 2009
[35] Id., pgs. 20-21, 30
[36] MSP Investigation, pg. 43
[37] Written statement of Sonya Gaskin.
[38] Written statement of John Matyn.
[39] Id.

After the shooting started, Kelly saw a white van parked in front of Robinson's house with people moving in and out of it.[41]

Kelly, who was sixteen-years-old at the time was in the company of his mother at the time he talked to the police. He refused to give a written statement, preferring to remain anonymous.[42]

The report that documented this information did not provide any details as to where Kelly was located when he supposedly witnessed the above events. Additionally no other witnesses that were interviewed provided any information that supported Kelly's account.

### 6.      Sadie Hunt

Sadie Hunt[43] reported on this night of the murders that she had *heard* that the shooters were two subjects from the area: "Shantonio" who went by the nickname of Tone-Tone, and "Antuan" who went by the nickname of Twan. She gave descriptions and other identifying information, and reported that the two had recently argued with Robinson. Hunt refused to give a written statement, preferring to remain anonymous.[44]

The officers who received the information from Kelly and Hunt went to the area described by Robinson as where Tone-Tone's residence was located and observed a white van parked across the street.[45]

The report that documented this information did not provide any details as to the original source of Robinson's information.

### C.      Officer in Charge of the Investigation

Though Det. Barbara Simon was assigned on paper as the Officer in Charge (OIC) of the investigation, she was not on the scene and was not officially assigned the case until the next day.[46] Sgt. Michael Russell,[47] who responded to the scene and took the confessions from Sanford, appears to have, in practice, functioned as the lead investigator on the case. For example, Russell reported to the Michigan State Police: "Barb Simon is a nice person and all that, but she was well past her investigative prime, and I got the homicide you know."[48] . Russell

---

[43] This report includes reference to "cousin" in its summary of Hunt's statements but, due a lack of clarity in the report, it is impossible to determine if this means Hunt is a cousin of victim Michael Robinson, or refers to the suspects that she named.
[44] Report of Ofc. Moises Jimenez and Sgt. Gerald Williams
[45] Id.
[46] MSP interview of Det. Collins, audiotape
[47] Sgt Russell will later be promoted to the rank of lieutenant. For consistency he will be referred to by his rank at the time this investigation began throughout this report.
[48] MSP interview of Sgt. Russell, November 3, 2015, pg. 19

also admits that he had an obligation to follow up on all leads on the case regardless of Simon's formal status as OIC.[49]

In spite of his status as the de facto lead investigator, Sgt. Russell created no investigative reports regarding his activities on the scene or any other part of this investigation.

### 3.2    Initial Contact and Statement of Davontae Sanford

#### A.    K-9 Dog Tracking of Suspect to Beland Street.

A police K-9 dog was brought to the scene in an attempt to track the suspects.  Picking up a scent where the suspects were last seen by witnesses, the dog went northwest across the field from Runyon Street to State Fair and then turned westbound.  The dog went across Teppert Street to a vacant lot just before Beland Street, crossed the lot and stopped around the upper end of the block at the driveway of 19770 Beland Street where the dog lost the scent.[50]

Based on the information learned from the K-9 Track, Sgt. Russell and Det. Collins were conducting a neighborhood canvass in the 19000 block of Beland Street when they first encountered Davontae Stanford.[51]

#### A.    Sanford's First Contact with Investigators

At the time of the murders, Davontae Sanford was a sixteen-year-old male who lived at the corner of Beland Street and Manning Street. Sanford's house was located on the far opposite end of the block from where the K-9 track ended.  Sanford had left his house and was north on Beland when he encountered the investigators.

When he was younger Sanford suffered an injury to his right eye.  The injury was still visibly noticeable and had resulted in blindness to that eye.

There are conflicting versions of Sanford's first contact with the investigators.  Sgt. Russell said that Sanford, who was walking up the street approached him, initiated contact, and interjected himself into the investigation.  Sgt. Russell would later say that it was these actions by Sanford that supported his initial suspicions that Sanford was involved in the murders.  Sgt. Russell testified that Sanford approached him, asked Sgt. Russell if he was a police officer and asked what he was investigating.  Sgt. Russell said he told Sanford that "he knew what I was investigating."  Sgt. Russell said that Sanford then began telling him about some individuals and their involvement in the shooting on Runyon Street.[52] In his interviews to the MSP investigators, Sgt. Russell said that he was "frank" with Sanford because "he was clearing on some bullshit" and "you know when someone is BS'ing you."[53] Sgt. Russell's statements regarding the

---

[49] Id. pgs. 26, 31

[50] Police report of Ofc. Christopher Salisbury.

[51] October 1, 2007 Preliminary Hearing testimony of Sgt. Russell and July 13, 2010 Evidentiary Hearing testimony of Sgt. Russell

[52] October 1, 2007 Preliminary Hearing testimony of Sgt. Russell

[53] MSP interview of Sgt. Russell, September 11, 2015, pg. 5

confrontational nature of his initial interactions with Sanford indicates that Sgt. Russell's mindset was guilt presumptive from the start.

Both Det. Collins and Sanford said that it was Sgt. Russell who first approached Sanford.  Det. Collins testified that he observed Sgt. Russell walk over to Sanford and engage him in conversation.[54]  Det. Collins heard Sanford tell Sgt. Russell that he "…didn't want to help the police out."[55]   Both Det. Collins and Sanford said that it was only after Det. Collins contacted Det. Rice, whom Davontae identified to the investigators as his uncle, that Sanford began cooperating with the investigators. In his interview with the MSP investigators, Det. Collins said that when he walked up to Sgt. Russell and Sanford they were engaged in conversation.  Det. Collins said that when he was asked if he knew anything about the shooting, Sanford said that he did not.[56]

Sanford said that he left his house and was walking north up Beland Street when he first saw the K-9 dog and investigators.  Sanford said that as he was walking Sgt. Russell shined a flashlight on him and asked him who he was and from where he was coming.[57]  Sanford denied initiating the conversation with Sgt. Russell.[58]

Sanford said that he told Sgt. Russell who he was, that he lived down the street, and that he was going on his way to Rowe Street.  Sanford said that Sgt. Russell asked him if he had seen or heard anything and Sanford replied that he had not.[59]

Sanford said that he then told the investigators that he had just come back from his "Uncle Bill" who was a police officer.  Sanford said that Det. Collins asked for Uncle Bill's full name, and when Det. Collins learned that it was Det. Rice, Det. Collins called him from his cell phone. Sanford said that he believed that Det. Rice told Det. Collins that Sanford was knowledgeable about things that went on in the neighborhood.[60]

According to Sanford, the K-9 dog was still present when Sgt. Russell first made contact with him.  If this is true, it is worth noting that no mention has been made of the K-9 dog reacting to Sanford who, according to Sgt. Russell's theory, was one of the subjects that the K-9 dog had just been tracking.  It is also worth noting that even if the K-9 dog had left the scene, the investigators did not call it back to see if it reacted to Sanford's scent.

### B.    Initial Information Provided by Sanford

After the initial interaction on the street, Russell and Collins obtained consent from Davontae Sanford's grandmother to question him further. The documentation indicates that Russell,

---

[54] July 13, 2010 Evidentiary Hearing testimony of Det. Collins.
[55] Id, pg. 156.
[56] MSP interview of Det. Collins, September 8, 2015, audiotape
[57] MSP interview of Sanford, August 11, 2015, pgs. 24, 29-31
[58] Id. pg. 170
[59] Id. pgs. 32-33
[60] Id. pgs. 33-34

Tolbert and Collins then spent approximately 3 hours with Mr. Sanford in Commander Tolbert's police vehicle at different locations.

The accounts regarding the quality and type of information that Sanford provided during this time vary.  Commander Tolbert testified that Sanford was talking about who may have committed the crime, that he was dismissive of Sanford's information, that Sanford did not appear to have personal knowledge of the crimes,  and that he (Tolbert) was under the impression that Sanford was just "fascinated with talking to the police."[61]

Det. Collins said that Sanford pointed out houses were guns and drugs were kept, but did not provide much information as it pertained to the actual shooting.[62]

Sanford said that he provided the investigators with information about gangs and crime in the neighborhood but never suggested that he had been involved in the murders himself. [63]

Sgt. Russell stated once he heard Stanford's "story" about Tone-Tone and others, this led Sgt. Russell to believe that the case would be easy to close, and that he took Sanford downtown following the interview in the car to "fine tune" the information Sanford had given.[64]

### C.    Gunshot Residue Test

Following the drive-around, at 3:13 a.m., the investigators and Sanford returned to the crime scene. Once there a crime scene search technician swabbed Sanford's hands for any traces of gunshot residue, which came back negative.[65]   After the GSR-test was finished, Sgt. Russell then took Sanford to the police station for further questioning.

### 3.3    First Confession of Davontae Sanford

### A.    Miranda and Creation of the Statement

Sgt. Russell testified that at some point while they were at the police station, he read Sanford his Miranda warnings and Sanford waived them.[66]  Sgt. Russell said he took a typewritten statement from Sanford, with the start time of 4:00 a.m. typed in at the top.[67]  Sgt. Russell typed in that Sanford was 5'5" tall and weighed 155 lbs.[68]  It should be noted that this physical description did not match any of the physical descriptions of the suspects provided by any of the eyewitnesses.

---

[61] MSP interview of Commander Tolbert, October 2, 2015, pgs. 2-3

[62] MSP investigation, pg. 76

[63] MSP interview of Sanford, August 11, 2015, pgs. 34-37, 49-59, 63

[64] MSP interview of Sgt. Russell, September 11, 2015, pg. 11

[65] Gunshot Residue Test Information Sheet, Kit # 5038, E24220104.

[66] Detroit Police Constitutional Rights Certificate of Certification, dated 9/18/07 and signed by Davontae Sanford. Though the date in one place on the form, there is no date or time indicating when the form was signed by Sanford.

[67] March 17, 2008 Waiver Trial testimony of Sgt. Russell, pg. 44

[68] Detroit Police Witness Statement Form, 9/18/07, 4:00 am statement of Davontae Sanford.

The statement consists of a combination of typewritten questions and answers, handwritten answers by Sanford, and Sanford's signature by typed responses to questions.  The statement begins with Sgt. Russell typing out questions regarding Sanford's knowledge that he was not under arrest and did not have to talk to Sgt. Russell.  There is a handwritten "yes" under each question, with Sanford's signature beside the yes.  For the third question, Sgt. Russell asked Sanford if he [Sgt. Russell] first made contact with Sanford, or did Sanford contact him regarding the shooting on Runyon Street.  The handwritten response is "yes", which does not answer Sgt. Russell's questions, and raises questions as to Sanford's level of comprehension at the time of the interview.[69]

According to the statement, Sgt. Russell then asked Sanford to tell him what he knew about the Runyon Street shooting.  This is followed by a long narrative that is summarized below. The narrative is followed by another question/response section where, instead of having Sanford write out his response as before, Sgt. Russell chose to type the answer out himself, having Sanford place his signature next to each answer.[70]

Though Sgt. Russell reported the "start time" of the statement as 4:00 a.m., it is unlikely that the narrative was typed at that time. Sgt. Russell said that Sanford's interrogation lasted approximately three (3) to four (4) hours.[71]  It is unlikely that it would have taken that long to produce a verbatim, three (3) page typewritten statement.

## B.    Contents of the Statement

In summary, the statement says that during the afternoon of September 17, 2007, Sanford was at the Coney Island restaurant at 7-Mile and Albion with subjects known to him as Tone, Tone-Tone, and Carrie.  While there, they agreed to rob the house of a subject nicknamed Milk Dud on Runyon Street.  Sanford knew Milk Dud's true name to be Mike or Michael, and had purchased marijuana from him several times in the past. The plan was to take everything (televisions, games, etc.) and sell it, and then keep the stolen money and guns for themselves. Sanford then left the group and went to his girlfriend's house.  At approximately 9:00 pm, he returned home. Shortly afterwards, Sanford went to a park across from his house where he again met with Tone, Tone-Tone, and Carrie.  Tone-Tone gave Sanford a .38 revolver.  Sanford said that the others had a "chopper," a "Mini-14" and a .45.[72]

Another subject know to Sanford as Los arrived, driving a Grand Marquis. They all got into the car and drove by Milk Dud's house.  A few blocks away, Sanford told the others that he wanted to get out of the car.  Sanford stated that he left the others and walked to his home. When he got there he heard the gunshots.  A short time later, Sanford stated that he was looking out of a window and saw Tone-Tone jumping the fence of Sanford's back yard, then running to his grandmother's house on Algonac Street  As he ran by, Tone-Tone shouted to Sanford that he had had shot someone.[73]

---

[69] Id.

[70] Id.

[71] March 13, 2008 Waiver Trial testimony of Sgt. Russell, pg. 44

[72]  Detroit Police Witness Statement Form, 9/18/07, 4:00 am statement of Davontae Sanford.

[73] Id.

The statement said that Sanford provided additional identifying information about the group.  He was then shown photographs and identified photographs of Los, Tone-Tone, and Tone.[74]

Asked what he was wearing when he was with Tone, Tone-Tone, and Carrie, Sanford replied the brown shirt that he had on at the time the statement was being taken, a black "fat farm" hoodie, blue and white "Jordens" shoes, and blue jeans.[75]

Once they were finished, Sgt. Russell arranged for Sanford to be taken home.   Sgt. Russell did not document what time Sanford was taken home.

### C.      Sanford's Account of how the Statement was Created

Sanford told the MSP investigators that after the gunshot residue test Sgt. Russell and Det. Collins took him to get some food and then went to the police station.[76]

Sanford said that at the police station he was taken to a back room where Sgt. Russell's desk was located.  Sanford said that he was with Sgt. Russell, and Det. Collins as they all ate their food. Sanford said that Det. Collins asked him if he wanted to get on the computer.  Sanford said that he got on the computer and went to the Crush Spot web page.  Sanford said that he was explaining Crush Spot to Det. Collins when Sgt. Russell came over with some photographs. Sanford said that Sgt. Russell showed him "mug shots" of Tone, Tone –Tone, Cary, "things like that" and had Sanford identify the photographs of them.[77]

Sanford said that he remembered sitting next to Sgt. Russell's desk as he was typing on the computer. He said that he remembered Sgt. Russell asking him some questions but that he did not remember much about their interaction at that time.[78]

During their interview the MSP investigators went over the typewritten statement with Sanford line for line.  In essence, Sanford said that he did not remember making the statements but said that none of the events described were true.[79]

Sometime the morning of 9/18/07, Sanford was taken home.

### 3.4      Follow-up Investigation

### A.      Recovery of Sanford's Shoes

At some point around the time of Sgt. Russell's initial contacts with Sanford, Sgt. Russell obtained possession of Sanford's gym shoes.  Sanford had washed the gym shoes sometime

---

[74] Id.

[75] Id.

[76] MSP interview of Sanford, August 11, 2015, pgs. 67-68

[77] Id., pgs. 78-83

[78] Id. pg. 95 - 96

[79] Id. pgs. 100-130

during the evening that the murders occurred.[80] No lab report that reflects that the shoes were found to have had blood on them (as Sgt. Russell will allege in later conversations with Sanford) have been made available as part of this review.

### B.       Coney Island Restaurant

In Sanford's first written statement to Sgt. Russell he had said that on the night of the murder he and the other suspects planned the robbery at the Coney Island restaurant located at 7-Mile and Albion. Sgt. Russell testified that his investigation had revealed that restaurant had been closed for renovation, thus casting doubt on the accuracy of Sanford's information.[81]

### C.       Arrest of Tone and Lo

On September 18, 2007 at 11:50 am, the police located and arrested Tone (Antonio Langston) and Lo (Angelo Gardner) at 11421 Christy.[82] Every officer questioned thus far appears to agree that the four other individuals named in the confessions were investigated and completely cleared of any involvement. The records indicate, however, that determination did not occur until *after* all of Mr. Sanford's statements to Sgt. Russell were completed (including the second confession, discussed below)

Importantly, investigators were not able to corroborate any of the information Davontae Sanford volunteered in his initial statement, and prior to questioning him again, they had already discovered that some of the details he had provided were false.

### 3.5      Second Confession and Arrest of Davontae Sanford

### A.       Initial Contact

Later in the evening of September 18, 2007, Sgt. Russell returned to Sanford's home to bring him in for further questioning.[83] Sgt. Russell failed to bring the department's consent form for conveyance and questioning of a witness. Instead, he wrote out a handwritten consent form. At 8:40 p.m., Sanford's mother signed this handwritten consent form. The form stated that Sanford's mother "…gave permission for my son….to be conveyed to Detroit Police Homicide for follow-up questioning." The form stated that Sanford was not under arrest, and was going to be questioned regarding his "involvement in a homicide."[84] Based on the language of the form, Sgt. Russell no longer thought of Sanford as a mere witness but now thought of him as a suspect.

### B.       Ride to the Police Station

Sanford told the MSP investigators that during the car ride to the police station, Sgt. Russell told him that they had found blood on his shoes. Sanford said that by that time he had heard what

---

[80] Videotape of Sanford's confession,  MSP interview of Sanford, August 11, 2015, pgs., 126, 133 - 136
[81] July 21, 2009 Evidentiary Hearing testimony of Sgt. Russell, pg. 47
[82] Detroit Police Department Arrest Report 0709180002.17
[83] July 21, 2009 Evidentiary Hearing testimony of Sgt. Russell, pg. 145
[84] Handwritten consent form

had happened on Runyon Street, so he lied and said that the blood was he had broken up a dog fight the day before.[85] At the time Sanford did not know that Sgt. Russell was lying and that based on the available information no blood was ever found on his shoes.

### C.      Interrogation and Creation of the Confession

Sgt. Russell testified that his interview of Sanford started at 9:30 pm.[86] Sgt. Russell said that though Sanford was not under arrest at the time that he was advised of his Miranda warnings. Sgt. Russell said that Sanford signed the waiver and agreed to talk to him. [87]

Sgt. Russell told the MSP investigators that at the station he told Sanford that the earlier statement that he gave was "bullshit."  Sgt. Russell said that Sanford eventually admitted that he participated in the murder and "told us what he was wearing, laid the scene out."[88] Russell typed a second Q & A form that memorialized a full admission to the crime and details about how it purportedly occurred.

The Q & A has the start time 9:30 p.m. typed at the top.  The Miranda waiver that Sanford signed gave a time of 10:00 p.m.[89]  This written statement was structured the same way as the first.  While we do not know what time Sgt. Russell actually typed up this statement, we do know, based on his and Commander Tolbert's testimony and statements that he questioned Sanford before typing up the report.  It was during this time that Sanford was alleged to have provided the investigators with a sketch of the crime scene which will be discussed below.

