UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

                Plaintiff,                      Case Number 17-13062

v.                                             Honorable David M. Lawson

MICHAEL RUSSELL and JAMES TOLBERT,

                Defendants.

_____/

## CORRECTED OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The Court issues this corrected opinion and order to correct certain non-substantive errors in the original.

Defendants Michael Russell and James Tolbert move for a summary judgment of dismissal of all claims brought against them by plaintiff Davontae Sanford. Sanford alleged in a complaint that when he was fourteen years old, he was coerced into confessing and pleading guilty to murdering four people, largely based on the misconduct of the defendants, who were Detroit police officers at the time. After another person confessed to the crimes and confirmed that Sanford was not involved, a state police investigation uncovered evidence that lent substance to Sanford's claims. The defendants argue here that discovery has not borne out the allegations in Sanford's complaint, and that the undisputed facts require judgment in their favor as a matter of law. The Court disagrees and will deny the motion for summary judgment.

### I. Facts and Proceedings

The facts of the case as taken from the complaint were discussed at length in the opinion and order denying the present defendants' motion to dismiss. *See Sanford v. City of Detroit*, No.

17-13062, 2018 WL 6331342, at *1-4 (E.D. Mich. Dec. 4, 2018). The following factual record was developed through the discovery taken in the case.

## A. The Murders on Runyon Street

Former hitman Vincent Smothers testified under oath that, on September 17, 2007, he and an accomplice, Ernest Davis, murdered Michael Robinson at his home on Runyon Street, on the east side of Detroit. Vincent Smothers dep., ECF No. 170-5, PageID.8386-87. Smothers was hired to kill Robinson by Leroy Payne. *Id.* at PageID.8388. Smothers assumed that Payne wanted Robinson killed because he was a rival drug dealer. *Ibid.* Smothers used an AK-47 rifle, and Davis used a .45 caliber pistol for the hit. *Id.* at PageID.8389. Smothers was dressed in a Carhartt "overall jumpsuit" and wore a ski mask. *Id.* at PageID.8392. He also found a .40 caliber pistol at the scene, lying on a coffee table next to Robinson's dead body, which he took with him when he left. *Id.* at 8389. Smothers later informed police that two of the weapons involved in the murders had been hidden at a house on Promenade Street. Both the .45 and .40 caliber pistols were recovered by police from the residence. *Id.* at 8390.

Smothers initiated the attack by attempting to push open the front door; when the door was opened from the inside, Davis began shooting through the front window at a person who could be seen sitting on a couch. Smothers dep. at PageID.8391. Smothers fired through the front door, hitting the person who had opened it. *Ibid.* As Smothers burst into the house, he saw a woman who was inside "run[] past into a hallway and out of [his] field of view." *Ibid.* Once inside, Smothers saw several persons in the front room who were hit by gunfire. The assault on the home ended with four people dead. *Id.* at 8392.

The first arriving officers on the scene found four dead bodies in the front room of the home. In the southwest bedroom of the home a woman, Valerie Glover, was suffering from several gunshot wounds; her seven-year-old son, also in the room, was unharmed. Incident Report dated Sept. 17, 2007, ECF No. 170-6, PageID.8402. Glover testified that she was shot five times while she was in and running from the front room of the house, and that she then ran and hid in the bedroom. Valerie Glover dep., ECF No. 170-7, PageID.8763, 8769. Smothers attested in an affidavit that as he was going through the house, he found Glover hiding under a bed in a back room, and she said, "Don't kill me"; Smothers assured her that he would not kill her, and he told her to stay in the bedroom until he had left the house. Smothers aff. ¶ 41, ECF No. 170-8, PageID.8784.

Smothers attested that he did not know Davontae Sanford or any of his family. He also verified that Sanford was not present during the attack, nor was he involved in any way with the planning of the hit, which was done entirely by Smothers and Davis. Smothers dep. at 8393-94.

## B. The Police Investigation

Defendant Michael Russell was assigned to the Detroit police homicide department in September 2007. He was dispatched to investigate the Runyon Street murders and arrived on the scene with another Detroit police investigator, Dale Collins, and a K-9 unit. Criminal Trial Tr., ECF No. 170-10, PageID.8870, 8878. In September 2007, due to his supervisory role, Tolbert was "never directly investigating homicides." Tolbert dep. at PageID.8802. However, when the Runyon Street murders occurred, he was on the scene within hours. *Id.* at PageID.8805. Tolbert subsequently spent hours at the scene investigating and attempting to piece together what had happened. *Id.* at PageID.8806-08.

Sanford recalled that he encountered Russell outside, on a street near his home, early in the morning of September 18, 2007, when the two walked up to each other and had a conversation. Davontae Sanford dep., ECF No. 170-12, PageID.8941-43. Russell asked Sanford who he was, where he lived, and if he had "seen anything"; he responded that he had not. *Id.* at PageID.8944. Sanford says that, after a brief conversation, the officers took Sanford to his home and spoke to his grandmother. *Id.* at PageID.8948. At some point Tolbert was told by defendant Russsell that Russell had a person who might know about the crime and identified the person as Sanford. Tolbert dep. at PageID.8810. Russell and Tolbert went to Sanford's home, spoke to Sanford's grandmother, and got her permission to question the boy. *Ibid.* The police told Sanford's grandmother that they wanted to talk to him to see if he had any information about what was "going on in the area," and she then signed a consent form allowing the police to talk to Sanford. Sanford dep. at PageID.8949-50.