### D.      Showing Crime Scene Photos

#### 1.      Sanford's Account

Sanford told the MSP investigators that once they got to the police station they went to Sgt. Russell's desk.  Sanford said that as they talked, he kept telling Sgt. Russell that he didn't know anything about the murder.  Sanford said that Sgt. Russell took a digital camera and began showing him pictures of the inside of the crime scene.  Sanford said that he saw approximately five or six pictures of the victims' bodies in the house.  Sanford said that he remembered seeing a picture of a guy in a chair, one on a couch, and a couple of people on the floor.  Sanford said that as he was looking at the pictures, Sgt. Russell kept telling him that "this ain't a game" and reminding him of the seriousness of the situation.[90]

#### 2.      Testimony and Statements of the Investigators

At the preliminary hearing approximately two weeks after the confession, Russell testified that at the time he questioned Sanford he was "sure I had pictures, because that's my general practice"

---

[85] MSP interview of Sanford, August 11, 2015, pg. 134-135
[86] October 1, 2007 Preliminary Hearing testimony of Sgt. Russell, pg. 47
[87] March 17, 2008 Waiver Trial testimony of Sgt. Russell, pg. 47
[88] MPS interview of Sgt. Russell, September 11, 2015
[89] Detroit Police Constitutional Rights Certificate of Notifications, dated 9/18/06, signed by Sanford.
[90] MSP interview of Sanford, August 11, 2015, pgs. 136-138

adding that the photographs would have been in his camera.[91]  Russell also gave testimony in January 18, 2007, in the case of People v. Mills approximately eight months before the Runyon Street murders in which he stated that he had a digital camera at that time.[92]  In 2015, Russell told the Michigan State Police that showing a suspect photographs is "not outside of your investigative tools," [93] and that he has showed "a bunch of people" photographs; "it's what you do."[94]  Commander Tolbert testified that he purchased digital cameras for the homicide unit in approximately 2008 because investigators were reporting that they were a useful tool.[95]

However, in his testimony during the criminal proceedings, in his interview with the MSP investigators, and at his 2018 deposition, Sgt. Russell insisted that he never showed Sanford any photographs of the crime scene in this case.

### 3.   Red Flags

If Sanford's account regarding being shown crime scene photographs by Sgt. Russell is true, Russell had an obligation to accurately document what photos he showed Davontae Sanford and when, and to make sure that information was included in the homicide file. That contamination would have to be considered in the final analysis of the overall reliability of Sanford's subsequent statement, and casts serious doubt on the reliability of his admissions, *especially* given that Sanford was not able to provide any information not known to police that could be independently corroborated. If Russell showed Sanford crime scene photographs and intentionally failed to document that and/or misrepresented that he had not done so, then that would be an egregious departure from Russell's training and from minimally-accepted police practices. This is especially true in the context of this case, given the many red flags casting doubt on the validity of Sanford's confession, the fact that Sanford was not able to lead police to the murder weapon or provide any information police could corroborate, and the import of the crime scene sketch on which Sanford drew the placement of the victims' bodies (discussed below), which was made part of the file and passed along to the prosecution. If this occurred, it is such a serious violation of Russell's training and minimally accepted police practices that it should call into question Russell's entire account of the interviews/interrogations and the integrity of the investigation as a whole.

### E.   Creation of the Crime Scene Diagram

During Russell's second interrogation of Sanford on the night of September 18, Commander Tolbert provided Sanford with a diagram of the interior of the crime scene and had Sanford draw the locations of the bodies on the diagram. Russell was seated next to Sanford at this point, and observed the diagram being created.[96]  Though both Russell and Tolbert testified during the criminal proceedings that Sanford drew the entire sketch, rather than just the bodies, both Russell and Tolbert now acknowledge that Tolbert, and not Sanford, drew the layout of the crime scene,

---

[91] Testimony of Sgt. Russell, October 1, 2007, pg. 60
[92] Id. pg. 255
[93] MPS interview of Sgt. Russell, September 11, 2015, pg. 62
[94] MSP interview of Sgt. Russell, November 3, 2015, pg. 76
[95] Deposition of Commander Tolbert, June 28, 2018, pgs. 153-154
[96] MSP interview of Sgt. Russell, September 11, 2015, pg. 56

and Sanford drew only the bodies. Sanford reports that he was able to accurately draw the locations of the bodies because he had been shown crime scene photos by Russell.

The importance of the sketch in confirming Sanford's guilt and the reliability of the confession is not disputed.  ADA Kym Worthy was quoted as saying that "the sketch was a major building block in our case."[97]  Though Sgt. Russell initially disputed the importance of the sketch in his April 12, 2018 deposition, later in his deposition, and during his interviews with MSP investigators, Sgt. Russell acknowledged that the sketch (and the fact that Sanford was alleged to have drawn it himself without any assistance or contamination) was a key piece of evidence pointing to Sanford's guilt.

### 1.    Commander Tolbert's Account

Commander Tolbert testified that at some point during Sgt. Russell's second interview of Sanford, Sgt. Russell told him that Sanford was saying that he had participated in the murder. Commander Tolbert said that because he did not think Sanford was involved in the crimes, he entered the room and told Sanford that if he had participated in the murders, then he should be able to provide an accurate sketch of the interior of the house. According to Commander Tolbert, the purpose was to clear Sanford. Commander Tolbert said that he wanted to see if Sanford could accurately draw the crime scene "down to the television and the position of the bodies" to confirm that Sanford had actually been in the house. Commander Tolbert said that Sanford then "proceeded to sketch the interior of the house and the positions of the bodies as… [Commander Tolbert] had observed them the night of the homicide."[98]

.Commander Tolbert said that based on their investigation, no one but the police had been in the house after the shooting and the position of the bodies was not visible to anyone from outside the house. During his testimony at a 2010 post-conviction hearing in which Davontae Sanford attempted to withdraw his plea based on Smothers' confession, Commander Tolbert was asked to compare Sanford's drawing to the diagram made of the scene by the crime scene technician. Commander Tolbert noted the close similarities between the two diagrams, saying that "whoever made both of these drawings obviously had an opportunity to observe the crime scene."[99]

During his testimony, the judge had the following exchange with Commander Tolbert:

| | |
|---|---|
| Judge: | Was this sketch done entirely in the defendant's hand? |
| Tolbert: | Yes, it was. |
| Judge: | So you gave him – what you gave him a blank piece of paper? |
| Tolbert: | That's correct. |
| Judge: | And then he drew everything on it except for – |
| Tolbert: | Sgt. Russell's signature [100] |

---

[97] April 12, 2018 deposition testimony of Sgt. Russell. Refers to an article written by George Hunter on June 9, 2016 for The Detroit News.
[98] Deposition of Commander Tolbert, June 2018, pgs. 132 - 135
[99] Id., pgs. 133-135.
[100] Id. pg. 136

Commander Tolbert said that he was present the entire time that it took Sanford to draw the diagram. Commander Tolbert said that once Sanford drew the diagram of the scene he was "more than satisfied" that Sanford had been involved in the murder.[101]

This question was again raised when Commander Tolbert was interviewed by MSP investigators on October 2, 2015. Commander Tolbert said on the night of the second interrogation he handed Sanford a piece of paper and told him to draw a diagram of the scene.   Commander Tolbert said that the accuracy of details contained in the diagram drawn by Sanford was key [to proving Sanford's guilt], and that Sanford could only have known those details by being present on the scene of the murder.[102]

The MSP investigators reported that Commander Tolbert asked them for a piece of paper so that he could replicate the sketch.  After he finished, the MSP investigators compared Commander Tolbert's sketch with a copy of the original diagram allegedly drawn by Sanford. According to Tolbert, both the investigators and Tolbert realized that the two drawings closely resembled each other. The MSP investigators reported that Commander Tolbert acknowledged that he had drawn the original sketch and had only asked Sanford to mark the location of the bodies.  The MSP investigators reported that before the interview ended, Commander Tolbert grabbed the new sketch that he had just drawn, crumpled it up, and attempted to leave the room with it.  The MSP investigators reported that they recovered the crumpled up sketch and preserved it as evidence.[103] Tolbert testified that the reason he crumpled up the drawing after the interview was in an effort to clean up after himself.[104]

## 2.      Sgt. Russell's Account

At a pretrial evidentiary hearing in July 21, 2009, Sgt Russell testified that Sanford had drawn the entire crime scene diagram, including the layout of the room, and denied suggesting to Sanford what the interior of the house looked like.[105] Sgt. Russell now admits that Commander Tolbert, not Sanford, drew the layout of the room---in other words that his testimony was wrong. When questioned at his deposition, Sgt. Russell first stated that his inaccurate testimony was due to the passage of time. When confronted with the fact that his testimony occurred two weeks after the sketch was drawn, he stated that his only explanation was that he made an honest mistake. He could not explain why he and Commander Tolbert both volunteered in the course of their testimony that Sanford had drawn a TV stand in the corner of the room, but acknowledged the unusual coincidence that they both got the origin of the diagram wrong in their testimony in a similar way. He had no explanation for that coincidence, or for his inaccurate testimony.  Both Sgt. Russell and Commander Tolbert admitted that they discovered he had testified inaccurately about Sanford drawing the diagram during their interviews with the Michigan State Police. Neither took any steps to correct their inaccurate testimony. The obligation to do so is basic: any officer with Commander Tolbert or Sgt. Russell's training and level of experience should know that as soon as this inaccuracy was discovered they had an absolute obligation to document it and

---

[101] Id. pg. 137 - 138
[102] MSP interview of Commander Tolbert, audiotape
[103] MSP investigation, pgs. 84-85
[104] Deposition of Commander Tolbert, June 29, 2018, pg. 234
[105] Testimony of Sgt. Russell, July 21, 2009, pgs.47-49

report it up their chain of command, as well as to the prosecuting entity. The failure to immediately do was a gross departure from minimally accepted police practices and calls into question the integrity of the investigation.

When Sgt. Russell was interviewed by the MSP investigators they asked him repeatedly about the creation of the diagram. Sgt. Russell acknowledged that the diagram was a key piece of evidence pointing to Sanford's guilt.[106] Sgt. Russell said that in order for Sanford to have provided the details that were included in the diagram that he would have either have to have been shown photographs or video of the crime scene or he had to have been there. Sgt. Russell said that the details were such that could not have been obtained through a casual conversation.[107]

In his deposition Sgt. Russell continued to insist that the diagram still pointed to Sanford's guilt. According to Sgt. Russell it was Sanford who accurately placed the stick figures representing the victim's bodies into the diagram, and that the only way he could have known that information was by being there.[108] Sgt. Russell has continued to deny showing Sanford any crime scene photographs prior to the creation of the diagram.

### 3.    Sanford's Account

In his interview with the Michigan State Police, Sanford said that Commander Tolbert took a piece of paper and drew a diagram of the inside of the house. Sanford said that Commander Tolbert drew the couch and other thing that were in the house as well as the entrance. Sanford said that Commander Tolbert then told him to draw the location of the bodies. Sanford said that since he had just seen the pictures that Sgt. Russell had showed him of the bodies, he was able to draw their locations on the diagram.[109]

### 4.    Investigator Ira Todd

During their investigation into the Detroit Police Departments handling of the Runyon Street murder investigation the MSP investigators interviewed Investigator Ira Todd. Investigator Todd told the MSP investigators that he had been assigned to work with the Wayne County Prosecutor's Office during the post-conviction appeals process for Sanford. Investigator Todd said that during that time he received a telephone call from Sgt. Russell, asking if he [Sgt. Russell] was all right. Investigator Todd said that Sgt. Russell went on to say that he had nothing to do with the sketch. Investigator Todd said that when he asked what sketch, Sgt. Russel said that Commander Tolbert had done the sketch and had pointed out details to Sanford.[110]

---

[106] MSP interview of Sgt. Russell, November 7, 2015, pg. 53
[107] MSP interview of Sgt. Russell, September 11, 2015, pg. 39
[108] Deposition of Sgt. Russell, April 12, 2018, pgs. 203 - 205
[109] MSP interview of Sanford, August 11, 2015, pgs. 141-142
[110] MSP interview of Investigator Todd, September 16, 2015, pg. 83

4.      **Red Flags**

It goes without saying that if Sgt. Russell or Commander Tolbert intentionally misrepresented that Sanford had drawn the entire diagram when in fact the layout of the house---including the placement of the furniture---was drawn by Commander Tolbert that would be an egregious departure from both officers' training, and from minimally-accepted accepted police practices. Misrepresenting the source of *any* evidence is a serious violation, but it would be a particularly gross violation here given the import of the diagram to the case. Although my role is not to make credibility determinations, in my view the following facts raise major red flags about whether Sgt. Russell and Commander Tolbert are being truthful when they state that the inaccurate testimony about the confession was an unintentional mistake: (1) that two different homicide investigators (one a Commander) made the same misrepresentation about a critical piece of evidence in a quadruple homicide investigation; (2) that Sgt. Russell's inaccurate testimony occurred at a preliminary hearing two weeks after the sketch was created, in front of him, allegedly by a suspect he was interrogating and subsequently took a written confession from, (3) that Commander Tolbert made that misrepresentation on questioning by the Court during a hearing concerning whether Sanford should be permitted to withdraw his plea on the basis of Smothers' confession;[111] (4) that both investigators failed to take affirmative steps to correct their testimony after their interviews with the Michigan State Police, and (5) that it is at least alleged that Commander Tolbert attempted to destroy the sketch at the end of his interview.

Perhaps the biggest red flag in this regard is the fact that Commander Tolbert and Sgt. Russell now admit that the diagram was created exactly the way Sanford reports. As Sgt. Russell admitted to the MSP investigators, the fact that Sgt. Russell and Commander Tolbert now admit Sanford's account of the sketch was correct lends credence to Sanford's account of how he came to be able to draw the bodies and adopt a confession containing details about the crime scene that were known to the police. This is especially so in light of Sgt. Russell's conflicting statements and testimony about cameras, photographs, and their use as investigative tools. In other words, the apparent misrepresentations made by Sgt. Russell and Commander Tolbert about the sketch makes Sanford's report that Russell showed him crime scene photos and that's how he was able to draw the bodies more plausible.

Finally, when one compares the crime scene sketch created by the evidence technician to the one prepared by Sanford/Commander Tolbert (during the interrogation), Sanford has the two victims on the floor facing in the wrong direction. The crime scene sketch has the two victims on the floor facing in the direction the bodies were in fact facing (as does the diagram created by Vincent Smothers, which I discuss in more detail below). I agree with Tolbert's admission at his deposition that one explanation for why Sanford drew the bodies facing the wrong direction is that he was drawing the bodies based on what he observed in a photograph, rather than based on actual knowledge of the scene. This is, in my view, the most likely explanation for that error in Sanford's drawing, particularly in light of the other direct and circumstantial evidence that Russell showed Sanford crime scene photos.

---

[111] At his deposition, Tolbert testified that he was not aware that the hearing had anything to do with Smothers, though he was recalled to the stand to answer questions about Smothers during the course of the hearing.

In regards to Investigator Todd's statement regarding what Sgt. Russell told him once Sgt. Russell learned of the prosecutor's investigation into Sanford's post-conviction appeal; if true, the timing and substance of this call supports the contention that Russell intentionally misrepresented the way the diagram came about. If believed, it shows that Sgt. Russell was aware of the problems concerning the diagram and was willing to make such a self-serving statement to protect himself.

### F.    Post-Diagram Interrogation and Final Confession

#### 1.    Sanford's Account

Sanford told the MSP investigators that after the diagram was created Sgt. Russell kept telling Sanford that Sanford knew what had happened that he had to tell the truth.  Sanford said that he kept telling the investigators that he did not know what happened. Sanford said that Sgt. Russell told him to "let's get this over with so I can take you back home; I promised your mom I was going to take you back home."  Sanford said that with Sgt. Russell saying that they had found blood on his shoes and after having seen the pictures he was scared so he agreed to give a second statement.[112]

The MSP investigators went over Sanford's second statement line by line with him.  The majority of the time, Sanford admitted that he made the statements but said that the details pertaining to his involvement in the murders and his interactions with the other suspects were not true.

Sanford said that his statement continued in this vein with him guessing until he provided the answer that Sgt. Russell wanted to hear or adopted suggestions made by Sgt. Russell.  Sanford said that at that point he just wanted to get the statement over with so that he could go home as he had been promised by Sgt. Russell.[113]

Of note, Sanford's description of how his confession was created matches the accounts (sometimes documented by videotape) of how other confirmed false confessions were created.

#### 2.    Sgt. Russell's Account

Sanford's account of how the interrogation occurred is disputed by Russell. Russell maintains that he did not pressure Sanford that he spoke with him in a conversational tone, that he made no false promises of leniency, and that he never denied Sanford an attorney or called him a "dumbass" in response to Sanford requesting an attorney. Russell also maintains that all of the accurate details in the second written confession originated with Davontae Sanford, and that he (Russell) did not provide Sanford with any of the details in the confession.

Sgt. Russell does not explain the multiple inaccuracies contained within Sanford's confession.

---

[112] Id. pg. 148
[113] Id., pg. 160

G.     **Videotaped Confession**

After Sgt. Russell completed Sanford's second typewritten statement, he then took Sanford to a second location where video recording equipment was set up.  On September 19, 2007, at 1:17 a.m., Sgt. Russell videotaped himself reading the typewritten statement to Sanford. [114]

Sgt. Russell said that he remembered when he was taking Sanford's videotaped statement that Sanford was "adamant in certain details" and that except for a few grammatical errors it was Sanford who told him what corrections to make.[115]

The review of the videotaped confession directly contracts Sgt. Russell's interoperation of the events captured on the tape.  Any corrections that were made were first pointed out by Sgt. Russell, not Sanford.   Sanford did not appear to be "adamant" about any of the details contained within the statement.

 When Sgt. Russell discovered errors in the statement it was Sgt. Russell who pointed them out. Sgt. Russell would make the corrections and have Sanford initial beside them.[116]

H.     **Sgt. Russell's training and Experience at the time of the Investigation**

Though his training records have not been made available, Sgt. Russell testimony during his deposition revealed that by the time of the Runyon Street murder investigation in 2007, he was trained and experienced investigator.  His testimony shows that he was well versed in both minimally accepted practices when conducting interrogations and minimal requirements for conducting homicide investigations generally.