Sanford then got into a police car with Russell, and they drove around to various places, passing some houses and stopping at a Coney Island restaurant. Sanford dep. at PageID.8951. Tolbert testified that they drove around in the police car with Sanford for some length of time, during which he asked Sanford questions. Tolbert dep. at PageID.8811. Tolbert and Russell both were in the car, along with another police investigator and Sanford. *Id.* at PageID.8813-14. During that initial interview in the car, Sanford "did not make any admissions concerning the crime." *Id.* at PageID.8813. However, the police asked Sanford about "who . . . in the neighborhood [sells] drugs and different things like that," and Sanford "gave them two or three names." Sanford dep. at PageID.8951.

Russell later interviewed Sanford at police headquarters for around three or four hours, starting at 4:00 a.m. on September 18, 2007. Trial Tr. at PageID.8887; Tolbert dep. at

PageID.8816-17.  During that interview Sanford did not make any admissions to involvement in the crime.  Tolbert dep. at PageID.8817.  After the interview, the police took Sanford back home, where he went inside and fell asleep on the couch.  Sanford dep. at PageID.8961.

Sometime in the evening of the 18th, after dark, Russell again went to Sanford's home and requested permission to interview him; Sanford's mother gave her permission for the police to talk to Sanford again.  Trial Tr. at PageID.8887; Sanford dep. at PageID.8961.  Russell woke Sanford up, and he told Sanford's mother that he thought Sanford "had some information about the Runyon Street murders," but that he "wasn't being forthcoming."  Sanford dep. at PageID.8961.  Russell had Sanford's mother sign a consent form and then they left to go back to the police station.  *Ibid.* During the drive to the police station, Russell said to Sanford, "You know you haven't been telling the truth," and he told Sanford — falsely— that tests on his shoes had indicated the presence of blood.  *Id.* at PageID.8967.  At the police station, in the interview room, Russell "whipped out a camera from his desk, [and] got to showing [Sanford] pictures of the crime scene," and said "This is not a game.  These people lost their lives."  *Id.* at PageID.8969.

Tolbert and Russell both were present during the interview when a sketch of the crime scene was created; Russell was sitting beside Sanford the entire time while the drawing was made.  Tolbert dep. at PageID.8821-23.  Sanford did not create the diagram.  Tolbert admits that the drawing was done by him, and that he spent several minutes drawing out the detailed sketch in his own hand.  He explained that he was able accurately to recall the layout due to his extensive observations of the crime scene.  *Id.* at PageID.8838-39.  After he finished drawing the diagram, Tolbert put down the pen and told Sanford to "draw where the bodies was at [sic]," and Sanford did so.  Sanford dep. at PageID.8977.  However, Sanford attested that he knew where to draw the bodies in only because Russell had shown him photos of the crime scene depicting where the

bodies were. Sanford decl. ¶¶ 1-2, ECF No. 170-16, PageID.9010. Sanford insists that he had no involvement in the murders, never was inside the Runyon Street home, and did not know anything about the bodies except what Russell told and showed him. *Ibid.*; Sanford dep. at PageID.8987.

Tolbert then left the room, and Russell continued to question Sanford. Sanford dep. at PageID.8979. The questioning continued for "a couple of hours." *Id.* at PageID.8981. During the questioning, while discussing details of the crime, Russell "suggest[ed] stuff" to Sanford if Sanford's responses "didn't go with what [Russell] was saying." *Id.* at PageID.8982-83. Sanford attested that he could not recall what specific details Russell supplied to him that were recorded in his statement, but he insists that everything in his statement about the circumstances of the murder must have come from Russell, because he was not involved in the killings and did not know any details about them. Sanford decl. ¶¶ 2-3, PageID.9010. At some point during the interview a phone rang, and Russell went to answer it; when he returned from taking the call, he said to Sanford, "We gotta hurry up. Let[']s finish this so I can get you home so you can be in school tomorrow." *Id.* at PageID.8984. However, at the end of the interview, Sanford was arrested and charged with the four murders. *Id.* at PageID.8985-86.

Tolbert understood that the sketch was "important evidence" because it showed that "Sanford knew details about the crime scene he could only know if he was guilty"; in fact Tolbert considered the diagram to be a "critical" piece of evidence. Tolbert dep. at PageID.8823-24, 8831-32. However, Tolbert recalled that he had "absolutely not" ever drawn a sketch of a crime scene and asked a suspect to fill in details before, and he admitted that "it was just this case" when that was done. *Id.* at 8824. In fact, the process of creating the sketch "stood out in [Tolbert's] mind," because he "never did it before." *Id.* at PageID.8825. Tolbert admitted that he later testified at the plaintiff's bench trial that he found it "significant" that the plaintiff was able to draw details into

the sketch such as the location of the television set in the living room; but that testimony was false, because Tolbert himself drew those details into the sketch. *Id.* at PageID.8828. Tolbert further testified at the criminal trial that the plaintiff had drawn "everything" in the sketch except defendant Russell's signature. *Id.* at PageID.8830. Russell also testified that he considered the sketch to be "important evidence that Davontae Sanford was telling the truth when he stated that he was involved in the shooting," because "it showed he knew details about the crime scene that he could only know if he was guilty." Russell dep. at PageID.9102.