Sgt. Russell testified that in 2007 he had been assigned to the homicide unit for over two years and considered himself to have been very experienced investigator by the time of the Runyon Street investigation.  He had been involved in the investigation of at least fifty homicides and had been the lead investigator on twenty or more.  Sgt. Russell was also very familiar with the department's homicide practices and procedures.[117]

By the time of the Russell Street investigation, Sgt. Russell described himself as very experienced in the interrogation of suspects and had conducted at least one-hundred interrogations by that time.[118]

Sgt. Russell had attended training in the use of the Reid interrogation technique in the 1990's. During his deposition, Sgt. Russell denied having received training that false confessions happed.  However he admitted that by 2007 he knew that "because of my experiences as an

---

[114] Timestamp on video.
[115] Deposition of Sgt. Russell, April 12, 2018, pgs. 171 - 172
[116] Id.
[117] Id. pgs. 65-67
[118] Id. pgs. 67-68, 70

investigator and being in the field that I'm in, and I do read…" that he knew false confessions did occur.[119]

Sgt. Russell acknowledged that by the time of the Runyon Street investigation he was aware through his training investigators were supposed to hold back details about the crime from the press and public so that the details could be used to assess the reliability of a suspect's confession.  Sgt. Russell know that the key to establishing the reliability of a confession was the ability of the suspect to provide those details in their own words.  Sgt. Russell knew that during an interrogation, an investigator should avoid the use of leading questions, and that any details about the case that were provided to the suspect by the investigator during the interrogation need to be documented. This is to insure that the suspect is not just repeating back to the investigator the information that the investigator provided, and is part of establishing the reliability of the confession.[120]

Sgt. Russell also testified that by the time of the Runyon Street investigation, he knew that it was important for the suspect to provide their information in their own words that it was also important for the investigator to document any relevant statements made by the suspect.[121]

### 3.6    Additional Statements from Sanford

#### A.    Sanford's Forensic Evaluation

Sanford underwent a forensic evaluation before trial to determine his competency to waive his Miranda rights. During the evaluation, Sanford was asked to describe the circumstances of his arrest and confession.[122]

When questioned about his confession, Sanford reported, among other things, that at one point he asked for an attorney and in response the police called him a "…dumb-ass and they said there was no lawyer up at this time of night."[123]

At the station, Sanford said that he told the police that he did not do the murders. Sanford said he felt sick.  He said that the investigators told him he could go home if he gave them a statement. Sanford said he started making things up. Sanford said at one point he was "…answering questions like yes or no."  He stated that the investigators were showing him pictures and giving him details about the crime.  Sanford stated that the investigators gave him a something and told him to sign it.[124]

---

[119] Id. pg. 125
[120] Id., pgs. 127, 129, 136-137
[121] Id. pgs. 138-140
[122] Michigan Department of Community Health, December 4, 2007 report of Dr. Lynne Schwartz.
[123] Id.
[124] Id.

### B.       Sanford's Guilty Plea

#### 1.       Sanford's In-Court Admissions

On March 18, 2008, Sanford entered a plea of guilty in the Runyon Street murders. As part of his plea, Sanford gave yet another statement in which he admitted his participation in the murders but provided new, different names for his accomplices. In essence, Sanford said that on September 17, 2007, he, along with subjects known to him as Bug, T and Homie conspired to rob a drug house of its money. All three subjects were cousins of Sanford. Sanford stated that everyone had a gun: Bug had an AK long gun, T had a handgun, and Sanford had a Mini-14. They met in front of Sanford's house and used Bug's van to get to the drug house. After they killed the people in the house, Sanford fled the area on foot with Homie while the others drove away. The route Sanford stated they took was the same route as was testified to by the K9 officer earlier that day. Sanford stated that, after the robbery was over, he gave the Mini-14 back to Homie. He stated that he did not know where the guns currently were.[125]

#### 2.       Sanford's Account

Sanford told the MSP investigators that after the investigators had ruled out Tone Tone and the others as accomplices, they approached his mother. Sanford said that the investigators said that they knew that Sanford had committed the murders with his cousins, who were known to have a criminal history that included robbery and drug sales. Sanford said that the investigators told his mother they knew that he was taking the fall for them and that she should talk to him and convince him not to continue to protect them.[126]

Sanford said that his attorney basically told him that he had no chance of an acquittal at trial and never talked to him about mounting any kind of defense. Sanford said that he was also getting pressure from his mother, who he said trusted what his attorney was saying.[127] These factors contributed to his guilty plea. In order for the plea to be acceptable, Sanford had to supply the investigators with the names of his cousins to replace Tone, Tone Tone, and the others.

### 3.7       Sgt. Russell's Lack of a Follow-up Investigation

There is no documentation of any follow-up investigation into the perpetrators named during the plea colloquy. Any minimally-trained homicide investigator should understand how important it is to investigate three alleged additional perpetrators of a quadruple homicide. There is no legitimate law enforcement purpose in failing to investigate these purported accomplices. The failure to do so raises an even bigger red flag given that the Detroit Police Department *did* fully investigate and rule out the first set of perpetrators Mr. Sanford named. This failure suggests that the officers involved intentionally did not investigate this second set of suspects because they were trying to protect a bad arrest and cover-up their own misconduct. Furthermore, the apparent failure of Sergeant Russell or any other detective to re-interview Sanford about his accomplices

---

[125] Guilty plea of Sanford, March 18, 2008
[126] MSP interview of Sanford, August 11, 2015
[127] MSP interview of Sanford, August 11, 2015, pgs. 184-186

after the suspects named in the confessions were cleared is a clear departure from minimally-accepted police practices and raises red flags for the same reasons.

### 3.8    Vincent Smothers

On April 19, 2008, just over one month after Sanford pled guilty and a little over two weeks after he was sentenced, Vincent Smothers was arrested and charged with a murder unrelated to the Runyon Street murders.  Smothers had been under investigation by the Detroit Violent Crimes Task Force as part of their investigation into a gang known as the Medbury Goons.  Smothers was believed to be a "hit man" for the gang and was under investigation for several murders.[128]

### A.    Initial Interview by Investigator Ira Todd

At the time of the Runyon murders, Investigator Ira Todd was assigned to work with the Violent Crime Task Force, which was a multi-jurisdictional task force.  Investigator Todd had identified Smothers and Ernest Davis (aka Nemo) as professional "hit men" who performed murders for hire for drug gangs.[129]

Investigator Todd was involved in the arrest of Smothers on outstanding murder warrants that had been obtained by members of the Detroit Police Department's Homicide Unit.[130]  One of the cases in which Smothers was a suspect was the December 26, 2007 murder of Rose Cobb in which a .40 caliber handgun was used [131]

On April 19, 2008 Investigator Todd interviewed Smothers from 10:30 pm to approximately 3:00 am the next morning.[132]  Investigator Todd told the MSP investigators that the focus of his interview was the Rose Cobb murder. Investigator Todd said that it was during that interview that Commander Tolbert pulled him out of the interview room.  Investigator Todd said that Commander Tolbert told him specifically what topics he could and could not question Smother's about.[133]  What those specific topics were was not discussed during the MSP interview.

During his interview with the MSP investigators Commander Tolbert confirmed Investigator Todd's account.  Commander Tolbert told the MSP investigators that he did not believe that Investigator Todd should have been interviewing Smothers about cases that were under investigation by other detectives.[134]

---

[128] March 16, 2010 Evidentiary Hearing testimony of Inv. Ira Todd.
[129] March 16, 2010 Evidentiary Hearing testimony of Inv. Ira Todd, pgs. 6-7
[130] MSP interview of Investigator Todd, September 16, 2015 audiotape
[131] Id., and Evidence Technician Report of Rose Cobb case.
[132] March 16, 2010 Evidentiary Hearing testimony of Investigator Todd, pgs. 18 -19
[133] MSP interview of Investigator Todd, audiotape and MPD investigation, pg. 83
[134] MSP interview of Commander Tolbert, October 2, 1015

33

### B.    Interview by Sgt. Gerald Williams

Sgt. Gerald Williams began his interview of Smothers sometime in the afternoon before 3:00 pm on April 20, 2008. Sgt. Williams testified that he was not aware that Investigator Todd had spoken to Smother's previously.[135]

Sgt. Williams said that the focus of his interview was the murder of Carl Thompson, however, Sgt. Williams said that he and Smothers talked about other murders as well.   Sgt. Williams said that the protocol for when a suspect begins talking about other murders where the interviewer is not the primary investigator is to notify the persons involved in that investigation about what was said.[136]

The final part of Sgt. Williams' interview was videotaped.  During the videotape, Sgt. Williams asked Smothers to write a statement detailing one of the murders that he had committed.  In his statement, Smothers wrote that he was being so cooperative because he had a three-week-old daughter and a wife and "I don't want anyone else to be hurt because of me."[137]

As part of the "question-answer" part of the video/written statement, Smothers was asked to give Sgt. Williams the order in which he had committed the murders.  As he was going through the cases, Smothers starts to talk about a hit he did at a "…house off of State Fair and Hoover" in 2007.[138]  Smothers said that he killed three guys in a house where there was also a female. He wasn't sure if the female died or not.[139]

Smothers said that this murder was a contract hit that he did for a subject named Leon Payne.[140] One of the men killed was someone Leo was getting his drugs from.  Smothers stated that he used an AK-47 in the hit.[141]

Sgt. Williams went on to discuss other murders.  Later, he asked Smothers when the State Fair murder occurred, and Smothers said it was before he murdered the police officer's wife.[142] Smothers told Sgt. Williams that he had gone inside the house in question.  In trying to describe its location, Smothers remembered that it was on Runyon Street.  He described the house as a white, single family residence.  Smothers didn't know if the female in the house was struck by the gunfire or not.[143]

Later, Sgt. Williams and Smothers talked about a subject named Ernest Davis.  Smothers said that Davis did the Runyon Street hit with him.  Smothers stated that Davis had a .45 and fired it into the window from the outside. They both went inside and a woman ran to the back room.

---

[135] May 13, 2015 Evidentiary Hearing testimony of Det. Williams, pgs. 7-9. Det. Williams testified that Smothers signed a Miranda waiver form at 3:34 pm.

[136] Id., pgs. 16-18

[137] Smothers handwritten statement on April 20, 2008.

[138] Transcript of Smother's video statement on April 20, 2008, at 24.

[139] Id, at 28.

[140] Smother's August 13, 2013 transcript has the name as Leroy Payne, I will use Leon for consistency

[141] Id, at 28-29.

[142] Rose Cobb was murdered on December 26, 2007.

[143] Id., at 42-44.

Smothers gave the AK to Davis and went into the back room and found the woman under the bed.  Smothers said that he told the woman everything was all right and that she didn't have to worry.[144]

Smothers stated that he then went downstairs.  While downstairs he heard more gunshots.  Upon returning upstairs, he checked on the woman in the bedroom.  He stated that there was also a little boy who told Smothers that he was fine.

Smothers remembered that there was another female who was dead and "laid out" with one of the guys.

On leaving the house, Smothers said that he and Davis took a .40 handgun that he later used to kill the police officer's wife.  He said they also took about a half pound of marijuana and "maybe" $2,000 in cash.[145]

Sgt. Williams then asked Smothers to review the written statement and sign it.  The interview was terminated soon after that.

Sgt. Williams later testified that though he had been on the scene of the Runyon murders the night that they occurred, he did not recall knowing that anyone had been convicted of the crime.[146]   Sgt. Williams said that he believed Sgt. Russell was in charge of the Runyon murder investigation and therefore (as was protocol) he notified him of Smother's confession to the Runyon Street murders either that day or the day after.[147]

### C.    Smothers' Contact with Sgt. Russell

After Smothers had provided the above information on the Runyon Street murders, he was escorted to the restroom by Sgt. Russell.  According to Smothers, Sgt. Russell told him that he heard that Smothers was confessing to the Runyon Street murders.  When Smothers confirmed that he was, Sgt. Russell told him that was impossible, that they already had the guy who did it and the guy had confessed. Smothers told Sgt. Russell several details; how the shootings occurred, the position of the bodies, his encounter with Glover and Mike Jr., and that a man shot at them from across the street.[148]

In a 2009 evidentiary hearing, Sgt. Russell confirmed that he was at the station when Smothers was giving his statement, and said that he escorted Smothers to the restroom.  Sgt. Russell denied having any conversation with Smothers about the Runyon Street murders.  He testified that he never interviewed Smothers at any time about anything.[149]

---

[144] Id., pgs. 54-55.
[145] Id., pgs. 56-57.
[146] May 13, 2010 Evidentiary Hearing testimony of Sgt. Williams, pg. 25
[147] Id,. pgs. 25, 28-29.
[148] August 13, 2013 transcript of Smothers interview, pgs. 52-53. Smothers confirmed this exchange in even more detail in his December 8, 2015 interview with the MSP investigators.
[149] July 21, 2009 Evidentiary Hearing testimony of Sgt. Russell, pg. 21.

### D.      Smothers' Follow-up Conversation with Sgt. Williams

Sgt. Williams said that after he finished his interview he bought Smothers a shrimp dinner.  Sgt. Williams said that Smothers was then interviewed by Ofc. Brooks regarding other crimes.  After Ofc. Brooks finished his interview, Sgt. Williams said that he took Smothers back down to the cellblock. [150]

Sgt. Williams said that as he was taking Smothers down to the cell block, Smothers told him that "in regards to the Runyon case that we had the wrong person."[151]

### 1.      Review of the Videotape Interview

A review of the videotaped interview between Sgt. Williams and Smothers reveals that Sgt. Williams did not tell Smothers that anyone had been arrested for the Runyon Street murders.  As mentioned above, Sgt. Williams testified that at the time of the interview he was unaware that anyone had been arrested for the crime.  Thus Smothers' statement to Sgt. Williams (made after having contact with Sgt. Russell) regarding the police having the wrong person is evidence that Smothers' account of his conversation with Sgt. Russell is accurate.

### E.      Smothers' Second Confession to the Runyon Murders

On May 6, 2008, Investigator Ira Todd interviewed Smothers in the Violent Crime Task Force Office.  During this interview, Smothers admitted to Investigator Todd that he had committed the Runyon Street murders and provided details about the murders.  Smothers said he had told the other detectives in the earlier interview about the case but had forgotten to tell Inv. Todd.  Smothers stated that he didn't want Inv. Todd to think he was holding back on him.[152]

### F.      Forensic Corroboration of Smothers' Confession

Prior to Smothers' arrest, his wife, Cecily Smothers, told investigators where Smothers was concealing his firearms.  Based on this information, investigators seized various weapons, including a .45 handgun from the residence of Ernest Davis' cousin.[153]  Forensic examination revealed that the shell casings recovered from the scene of the Runyon Street murders had been fired by that .45 handgun.[154]

They also seized the .40 semi-automatic pistol that Smothers said he stole from the Runyon Street address.  Smothers said that he used that pistol to murder Rose Cobb. A forensic examination confirmed that the .40 semi-automatic was the one used at the Cobb murder.[155]

---

[150] May 13, 2015 Evidentiary Hearing testimony of Det. Williams, pg. 41
[151] Id. pg. 42
[152] March 16, 2010 Evidentiary Hearing testimony of Inv. Todd, pg. 35.
[153] Id, pg. 48-49.
[154] ATF Report of Investigation, 774025-08-0057, 3/27/09 & ATF Laboratory Report, 08N042 (1,2 &3), 7/14/08
[155] Transcript of Smother's video statement on April 20, 2008 at 55-57; 12/28/07 Evidence Technician Report for Rose Cobb case, at 2-4.

Smothers described the .40 semi-automatic pistol that he stole from Runyon Street as being a Springfield Arms model.[156] In an ATF Laboratory report titled "Smothers Evidence," they list as one of the firearms turned over for testing as a "Springfield Armory" model .40 semi-automatic pistol (Item 181). The report stated that it was determined that that weapon was found to have had fired the three (3) .40 Winchester cartridges (Items 155-157), also listed in the same report as having been turned over for testing.[157]

Though at this time, no report has been made available that specifically identifies which crime scene the three (3) .40 Winchester cartridges were recovered, the Evidence Technician Report for the Rose Cobb murder lists three (3) .40 Winchester cartridges as having been recovered from the crime scene.[158]

Additional corroboration that the .40 handgun that was used in the Cobb murder came from Runyon Street was provided by the MSP investigators. When interviewed by the MSP investigators, Valerie Glover said that she had seen Robinson with a semi-automatic pistol. The MSP investigators obtained Robinson's cell phone. Contained within the cell phone data the MSP investigators discovered a photograph of a semi-automatic handgun that as much as they could tell, closely resembled the gun used to murder Cobb.[159]

Forensic examinations also revealed that expended AK-47 bullets found at the Runyon Street murders were fired by the same weapon that left expended bullets at the scene of another murder to which Smothers had confessed.[160]

### G. Criminal Charges and Guilty Pleas of Smothers

Smothers confessed to having committed a total of twelve (12) murders for hire, including the four (4) murders on Runyon Street. In June, 2010, Smothers plead guilty to eight (8) of those murders. He was never charged with the Runyon Street murders.[161]

### H. Additional Investigation by the Detroit Police Department into the Runyon Street Murders

It is undisputed that Commander Tolbert knew about Smothers's confession to the Runyon Street homicides, and recognized that a full investigation into Smothers's culpability for those crimes should have occurred and should be documented in the Runyon St. homicide file.[162] This is an obvious and critical step, both to make sure all of the true perpetrators are apprehended, and to make sure that an innocent person isn't doing time for another's crimes. Indeed, each of the other crimes Smothers confessed to appears to have been investigated. No evidence has been presented as part of this review that reflects that the Detroit Police Department Homicide Unit did any additional investigation into the claims that Smothers committed the Runyon Street murders

---

[156] Transcript of Smothers interview, 4/20/13
[157] ATF Laboratory Report, 08N042 (1,2 &3), 7/14/08
[158] 12/28/07 Evidence Technician Report for Rose Cobb case, at 2-4.
[159] MSP Investigation, pg. 113
[160] ATF Report of Investigation, 774025-08-0057, 3/27/09 & ATF Laboratory Report, 08N042 (1,2 &3), 7/14/08
[161] August 16, 2012 affidavit of Vincent Smothers.
[162] Deposition of Commander Tolbert, June 29, 2018, pgs. 275-276

37

without the assistance of Sanford. There is no excuse for this failure, and Commander Tolbert was not able to offer one. Having a professional killer confess to multiple homicides---both open and closed---is one of the biggest events that can occur in a homicide squad. It is not the type of event that gets missed, or that investigators forget to follow-up on. The failure to fully investigate Smothers for the Runyon Street homicides and fully investigate whether Mr. Sanford is innocent for those crimes is an inexcusable deviation from minimally-accepted police practices and suggests an attempt to cover-up the misconduct in connection with the police investigation into Davontae Sanford for these crimes, including the misrepresentations around the crime scene diagram.

### 1.   Lack of Follow-Up by Sgt. Russell

Though Sgt. Williams told the MSP investigators that he would have notified Sgt. Russell of Smothers' confession to the Runyon Street murders the day that he obtained it or the day afterwards, Sgt. Russell said that he does not remember how he heard about the confession or from whom.   Sgt. Russell said that he did remember hearing about it during one of the court hearings where the confessing was discussed, but added that he had probably heard about it sometime before that. [163]

In his deposition Sgt. Russell claimed that since he was not the officer in charge of the case and that he had done only "specific things" on the case "for maybe the first or second day… [and that] everything else was out of my hands." [164]

During his interview with the MSP investigators, Sgt. Russell said that it was his belief that "someone got to Smothers to get him to say this boy didn't have nothing to do with it or he [Smothers] wanted to get the boy off…"  Sgt. Russell said that if Smothers could prove that he was there and since Sanford drew a diagram to prove to the investigators that he was there then they both must have been there.  Sgt. Russell classified his role as only that of a "supporting investigator."  In spite of this, Sgt. Russell said that if any leads in the Runyon Street murders had come to his attention, then he would have made sure they were followed-up on.[165]

Sgt. Russell testified at his deposition that he still believed that Sanford had committed the murders along with other persons who had not been charged. In spite of being notified of Smothers' confession, he did not take any steps to conduct any follow-up investigation to re-examine the validity of Sanford's confession, investigate the validity of Smothers' confession, or attempt to establish any link between Sanford and Smothers.