During a 2010 evidentiary hearing in the state court, Tolbert testified about the sketch again. He attested that nobody had entered the home after the shootings, and the bodies could not be seen from the outside, so the only way someone could know the locations of the bodies was if they were in the house during the shooting or its aftermath. Evid. Hrg. Tr., ECF No. 170-11, PageID.8928-29. Tolbert again attested that the sketch was "done entirely in the defendant's hand," that "all he gave [Sanford] was a blank piece of paper," and that Sanford "drew everything on it except for Sergeant Russell's signature." *Id.* at PageID.8930.

Russell testified during both the preliminary examination and the criminal trial that, during the evening interview on September 18th, Sanford drew a diagram of the murder scene, which was entered into evidence as part of his confession statement. Trial Tr. at PageID.8891; Prelim. Exam. Tr. at PageID.9075. However, Russell insisted that Sanford drew the sketch entirely on his own. Prelim. Exam. Tr. at PageID.9075. Russell also testified that he never showed Sanford any photographs of the crime scene. *Id.* at PageID.9076.

At the end of the interview, Sanford signed a written confession, which was read into evidence at his preliminary examination. Prelim. Exam. Tr., ECF No. 170-20, PageID.9068-71. According to the statement, on September 17, 2017 Sanford met up with "Tone," "Tone Tone,"

"Los," and "Carrie," and they talked about "robbing Milk Dud on Runyon" in the evening. Sanford later met his accomplices around 9:25 p.m. at a park across from his house, where they got into Los's car to drive over to Runyon Street. Sanford was armed with a "Mini 14," "Tone had a handgun," "Tone Tone had a chopper" (slang for AK-47), and "Carrie had a .45." When the group got out of the car, they ran up to the house and began shooting from the outside. They then went inside, where Sanford "saw Milk Dud sitting in a chair . . . in front of the door," another man sitting on the couch, and a man and woman on the floor. The two on the floor appeared already to be dead, and the others in the room had been hit. Tone and Tone Tone searched the house, and Sanford heard shots from a back bedroom. Tone Tone then retrieved two black duffel bags from the basement. The group then shot Milk Dud and the man seated on the couch several more times and ran out of the house. Carrie and Sanford then ran away up the street, but someone across the street shot at them, and the pair returned fire. Sanford then ran home and went inside, changed his clothes and put his shoes in the washing machine. After a few minutes his mother came home and said that someone had been shot on Runyon Street.

Numerous details of the written statement signed by Sanford later turned out to be false. The four accomplices named by Sanford in his statement were brought in during the police investigation, but all were cleared, and none were charged with the murders. Tolbert dep. at PageID.8860; Russell dep., ECF No. 170-21, PageID.9092. A gunshot residue test performed on Sanford's face and hands the night of the murders also came back negative. Laboratory Analysis dated Jan. 9, 2008, ECF No. 170-49, PageID.9732. And a search of the location where Sanford said the group hid the murder weapons turned up empty. The confession also incorporated details that later were established as false, such as that Valerie Glover was shot in a back bedroom, when she actually was shot in the living room, which Russell admitted was a conclusion he had drawn

from his own observations of the crime scene. Russell dep. at PageID.9136-37. Also, when Glover initially was interviewed by police, she described the man who confronted her in the bedroom as 6'1" tall and aged 30-35; in 2007 Sanford was only 14 years old and 5'6" tall. Witness Statement of Valerie Glover dated Sept. 18, 2007, ECF No. 170-6, PageID.8712; Medical Intake Form dated Sept. 19, 2007, ECF No.170-6, PageID.8677.

C. Smothers's Confession to the Runyon Street Murders

In April 2008, Smothers was arrested on a warrant charging him with several other murders. Smothers aff. ¶ 54, ECF No. 170-8, PageID.8787. He was interrogated over the course of two days by Detroit police officer Ira Todd and Sergeant Gerald Williams. Williams was interested primarily in Smothers's part in the murder of Carl Thornton, but during that discussion Smothers recalled that he had used the same AK-47 to kill Thornton that he used in the Runyon Street assault. That recollection prompted Smothers to also confess to Sergeant Williams that he was the one who committed the Runyon Street killings. *Id.* ¶ 60, PageID.8789.

At some point during his interrogation by Williams, Smothers was escorted on a bathroom break by defendant Russell. Smothers dep. at PageID.8395. While Smothers was using the bathroom, Russell said to him, "I heard you said that you did Runyon" — referring to the Runyon Street murders. *Id.* at 8397. Smothers responded, "Yes, I did say that," to which Russell replied that it was "impossible," because "We got the kid that did that." *Ibid.* Smothers then said, "Impossible? Why do you say that? Because I did it." *Ibid.* Smothers then walked past Russell and returned to the interrogation room, and he never spoke with Russell again about the Runyon Street murders. *Id.* at 8398. Smothers testified that, unlike the other murders to which he had confessed, he never was further interrogated about the Runyon street killings. *Id.* at 8399. Smothers confessed to his part in seven hits involving a total of 12 murders and three attempted

murders during his April 19-20, 2008 interrogations; the four Runyon Street killings are the only ones for which he was never charged. Smothers aff. ¶¶ 63-64, PageID.8790.