### 2.   Lack of Follow-up by Det. Simon

Det. Barbara Simon, the detective who was officially the officer in charge (OIC) of the Runyon Street investigation told the MSP investigators that she did not remember anyone coming to her with information about Smothers' confession.  Det. Simson said that if she had been told then she would have taken further investigative steps.[166]

---

[163] April 12, 2018 deposition testimony of Sgt. Russell, pgs. 148-149
[164] Id. pg. 104-107
[165] MSP interview of Sgt. Russell, September 11, 2015, pg. 41
[166] MSP Investigation Report, pg. 92

## I.   Additional Confessions of Smothers to the Runyon Murders

### 1.   Confession to Investigator Linda Borus

On November 22, 2010, in preparation for an evidentiary hearing in response to a motion for Davontae Sanford to withdraw his guilty plea,[167] Defense Investigator Linda Borus interviewed Smothers in prison.  The purpose of the interview was to determine if Smothers was willing to testify at the hearing as to his role in the Runyon Street murders.[168]

During their conversation concerning his potential willingness to testify, Smothers began voluntarily talking about the murders.[169]  He provided the same basic set of facts that he had provided to Sgt. Williams in his first interview.  Smothers said that he had been ordered to commit the murders because of a problem between two different drug organizations. The head of one drug organization ordered Smothers to kill Mike, who was associated with the rival organization.[170]

Smothers said that he committed the murders with Ernest Davis, also known as Nemo, and that there was no one else involved.[171] He remembered committing the murders on a Sunday or a Monday, because he remembered there being a football game on.[172]

Smothers said that he and Davis had been there earlier to look over the neighborhood.[173] When they returned, Smothers was armed with an AK-47[174] and Davis had a handgun.[175]

Smothers said that Davis went to the side of the house and he himself walked up the driveway. Suddenly, someone opened the front door and saw Smothers with the AK.  Smothers stated that at that point he began firing.  Davis began shooting as well into the house from the outside.[176]

Smothers said that he and Davis entered the house.  Smothers saw one man on the couch who had been shot in the neck.  He observed Mike dead on another couch against the wall.  Smothers saw a .40 handgun on a table next to the chair.  Smothers took the .40 with him when they left the house.[177]

Smothers stated that he went to the back of the house and found a young boy in one of the rooms.  Smothers said that he tried to calm the boy down, telling him that everything was going to be all right.  Smothers then went into the basement, after which he and Davis left the house.[178]

---

[167] A hearing during which Sgt. Russell testified.
[168] Evidentiary hearing testimony of Linda Borus, July 25, 2011, at 12.
[169] Id, pg. 14.
[170] Id.
[171] Id, pg. 16.
[172] Id, pg. 15.
[173] Id, pg. 16.
[174] Id, pg. 17.
[175] Id, pg. 25.
[176] Id, pgs. 16 -17.
[177] Id.
[178] Id, pg. 18.

Smothers said that he and Davis began walking north on Runyon Street towards State Fair. Smothers then heard gunshots, and saw that a person was shooting at them. Smothers described the location where the shots were coming from as a house located on the east side of Runyon Street, "a few houses north" of Mike's.[179]

Smothers said that he fired back at the man with his AK. Then he and Davis ran north on Runyon and across a lot.[180]

### 2.      August 16, 2012, Affidavit of Smothers

On August 16, 2012, Smothers swore to an affidavit in which he provided details regarding his role in the Runyon Street murders. Smothers provided the same basic set of facts that he had provided in his earlier interviews with law enforcement and Investigator Borus during his prison interview.

 In the affidavit, Smothers said that he and Ernest Davis committed the murders alone. Smothers said that he had been hired to kill Robinson, a low-level drug dealer, because of a dispute between two rival drug gangs.[181]

Smothers said that the murders occurred in September 2007 on a day where there was an NFL football game on that night. Earlier on the day of the murders, Smothers stated that he and Davis went to the neighborhood and tossed a baseball around in the street.  When they returned, Smothers said that he was armed with an AK and Davis had a .45 handgun.[182]

Smothers said that he walked up towards the front of the house carrying the AK, and Davis walked around the side. Smothers said that he was surprised when someone opened the door. Smothers began shooting at the door and Davis began shooting at the window.[183]

Smothers said on entering the house, he saw a man on the couch who had been shot in the neck. Mike was on the other couch, also shot. Smothers said he left the living room and went to a back bedroom. There he said he saw a small boy lying in the bed and a woman lying under it, who he talked to.

Smothers stated that on leaving the house, he and Davis walked towards State Fair.  Smothers said that just after leaving the house, a person across the street fired at him, so he returned fire with his AK.[184]

---

[179] Id, pgs. 18-19.
[180] Id. pg. 19.
[181] Affidavit of Vincent Smothers, August 16, 2012.
[182] Id.
[183] Id.
[184] Id.

3.      **Confession to Det. Sgt. Corriveau and Special Agent Nutt of the Michigan State Police**

On August 13, 2012, Smothers was interviewed by Det. Sgt. Corriveau and Special Agent (S/A) Matt Nutt of Michigan State Police. Det. Sgt. Corriveau and S/A Nutt told Smothers that they were looking into the Runyon Street murders.[185]  During this interview, Smothers not only provided the same basic facts as he provided in his earlier interview, but additional details as well.

Smothers said that he had been hired by Leon Payne to kill a guy who was selling drugs out of his house on Runyon Street.[186]  Approximately a month before the murders, Smothers said that Payne drove him over to Runyon and pointed out the house and the man, who was sitting on the porch.  For the next month, Smothers said he would return to the neighborhood to gather intelligence.[187]

The day before the murders, Smothers said that he and Ernest Davis were in the neighborhood playing catch and checking out the neighborhood.[188]

The night the murders occurred, Smothers remembered that there was a football game on TV.[189]  Smothers was armed with an AK-47 and a pistol (either a .40 or 9mm).[190]  Davis had a .45.[191]  Smothers said that he and Davis drove over to the neighborhood and parked their car one street over from Runyon, on Teppert Street, approximately the third house from the corner.[192]  They walked over to the back yard of a vacant house next door to the target's house.  There, Smothers said they conducted surveillance to gather more intelligence.[193]

When they decided it was time, Smothers said they went to the front of the house.  Smothers stated that he went up on the porch, which he described as two steps leading to a small concrete slab.  Smothers said he was facing the front door and Davis was over to his right, in front of a fairly large window. [194]

Smothers said that as he was trying the handle to the storm door, a man opened the front door.  He said he could see it was not Robinson but someone else.  Smothers stated he saw Robinson and described Robinson's location based on how he and the interviewers were sitting in the room. Smothers said he saw Robinson reach for a .40 handgun that was on a cocktail table next to his chair.[195]

---

[185] Transcript of Smothers interview, August 13, 2013, pg. 1.
[186] Transcript of Smothers interview, August 13, 2013, pg. 3.
[187] Id, pg. 4-5.
[188] Id, pg. 7.
[189] Id, pg. 9.
[190] Id, pg. 21.
[191] Id, pg. 18.
[192] Smothers said it was facing State Fair.  The transcript indicates he is pointing to a map but doesn't record the side of the street on which the car is parked.
[193] Transcript of Smothers interview, August 13, 2013, pgs. 10-12.
[194] Id, pg. 13.
[195] Id, pg. 16.

Smothers stated that he started shooting into the house with the AK-47, and Davis began shooting in through the front window. Smothers said he saw a female run from the living room into the hallway.[196]

Smothers said he and Davis entered the house. Smothers stated that he grabbed the .40 off the table.[197] Smothers described where the four (4) bodies were located in the living room.  He stated that he gave Davis the AK and started searching the house with his pistol.  Smothers stated that they went to the left to the bedroom where the female had run and he saw a little boy on the bed, and the female under it.

Smothers said that he was unaware that the female had been shot because she was not screaming. He said he told the little boy to stay in bed, and the woman to stay in the room, he was not going to hurt her. [198]

Smothers said he went into the kitchen and found a stairway leading into the basement. In the basement, Smothers said that he saw that the residents were growing marijuana plants down there.  While down in the basement, Smothers said he heard a couple of more shots from the AK. Smothers said that he returned to the living room and discovered that Davis had shot the people in the living room who might still have been alive.[199]

In the living room, Smothers said they found a shoe box with some loose marijuana and currency.  Smothers stated he took the AK back from Davis, put in a new thirty (30) round magazine,[200] and they left the house with the stolen .40 and the shoebox of marijuana and currency.[201]

Smothers said they left the house, walking back up to cross the field to get to the vehicle when they realized that they were being shot at by one of the neighbors.[202]  Smothers said the man came close to hitting them.  Smothers stated that he fired back with the AK-47.  He believed that he struck the house around the door and window as the man was trying to hide behind the wall in that area. Smothers said the two reached their vehicle and drove away.[203]

Smothers was asked by the investigators to draw a diagram of the house. Based on the transcript provided as a result of the interview, he drew a rather detailed diagram, noting the locations of doors, windows, rooms and stairs.  Smothers described the furniture and indicated its location. Smothers told the investigators where the bodies were located, as well as what specific individuals were doing during the assault.  Like the video recording, this diagram has never been provided to Mr. Smothers' former attorney or any attorney for Mr. Sanford.

---

[196] Id, pg. 20.
[197] Id, pg. 26.
[198] Id, pg.22.
[199] Id., pg. 23.
[200] Id, pg. 30.
[201] Id, pg. 26.
[202] The transcript seems to indicate that Smothers was pointing to a spot on a map.
[203] Transcript of Smothers interview, August 13, 201, pg. 30.

Smothers said that he believed that the police recovered the .45 that was used from the house of Davis' cousin.[204] Smothers said he wasn't sure if the police ever recovered the AK-47[205]

Smothers told the investigators about the bathroom encounter that he had with Sgt. Russell when he first confessed to the police in April 2008. He said that no one from law enforcement ever came back to specifically re-interview him about the Runyon Street killings after that.[206]

Smothers told the investigators that once, while waiting to be taken to court, he ended up in the same holding cell as Sanford. Smothers said Sanford told him that he was the one convicted of the Runyon crimes, and Smothers told him that he told police that he did it. Smothers asked Sanford how he ended up getting charged. Sanford said that "…the cops just happened to grab him." Other than that, Smothers said they didn't discuss it.[207]

Asked by the investigators if he would take a polygraph, Smothers agreed.  The investigators told Smothers that they would take his information, compare it to the information from the crime scene, and would probably come back and talk with him. The investigators said that they would turn the information over to "the proper people."  Smothers then expressed concern that if he was charged with the Runyon Street murders, his prison sentence could be increased.[208]

### 3.9    Exoneration of Sanford

#### A.    Michigan State Police Investigation

The Michigan State Police became involved in the Runyon Street Murders investigation following a post-conviction hearing in 2009 where retired Det. William Rice testified for Sanford.  The investigation concluded that Det. Rice had committed perjury and he later pled guilty.  As the result of that investigation, the MSP investigators came to the conclusion that a more in-depth investigation into the potential role Smothers may have played in the Runyon Street murders would be appropriate.  The investigators met with representatives of the Wayne County Prosecutors' Office and requested that the investigation be re-opened. On May 4, 2015 the Wayne County Prosecutors' Office formally requested the assistance of the MSP to re-investigate the Runyon Street Murders, resulting in a 114 page report.[209]

#### B.    Legal Proceedings

On June 7, 2016, Sanford's attorneys presented a motion to the Wayne County Circuit Court requesting that Sanford's conviction and sentences be vacated.  The court vacated the conviction the next day. On July 19, 2016, the charges against Sanford were dismissed.[210]

---

[204] Id, pg. 33.
[205] Id, pg. 42.
[206] Id, pg. 57.
[207] Id, pg. 65-66.
[208] Id, at 81-82.
[209] MSP Investigation Report, pgs. 1, 28
[210] https://www.law.umich.edu/special/exoneration/Pages/casedetail.aspx?caseid=4913

**Section Four:**          **Analysis of the Investigation and Confession Evidence**

This section will analyze the overall investigation and the theories of what happened on Runyon Street the night of September 17th, 2007.  Both theories rely heavily, if not completely, on separate and distinctly different confessions from two different people, both whom claimed responsibility for the crime.

The first part of this section will discuss the overall investigation. The second section will discuss the confession evidence of Sanford and Smothers. It will be begin with a discussion of the basic methodology that was applied to the analysis of the confession evidence.  It will then look at the confessions of Davontae Sanford, starting with a brief look at Sanford himself and things that could potentially impact the reliability of his confession.  It will discuss the possible interrogation tactics that may have been utilized to convince him to confess and help shape his narrative.  The section will then identify what Sgt. Russell knew, or believed that he knew, about the murders when he interrogated Sanford.

 As will be discussed further in the methodology section, it is necessary to determine what information the interrogator had about the crime at the time of the interrogation. This allows a determination of whether the details provided by the suspect during the confession can be corroborated dependently or independently.

Finally, this section will provide an analysis of Sanford's three (3) confessions and Smothers' five (5) confessions in terms of their content, reliability, and how well, if at all, they match the crime scene and other evidence.

### 4.1    General Analysis of the Police Investigation

#### A.    Review of Confirmation Bias, Ego, and Nobile Cause Corruption

The number of victims, combined with the savagery of the attack, guaranteed that the Runyon Street murders would be a high profile such cases come with increased pressure from the police administration to close the case quickly.  As discussed earlier in Section Two of this report, this pressure can contribute to focusing too early on a suspect or suspects and then closing off the investigation to alternative suspects and/or theories.  The investigation prematurely changes from being evidence-based to suspect-based.  Because of confirmation bias, the investigator molds the evidence to fit the suspect rather than lettering the evidence take them where it may.  This can also lead to an investigator ignoring or dismissing evidence that is exculpatory.

Once confirmation bias takes hold, other factors can prevent the investigation from changing course.  The egos of both the personnel involved and the organization can contribute to the inability to admit that an error has been made.  This combination can lead to noble cause corruption, where the individual investigator(s) and/or the organization commits improper or illegal acts to insure and preserve the conviction of the person they have decided it guilty. All of these factors can be found in the investigation of the Runyon Street murders.

44

B.        General Analysis of the Investigation

One of the first steps in the review of an investigation where a false confession is alleged is attempting to identify how the person who confessed became a suspect.  Because of Sgt. Russell's decision not to fully document or record his initial interactions with Sanford, we have only minimal information as to why and when Sanford's status switched from witness to prime suspect. Sgt. Russell testified that his initial suspicions were aroused when Davontae Sanford approached Sgt. Russell on the street as he was canvassing the neighborhood with an officer from the canine unit around 1:00 a.m. on September 18th.   Sgt. Russell has testified that "it was odd" that Sanford walked up to him,[211] and that based on Sanford's questions to him -- "was I the police?" and "what was I investigating?" – my "experiences" told me to that "the best way to approach him" was to confront Sanford with "you know what I am investigating?"[212]  Such behavior-based assessments, especially when based on such a short-initial encounter, may be unreliable and could lead to a misclassification error and the start of a path to tunnel vision and a false confession.  This is especially true with juveniles.

Since the interrogations were not recorded in their entirety, and Det. Russell decided not to adequately document the circumstances surrounding the confession, we do not definitively know why Sanford decided to confess or if the confession evidence was contaminated.[213]  We, however, do have more information about the follow-up investigation, and the roles that tunnel vision and verification bias appear to have played.

Sanford's confession contained details that Sgt. Russell believed to be true, based on the evidence, when he began the interrogation. It also contained information that, if corroborated, would insure the reliability of the confession.  Such information included Sanford's accomplices, the number and type of firearms used, the location of some of the murder weapons, and the clothes that Sanford was wearing at the time of the murder.

As will be discussed in detail in the next section, none of the above information that was unknown to Sgt. Russell before the confession was corroborated, and at least one key detail was proven to be false. Sanford told Sgt. Russell that there had been four (4) shooters, each with a different weapon. Ofc. Tenisha Bridgewater-Marble and Ofc. David Pauch, firearms examiners with the Detroit Police Department Laboratory, determined that all of the shell casings that were recovered at the Runyon Street scene[214] came from only two weapons.[215]  As is often found in wrongful arrests and conviction cases, additional investigation failed to strengthen the case against Sanford, and, in fact, weakened it. There is no evidence that any of these red flag issues raised any concern with the investigators or supervisors in this case.

The extent that tunnel vision and verification bias was in play in the Runyon Street murder investigation is highlighted by the detectives' response to the Smothers' confession.  Discussed in greater details below, Smothers confessed to several contract killings.  The part of the interview that lead to the Smothers' confession to the Runyon Street murders as well as the

---

[211] Mot. To Reopen the Plea Hearing, 7/21/2009 Tr., at 40.
[212] Preliminary Exam, 10/1/2007 Tr., at 30-31.
[213] Sanford's confessions are analyzed in detail below.
[214] With the exception of the 9mm shell casings fired by King.
[215] Detroit Laboratory Analysis form, Lab numbers, F0-1130A, F0-1130B, 11/15/07.

confession was videotaped in its entirety.  The interview was non-accusatory and the investigators did not use leading questions and it was Smothers who first brought up the murder. In fact, he volunteered his involvement with the Runyon Street murders.  There is no indication of contamination by the interviewer, Sgt. Gerald Williams (who had also participated in the Runyon Street investigation).

In his confession, Smothers said that he and his accomplice Davis did the murders alone. Based on my experience as a homicide investigator, I agree with the testimony given in this case that it would be highly unusual for a professional hitman to recruit a 14-year-old (especially one who was blind in one eye), to commit a homicide with---for both of the reasons Smothers gave: success of the planned hit and his own safety. Smothers also gave numerous, correct details about the murders.  In spite of this, and the fact that weapons that were connected to Smothers were later determined to have been used in the Runyon Street murders, Smothers' confession was ignored by the detectives. He was later charged with all of the other murders to which he confessed, but never for the Runyon Street murders. Although the other murders Smothers confessed to were investigated, Smothers was never re-interviewed by any member of law enforcement regarding the Runyon Street murders, until five (5) years later. Even then, he was interviewed in relation to a case unrelated to Davontae Sanford. Neither Sanford nor his lawyers was informed of this interview or Smothers' detailed statements about the Runyon homicides. The only investigation conducted by the detectives regarding Smothers' confession was an attempt to show that Smothers had recruited Sanford to participate in the contract hit – an attempt that failed.  Given the contrast between what Commander Tolbert states should have happened in the wake of Smothers's confession to the Runyon Street homicides---a full investigation documented in the homicide file---and what did happen, which is essentially nothing, an obvious and logical explanation for the failure to investigate Smothers' confession to these crimes is that Sgt. Russell and  Commander Tolbert were stuck with the sketch they had lied about, and wanted to prevent their misconduct from being uncovered.  This explanation is strengthened by Inv. Todd's statement that once the Sanford case came under scrutiny Sgt. Russell called Inv. Todd in an attempt to distance himself from the creation of the diagram.