In 2007, defendant James Tolbert was the commander of the homicide department of the Detroit Police Department. James Tolbert dep., ECF No. 170-9, PageID.8802. Tolbert was informed about Smothers's confessions to the multiple homicides after his interrogation in April 2008, and he acknowledged that the failure fully to investigate Smothers's admitted involvement in the Runyon Street murders was an "extraordinary investigative lapse." *Id.* at PageID.8847-51. Tolbert also testified that Russell was aware of Smothers's confession, and he admitted that, as the investigator in the Runyon Street case, Russell had an obligation fully to explore Smother's involvement. *Id.* at PageID.8855-56. Tolbert said that if there was an investigation of Smothers's involvement, it would have been documented in the homicide investigation file, and he conceded that he could not explain "why there's not a single document in the Runyon homicide file relating to an investigation into Smothers." *Id.* at PageID.8859. Russell admitted that when he was informed of Smothers's involvement in April 2008, he "did [not] do anything" to follow up on the information or investigate it further. Michael Russell dep., ECF No. 170-21, PageID.9098.

### D. Sanford's Conviction and Exoneration

Sanford was charged with four counts of murder, based solely on the purported written confession and the sketch that he supposedly had drawn. During a psychiatric exam ordered after his arraignment, Sanford insisted he was innocent and that the police had fabricated and coerced his confession.

During the preparation for the case, Russell met with prosecutors and told them that all of the details stated in Sanford's confession came from Sanford himself and were not suggested to him by the police. Russell dep. at PageID.9095. Russell also stated that when he met with

prosecutors he discussed the sketch of the crime scene with them and how it was created. *Id.* at PageID.9103.

Wayne County Prosecutor Patrick Muscat testified that he received the investigative file from the Detroit police department and relied on the materials in it for his understanding of the facts of the case. Patrick Muscat dep., ECF No. 170-25, PageID.9217-18. The sketch of the crime scene was in the file, and Russell told Muscat when they met to prepare for trial that the sketch was drawn by Sanford. *Id.* at PageID.9219-20. He also recalled that Russell told him that all of the details in the confession came from Sanford and none were supplied to him by the police. *Id.* at 9221.

The written statements and sketch were used as evidence at Sanford's preliminary examination, and at a bench trial in March 2008. The defendants also testified that all of the facts in the written statements were volunteered by Sanford with no prompting from his interrogators, and that many of them would have been known only by the shooters.

Sanford entered a mid-trial guilty plea to the four counts of second-degree murder and one felony firearm count. On April 4, 2008, the state court sentenced him to four concurrent terms of 37 to 90 years for the murder counts and an additional two-year term for the firearm count.

In 2008 Sanford's appellate counsel learned about Smothers' confession from news reports. Sanford filed a post-conviction motion asserting his innocence, supported in part by an affidavit supplied by Smothers. In 2015, the Michigan State Police began an investigation into alleged police misconduct surrounding the Runyon Street murders; as noted above, Tolbert finally confessed to state police investigators then that he had fabricated the sketch supposedly drawn by Sanford. The evidence collected by the state police also included the contents of victim Michael Robinson's cell phone, which included a photograph of a .40 caliber pistol that strongly resembled

the gun used by Smothers in one of the murders to which he confessed (the same gun that Smothers told police he had taken away from the Runyon Street scene).

On May 20, 2016, the state police submitted a report of the investigation to the Wayne County Prosecutor's office. On June 8, 2016, Sanford's attorneys and the Wayne County Prosecutor's Office submitted a joint stipulation asking the trial court to set aside Sanford's conviction, and Sanford was released from custody. Finally, on July 19, 2016, the state court dismissed all of the charges against him

E. Procedural History

The plaintiff filed his complaint in this case on September 18, 2017. It pleaded several counts for violations of Sanford's constitutional rights via 42 U.S.C. § 1983 and the Americans With Disabilities Act (ADA). In Count I, the complaint alleged that the police violated the plaintiff's right to due process under the Fifth and Fourteenth Amendments by (1) fabricating inculpatory evidence, and (2) compelling, manipulating, and coercing the plaintiff to make a false confession. In Count II, the plaintiff alleged that the police violated his rights under the Fourth Amendment by instigating a malicious prosecution against him based on fabricated evidence and without probable cause. Count III alleged a claim against the City of Detroit, but that was dismissed by the Court. Count IV pleaded failure to accommodate claim under the ADA, which the defendants previously challenged in their motion to dismiss, but which is not addressed in the present motion.

Defendants Tolbert and Russell contend that they are entitled to summary judgment because the undisputed facts show that they did not violate any of Sanford's constitutional rights.

## II.  Discussion

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627 (6th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "The moving party bears the burden of showing that no genuine issues of material fact exist," and it "must demonstrate the 'basis for its motion, and identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* at 627-28 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

To oppose that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted)).  The opposing party must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The submitted materials need not themselves be in a form that is admissible in evidence. *Celotex*, 477 U.S. at 324.