There are several failures during this investigation and the post-conviction proceedings that should trigger a full internal affairs investigation. These include: Sergeant Russell's failure to document the circumstances surrounding the confession; Mr. Sanford's allegation that he was shown crime scene photos; the failure to investigate *any* additional perpetrators after the perpetrators named in the confession were cleared; and, most glaringly, Commander Tolbert's and Sergeant Russell's false testimony about Sanford drawing the crime scene sketch. The failure by the Detroit Police Department to conduct *any* internal investigation into misconduct by Sergeant Russell and Commander Tolbert in this case is an egregious departure from minimally accepted police practices. It suggests, at best, ongoing, complete indifference to fabrication of evidence and perjury by officers in a homicide case, and, at worst, a deliberate and pervasive effort to cover up misconduct within the department.

### 4.2     Analysis of the Sanford/Smothers Confessions

#### A.     Methodology for Confession Evidence Evaluation.

##### 1.     Crime Scene Analysis[216]

The Association of Crime Scene Reconstruction defines reconstruction as "the use of scientific methods, physical evidence, deductive and inductive reasoning and their interrelationships to gain explicit knowledge of the series of events that surround the commission of a crime."[217]

The end product of an efficient and thorough crime scene analysis can be used to test and evaluate witness statements, confessions, and theories. "When compared against the reconstruction, either the statement or theory will be supported or some part or all of it will be refuted. Whenever the crime scene analysis is found to be out of sync with a given statement or theory that requires that aspect of the theory to be revised."[218]

Since an effective crime scene analysis is dependent upon evidence, the strengths and weaknesses of the evidence must be evaluated. An investigator must be able to answer the question, "How do we know what we think we know?" To be effective, the crime scene analysis should be a fluid hypothesis, open to change as new evidence and test results become available.

Properly used, a good crime scene analysis provides the investigator with additional avenues of inquiry by which to test the dominant theory. Such avenues may include the suspect's motive, opportunity, and means to commit the crime, as well as additional steps that may be taken to strengthen the results of these inquiries. In addition, a good crime scene analysis establishes baselines against which more subjective evidence, such as witness testimony and confession evidence, can be tested and evaluated.

##### 2.     Statement Evidence Evaluation

Statement evidence (including confession evidence) is like any other evidence in that it should undergo carefully scrutiny before it can be accepted as fact.  A proper evaluation requires an examination of who is providing the information, how it was obtained, and whether it is adequately corroborated. There are two types of corroboration that should be part of a sound investigation: dependent and independent corroboration.

Dependent corroboration is the corroboration of details that the investigator knew or believed to be true going into the interrogation.  Dependent corroboration includes follow-up such as: Does the information provided by the suspect contain the non-public details that should be known only to the suspect and those within the investigative circle?  Were those details provided by the

---

[216] In the context of crime scene investigations, the terms "analysis" and "reconstruction" are often used interchangeably.

[217] Association of Crime Scene Reconstruction By-Laws, 1995.

[218] Tom Bevel, Ross M. Gardner, Bloodstain Pattern Analysis with an Introduction to Crime Scene Reconstruction p. 320 (3rd ed. 2008).

suspect without contamination[219]  Independent corroboration occurs when the suspect provides information that was previously unknown to the investigators that they are later able to confirm.[220] By identifying details that are independently corroborated, the reliability of the confession evidence is strengthened.

When evaluating a confession to determine its reliability, it is important, especially in interrogations that are not audio or video recorded in their entirety, to determine what the interrogator knew about the crime at the time of the interrogation. This helps the reviewer identify facts that were, or could be, independently corroborated.

 Factual errors or omissions can be found in both reliable and unreliable confessions. The type of error or omission should be considered in the overall evaluation of the reliability of the confession evidence.  In a generally reliable confession, the error or omission is often one that would go to decreasing the culpability of the suspect, preventing linkage to other crimes, or protecting someone.  In unreliable confessions, the factual error often increases the suspect's culpability.[221]  An omission may be because the information was not provided to the suspect through contamination during the interrogation.

In its later training, The Reid Institute recommends caution regarding multiple confessions to the same crime from the same suspect. "When a suspect offers multiple confessions to the police that contain substantial differences, the confessions should be viewed with skepticism. Often, under these circumstances, the police learn that a suspect's initial confession cannot be substantiated by the facts of the case, so the suspect is re-interrogated to obtain ether a new statement or one that is consistent with the known facts."[222]  Though the Reid Institute includes this information in their 2013 textbook it was basic knowledge at the time of the Runyon Street murders.

## B.    Confessions of Davontae Sanford

### 1.    Davontae Sanford

At the time of his interrogations, Sanford was fourteen (14) years old.  Law enforcement agencies have long recognized that juveniles can be problematic witnesses, susceptible to suggestibility and other issues.  That is why many agencies use specially trained experts to interview juvenile witnesses and victims, and require that the entire interview be videotaped. Prior to 2007 The Reid Institute taught that juvenile suspects are at a greater risk of falsely confessing to a crime. Additionally they warned that when interrogating juvenile suspects, the investigator should exercise "extreme diligence in establishing the accuracy" of juvenile confessions "through subsequent corroboration."  The Reid Institute taught that "it is imperative

---

[219] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions  (4th ed. 2004) at 432
[220] Id, at 433
[221] Such as the suspect admitting to a committing a non-existent sexual assault during a murder.
[222] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions  (5th ed. 2013) pg. 360.

that interrogators do not reveal details of the crime so that they can use the disclosure of such information by the suspect as verification of the confession's authenticity."[223]

Based on Sgt. Russell's testimony, when he first encountered Sanford, he considered him to be a witness, not a suspect.[224]  Once Sanford told him that he was part of the planning, Sanford became a suspect.  According to a Detroit Metro Times article published in 2004, the reported Detroit Police Department Departmental Policy in place at the time was that, "A member wishing to interview and question a juvenile with respect to the juvenile's part in the commission of a crime must do so in the presence of a parent or legal guardian of the juvenile."[225]

The current policy contains almost identical language quoted in the 2004 Detroit Times article, except that it includes the caveat that the interview should take place in the presence of a parent or guardian *if feasible* [my italics].[226]  There is no evidence that indicates that it was not feasible to interview Sanford in the presence of his parent. The policy was not followed, thus making Sanford even more vulnerable.

## 2.        Interrogation Tactics of Sgt. Russell

The only video or audio recording of the interrogations and confessions of Sanford are the September 19th, 2007, video of Sgt. Russell reading Sanford's previously typed and signed statement. There is no direct information as to what tactics or techniques Sgt. Russell used to convince Sanford to confess or to change the information contained within his confessions as time progressed.  Due to the lack of a recording of the interrogation, the only account of interrogation tactics used are Sanford's and Russell's accounts, as well as what can be inferred from examination of the written confessions, and available video footage of another interrogation conducted by Sgt. Russell.  Investigators, like everyone else, are creatures of habit.  Reviews of videotapes of multiple interrogations by the same investigator show that if a technique has worked for them they will use it repeatedly.

The only portion of Sgt. Russell's interaction with Sanford that was videotaped was in the early morning hours of September 19th, 2007. This recording shows Sgt. Russell reading the statement that Sanford had signed earlier and have Sanford make any corrections. Having Sanford make corrections is a known interrogation tactic taught in The Reid Technique in which the investigators tries to demonstrate that the suspect has read every page of the statement.

---

[223] Fred E. Inbau, John E. Reid, Joseph P. Buckley, Brian C. Jayne, *Essentials of the Reid Technique: Criminal Interrogation and Confession*, Jones and Barrlett Publisher2005, pg. 235 & http://www.reid.com/educational_info/r_tips.html?serial=1080839438473936
[224] July 21, 2009 Evidentiary Hearing testimony of Sgt. Russell.
[225] Ann Mullet, Confessions and Recantations, Detroit Metro Times, Jan. 21, 2004, http://www.metrotimes.com/detroit/confessions-and-recantations/Content?oid=2177868 (last visited March 10, 2015) (quoting the Detroit Police Department policy in place from 2003-2008; Detroit Police Department Manual, "Juveniles and School Incidents," Policy 203.5-8, Eff. 7/1/08.
[226] Detroit Police Department Manual, Directive Number 203.5, part 8, Interviewing Juveniles, effective date, 7/1/08

Investigators are trained to intentionally insert errors in the statements. The correction of these "errors" by the suspect is supposed to go toward confirming the statement's reliability.[227]

What Sanford described are commonly used interrogation tactics that have been shown to contribute to unreliable confession evidence. The use of false evidence ploys, showing the subject crime scene photos, and asking leading questions have been long identified as common, but problematic tactics, particularly for juveniles. Sanford's allegation that the detectives told him that he could go home once he gave them a statement is a commonly found theme in many confirmed false confession cases involving juveniles.

While there is no video or audio recording of the interrogation that lead up to Sanford's confession, there is a partial video recording of Sgt. Russell conducting an interrogation in an unrelated case about a year earlier. This video shows Sgt. Russell using problematic interrogation tactics that have been found to contribute to false confessions.

On July 6, 2006, Randy Duffy was shot and killed while driving his car on Interstate 96 in Detroit. The A&E television show First 48 filmed the investigation and segments of the interrogation of the suspects by Sgt. Russell.[228]

During the interrogation of the alleged shooter, Sgt. Russell threatens the suspect with inevitable consequences. When the suspect gives an alibi for his whereabouts at the time of the shooting, Sgt. Russell tells him "I will send you to prison for the rest of your life with that story."[229] Later he forcefully tells the suspect, "…I guarantee you I can convict you of first degree murder."[230] Sgt. Russell's threat of severe inevitable consequences is not a tactic supported by The Reid Institute, especially if the suspect being interrogated is a juvenile (as Sanford was) or has cognitive issues.

Evidence of the technique of implying leniency also exists. In the beginning of the interrogation, Sgt. Russell said, "Depending on what you do today, it's going to affect the rest of your life." Later, he says, "We can do it two ways. We can do it the easy way or the hard way."[231]

There is also evidence of contamination introduced by Sgt. Russell in the interrogation. While attempting to get the suspect to confess, Sgt. Russell tells the suspect that he knew that someone else was driving the truck while the suspect sat in the back seat and shot the victim.[232] By providing the suspect with this information first, Sgt. Russell was no longer able to use these specific details as corroboration of any subsequent confession.

---

[227] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions (5th ed. 2013) at 317.
[228] First 48, A&E Productions, season 5, episode 8, "Highway Revenge."
[229] Id.
[230] Id.
[231] Id.
[232] Id.

### 3.    Information Available To Investigators at the Time of the Interrogation

As discussed under Methodology, in order to determine if the classification of the corroboration of the evidence provided in a confession is dependent or independent, you must know what the interrogator knew, or should reasonably have known about the crime at the time the conducted the interrogation. Sgt. Russell's alleged lack of knowledge about the crime at the time he interviewed Sanford was used to help bolster Sanford's confession reliability at his trial.[233] Sgt. Russell testified that although he did have some information about the crime, he did not provide it to Sanford during the interrogation.[234]

This segment will detail what was known to the police, and what appears to have been known to Sgt. Russell during his interrogations of Sanford.

### a.    What Sgt. Russell Knew

In his trial testimony, Sgt. Russell said that he had not interviewed living victim Valerie Glover or witness Jessie King, that none of the forensic evidence (ballistics or gunshot residue) had been returned to him yet, and that a crime scene sketch had not been completed.[235]

Sgt. Russell also testified, however, that he arrived at the scene of the murder around midnight, and had been working on the investigation for approximately one hour before his encounter with Sanford.[236]   During that hour, Sgt. Russell went into the Robinson residence.  He saw the marijuana plants and growing equipment in the basement.  He went into the back bedroom where Valerie Glover had been.  Sgt. Russell closely examined the living room and the bodies, making notations.  He saw the bullet holes in the front door and window.  Sgt. Russell observed shell casings at the scene and noted that several of the shell casings were from an assault type weapon. He concluded that two or more firearms were used in the assault. Sgt. Russell learned from other investigators where the suspects were standing when they exchanged gunfire with a man across the street.  Using that information, Sgt. Russell was able to tell the K9 Officer where to start the dog track.  And Sgt. Russell observed the path that the K9 dog took during the track.[237]

Though he did not personally interview many of the witnesses, it is highly unlikely that Sgt. Russell had not been personally briefed on or read the reports regarding their statements.  At the

---

[233] March 17, 2008 trial testimony of Sgt. Michael Russell.

[234] Id.  As discussed in this report in Section Two under Contamination of the Confession Evidence, reviews of confirmed false confession cases revealed that the interrogator was unaware that they were providing detailed crime scene information to the suspect that was later incorporated into their false confession.

[235] Id, pgs. 53-54. As discussed in this report in Section Two under Contamination of the Confession Evidence, reviews of confirmed false confession cases demonstrate that these confessions were filled with detailed crime scene information which investigators testified they did not provide to the suspects.  The level of detail and the fact that the details concerned facts that "only the true perpetrator could have known" strongly suggest that the Sgt. Russell and/or other interrogators fed these details to the suspects who later incorporated them into their false confessions.  Such contamination is usually inadvertent and the investigator is usually unaware that he is doing it.

[236] March 17, 2008 trial testimony of Sgt. Russell.

[237] July 21, 2009 Evidentiary Hearing testimony of Sgt. Russell.

time of this investigation the Detroit Police Department was using an information management system called CRISNET.  Officers and investigators entered detailed information regarding their observations, actions, and witness statements into the system from vehicle mounted computers while on the scene.  Such information was available to any investigator working the case. Indeed, Sergeant Russell testified at his deposition that based on his practice and the way he worked, he would have attempted to find out what had happened in the investigation to date before questioning Sanford the second time.[238]

### b.      Facts Known to the Police

A review of the police reports and transcripts reveals what information the police had regarding the Runyon Street murders in the early morning hours of September 18, 2007.   This information can be broken down into two categories: hard information and soft information.  Hard information is the result of an accurate analysis of the crime scene as well as witnesses whose information can be corroborated.  The hard information known by the police was:

- Mike Robinson grew and sold marijuana from his residence
- The home invasion began outside with the assailants shooting multiple rounds through the front door and window of the house.
- Additional gunshots were fired once the assailants entered the house. Those gunshots were fired in the living room
- Three men and one woman were killed in the living room. The exact positions of their bodies were known.
- One of the weapons was an assault style rifle, the other a .45 handgun.
- Two assailants were involved.  Both were African American males, tall (5'11" to 6'), medium to slim build, wearing dark clothing and winter stocking hats or ski masks.
    - The one with the assault rifle was described as soft spoken.[239]
- After the initial assault, the house was searched.
- The assailant with the assault weapon found Valerie Glover under a seven-year-old boy's bed.  The boy was in the room as well, hiding under the covers. The assailant said something while in the bedroom but the accounts are inconsistent about what was said.
- The K-9 evidence indicates that, on leaving the residence, the assailants walked north, cut across a vacant lot to the west, turning south on Beland.
- On leaving the residence, the assailant with the assault weapon fired two rounds at a witness who was located across the street.  The witness fired back.
- There was a red car parked in the driveway of the Robinson residence

Soft information includes information such as rumors, suspicions, or witness statements that cannot be corroborated.  The soft information available to the police within thirty (30) minutes after the shooting was:

---

[238] Deposition of Sgt. Russell, April 12, 2018, pgs. 134-135
[239] Glover in her statements goes from two to three, but she saw only one.

- An acquaintance of Robinson suspected that the persons responsible are two eighteen-year-olds name Tone-Tone and Twan.  The basis for that suspicion is that the two had argued with Robinson in the past.[240]
- A sixteen-year-old witness reported seeing a Buick occupied by two (2) or three (3) subjects drive by Robinson's house shortly before the shooting and then park nearby. After the shooting, the witness says he saw a white van with a loud muffler parked outside Robinson's house with people going in and out of it.[241]

During their follow-up on the information provided by Hunt, relative of Robinson, the investigators went to the location where Tone-Tone was supposed to have lived.  They observed a white van parked in the block.[242]  There is no record of any follow-up investigation regarding that van.

### 4.    Overall Evaluation of Sanford's Confessions

During his interactions with the police and the courts, Sanford gave four statements regarding the Runyon Street murders in which he incriminated himself. There are several things about the information contained in those statements that stand out: (1) the large number of details that were incorrect, (2) the almost complete absence of any details that had the potential for independent corroboration, and (3) how the details changed over time to match the police investigation.  Each of these areas will be discussed in detail during the analysis of the individual confessions.

Another thing stands out when considering the overall investigation.  In contrast to Smothers' confession, the case against Sanford gets weaker, rather than stronger, during the follow-up investigation.  With regard to the probative information in the confessions that could potentially be corroborated (and was not known to them at the time of the confessions), the police either failed to follow up or discovered that the information was wrong. The only exception occurred during the second confession.

Sgt. Russell said that Sanford told him what clothes he was wearing and where they could be located in Sanford's house.  This description was different than the clothing he described in his first typewritten statement, and the new version described only black clothing, in line with witness statements describing the perpetrators wearing all black.  Sgt. Russell recovered shoes, a shirt, and a pair of pants from Sanford's house. The Detroit Police Laboratory examined the pants and reported that they discovered what they alleged is gunshot residue on the pants, but not on the shirt, the shoes, nor Sanford's hands. No blood was detected on any of the clothes.

There are several problems with considering this to be an example of independent corroboration of Sanford's testimony. First, Sanford's description of his clothing changed between his two statements to better reflect the evidence, indicating possible contamination. Second, the reliability of gunshot residue testing is questionable.[243] Third, the reliance on the gunshot resident test as a form of independent corroboration of Sanford's confession is particularly

---

[240] Ofc. Moises Jimenez and Sgt. Gerald Williams report of the interview of Sadie Hunt.
[241] Officer Moises Jimenez and Sgt. Gerald Williams report of the interview of Wallace Kelly.
[242] Id.
[243] http://wrongfulconvictionsblog.org/2012/03/16/gunshot-residue-evidence-what-it-really-takes/

problematic given the lack of blood on any of the clothing.  In Sanford's second confession, he says that multiple high power weapons were fired multiple times into four bodies in a confined space. This would have caused an immense amount of forward and black blood spatter, along with blood mist in the air.[244]  Sanford's clothing should have had blood on it.

### a.        Sanford's First Documented Confession

In the first confession where Sanford is reported to have said that he participated in the planning but was not there for the murder, he provides the names of the other participants. At least one of the names, Tone-Tone, had earlier been provided to the police as potentially involved. The other names, Los and Carrie, are critical pieces of evidence as they provide the potential for independent corroboration of Sanford's confession.

In his statement, Sanford said that the group had two assault style weapons as well as two other guns.  Despite the presence of four guns which would have produced four different types of casings, only two types of casings were found at the scene: casings from an assault style weapon and a .45.[245]

The following is a breakdown of the critical details provided in Sanford's first confession.  The analysis will include if the detail was corroborated, how it was corroborated, and if it wasn't corroborated, the steps that could have been taken to corroborate it, whether or not any corroboration was independent or dependent corroboration, and the sources of potential contamination for the detail.

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Tone, Tone-Tone, and Carrie committed the murders | Sadie Hunt, an associate of Robertson heard that Tone-Tone & Twan were the shooters and the two had argued with Robinson sometime before | Dependent | Available to Sgt. Russell at time of the interview. Could have been common knowledge in the neighborhood | Later determined to be inaccurate. Tone, Tone-Tone, and Carrie were identified and were able to provide alibis. |

---

[244] Tom Bevel & Ross M. Gardner, Bloodstain Pattern Analysis: With an Introduction to Crime Scene Reconstruction, (3rd ed. 2008), pg. 212.