"The reviewing court must then determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman*, 901 F.3d at 628 (quoting *Anderson*, 477 U.S. at 251-52).  In

doing so, the Court must "view the facts and draw all reasonable inferences in favor of the non-moving party." *Ibid.* (quoting *Matsushita*, 475 U.S. at 587).

The defendants' motion challenges only Counts I and II of the complaint. As noted above, Count III (the *Monell* claim) previously was dismissed. The defendants did not challenge Count IV, which pleaded violations of the plaintiff's rights under the ADA. However, after the motion was argued, the parties stipulated to dismiss Count IV as to remaining defendants, and the Court dismissed that count on February 28, 2019.

The defendants make several arguments in support of their contention that all of the section 1983 claims should be dismissed, some of which were raised in a motion to dismiss, addressed by the Court, and rejected in the opinion and order denying the motion to dismiss. Those arguments will not be revisited here.

The plaintiff concedes that he no longer intends to pursue any *Brady* claim for pre-trial suppression of evidence. Thus, his response only defends his claims for (1) fabrication of evidence (under the Fourteenth Amendment); (2) coerced confession (Fifth Amendment); and (3) malicious prosecution (Fourth Amendment). The plaintiff makes no mention of, or any attempt to defend, any claims for "false arrest" or "false imprisonment." If the pleadings could be construed to embrace any such claims, they have been abandoned.

## A. Fabrication of Evidence Claim

The defendants argue that they are entitled to qualified immunity on the plaintiff's fabricated evidence claim because their conduct did not violate any clearly established law at the time of their conduct. They reason that Sanford cannot identify any information on the sketch (which Tolbert drew) that did not come from him, and he admitted that he drew the location of the bodies. They also contend that a fabrication-of-evidence claim does not arise under the Fourth

Amendment; and if the plaintiff intends to raise a due process challenge, that arises under the Fifth Amendment. The defendants also assert a claim of absolute immunity, premised on the idea that a police officer cannot be sued for activities that are preparatory to testifying.

The doctrine of qualified immunity insulates state actors from liability in close-call situations. *See Saucier v. Katz*, 533 U.S. 194, 206 (2001) (explaining that the defense is intended to protect state actors who must operate along the "hazy border" that divides acceptable from unreasonable conduct). But that affirmative defense protects government actors performing discretionary functions from liability for civil damages only when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The purpose of the defense is to strike a balance that "accommodates the tension between permitting litigants to recover damages, which is often the only realistic avenue for vindication of constitutional guarantees, and the social costs of such suits, including the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 900 (6th Cir. 2004) (quotation marks and citation omitted).

Once the qualified immunity defense is raised, "the plaintiff must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)). The plaintiff must clear both hurdles, but the Court may take up the questions in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (abrogating in part *Saucier*, 533 U.S. at 201).

The qualified immunity defense may be raised at any stage of the case. When it is raised in a motion for summary judgment, as here, courts must weave the summary judgment standard

into each step of the qualified immunity analysis.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  That means that the court must view the facts in the light most favorable to the plaintiff, *Saucier*, 533 U.S. at 201; "[i]n qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott*, 550 U.S. at 378.

"'It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury.'"  *Jacobs v. Alam*, No. 17-2159, 915 F.3d 1028, 1042 (6th Cir. 2019) (quoting *Gregory v. City of Louisville*, 444 F.3d 725, 737 (6th Cir. 2006)).  "[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.'" *Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) ("[T]he presentation of testimony known to be perjured . . . to procure the conviction and imprisonment of a defendant is as inconsistent with the rudimentary demands of justice as is the obtaining of a like result by intimidation.")).  "'A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.'" *Ibid.* (quoting *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997)).

The defendants' argument that the facts do not demonstrate that the sketch was fabricated is based on a narrow and stilted view of the evidence in the record.  But the Sixth Circuit sternly has warned that, when seeking summary judgment, particularly on the ground of qualified immunity, defendants unequivocally must accept the facts as asserted by the plaintiff, not as asserted or shaded by their own testimony and arguments.  *See McDonald v. Flake*, 814 F.3d 804, 816 (6th Cir. 2016) ("As the plaintiffs point out, Officer Flake's appeal was solely a fact-based

challenge to the plaintiffs' evidence and the district court's findings, which was both contrary to settled law and in flagrant disregard of the district court's direct admonition that Flake must accept the plaintiffs' version of the facts in order to raise a justiciable appeal. Despite his protests in his response filing, Flake cannot overcome this problem. His appeal was 'obviously without merit.'") (quoting *Bridgeport Music, Inc. v. Smith*, 714 F.3d 932, 944 (6th Cir. 2013)).

There is ample evidence in the record demonstrating that Tolbert fabricated the sketch of the crime scene that formed a critical piece of the evidence used to charge and convict Sanford, and Russell presented that evidence to the prosecutor, explicitly representing that it was created entirely by Sanford, with no input from the defendants. The prosecutor's recollection was somewhat vague on the exact discussions that he had with Russell when deciding to charge the case and before trial, but Russell's testimony at the preliminary examination and the bench trial are crystal clear in showing how he characterized the sketch and confession; a jury certainly reasonably can infer that Russell communicated the substance of that testimony to Muscat during the charging and trial preparation discussions.