[245] The firearms experts who have examined the evidence in this case cannot reach an agreement as to if one, or more than one assault weapon was used.

| | | | | |
|---|---|---|---|---|
| Sanford met the group at the Coney Island and they discussed the robbery | None | | | The Coney Island Sanford specified was closed at this time. |
| Michael Robinson was known as Milk Dud | None | | | Potential corroboration through interviews with family and associates.  No evidence this was done. Witnesses that were interviewed knew Robison as "Big Mike" |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Sanford and the others gathered in the park across from his house for several hours before the shooting | None | | | Potential corroboration through interviews of people who live in the area. Except for the initial canvass, there is no evidence that this was done. |

55

| | | | | |
|---|---|---|---|---|
| The weapons that the group had were a .38 revolver, a "chopper," a Mini 14 and a .45 handgun | Shell casings recovered from the scene were from a .45 handgun and an assault weapon. | Dependent (see comments) | Sgt. Russell had been to the scene before the interview and viewed the shell casings | Initial examination by the Detroit Firearms Examiners determined that all of the assault weapon shell casings came from the same weapon. The Mini-14 does not fire the same type of shell casings found on the scene. |
| Los drove the scene in his Grand Marquise. | None | | | Los was later identified and was able to provide an alibi. |
| Sanford was wearing a brown shirt, black hoodie, and blue jeans. | None | | | Does not match the clothing description provided by the witnesses of the shooters. |
| Sanford saw a red car in the driveway of Robinson's house. | There was a red car parked in the driveway of Robinson's house | Dependent | Sgt. Russell had been to the scene before the interview. Sanford was brought to the scene for GSR testing before the police station. | |

### b.    Sanford Second Documented Confession

Following the first confession, Sgt. Russell had several hours to investigate Sanford's statement and obtain more details about the murders.  He learned that the Coney Island that Sanford identified in his statement was closed for renovations [246] Sanford could not have met with Tone,

---

[246] July 21, 2009 evidentiary hearing testimony of Sgt. Russell, pg. 47.

56

Tone-Tone, Los, and Carrie inside this restaurant.  Armed with additional information, Sgt. Russell interrogated Sanford a second time.

At the start of the second interrogation, Sanford is clearly a suspect.  Though the handwritten permission letter signed by Sanford's mother specified that Sanford was not under arrest, it appears to read that he was going to be questioned regarding his "involvement" in a homicide.  And if Sanford's first confession was true, he had already implicated himself as a co-conspirator. Sgt. Russell told Sanford's mother he did not think Sanford was being truthful, and his mother told him he better tell the truth to police.

In this confession, Sanford admits that he participated in the robbery and the murders.  Since he can no longer say that the planning took place at the Coney Island, he moves it to the home of one of his accomplices. This time Sanford adds marijuana to the list of things they intended to steal and omits the TV which was still in the house after the homicide. Sanford lists the same weapons as he did in the first statement, but now says that he is carrying the Mini-14 assault rifle.

Sanford now says that once Los pulled the car up in front of Robinson's house, he and the other three accomplices with guns got out and started shooting. In his statement, Sanford said that the group had two assault style weapons, one being a Mini-14.  The other two weapons were handguns, a .45 semi-automatic pistol and a revolver.[247]

7.62X39mm shell casings from an assault rifle and .45 shell casings from a handgun were found on the scene. A Mini-14 fires a .223 Remington or a 5.56x45 round,[248] none of which were found on the scene. A revolver would leave no shell casings. Ofc. Tenisha Bridgewater-Marble and Ofc. David Pauch, firearms examiners with the Detroit Police Department Laboratory, determined that all of the shell casings that were recovered at the Runyon Street scene[249] came from only two weapons.[250]

All the facts that Sanford provided in his second confession that could have been corroborated were dependent facts, facts known to Sgt. Russell at the time he conducted the interrogation. Sanford did give three (3) details that were not known to Sgt. Russell at the time of the interrogation, and if corroborated, would have provided independent corroboration of Sanford's involvement in the murder.  None of these facts proved to be correct.

The first fact was the names of his accomplices. Sanford provided Sgt. Russell with the names of the four people who Sanford said committed the crime with him. Additional investigation eliminated them as suspects to such a degree that Sanford had to provide totally different names during his plea allocution.  Investigators were unable to corroborate that these four were involved in the murder as well.

---

[247] Sanford mentions that one if the handguns is a revolver in his first confession.  He only refers to the forth gun as a non-descript handgun.

[248] http://en.wikipedia.org/wiki/Ruger_Mini-14

[249] With the exception of the 9mm shell casings fired by King.

[250] Detroit Laboratory Analysis form, Lab numbers, F0-1130A, F0-1130B, 11/15/07.

The second fact was the location of the weapons. Sanford said that as they were fleeing the scene, he and Carrie tossed their weapons over the fence at the AT&T lot.[251] The police arrived on the scene shortly after the shooting and quickly secured the area where the suspects made their escape, thus allowing a K-9 dog to track the route the suspects took. The K-9 did not track over to the AT&T lot. There is no evidence that Sgt. Russell or anyone else checked the lot for the guns, or canvassed the area to determine if anyone had found any guns. The only indication that there was any follow-up at all is the fact that Sanford changes his story regarding the gun disposal during his plea allocution.

The third fact that could have provided independent corroboration was the clothing Sanford said he was wearing that night. Those exact items of clothing were recovered by the detectives and submitted to the laboratory for testing. The laboratory reported that gunshot residue was found on the pants, but on none of the other clothing. No blood was found on any of the clothing. As discussed earlier in this report, the reliability of gunshot residue testing is highly questionable. Additionally, if Sanford was in a small room where multiple, high power weapons were fired at close range into multiple bodies, there should have been blood on his clothing.

Sanford's confession failed to provide any facts that were unknown to Sgt. Russell at the time of the interrogation that could be or were corroborated through additional investigation.

Sanford's confession did contain at least one "false fact"---that is, a fact consistent with what Russell believed at the time, which was later disproven. At his deposition Sgt. Russell testified that he formulated a belief at the scene that there had been a shooting in the back bedroom of the house where Valerie Glover was found.[252] The confession reflects that, consistent with Sgt. Russell's belief, shots were fired in the back bedroom. However, Valerie Glover was shot in the living room, and no evidence was uncovered that a shooting ever occurred in the back bedroom. In other words, the confession is wrong in a manner that is consistent with what Sgt. Russell wrongly believed at the time he took it. This is not only a red flag to the presence of contamination by the investigator but also to the suggestibility of the suspect. It should be noted that one of the ways investigators are taught to determine the overall suggestibility of a suspect is to intentionally "leak" a false fact about the crime during the interrogation to see if the suspect incorporates it into their confession.[253]

The following is a breakdown of the critical details provided in Sanford's second confession. The breakdown will include if the detail was corroborated, how it was corroborated, and if it wasn't corroborated, the steps that could have been taken to corroborate it, and whether or not any corroboration was independent or dependent corroboration, and the sources of potential contamination for the detail.

---

[251] Detroit Police Witness Statement Form, 9/18/07, 4:00 am statement of Davontae Sanford.

[252] Deposition of Sgt. Russell, April 12, 2018, pgs. 285-286

[253] Fred E. Inbau, John E. Reid, Joseph P. Buckley & Brian C. Jayne, Criminal Interrogation and Confessions (4th ed. 2004) pg. 425

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Sanford committed the murders with Tone, Tone-Tone, Carrie and Los | Sadie Hunt, a cousin of Robertson heard that Tone-Tone & Twan were the shooters. The two had argued with Robinson Sometime before | Dependent | Available to Sgt. Russell at time of the interview. Could have been common knowledge in the neighborhood | Later determined to be inaccurate. Tone and Tone-Tone were identified and were able to provide alibis. Carrie was never identified. |
| The plan was to rob Milk Dud of weed and money. | Robinson was growing and selling marijuana from his house | Dependent | Sgt. Russell had been in the basement of Robinson's house and saw the marijuana and growing material. | |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Sanford has the Mini-14, Tone had a handgun, Tone-Tone had a chopper and Carrie had a .45 | Shell casings recovered from the scene were from a .45 handgun and an assault weapon. | Dependent (see comments) | Sgt. Russell had been to the scene before the interview and viewed the shell casings | Initial examination by the Detroit Firearms Examiners determined that all of the assault weapon shell casings came from the same weapon.  The Mini-14 does not fire the same type of shell casings found on the scene. |

59

| | | | | |
|---|---|---|---|---|
| All those with guns got out of the car and started shooting at the house. | none - see comments re: above detail | | | |
| Sanford and the rest with guns go inside and Sanford describes the location of the bodies on the floor | The bodies were found where described. | Dependent | Sgt. Russell had been in the house and seen the bodies. | |
| All the victims had been struck by gunfire fired from the outside. | Glover's statements and crime scene analysis | Dependent | Sgt. Russell has access to this information | |
| Tone-Tone and Tone began searching the house. | Glover said one subject came into the back bedroom. | Dependent | Sgt. Russell had access to this information | |
| Sanford heard gunshots from the back of the house. | None | | There is no evidence that any guns were fired except in the living room and outside. | Sgt. Russell admitted that at the time of the interrogation he was under the mistaken belief that this was true |

60

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Tone-Tone checked the basement | Glover said that there were people in the basement and the subject in the bedroom left when they came upstairs, saying "I got it." | See comment | | Glover does not provide any of this information in her original statements. She includes it in her Preliminary Hearing testimony |
| Tone-Tone came up from the basement with two duffel bags. | Glover said that there were people in the basement and the subject in the bedroom left when they came upstairs, saying "I got it." | See comment | | Glover does not provide any of this information in her original statements. She includes it in her Preliminary Hearing testimony |
| Tone-Tone said "fuck all the witnesses" and began shooting. | Glover heard more shots from the living room area. | dependent | Sgt. Russell had access to this information | If they wanted to eliminate all of the witnesses, why leave Glover alive? |
| Carrie shot the guy on the couch in the legs. | See comment | | Sgt. Russell had been to the house and seen the bodies. | Insufficient information to identify the victim who was on the couch to match to findings in autopsy report |

| | | | | |
|---|---|---|---|---|
| Los was out of his car and on the porch at one point. | none | | | No witnesses reported seeing a car or anyone standing on the porch. Kidd reported seeing a van |
| Tone-Tone and tone got into Los' Marquise and drove off | none | | | No witness reported seeing or hearing a vehicle leave the scene. |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Carrie and Sanford ran up Runyon Street towards State Fair | King observed two subjects walking north on Runyon Street. | Dependent | Sgt. Russell had access to this information. | King describes the two as being much taller than Sanford.  Sgt. Russell never gets a physical description of Carrie |
| Someone across the street shot at Sanford and Carrie and they both fired back. | King said the subject with the long rifle [Sanford] fired at him and he fired back. Assault weapon shell casings found | Dependent | Sgt. Russell had access to this information | King said only the person with the long rifle fired at him |

| | | | | |
|---|---|---|---|---|
| Sanford fired back at the man across the street with the Mini-14 | King said that the subject with the long rifle fired back him. | Dependent | Sgt. Russell had access to this information. | A Mini-14 is a long rifle, but does not fire the type of cartridge casings found where the suspect with the long rifle fired at King. |
| Sanford shot back at the man eight (8) or nine (9) times | none | | | There is evidence that only two (2) to three (3) shots were fired |
| Sanford and Carrie ran up to State Fair and turned to go towards Beland. | K-9 dog tracked the suspects along this route. | Dependent | Sgt. Russell was present during the K-9 track | The K-9 track ended at the north end of Beland, approximately 310 feet from Sanford's house. |
| Sanford and Carrie threw the guns over the fence into the ATT lot | none | | | K-9 did not track the suspects over to the ATT lot. No guns were recovered from that location |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Sanford was wearing dark clothing. | Witnesses reported that the suspects were wearing dark clothing | Dependent | Sgt. Russell had access to this information. | Sanford's description of what he was wearing that night changed from his first confession to match Sgt. Russell's knowledge of what he witnesses saw |
| Sanford names the specific items of clothing he was wearing and their location in his home | The items were located and recovered. The pants tested positive for gunshot residue | Independent (see comments) | | Gunshot residue testing reliability is questionable. No blood found on the clothing. |
| There was a female laying on the floor in the back room | Glover was laying under the bed in the bedroom | dependent | Sgt. Russell had access to this information | This information was provided after the narrative and in response to a specific question.  He did not say he went into the back room, that it was a bedroom, that the female was under the bed, or that a child was also in the room |

### c.        Sanford's Third Confession

Sanford's final confession took place during his March 18, 2008, plea allocution. The format was primarily that of leading questions.

Since the investigators had eliminated Tone, Tone-Tone, and Carrie as Sanford's accomplices, Sanford again had to change the narrative to fit what the police knew.  In this narrative, Sanford identified Bug, T, and Homie as participating in the murder.  Sanford also changed the type of vehicle that was used.  He now said that they used a van, adopting the account of sixteen-year-old Wallace Kelly, who claimed to have seen a van out in front of the house at the time of the shooting, a van that no other witness saw.

Bug, T, and Homie were never arrested for the Runyon Street murders.  I have been informed by Mr. Sanford's attorneys that information regarding any investigation into the three was requested, and to date none has been provided.

### C.        Confessions of Vincent Smothers

### 1.        Vincent Smothers

At the time of his confession to the Runyon Street murders, Vincent Smothers was 27 years old. He and Ernest Davis had been identified by law enforcement to be members of a group called the Medbury Goons.  Investigator Ira Todd testified that the Medbury Goons consisted of a group of men who grew up together.  He testified that the Goons sold drugs, robbed drug houses, and committed murders for hire. One drug gang that would hire the Goons to commit contract killings was a large drug ring out of Detroit known as the Hustle Boys.[254]

According to Investigator Todd, when the Goons were hired to commit a contract murder, they were very meticulous in their planning and execution.  The Goons were known to conduct surveillance and gather intelligence on their targets before attempting to kill them.[255]

Smothers was arrested by the Violent Crimes Task Force on April 19th, 2008.  He was being interrogated regarding several contract killings in which he was a suspect when he confessed to the Runyon Street murders.

### 2.        Overall Evaluation of Smothers' Confessions

During his interactions with the police and private investigators, Smothers gave five (5) statements regarding the Runyon Street murders in which he incriminated himself. The major differences between the confessions of Smothers and the confessions of Sanford are:

1.  The two interactions in which Smothers confesses to the police are recorded almost in their entirety.

---

[254] March 16, 2010 Evidentiary Hearing testimony of Inv. Ira Todd.
[255] Id.

2. Smothers provided an immense amount of detail that could be both dependently and independently corroborated.
3. Smothers confessed during non-confrontational, non-accusatory interviews where there is no contamination by the police.
4. Smothers' confessions are consistent over time and across five different confessions.

Smothers' first confession came as a surprise to the investigators. He first mentioned the Runyon Street murders during the interview when he was giving a chronological account of all the murders that he had committed.  Sgt. Gerald Williams, who conducted the interview, and who participated in the investigation of Runyon Street murders, asked relatively few questions about Runyon Street, thus obtaining far fewer details than was possible at the time.

Smothers' second confession regarding the Runyon Street murders to law enforcement also contained few details, primarily because he was not asked to elaborate. Smothers told Inv. Todd of the Violent Crimes Task Force that he had committed the murders because he had forgotten to mention it to him earlier. Smothers told Inv. Todd that he didn't want Inv. Todd to think he was holding back information.

Investigators and prosecutors considered Smothers' information to be reliable enough to allow him to plead guilty to eight (8) of the twelve (12) murders to which he confessed.  However, in spite of the level of accurate detail, and the independent corroboration that came from the investigators linking the firearms evidence recovered from Runyon Street to Smothers, they discredited his confession to the Runyon Street murders.  The only information that has been made available in regards any additional investigation by law enforcement regarding Smothers' Runyon Street confession is law enforcement's attempt to link Smothers to Sanford.

### a.  Smothers' First Confession

Unlike Sgt. Russell's interrogations of Sanford, and subsequent confessions, Smothers' first interview and subsequent confession was videotaped in its entirety. In spite of the fact that there was minimal questioning by Sgt. Williams, Smothers was able to provide investigators with a several details that were corroborated by the crime scene and witnesses.  Additional, independent corroboration was obtained when firearms examiners forensically linked the weapons used at Runyon Street to Davis. Smothers also provided information that could potentially have been independently corroborated if any follow-up investigation was done by law enforcement. The following is a breakdown of the critical details provided in Sanford's first confession.  The analysis will include if the detail was corroborated, how it was corroborated, and if it wasn't corroborated, the steps that could have been taken to corroborate it, and whether or not any corroboration was independent or dependent corroboration, and the sources of potential contamination for the detail.

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| The murders were a contract killing for Leon Payne | None | | None | Potential for independent corroboration through additional investigation |
| There was a drug connection between Payne and the target | Robinson was involved in the growing and sale of marijuana | Dependent | None | Potential for additional independent corroboration through additional investigation |
| Murders occurred after the Gravier Street murder and before the Cobb murder | The Graver Street murder occurred on 6/23/07. Runyon Street on 9/17/07 Cobb murder on 12/27/07 | Dependent | None | |
| Smothers had an AK-47 | Shell casings for an assault weapon found on the scene | Dependent | None | |

| | | | | |
|---|---|---|---|---|
| Smothers had an AK-47 | Shell casings fired from an assault weapon from another murder scene to which Smothers confessed were fired by the same weapon that was used in the Runyon Street murders | Independent | None | Expended bullets from an assault weapon recovered from Runyon Street were fired from the same gun as expended bullets recovered from another Smothers murder |
| Did the murders with Ernest Davis who had a .45 handgun | Shell cases from a .45 handgun found on the scene. | Dependent | None | |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|---|---|---|---|---|
| Did the murders with Ernest Davis who had a .45 handgun | The .45 that was used in the Runyon Street murders was recovered and linked to Davis. | Independent | None | |
| The house was on the left hand side of Runyon Street if you are coming from 7 Mile and is closer to State Fair | Correctly describes the location of the house. | Dependent | None | |

68

| White, single family dwelling | Correctly describes the house. | Dependent | Leading question posed by detective regarding if it is a single family home | |
|---|---|---|---|---|
| Davis fired through the front window from outside the house | Shell casings from the .45 were outside the house and shots had been fired through the window | Dependent | None | |
| A female had ran into a back room | Glover ran into a back room | Dependent | None | |
| Smothers found the woman in the back room hiding under a bed | Glover hid under the bed | Dependent | None | |
| Smothers told the woman that everything would be all right and not to worry | In two statements, Glover said that the subject who came into the back room tried to re-assure her | Dependent | None | |

| DETAIL | CORROBORATION | TYPE OF CORROBORATION | CONTAMINATION | COMMENTS |
|--------|---------------|----------------------|---------------|----------|
| Smothers did a quick search of the house and the basement | Glover testified in the Preliminary Hearing that she heard someone in the basement. This was in none of her previous statements | Dependent | None | Glover also testified that the gunman stayed in the room while others searched the basement. Her later additions is evidence of post-confession contamination |
| Smothers heard firing from upstairs when he was in the basement | Glover hears additional shots from the living room | Dependent | None | |
| Killed three male victims and one female | Correct number of victims | Dependent | None | |
| There was a little boy in the house. | Mike Junior was in the back bedroom | Dependent | None | |
| Took from the house the .40 handgun used in the Cobb murder | Cobb was killed with a .40 | | None | Potential for independent corroboration through interviews of those who knew Robinson. |

| Took marijuana and money - maybe a half pound, maybe $2,000 | see comments | | None | Potential for independent corroboration through interviews of those who knew Robinson. |
|---|---|---|---|---|
| Left the house and went to their vehicle parked around the corner. | K-9 Track | Dependent | None | |

### b.    Smothers' Second through Fourth Confessions

Sanford's second confession to Inv. Todd was undocumented, and according to Inv. Todd was mostly a confirmation that he had provided the first confession.  His third and fourth confessions were made to a defense investigator and in the form of an affidavit submitted to the court on the behalf of Sanford. They contained mostly the same factual details as Smothers provided in his first confession. In addition, the third and fourth confessions contained information as to the position and injuries of some of the victims.