The Sixth Circuit has recognized since at least 1994 that a criminal suspect has a clearly established right not to be charged and convicted by the State based on fabricated evidence. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) (collecting cases) ("Under law that was clearly established in 1994, [the police] would have violated [the plaintiff]'s right to due process if [they] knowingly fabricated evidence against her, and if there is a reasonable likelihood that the false evidence could have affected the judgment of the jury."). A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant.

The evidence here — the sketch misrepresented as Sanford's own work — certainly could have affected the judgment of a jury; it unquestionably affected the judgment of the trial court before which the plaintiff was convicted. The defendants' position that there is some doubt about the establishment of the plaintiff's right not to be charged and convicted based on false and fabricated evidence borders on the frivolous.

The defendants contend that they can avoid this lawsuit by testimonial absolute immunity. But that principle has no bearing on the fabrication of evidence claims, which involved pretrial, non-testimonial conduct that prompted the prosecutor's decisions to initiate and continue the case. "Subsequent testimony cannot insulate previous fabrications of evidence merely because the testimony relies on that fabricated evidence. This Court has never endorsed such a self-serving result. Merely because a state actor compounds a constitutional wrong with another wrong which benefits from immunity is no reason to insulate the first constitutional wrong from actions for redress." *Gregory v. City of Louisville*, 444 F.3d 725, 738–39 (6th Cir. 2006); *id.* at 741-42 ("Plaintiff alleges and puts forth evidence that the investigative notes are false. Carroll and Clark are not entitled to absolute immunity for these pre-trial acts; accordingly, this Court affirms the district court's refusal to grant Carroll and Clark absolute immunity on Plaintiff's fabrication of evidence claims."). As the Sixth Circuit has explained:

> Absolute immunity shields all testimony given in judicial proceedings, including perjured testimony. Deeply rooted in common law, testimonial immunity protects the integrity of the trial process by preventing witnesses from self-censorship out of fear of future liability. But it offers no protection to pretrial conduct, including the fabrication of evidence later adopted in trial testimony; that receives only qualified-immunity protection.

*LeFever v. Ferguson*, 567 F. App'x 426, 430 (6th Cir. 2014).

The plaintiff's right to be free from the sort of police misconduct alleged in this case was clearly established at the time of the investigation, arrest, and trial in the state court prosecution case.

## B. Coerced Confession Claim

The defendants contend that they are entitled to qualified immunity on the coerced confession claim because there was no controlling Supreme Court precedent in 2007 condemning the techniques used in the plaintiff's interrogation, and none of the various techniques and circumstances described by the plaintiff have been held (at least standing alone) to be sufficient to show that a confession was coerced.

For more than 50 years, it has been established that "an accused's confession must be 'made freely, voluntarily and without compulsion or inducement of any sort.'" *United States v. Binford*, 818 F.3d 261, 271 (6th Cir. 2016) (quoting *Haynes v. Washington*, 373 U.S. 503, 513 (1963)). "In determining whether a confession is involuntary due to police coercion, [the] court employs a three-step analysis: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements.'" *Ibid.* (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)).

It is true that "a claim that an officer coerced a witness to give incriminating evidence does not, at least standing alone, violate the wrongly convicted person's due-process rights." *City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017) (citing *Chavez*, 538 U.S. at 767). "Using a coerced confession against the accused at trial may give rise to a claim for violation of the accused's Fifth Amendment right not to be a witness against himself," *id.* at 439 n.2 (citing *Chavez v. Martinez*, 538 U.S. 760, 767 (2003)), but mere coercion does not violate the text of the Self–Incrimination

Clause absent use of the compelled statements in a criminal case against the witness," *Chavez*, 538 U.S. at 769.

The cases also clearly establish that "in some situations, '[p]olice promises of leniency . . . can be objectively coercive,'" but "generally, such promises are coercive only 'if they are broken or illusory.'" *Binford*, 818 F.3d at 271 (quoting *United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003)). "'[P]romises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements involuntary.'" *Id.* at 271-72 (quoting *United States v. Delaney*, 443 F. App'x 122, 129 (6th Cir. 2011)). "Further, '[a] promise of leniency in exchange for cooperation . . . usually [is] permissible.'" *Ibid.*

"'[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action.'" *Id.* at 272 (quoting *Johnson*, 351 F.3d at 262 n.1; *United States v. Siler*, 526 F. App'x 573, 576 (6th Cir. 2013) ("[A] promise is problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely, and makes a promise, without authorization by the prosecution." (quotations omitted)). In the earlier opinion in this case, the Court found that the complaint alleged detailed facts that constituted illusory promises and other coercive conduct by the defendants. *See Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *7 (E.D. Mich. Dec. 4, 2018). The discovery has borne that out.

Although, once again, the defendants point to contrary facts in the record, shading them by their own arguments, nothing has changed about the factual basis of the confession since the Court previously ruled that this claim was sufficiently pleaded. The evidence amply supports Sanford's allegations that Russell made false promises of leniency to Sanford, which Russell knew would

not be fulfilled, and that he had no authority to make any charging decision in the case. *Siler*, 526 F. App'x at 576.