### c.    Smothers' Fifth Confession

Smothers' final confession was the first time he underwent a serious interview by law enforcement regarding the Runyon Street murders. Like the first interview, this interview appears to have been videotaped in its entirety.[256] Again, any contamination by the investigations during this interview was minimal.

The videotape of this interview has not been made available at the time of this review. It is apparent from the transcript that the investigators had Smothers point out various locations on a map or aerial photograph,[257] neither of which has been made available at the time of this review. It is also apparent from the transcript that Smothers made detailed sketches of the entire interior of the house, showing the investigators the locations of the victims and various pieces of furniture, none of which has been made available at the time of this review.  These items could provide additional corroboration of the reliability of Smothers' confession.

---

[256] Interview of Vincent Smothers, RE: People v. Rice, August 13, 2013
[257] Locations such as the location of Robinson's house, King's house, where they parked their car, and the route they took too and from Robinson's house.

Smothers again provided the same, accurate, factual details as in previous interviews. This time, he also provided a great number of additional details, such as:

1. The house that was adjacent to the north side of Robinson's house was vacant at the time of the murder.
2. To get to the front door of Robinson's home, one had to go up two steps to a small concrete slab.
3. There was a white storm door as well as the front door.
4. The front door had a double lock.
5. The television in the house was on "super loud" and Smothers could hear it from outside.
6. The hallway/bedroom where the woman ran was located to the left.
7. The stairway leading into the basement was located off of the kitchen.
8. The man on the couch who was shot in the neck had blood "squirting to the ceiling."

All of the above details could have been potentially corroborated through crime scene photos and/or additional witness interviews.  No crime scene photographs have been made available at the time of this review.

Smothers' confession does include two details that are inconsistent with what law enforcement believes to be true. The first is Smothers said that the neighbor across the street opened fire on Smothers and Davis first, and Smothers returned fire. Jessie King said that as the two subjects were making their escape, the one with the long rifle turned and fired at him, and King returned fire.

The second discrepancy is the location where Smothers parked the "get-away" vehicle. Smothers said that he parked his car on Teppert Street, one block west of Runyon, and at approximately the third house down from the corner. The K-9 dog tracked a scent along the route described by Smothers, except the K-9 dog went over an additional block past Teppert to Beland Street,  where the track ended at the end of the driveway of the second house from the corner.

As discussed earlier, discrepancies in a subject's statement should be evaluated in context with the rest of the statement evidence. Does the discrepancy increase or decrease the subject's criminal culpability? Is there other evidence contained within the statement that passes dependent/independent reliability tests?

In evaluating the first discrepancy, there are no unbiased, independent witnesses to verify whether Smothers shot first, or did King. Smothers had just confessed to killing four people. Saying that he returned fire to protect himself, rather than admitting that he took shots at yet one more potential victim does little to decrease his criminal culpability in this case.

Regarding the second discrepancy, the only one that exists is that Smothers has the location of the parked get-away car off by only one block. The rest matches the K-9 dog's track and the investigators initial theory of the case.[258]

Neither of these discrepancies can negate the quantity and quality of evidence provided by Smothers in his confessions that was both dependently and independently corroborated.

---

[258] Det. Collins noted on a "canvass sheet" filled out while he was conducting a neighborhood canvass that Beland Street was "...the street where the perps' vehicle may have picked up perps."

Nevertheless, stunningly, there is no evidence of the Detroit Police Department conducting *any* follow-up investigation in response to Smothers's confession. As indicated above, Commander Tolbert admits that a complete reinvestigation investigation should have been done for at least two reasons: to make sure that Davontae Sanford was not wrongly convicted of the homicides, and to make sure that if Smothers and Davis were indeed responsible, evidence of their culpability was fully investigated and documented. I agree with Commander Tolbert that a full investigation should have been conducted and documented, including a full review of the underlying evidence against Davontae Sanford. The failure to do so is a gross departure from minimally-accepted police practices. Any investigator, and any minimally trained supervisor would know, as Commander Tolbert did, that doing so is a most basic, critical task. I can think of no explanation for that failure aside from a systematic effort to cover up misconduct in the underlying investigation of Davontae Sanford.

**Section Five:  Summary of the Case and Findings**

### 5.1    Summary of the Case

On September 17, 2007, there was a home invasion of a known drug house on Runyon Street, in a residential Detroit, Michigan, neighborhood.  Shell casings from two weapons, an AK-47 assault rifle and a .45-caliber pistol, were found inside and outside the house.  Four people were killed.  Two people survived the attack – an adult female who was shot and wounded and hid in a back bedroom, and a child, found in the same bedroom.  During the assault, a masked gunman came into the bedroom, spoke to the woman, and then told her to say hidden under the bed.

A Detroit Police chaplain lived in a house across the street.  When he heard the gunfire, he came out and saw two masked gunmen running away from the scene.  He exchanged shots with the man with the assault weapon, but no one was hit.  The chaplain and the wounded female from the house provided police with descriptions of the two shooters.

Other witnesses were less reliable.  A 16-year-old, who did not want to be identified, said he saw a white van parked in front of the house after the shooting; this detail was not corroborated by anyone else.  Another witness told police that the neighborhood rumor was that Tone-Tone and Twain were involved in the shooting.  Investigators drove by Tone-Tone's house and saw a white van parked across the street.  They later determined that neither Tone-Tone nor a white van were involved.

A dog track led through a vacant lot and ended after two blocks on Beland Street. This supported a theory that the suspects got into a vehicle at that point to make their escape.

Sgt. Russell, was canvassing the neighborhood soon after the shooting when he encountered 14-year-old Davontae Sanford walking in the street.  Sanford lived near the crime scene, on Beland Street.  He was obviously blind in one eye from an old injury,.  He was 5'5" in height, much shorter than the almost 6 feet witnesses described the shooters as being.  Sanford told Sgt. Russell he had seen people running from the direction of the shooting scene.  Evidence technicians later swabbed Sanford for gunshot residue, but the test results were negative.

Sgt. Russell and other investigators drove Sanford around for two hours and then took him to the police station for a statement at 3:00 am.  Sanford provided a written statement in which he named Tone-Tone and Lo as two of four people who committed the murders.  Other details

73

provided by Sanford were inconsistent with witnesses' statements and the physical evidence at the crime scene (e.g., the caliber of the firearms).

After Sgt. Russell discovered some discrepancies in Sanford's narrative he interviewed him a second time the next night. During this second interview, Sgt. Russell notified Homicide Commander Tolbert that he believed Sanford participated in the murders. According to Sgt. Russell and Commander Tolbert, Sanford proved his participation by independently creating an accurate sketch of the interior of the crime scene which included the position of the bodies. Afterwards, Sanford provided a written confession in which he said that he participated in the murders and named four accomplices. Though Sanford's second statement contained some information consistent with the crime scene, much of it was wildly inaccurate. On the basis of his statement and the sketch, Sanford was charged with the murders.

Two of the four other participants named by Sanford were arrested, but charges were quickly dropped. One of the two men was able to provide an alibi for the time of the murders.

On March 18, 2008, the second day of his trial, Sanford entered a guilty plea upon the advice of his lawyer. His plea presented a very different version of events from what was in his original statements. He also named different accomplices, but no additional investigation was documented and none of the newly named accomplices were ever charged. Sanford was sentenced to prison for 37 to 90 years.

In spite of being the investigator who performed the majority of the investigative work on the case, Sgt. Russell created no investigative reports outside of the written confessions of Sanford.

One month later, Vincent Smothers, a known professional "hit man," was being debriefed by members of the Detroit Homicide Unit. Smothers admitted to having committed 12 murders-for-hire, including the home invasion and murders on Runyon Street. Smothers provided accurate details of the crime, identified his accomplice, and eventually led investigators to one of the guns used in the murders. Very strong evidence exists that Sgt. Russell was made aware of Smother's confession, however, he conducted no follow-up investigation. Smothers eventually pled guilty to all the murders to which he confessed, but he was not allowed to plead guilty to the Runyon Street murders. The only additional investigation into Smothers' involvement in the Runyon Street murders occurred following an inquiry initiated by Stanford's attorneys.

In 2014, Stanford's attorneys presented an affidavit from Smothers to the prosecutor's office in which Smothers admitted that he committed the Runyon Street murders with another person who was not Sanford. The Michigan State Police conducted an investigation during which they interviewed Sanford. Sanford denied having participated in the murders, saying that among the reasons that he had confessed to the crime was because Sgt. Russell had told him that if he did then he could go home. Regarding the sketch of the crime scene that Sgt. Russell and Commander Tolbert said that he created all on his own, Sanford said that his only contribution to the sketch was to draw in the location of the bodies (two of which he placed inaccurately). Sanford said that the only reason that he was able to place the bodies in their approximate location was because Sgt. Russell had shown him photographs of the crime scene on a digital camera prior to him drawing the bodies on the diagram, and act that Sgt. Russell denied.

Sgt. Russell and Commander Tolbert initially repeated their earlier testimony to the State Police investigators that Sanford was the sole creator of the crime scene sketch. When confronted with evidence to the contrary, Sgt. Russell and Commander Tolbert admitted that their earlier

testimony was wrong and that Commander Tolbert had drawn the detail on the sketch that included the interior of the crime scene.  Evidence was also uncovered that in all likelihood and contrary to his testimony, Sgt. Russell had shown Sanford photographs of the crime scene which included photos of the positions of the victim's bodies.

Once the prosecutor's office learned the results of the State Police investigation they moved to dismiss the murder charges against Sanford. On June 8, 2016, Sanford was released from prison, and on July 19, 2016, his charges were dismissed.  No further action was taken by the Detroit Police Department against Sgt. Russell or Commander Tolbert.

### 5.2    Findings

- Based on my review of the materials listed in Appendix A, it is clear that the Detroit Police Department (DPD) investigation into the quadruple homicide on Runyon Street and Davontae Sanford suffered from a series of serious failures. First, even the undisputed evidence reveals blatant deviations from the most basic minimally acceptable police procedures. These include Sergeant Russell's failure to document the circumstances surrounding the interrogations of Davontae Sanford and the crime scene sketch later attributed to him, the failure to re-interview and/or document interviews with Davontae Sanford concerning the murder weapons and identities of his accomplices, the failure to conduct and/or document any investigation into the individuals named by Davontae Sanford during his plea, and, most egregiously, the failure to conduct any investigation into Vincent Smothers and Ernest Davis as perpetrators of the quadruple homicide following Vincent Smothers's confession. Additionally, disputed evidence suggests far worse: misrepresenting the circumstances surrounding Mr. Sanford's confession, and the crime scene sketch falsely attributed to him.
- Sgt. Michael Russell of the Detroit Police Department's Homicide Unit, and other members of the department, exhibited tunnel vision and verification bias in their investigation into the Runyon Street murders. This resulted in their arresting Davontae Sanford, and then closing off the investigation to alternative suspects by ignoring overwhelming evidence both that Sanford's confession was unreliable and that Vincent Smothers' confessions were reliable.
- There is a high probability that during his interrogation of Davontae Sanford, Sgt. Michael Russell used tactics, including violating departmental policy by interrogating a juvenile suspect without the presence of a parent or a guardian, that have been found to increase the probability of false confessions by juvenile suspects.
- There is a high probability that Davontae Sanford was provided the details that he gave in his confession from outside sources, including Sgt. Michael Russell, thus calling into question the reliability of the confession. I reach this conclusion because all of the verified details found in Sanford's confession were facts known to Sgt. Russell and the police at the time of the confession, while none of the details provided by Sanford regarding facts not known to Sgt. Russell and the police were confirmed by investigation and many of those details provided by Sanford (such as the types of guns used by the killers and the identity of the accomplices) have proven to be false. Furthermore, based on my experience reviewing old homicide cases, the fact that it is now undisputed that Davontae Sanford's account of the way the crime scene sketch came about is correct, and Sergeant Russell and Commander Tolbert's accounts under oath were false, makes

Davontae Sanford's allegation that Sergeant Russell showed him crime scene photos during the interrogation more plausible. Sanford's allegation that he was shown crime scene photos is bolstered by Russell's statements that he owned a digital camera at the time of the interrogation, and that he has in the past shown multiple suspects crime scene photos in a manner similar to what Davontae Sanford describes.

- Based on my experience as a supervisor and my experience reviewing homicide and other cases, the fact that Sergeant Russell and Commander Tolbert both gave very similar, false accounts under oath of how the crime scene sketch was created that strengthened the case against Davontae Sanford raises major red flags about their deposition testimony that they each inadvertently made the same mistake. The timing of those false accounts---Sgt. Russell gave false testimony two weeks after the sketch and Commander Tolbert gave extremely similar false testimony over two and one half years years later, and after Davontae Sanford sought to withdraw his plea based on Vincent Smothers's confession---further calls them into question from a supervisor's perspective.

- In the aftermath of Davontae Sanford's confession, Sgt. Michael Russell and others ignored numerous red flags that should have created serious doubt regarding the reliability of the confession and the guilt of Davontae Sanford.  These red flags include, but are not limited to: the fact that Davontae Sanford was not able to provide any independently corroborated information about the crimes, the fact that the murder weapons were not in the location he described, the fact that the perpetrators named in the confession were investigated and cleared, and the fact that Vincent Smothers' confessions to the Runyon Street murders, in contrast to Sanford's confession, were detailed, consistent over time and, crucially, provided details not known to the police that were proven to be true. In particular, Smothers correctly identified the kinds of guns used in the killings, and testing has shown that one of the guns used in the Runyon Street killings was used in another murder Smothers committed.

- In spite of the above red flags, Sgt. Michael Russell and other police officers ignored the implications of the confession of Vincent Smothers, and failed to conduct any meaningful investigation into its reliability.  In addition, after being aware of Vincent Smother's confession, Sgt. Michael Russell and Commander James Tolbert offered false testimony in an effort to continue to link Davontae Sanford to the crime.

-  Though Sgt. Michael Russell performed the overwhelming majority of the critical investigative work during the case he failed to properly document his activities through investigative reports as is considered minimally-accepted practice in general, and which Commander James Tolbert testified was the practice in the department.  The fact that this lapse was not caught and corrected reflects a lack of adequate supervision and oversight by the department.  Based on my experience, my knowledge of widely-accepted police practices standards at the time, and my knowledge of Sergeant Russell's training, I would expect Sergeant Russell to have known that his failure to properly document his activities in this case would hinder the defense attorney's ability to challenge the testimony of Sgt. Michael Russell and Commander James Tolbert, including with regard to how the confession came about and the creation of the crime scene sketch by Davontae Sanford. Even after being made aware of the problems with the investigation, including the allegations of perjury against Commander James Tolbert, no evidence has been presented that indicates that the Detroit Police Department took it upon themselves to conduct an independent investigation into those allegations of wrongdoing and/or the quality of the

investigation into the Runyon Street murders. There are several points in this investigation and the post-conviction proceedings at which a full internal affairs investigation should have taken place---most glaringly, at the point at which it came out that Tolbert and Russell testified had falsely about Sanford drawing the crime scene sketch. The failure by the Detroit Police Department to conduct *any* internal investigation into misconduct by Sergeant Russell and Commander Tolbert in this case is an egregious departure from minimally accepted police practices. It suggests, at best, ongoing, complete indifference to fabrication of evidence and perjury by officers in a homicide case, and, at worst, a deliberate and pervasive effort to cover up misconduct within the department.

James Trainum

77

## Appendix A

- Sanford v. City of Detroit, et al., Complaint
- Documents re Detroit Police Department Runyon Street Quadruple Homicide Investigation
    - Detroit Police Department investigative reports
    - Witness statements
    - Case progress reports
    - DPD notification of rights forms
    - Arrestee booking forms
    - Evidence Technician reports and diagrams
    - Homicide Scene Investigation report
    - Written Statements attributed to Davontae Sanford
    - Video of Davontae Sanford
    - Photographs – crime scene and subject
    - Detroit Police Department Laboratory reports
    - Autopsy reports
    - Detroit Police Homicide Section canvass sheets
    - LEIN printouts
    - AIMS Subject Summary reports
    - Gunshot Residue Test Information Sheet, Kit # 5038, E24220104
    - Criminal history reports
    - Homicide progress notices
    - Identification photographs
    - Statement of DeAngelo Gardner
    - Statement of Antonio Langston
    - Warrant Request, 9/20/07
    - Property release form
    - Undated handwritten notes
    - Crime report, 9/21/07
    - Detroit Laboratory Analysis form, Lab numbers, F0-1130A, F0-1130B, 11/15/07
    - Handwritten consent form
- Competency report of Dr. Lynne Schwartz, 12/4/07
- Medical intake forms – Davontae Sanford
- Juvenile referral forms
- Transcripts of Davontae Sanford Criminal Proceedings
    - Preliminary hearing transcripts
    - Trial and plea transcripts, 3/17/08-3/18/08
    - Post-conviction evidentiary hearing transcripts
- Pretrial Settlement Offer/Acceptance – Davontae Sanford
- Transcript of phone call dated 5/28/08
- Presentence Investigation Report for Davontae Sanford

- Documents Relating to Vincent Smothers
  - o Transcript and video of Vincent Smothers' statement, 4/20/08
  - o Transcript of Suppression hearing – Smothers
  - o Affidavit of Vincent Smothers, 8/16/12
  - o Affidavit of Vincent Smothers
  - o Lebanon Police Department report, 4/20/07
  - o 12/28/07 Evidence Technician Report for Rose Cobb case
- Affidavit of Antonio Langston
- Appeals Court decision, 9/26/13
- Reports from the Bureau of Alcohol, Tobacco, Firearms and Explosives
- Detroit Police Department Directive Numbers 201.2 and 203.5
- The Hit Man's Tale – New Yorker digital edition, 10/15/12
- Michigan State Police (MSP) Report regarding Reinvestigation of Runyon Street Homicides
- MSP interview transcripts
  - o Transcript of MSP interview with Davontae Sanford, 8/11/15
  - o Transcript of MSP interview with Ernest Davis, 2/4/16
  - o Transcript of MSP interview with Commander Tolbert, 9/11/15
  - o Transcript of MSP interview with Sgt. Russell, 9/11/15
  - o Transcript of MSP interview with Sgt. Russell, 11/3/15
  - o Transcript of MSP interview with Vincent Smothers, 8/13/13
  - o Transcript of MSP interview with Vincent Smothers, 12/18/15
- MSP Audio Tapes
  - o Audio interview with Dale Collins
  - o Audio interview with Ira Todd
- Search warrants
  - o Search warrant for 5099 Van Dyke
  - o Search warrant for 11421 Christy
- Educational records for Sanford
  - o Individualized Education Program for Davontae Sanford, 8/23/10
  - o Detroit Public Schools Transcript, 1999-2007
  - o MDOC Educational records
- Testimony of Michael Russell in People v. Mills, 1/18/07
- Transcript of Deposition of Michael Russell, 6/12/08
- Transcript of Deposition of James Tolbert, 6/29/18
- Crime scene sketches (Deposition Exhibit 5)
- First 48, A&E Productions, season 5, episode 8, "Highway Revenge."