In addition to the false promises of leniency, the plaintiff has advanced evidence on which a jury readily could conclude that other circumstances of the interrogation also rendered the questioning coercive, where Russell questioned a 14-year old suspect about a heinous crime over many hours, without a parent or guardian present, accosted him with false evidence of guilt such as supposed blood found on his shoes (no evidence exists suggesting that any blood ever was found on Sanford's clothes), and where the plaintiff also has offered expert testimony suggesting that he had impairments such as developmental immaturity, low intelligence, and prior mental health diagnoses. *See Harris v. Bornhorst*, 513 F.3d 503, 512 (6th Cir. 2008) ("[A]ny reasonable prosecutor . . . would have known, after listening to the tape of the confession, that it was involuntary as a matter of law and thus untrustworthy. First, . . . any waiver of *Miranda* rights was rendered involuntary by Harris's age, lack of any previous criminal history or experience, and physical separation from his mother, in addition to the 'intensity of the interview' conducted by Vaughn. More important, the techniques used by Vaughn in questioning a twelve-year-old child were coercive, irrespective of the effectiveness of the *Miranda* warning.").

Fact questions, therefore, preclude summary judgment on the defendants' qualified immunity defense as asserted against this claim.

### C. Malicious Prosecution Claim

The defendants also argue that the malicious prosecution claim is barred because (1) there was probable cause to prosecute the plaintiff; and (2) neither of the individual defendants "influenced" or "participated" in the decision to prosecute, where no statements by them were introduced into the record at the preliminary examination. They also contend that there is no

evidence that either of the defendants "knew that Sanford was not involved in the murders," and, thus, there is no showing that either of them "knowingly" made any false statements.

The elements of a Fourth Amendment malicious prosecution claim are "(1) that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding must have been resolved in the plaintiff's favor." *Mills v. Barnard*, 869 F.3d 473, 480 (6th Cir. 2017) (quotations omitted). "The prototypical case of malicious prosecution involves an official who fabricates evidence that leads to the wrongful arrest or indictment of an innocent person." *Ibid.*

There is ample evidence to support the malicious prosecution claim; under the circumstances, a determination that there was an absence of probable cause is not required. First, a police officer unquestionably is liable for malicious prosecution where he knowingly submits false information to the prosecutor that formed the basis of the charging decision. *Sykes v. Anderson*, 625 F.3d 294, 315-16 (6th Cir. 2010). Muscat testified that he relied entirely on the investigative file (which included the fabricated sketch) and discussions with Russell in making his decisions; no other investigation or inquiry was conducted to inform his decisions. The jury readily could conclude that Russell told the same falsehoods to Muscat that he told at trial and afterwards, repeatedly. Russell, Tolbert, and Muscat all admitted that they considered the sketch and the details of the confession — which Russell told Muscat all originated from Sanford — to be "significant" and "critical" pieces of evidence, since they proved Sanford's knowledge of details about the crime scene that a person only could know if he was involved in the murders (or was one of the investigators on the scene). That certainly suffices to show that Tolbert (by creating

the fabricated sketch) and Russell (by presenting it and vouching for its creation), both influenced the decision to prosecute. *See Sykes*, 625 F.3d at 315-16 (holding that a malicious prosecution claim against an investigating officer can "be based on [the officer's] 'knowing misstatements to the prosecutor' or his 'pressure or influence' over an individual who either made the decision to prosecute," even though the officer "did not make the decision to initiate the criminal proceedings against the Plaintiffs") (citations omitted). The investigator "cannot hide behind the officials whom they have defrauded." *Id.* at 316 (quoting *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988)).

The defendants' second argument is more troubling. In their motion brief, counsel wrote: "[N]either Tolbert's nor Russell's false statements were introduced as exhibits into evidence at the preliminary hearing." Defs.' Mot. for Summ. J., ECF No. 148, PageID.5934. However, Russell testified at the preliminary examination, and the following exchange occurred between him and the prosecutor:

> Q.    Did Mr. Sanford draw you a sketch of where victims were located on People Exhibit Seven?
>
> A.    Yes, he did. In his handwriting, Mr. Sanford drew a sketch of — as he recall the layout of the living room of the house and where the persons were located in the house.
>
> . . .
>
> Q.    Officer, at the time when you were questioning him, did you have any pictures at the scene?
>
> A.    I'm sure — I'm sure I had pictures, because that's my general practice.
>
> Q.    Do you know if he — meaning Mr. Sanford had any opportunity to see any of those pictures?
>
> A.    No, because they would have been in my camera.
>
> . . .
>
> A.    I have no — I did not show Mr. Sanford any pictures.

Prelim. Exam. Tr., ECF No. 170-20, PageID.9075-76.