**Appendix B**

1639 Potomac Ave SE
Washington, D.C. 20003

Phone 202-359-9454
E-mail
james.trainum@yahoo.com

# James L. Trainum

## Employment

### Criminal Case Review and Consulting

2010-present

#### Private Consultant

- Review of open and closed criminal cases at the request of law enforcement, attorneys and organizations.
- Identification of solvability factors in open cases for the purpose of making investigative recommendations.
- Review of alleged wrongful conviction cases – specializing in alleged false confessions.
- Review of law enforcement agencies' policy and procedures in the area of cold case investigations and interview and interrogation procedures.
- Provide expert testimony on police and interrogation procedures in criminal cases and before legislative bodies.
- Provide instruction to law enforcement agencies, attorneys and universities on law enforcement investigative procedures, cold case investigation, interview and interrogation and the prevention of false confessions and wrongful convictions.

### Metropolitan Police Department, Washington, D.C.

1983-2010

#### Violent Crime Case Review Project
#### Project Director – Detective

2000-2010

- Created the Project in response to a need to better select old unsolved homicides (cold cases) for re-assignment and additional investigation.
- Responsible for the comprehensive review of all homicide cases over three years old.
- Developed policy and procedures pertaining to case reviews, case tracking, file tracking, case reassignment and investigation.
- Acted as liaison with Forensic Psychology, Forensic Science and Psychology Departments at local universities in order to obtain student interns to work in the project.
- Created a selection process and training program for student interns in the Project.
- Provided ongoing training for and day-to-day supervision of four to fourteen college student interns each semester. Students were taught to review cases, create case summaries, complete data collection books and identify relevant cold case solvability factors.

1

- Identify those cases with a high solvability potential, especially those with good forensic evidence potential.
- Successfully obtained and managed grant funding for equipment, data entry personnel and DNA backlog testing.

**MPD Violent Criminal Apprehension Program (ViCAP)** 2000-2010
**Program Director – Detective**

- Managed the MPD ViCAP database and developed policy and procedures for data entry and quality control. The national FBI ViCAP system is run in conjunction with the Violent Crime Case Review Project. The Violent Crime Case Review Project is the main case tracking database for ViCAP.
- Trained and supervised interns, volunteers, detectives and crime analysts on data entry and searches. This involved searches of not only the ViCAP system but local and federal data bases such as BARS, DC-DOC, NCIC, CJIS and the FBI data base.
- Liaison with the National FBI ViCAP Unit.

**Major Case/Cold Case Unit**                                    1997-2000
**Detective**

- Investigated cold unsolved murders, recent murders involving three or more victims, child murders and murders involving police officers.
- Worked as part of a MPD/FBI Task Force on cold cases.

**Homicide Branch**                                               1993-1997
**Detective**

- Investigated recent murders, suspicious deaths, suicides and natural deaths.
- Specialized in gang related murder.

**Fifth District Detective Unit**                                 1992-1993
**Detective**

- Responsible for general investigative assignments but primarily handled burglary investigations for the north section of the Fifth District.
- Worked with individuals and groups within the community to identify and address issues of concern involving crime and safety.
- Trained officers in basic investigative techniques – including drafting and successfully obtaining search and arrest warrants.

**Repeat Offender Project**                                       1986-1992
**Detective - Investigator**

- Participated in and directed investigations targeting persons who committed 5 or more felonies per week – but specializing in persons trafficking in stolen property.
- Performed numerous long and short term undercover operations.

2

- Worked with numerous task forces and regional working groups, involving local and federal law enforcement agencies.

**Third Police District Patrol and Support Operations Officer**   1983-1986

- Performed uniformed patrol functions.
- Detailed to specialized units such as narcotics, prostitution, auto theft, surveillance and tactical work.

**Arlington County, Virginia Fire Department**   1977-1983

**Firefighter – Paramedic**

- Proficient in basic firefighting duties involving fire suppression, search and rescue, engine company and truck company functions.
- Nationally Board Certified Paramedic – assigned to a Medic Unit. Responsible for administering emergency medical and advanced life support care.

## Volunteer Work

**Marymount University**   2009-present

**Professional Adjunct Professor**
**Forensic Psychology Graduate Program**

- Facilitate the week-long Criminal Assessment Class that conducts a comprehensive review of an alleged wrongful conviction case.

**National Center for Missing and Exploited Children**   2010-present

**Consultant**
**Project Alert**

- Conduct reviews of unsolved missing children and child homicide cases for law enforcement agencies.

3

## Specialized Training and Experience

- Extensive experience in working multi-jurisdictional cases and on local and federal law enforcement task forces.
- Experience in obtaining appropriate court orders for and the utilization of electronic surveillance and monitoring equipment, including wire-taps, Dialed Number Recorders and pole-cameras.
- Training through the FBI in financial investigations.
- Specialized training through the FBI, local law enforcement agencies and other organizations in homicide investigation, arson investigation, child exploitation, crime scene examination and processing, crime scene analysis, advanced forensic DNA applications and interview and interrogation.
- Adult education instruction training through the National Institute of Justice's National Instructor Development Academy.
- Investigative Interviewing Masterclass through the International Investigative Interviewing Research Group.
- Advancements in Interrogation Research by the High Value Detainee Interrogation Group Research Project.

## Accomplishments

- Developed policy and procedures for MPD cold case and evidence reviews following a study of other cold case homicide review processes across the country.
- Started a departmental intern program that has since been adopted by many other DC MPD units.
- Created training programs for interns and detectives on homicide investigation, case reviews, evidence, forensic database and the FBI ViCAP database.
- Obtained grant funding for DNA backlog reduction.
- Created the MPD VICAP Program.
- Recipient of the Marymount University Forensic Psychology Program Award in Ethics in Law Enforcement (2005)
- Recipient of the 2009 Innocence Network's Champion of Justice Award.
- Testified before the Ohio, Oregon and Maryland Legislatures on the benefits of videotaping interrogations.
- Testified before the New York State Task Force and the Florida Innocence Project on the benefits of videotaping interrogations.

## Committees, Advisory Boards and Professional Organizations

- The Vidocq Society (May 2008-present).
- FBI ViCAP National Advisory Board (2003-2008)
- DC Homicide Coalition – a cooperative effort of multiple agencies tasked with improving and coordinating the response of government and private agencies to the needs of co-victims/survivors of homicide (2005-2010).
- Mid Atlantic Cold Case Homicide Investigators Association (2004 - present, member of the board of directors 2011-2016)
- International Investigative Interviewing Research Group (2011- present)
- International Homicide Investigators Association (2006-present)
- Homicide Research Working Group (2005-present)
- Police Executive Research Forum Eyewitness Identification Research Project (2011)
- Mid-Atlantic Innocence Project Honorary Board Member (2010-present)
- The Constitution Project, co-chair of the Committee on Policing Reforms (2015 – 2016t)

## Lectures – Presentations – Teaching

- Basic Crime Analysis Techniques presented to DC MPD detectives, American University Criminal Justice Department
- Intuition and Police Work- Marymount University Department of Forensic Psychology
- " The Starbucks Triple Murder / Cooperation Between Local and Federal Law Enforcement Agencies" presented to Marymount University; American University; the DC MPD Police Academy, LeadAmerica
- "The Freeway Phantom Serial Murder Investigation- A Case Study" presented at the ATAP DC Annual Conference (2006); The Mid-Atlantic Cold Case Homicide Investigators Association Conference (2006)
- Interrogation and False Confessions- Georgetown University; American University Law School; Marymount University, D. C. Public Defender Service, U. S Attorney Office for the District of Columbia.
- Identifying and Avoiding Criminal Investigation Pit Falls, and Evaluating Statement Evidence: - MPD basic investigators class and homicide school, Richmond Va. Homicide school
- The MPD ViCAP Program-DC MPD personnel, DC Metropolitan Regional Sex Offense Detectives conference
- Basic Homicide Investigation-DC MPD
- Forensic and Computer Databases-DC MPD
- Evaluating Confession Evidence- Institute for Law Enforcement Administration, Plano Texas conference on Best Practices in Law Enforcement Investigations: The Role of Leadership in Avoiding Wrongful Convictions (yearly 2010-2012)
- False Confessions and the Case for Videotaping: Arizona Attorneys for Criminal Justice Winter Seminar (2011)
- Evaluation of Witness Statements and Confession Evidence:  Office of the Wisconsin Sate Public Defender Annual Conference (2011)
- Police Investigative Practices:  Public Defender Services of the District of Columbia (2011)

- Detecting Deception – Behavior Analysis and the Polygraph: Juvenile Defender Leadership Summit, Washington, D.C. 2010
- Creating and Managing Cold Case Units & Evaluation of Confession Evidence - Nevada Chief's and Sheriff's Association Annual Retraining Conference (2011)
- The Three Steps to a False Confession – Brown University, Providence, RI (2013), Mississippi Public Defenders Conference (2014)
- Witness Interviews – Investigation Processes, Practices and Pitfalls – Suffolk Co. MA District Attorney's Office, Boston Police Homicide Unit & Massachusetts State Police (2014)
- Unreliable Statement Evidence Issues – Panels at: Washington & Lee Law School, False Confession: The True Story Symposium (2014), Pennsylvania State University Quattrone Center, A Systems Approach to Conviction Integrity (2014), Temple University, False Confessions, Intersecting Science, Ethics & the Law.
- Academic Director, Georgetown University Summer Forensic Science Program (2010)
- Interviews & Interrogations – Understanding Best Practices, Forty-Fifth Annual Criminal Law Seminar, Virginia CLE & Virginia State Bar, 2015
- Interrogation Practices and Evaluating Witness Evidence: Federal Defender Service 11th Annual Saint Crispin Day Celebration CLE, Atlanta, Ga (2015)
- Investigating the Investigation & Identifying Bad Statement Evidence, Wisconsin State Public Defenders Annual Criminal Defense Conference (2016)
- Testimony regarding videotaping of interrogations: Kansas State Legislature (2016)
- Increasing Reliability and Accuracy of Statements, Minnesota Juvenile Officers Association, (2017)
- Testimony regarding videotaping interrogations and special considerations for juvenile suspects, Oregon State Legislature (2017)
- Three Steps to Bad Statement Evidence,
  - Major City Chiefs Association Conference, Washington, D.C. (2017)
  - Center for Wrongful Convictions, Chicago, Il (2017)
  - Legal Aid, Brooklyn, NY (2017)
  - State Bar of Michigan, Criminal Law Section (2017)
- Interrogation in the US: Where we are and how we got there, Innocence Project Policy Conference, Excelsior Springs, MO. (2017)
- International Investigative Interviews Research Group Conference, A comparative study of confession evidence evaluation (2017)

## Publications – Research

- James Trainum and Diana Havlin. A False Confession to Murder in Washington, D.C.  In *Criminal Investigative Failures* by D. Kim Rossmo (2009)
- James Trainum, Nancy Brown, Ray Smith, Fencing Operations*,  FBI Law Enforcement Bulletin* (6/2001)

- Study of post-release arrests of suspects in dismissed homicide cases for the Metropolitan Police Department (2003).
- Primary author of the Metropolitan Police Department's Major Case/Cold Case Unit's Standard Operating Procedure.
- Steven Drizin and James Trainum (2010).  A report for the Department of Justice on the interview and interrogation practices of the New Orleans Police Department, with recommendations.
- Consultant and author of the Forward for *Cold Case Research Resources for Unidentified, Missing and Cold Case Homicides* by Silvia Pettem.
- " 'I Did It' – Confession Contamination and Evaluation," *The Police Chief* 81 (June 2014); Web-only
- "Get it on tape", Op-Ed for the Los Angeles Times newspaper, (10/24/2008)
- Gary David, Anne Rawls, James Trainum, "Playing the Interrogation Game: Trust, Coercion and Confessions in Police Interrogations", Presented at the American Sociological Association Annual Meeting, Chicago, 2015. Published as "Play the Interrogation Game: Rapport, Coercion and Confessions in Police Interrogation." *Symbolic Interaction*, (Vol 41, Issue 1), 2017
- *How the Police Generate False Confessions: An inside look at the interrogation room* (Rowman and Littlefield, 2016)
- Pending publications:
  - Disbelief Repeats in Deception Tagging: Conversational Strategies for Labeling Lies in Interrogations, with Gary David, PhD. – Chapter in *Palgrave Handbook of Deceptive Communication,* (MacMillan Press)

## Current Projects

- Texas State University
  - Identifying, reviewing and analyzing criminal investigations as part of the University's "Case Deconstruction of Criminal Investigative Failures" research project.
  - Research fellow: Center for Geospatial Intelligence and Research
- Police Executive Research Forum (PERF)
  - Assessment of the homicide investigative process of selected law enforcement agencies.
- University of Pennsylvania Law School's Quattrone Center
  - National Institute of Justice consultant assisting with the sentential event review of a near wrongful conviction in Philadelphia, PA.

## Past Projects

- The Constitution Project
  - Co-Chair for publications:
    - Suggested model policies for the police use of body cameras.
    - The militarization of law enforcement in the U.S.

**<u>Media</u>**

- National Public Radio Podcast "Serial"
  - Review the law enforcement investigation into the murder of Hae Min Lee in Baltimore, Maryland in 1999 (2014)
- National Public Radio, This American Life
  - Episode 507 – "Confessions"
  - Interviewed about law enforcement interrogation tactics and how they lead to Trainum obtaining a false confession in 1994
- The New Yorker magazine
  - The Interview: Do police interrogation techniques produce false confessions?  December 8, 2013
- The New York Times
  - Confessing to Crime, but Innocent, September 12, 2010
- CBS "48 Hours"
  - Murder on the Hudson, September, 2015
  - Reviewed and commented on the police investigation into the death of Vincent Viafore
- USA Today
  - "Speeding train" interrogations can fuel false confessions, December, 2011
- Nexflix
  - The Confession Tapes
    - Episode: 8th and H
    - September, 2017

**<u>Expert Testimony:  details available upon request</u>**

- Superior Court of the State of Delaware – New Castle County
  - State of Delaware vs. Jermaine Wright
  - Case Number 91004136D1
  - 2009
- Fifth Judicial Circuit Court – Hernado County, Florida
  - State of Florida vs. Paul Christopher Hildwin
  - Case Number 1985-499-CF
  - 2010
- Superior Court of the District of Columbia
  - United States v. Reco Coates
  - Case Number 2009 CF1 15475
  - 2012
- U.S. District Court for the District of Columbia
  - Donald Eugene Gates vs. District of Columbia et. Al.
  - Case Number 1:11-cv-00040
  - 2012
- U. S. District Court for the Western District of Virginia
  - Ivan Teleguz v. Keith W. Davis, Warden, Sussex I State Prison
  - Case Number 7:10-cv-00254
  - 2013
- Superior Court of the District of Columbia

- o United States v. Daquan Tinker
- o Case Number 2012 CF1 15125
- o 2013
- Navy-Marine Corps Southern Judicial Court
  - o United States of America vs. David W. Neiman, ABHAN, USN
  - o 2013
- U.S. District Court for the Western District of Virginia – Charlotte Division
  - o Robert Wilcoxson vs. Buncombe County, et al
  - o 2015
- U.S. District Court for the Northern District of Ohio – Cleveland Division
  - o Glenn Tinney vs. Richland County, et al
  - o 2015
- U.S. District Court for the Eastern District of New York
  - o Martin Tankleff vs. The County of Suffolk, et al
  - o 2015
- State of Wisconsin
  - o State of Wisconsin v. Chong Lee
  - o 2015
- District Court of the Fifteenth Judicial District of Oklahoma
  - o State of Oklahoma vs. Christopher Jason Netz
  - o 2016
- State of Michigan
  - o People of the State of Michigan v. Lamarr Monson
  - o 2016
- State of New Jersey
  - o State of New Jersey v Eric Kelly & Ralph Lee
  - o Passaic Co. Ind. No. 93-10-1183
  - o 2016
- State of Virginia
  - o Commonwealth of Virginia v. Natalie M. Keepers
  - o CR16000629-00 and CR16000630-00
  - o 2017
- District of Columbia Superior Court
  - o U.S. vs. Gary Montgomery
  - o 2012-CFI-2614
  - o 2017
- State of Michigan
  - o People of the State of Michigan v. Charles Beneitz Suel
  - o 3017-000463-FH
  - o 2018

9

**Appendix  C**

**Cases in which James Trainum Has Testified in the Past Four Years**

- U.S. District Court for the Western District of Virginia – Charlotte Division
  - Robert Wilcoxson vs. Buncombe County, et al
  - 2015
- U.S. District Court for the Northern District of Ohio – Cleveland Division
  - Glenn Tinney vs. Richland County, et al
  - 2015
- U.S. District Court for the Eastern District of New York
  - Martin Tankleff vs. The County of Suffolk, et al
  - 2015
- State of Wisconsin
  - State of Wisconsin v. Chong Lee
  - 2015
- District Court of the Fifteenth Judicial District of Oklahoma
  - State of Oklahoma vs. Christopher Jason Netz
  - 2016
- State of Michigan
  - People of the State of Michigan v. Lamarr Monson
  - 2016
- State of New Jersey
  - State of New Jersey v Eric Kelly & Ralph Lee
  - Passaic Co. Ind. No. 93-10-1183
  - 2016
- State of Virginia
  - Commonwealth of Virginia v. Natalie M. Keepers
  - CR16000629-00 and CR16000630-00
  - 2017
- District of Columbia Superior Court
  - U.S. vs. Gary Montgomery
  - 2012-CFI-2614
  - 2017
- Northern District of California
  - Trulove v. City and County of San Francisco
  - 16-cv-50-YGR
  - 2017
- State of Michigan
  - People of the State of Michigan v. Charles Beneitz Suel
  - 3017-000463-FH
  - 2018

<u>**Appendix D**</u>

**Statement of Compensation of James Trainum**

For my professional services in this matter, as a consultant and a possible expert witness, my understanding is that I will receive compensation at a rate of $150 per hour for my work on this report and at a rate of $150 per hour for my sworn testimony plus expenses.