It is difficult to square that record with counsel's assertion that Russell's false statements were not entered into evidence at the preliminary examination hearing. These particular falsehoods — that Sanford drew the diagram himself, from his own knowledge of the scene, and that Sanford was not shown any photos of the crime scene depicting the bodies — are at the very heart of this case. These are the two central, crucial lies that were told over and over by Russell and Tolbert before, during, and after the trial. The first proposition is demonstrably and indisputably false: Tolbert now candidly admits that he drew the layout of the sketch and Sanford only drew the bodies on the sketch Tolbert created. Russell admits he was present when that was done. Both claim that they were "mistaken" in their recall of how the sketch was made. Tolbert's testimony makes it seem unlikely in the extreme that either of them actually "forgot" how this "critical" piece of evidence came into existence.

But either way, the assertion that Russell's falsehoods were not made part of the record at the preliminary examination is plainly contradicted by the record of that proceeding. Certainly there is a question of fact about whether Russell showed Sanford the crime scene photos — Sanford says he did, Russell says he did not. But Russell's *statement* that he never showed the photos indisputably *was* entered into evidence and *was* a crucial piece of testimony at the preliminary examination hearing. Regardless of the ultimate truth or falsity of the statement, the assertion that Russell's lies don't matter because they never were presented at the probable cause hearing brazenly misrepresents the record.

Moreover, the defendants are not absolved from the malicious prosecution claim merely because there was other legitimate evidence that could have sufficed to form probable cause, because a defendant can be held liable where the fabricated evidence was material to the probable

-24-

cause determination. *Gregory*, 444 F.3d at 758 ("To establish that [the defendants] acted in an objectively unreasonable fashion in continuing Plaintiff's detention, Plaintiff must present evidence that the officers (1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that *the allegedly false or omitted information was material to the finding of probable cause*." (emphasis added)). It is beyond dispute that the sketch and confession were "material" to the charging decision; in fact, it is evident that they were by far the dominant facts that drove the prosecution. Moreover, as the Sixth Circuit explained in *Stemler*, the absence of probable cause is not a prerequisite for a malicious prosecution claim based on fabricated evidence. *Stemler*, 126 F.3d at 871-72 (citations omitted).

### D.  Estoppel

The defendants also reprise their argument that the plaintiff is barred by judicial estoppel from relitigating any of the issues concerning: (1) whether he voluntarily waived his *Miranda* rights; (2) whether at the time of his arrest and confession he could read and write the English language without difficulty; (3) whether his confession and the crime scene sketch were admissible in evidence; (4) whether there was probable cause to prosecute him; and (5) whether he in fact committed the Runyon Street murders. In its opinion on the defendants' motion to dismiss, the Court addressed similar arguments concerning whether the plaintiff is estopped from disputing that he could read and write the English language. *Sanford v. City of Detroit*, No. 17-13062, 2018 WL 6331342, at *11 (E.D. Mich. Dec. 4, 2018) ("The balance of equities does not favor the application of judicial estoppel here, because (1) the plaintiff does not stand to procure any "unfair advantage" by his supposed contradictory positions; and (2) in any event, he plausibly has alleged that his mental condition was such that he reasonably could have given his answer in the criminal

proceeding inadvertently or by mistake — i.e., because he did not fully understand the nature or consequences of the question posed to him."). However, the defendants did not raise the other grounds for estoppel in their earlier motion.

"Judicial estoppel is an 'equitable doctrine that preserves the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposite to suit an exigency of the moment.'" *United States v. Bates*, No. 17-5228, 2017 WL 5564676, at *2 (6th Cir. Nov. 20, 2017) (quoting *Mirando v. United States Dep't of Treasury*, 766 F.3d 540, 545 (6th Cir. 2014)). The three factors that "often guide a court in deciding whether to apply the doctrine [are]: 'First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Ibid.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001)).

The defendants' questionable position that the plaintiff is "judicially estopped" from disputing his innocence has no foundation in the law. For one thing, as the Court previously ruled on the application of this principle to other issues, the plaintiff certainly did not gain any "advantage" as a result of anything he did during the criminal trial, which ended with his conviction. Also, the state court certainly did not make any determination on any of the principal factual issues that are before this Court; in particular, it never was called on even to consider whether the prosecution of the plaintiff was instigated by lies and fabrications. *Stemler*, 126 F.3d

at 872 ("The state court only found that there was probable cause to prosecute Stemler, and made no findings with regard to any claim of fabrication of evidence. Thus, since . . . the court in the state criminal case did not make any findings on this issue that were necessary to the final judgment (i.e., Stemler's acquittal), she would not be estopped from pursuing this claim.").  Moreover, the judgment of conviction was vacated by the stipulation of the parties after evidence of the plaintiff's innocence came to light, so it no longer has any preclusive effect on anything, regardless of what determinations it rested upon.

Estoppel does not bar the plaintiff's claims, and it does not entitle the defendants to summary judgment.


## III.

The plaintiff has not asserted — or no longer asserts — claims based on *Brady v. Maryland* for pre-trial suppression of evidence, false arrest, or false imprisonment, and those claims are no longer a part of this case.  Fact questions preclude summary judgment for the defendants, based on qualified immunity and otherwise, on the plaintiff's claims for fabrication of evidence (under the Fourteenth Amendment); (2) coerced confession (Fifth Amendment); and (3) malicious prosecution (Fourth Amendment).

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 148) is **DENIED**.


s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:  May 15, 2019

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on May 15, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI