UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

                Plaintiff,                        Case Number 17-13062

v.                                            Honorable David M. Lawson

MICHAEL RUSSELL and JAMES TOLBERT,

                Defendants.

_____/

## OPINION AND ORDER ON DEFENDANTS' MOTIONS
## CHALLENGING PLAINTIFF'S EXPERT WITNESSES

Presently before the Court are motions by the defendants challenging the use at trial of testimony by four of the plaintiff's expert witnesses, in which the defendants variously argue that the experts are unqualified, or their opinions are unreliable or irrelevant (or all three). The substance and admissibility of each expert's opinion is discussed in turn below.

## I.

As discussed in the several opinions issued in this case, plaintiff Davontae Sanford filed this case in 2017, alleging that he was wrongfully convicted of a quadruple homicide allegedly committed when he was fourteen years old. He contends that defendants Michael Russell and James Tolbert — Detroit police officers — manufactured evidence against him, and used that evidence to coerce a confession from him, to prosecute him for the homicides, and to coerce a guilty plea from him during his bench trial in 2008. After he spent over eight years in prison, another person confessed to committing the murders, and a state police investigation uncovered evidence that Sanford's confession and ensuing guilty plea were the product of misconduct by the defendants. His conviction was set aside and all charges against him were dismissed in 2016.

The defendants challenge the opinions of Dr. Jeffrey Aaron, a psychologist who will testify to the psychological damage suffered by Sanford caused by his wrongful conviction and eight years in prison. Dr. Aaron also intends to give opinions on the reliability of Sanford's confession and the nature of the interrogation conducted by defendant Russell. The defendants also move to exclude the testimony of David Balash, a police practices expert. They also challenge the opinions of Dr. Allison Redlich, a psychologist and criminologist, who intends to offer testimony about false confessions and false guilty pleas. Last, the defendants move to prevent testimony from James Trainum, another police practices expert, who intends to comment on the propriety of the defendants' actions during the investigation and prosecution of the plaintiff.

## II.

These motions invoke Federal Rule of Evidence 702 and cases interpreting that rule. The following general principles govern all four of these motions.

As a general matter, "expert" testimony consists of opinions or commentary grounded in "specialized knowledge," that is, knowledge that is "beyond the ken of the average juror." *See United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016), *cert. denied sub nom. Casillas v. United States*, 137 S. Ct. 1120 (2017), and *cert. denied,* 138 S. Ct. 2701 (2018); *see also* Fed. R. Evid. 702. Such testimony is governed by Evidence Rule 702, which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)     the testimony is based on sufficient facts or data;

(c)     the testimony is the product of reliable principles and methods; and

(d)     the expert has reliably applied the principles and methods to the facts of the case.

The language added by the 2000 amendment — subparagraphs (b) through (d) — restates *Daubert*'s insistence on the requirements that an expert's opinion be based on a foundation grounded in the actual facts of the case, that the opinion is valid according to the discipline that furnished the base of special knowledge, and that the expert appropriately "fits" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

## A.  Dr. Jeffrey Aaron

Dr. Jeffrey Aaron is a licensed clinical and forensic psychologist from Virginia who is employed in private practice and with the Virginia Department of Behavioral Health and Developmental Services.  It appears that the plaintiff intends to call him as a damages expert.  He intends to offer the following opinions — detailed in his 30-page report — at trial:

1.      Mr. Sanford suffered substantial psychological harm from each of the following: his arrest and interrogation; his experiences as a defendant in the legal process; the finding of guilt and his sentencing; [and] his experiences [while] incarcerated over the time from his arrest in September 2007 until his exoneration and release in June 2016.

2.      The harm Mr. Sanford suffered from these events is distinct from the consequences of other stressful and traumatic events that he has experienced. However, the multiple traumas he experienced in prison almost certainly had more damaging effects than they otherwise would have as a consequence of his prior traumatic experiences.

3.      The harm Mr. Sanford suffered from these events has a substantial and ongoing effect on his mental health, his capacity for subjective pleasure, his interpersonal relationships, and his general capacity and functioning.

4.      The harm Mr. Sanford suffered from these events will almost certainly continue far into the future. In order to minimize this harm, Mr. Sanford will require extensive and intensive ongoing supports. Without such

supports, his prognosis for adequate functioning, the resolution of his mental health problems, and for a positive quality of life is poor.

Report of Dr. Jeffrey Aaron dated July 26, 2018, ECF No. 130-9, PageID.4383.

Dr. Aaron based his conclusions on 12 hours of personal interviews with the plaintiff, interviews with other persons who know him, an extensive catalog of educational, correctional, and medical records and evaluations of the plaintiff by other professionals spanning more than 17 years, and a review of court records from the criminal proceeding.

The defendants do not challenge Dr. Aaron's qualifications generally as a clinical or forensic psychologist, the methods he employed in reaching his conclusions, or his application of his methods to the facts of the case. Instead, they challenge on relevancy grounds the propriety of admitting certain statements from the report indicating that (1) the plaintiff's confession was unreliable and false; (2) the interrogation by defendant Russell was "intense, stressful, frightening, and confusing" for the plaintiff; and (3) the plaintiff "was not able to engage in a normal adolescent social experience, such as going to high school and graduating," and he "would not have had to readjust to leaving prison and re-entering society had he not pled guilty to the Runyon Street Murder."

The defendants' arguments fall into two broad categories. They first challenge what they perceive to be an opinion by Dr. Aaron that Sanford's confession was false. Second, they contend that allowing Aaron to expound on details of Sanford's life and his subjective feelings before, during, and after his incarceration would not be grounded in any specialized knowledge, since the jury does not need help to understand Sanford's own testimony about those things, which he presumably will offer, and, moreover, any opinion that Sanford would not have gone to prison if he had not been wrongly convicted is entirely speculative.

Taking the second argument first, Dr. Aaron's discussion about the plaintiff's past and present life situations, and his feelings about his prison experience, is not simply an untethered exegesis on the plaintiff's state of mind. Instead, those discussions provide the background for the opinion on damages. Isolating that component of the report, as the defendants have done in their argument, ignores the requirement that an expert's opinion must be based on the actual facts of the case. *See Lee v. Smith & Wesson Corp.*, 760 F.3d 523, 529 (6th Cir. 2014) (Keith, J. dissenting) ("The 'relevancy' prong of Rule 702 requires that an expert's theory adequately 'fit' the facts of the case. Expert testimony that does not fit the facts does not relate to an issue in the case and, therefore, is not relevant.") (citing *Daubert v. Merrell Dow Pharmaceuticals., Inc.*, 509 U.S. 579, 591 (1993)).

Challenging the opinion on the reliability of the confession, the defendants argue that (1) Dr. Aaron's testimony is irrelevant because whether the plaintiff's confession was true or false has no bearing on his section 1983 claims; on those claims he must show — and only needs to show — that the confession was procured via exertion of unconstitutionally coercive means, regardless of its truth or falsity; (2) the tactics condemned by Dr. Aaron are not pertinent to an assessment of whether the defendants' conduct violated constitutional standards, because various techniques that he cites have been held not to rise to the level of coercion (at least when considered piecemeal); (3) the postulated criteria for evaluating confessions is not scientifically sound because there is no scientifically verifiable means of predicting false confessions, nor is there any way to test purported factors in a controlled setting or to calculate any error rate for the supposed predictors; (4) the questions whether the confession was coerced — the ultimate legal issue in the case — and whether the plaintiff confessed falsely, are exclusively reserved for the jury's determination, and expert testimony on those topics would merely invite them to take the expert's view instead of

considering the evidence and the law and making up their own minds; and (5) Aaron is unqualified to opine about anything concerning false confessions because his background is in clinical and forensic psychology, and he has never conducted any experiments or published any studies on false confessions.

Once again, it appears that the defendants' attempt to isolate the integrated components of Dr. Aaron's report, and then misconstrue those isolated elements that they do challenge. For instance, Dr. Aaron does not actually assert anywhere in his report that Sanford's confession was false. Instead, he states: "Dispositional variables that have been demonstrated to be associated with decreased reliability of statements made in interrogation and thus increased risk of false confession include developmental immaturity, intellectual limitations, and the presence of mental health problems." Then he elaborates on "[t]he degree to which each of these was present in this case," i.e., the extent to which the plaintiff displayed those factors such as developmental immaturity, low intelligence, and psychological dysfunctions such as ADHD at the time of his arrest and interrogation. Therefore, the defendants' principal challenge to the report concerns an issue on which Dr. Aaron never expressed any expert view: whether the plaintiff in fact falsely confessed to the murders. Moreover, the recitation that the interrogation was "stressful" and "frightening" to the plaintiff was drawn from Sanford's own narrative of the event; it was merely one of many components of the plaintiff's narrative that was included to explain the basis for the opinion that the plaintiff's interrogation involved certain factors that often are associated with false confessions.

The statements that the plaintiff "was not able to engage in a normal adolescent social experience, such as going to high school and graduating," and he "would not have had to readjust to leaving prison and re-entering society had he not pled guilty to the Runyon Street Murder" are

simply observations of historical fact; the plaintiff, Dr. Aaron says, was deprived of certain opportunities for social development and benefit because of his incarceration, and his imprisonment had lasting psychological consequences to which he still is trying to adjust. Those are not expert opinions, but ordinary facts drawn from the historical context of the plaintiff's story, as told by him, and as documented by the extensive and largely undisputed record of the criminal process. But they form the basis for the opinions.

As to the most pertinent opinion that Dr. Aaron actually did express — that the plaintiff's characteristics and the circumstances of his interrogation involved a number of factors known to be associated with an increased risk of false confessions — the *Daubert* factors weigh in favor of allowing that testimony to be admitted. Under Evidence Rule 702 — which was modified in December 2000 to reflect the Supreme Court's emphasis in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), on the trial court's gate-keeping obligation to conduct a preliminary assessment of relevance and reliability whenever a witness testifies to an opinion based on specialized knowledge — an expert's opinion must be based on a foundation grounded in the actual facts of the case, the opinion is valid according to the discipline that furnished the base of special knowledge, and the expert appropriately must "fit" the facts of the case into the theories and methods he or she espouses. *See Daubert*, 509 U.S. at 591-93.

Federal courts often have been skeptical of and have excluded expert testimony on the topic of false confessions. *United States v. Redlightning*, 624 F.3d 1090, 1110 (9th Cir. 2010) (testimony excluded because expert could not point to any facts in the record to show that the techniques used in the defendant's case were associated with false confessions); *United States v. Phillipos*, 849 F.3d 464, 471-72 (1st Cir. 2017) (testimony excluded due to lack of any indication of a "body of reliable material that constitutes understanding [of false confessions]"); *United States v. Benally*,

541 F.3d 990, 995 (10th Cir. 2008) (expert testimony excluded because it would invade the province of the jury to assess witness credibility); *United States v. Hebah*, 164 F. App'x 678, 692 (10th Cir. 2006) (expert's use of unconventional and "shortcut" techniques and lack of training showed that his methods were unreliable); *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir. 2003) (experts failed sufficiently to show that they could relate the postulated factors for false confessions to the circumstances of the defendant's interrogation).

However, no categorical rule mandating the exclusion of such testimony ever has been laid down, and courts regularly have admitted expert testimony about factors that can precipitate a false confession, where the expert is able sufficiently to relate those factors to the circumstances of the particular interrogation at issue. As the Seventh Circuit explained in *United States v. West*, 813 F.3d 619 (7th Cir. 2015):

> Dr. Dinwiddie's expert testimony would have explained West's low IQ and mental illness and how these combined conditions might have influenced his responses to the officers' questions while in police custody. We think it plain that expert testimony that West is a suggestible, mentally ill person with a verbal IQ of 73 bears on the reliability of his statements to police. Testimony of this type is highly relevant to the jury's consideration of a defendant's "personal characteristics" — exactly the sort of evidence that a jury ought to be permitted to hear to assess the trustworthiness of the defendant's statements to the police. The judge did not abuse his discretion in disallowing the use of this evidence for the other purposes identified in the defense motion, but Dr. Dinwiddie's testimony was clearly relevant and admissible on the issue of the reliability of West's confession, as the government itself acknowledged.

813 F.3d at 624.

Similarly, in *United States v. Belyea*, 159 F. App'x 525 (4th Cir. 2005), the court held that the exclusion of testimony by the defendant's expert psychiatrist was not harmless because it could have offered powerful evidence bearing on the reliability of his confession. *Id.* at 531. The court noted that the defendant was able through his own testimony to explain why the confession was false. But without expert testimony, he "could not explain that false confessions, while counter-

intuitive, do in fact occur and are more likely to occur in certain circumstances, perhaps in the very circumstances of his case." *Ibid.*; *see also United States v. Hall*, 93 F.3d 1337, 1344-45 (7th Cir. 1996) ("Properly conducted social science research often shows that commonly held beliefs are in error. Dr. Ofshe's testimony, assuming its scientific validity, would have let the jury know that a phenomenon known as false confessions exists, how to recognize it, and how to decide whether it fit the facts of the case being tried."); *United States v. Shay*, 57 F.3d 126, 133-34 (1st Cir. 1995) ("Dr. Phillips was prepared to offer specialized opinion testimony, grounded in his expertise as a psychiatrist, that could have "explode[d] common myths" about evidence vital to the government's case. While the record contains other evidence that Shay Jr. told lies and boasted to an unusual degree, this evidence, standing alone, is much less powerful than the psychiatric testimony that Dr. Phillips was prepared to offer.").

Here Dr. Aaron's presentation adequately establishes that the requisites for admission of his testimony about false confessions are met. Those are that (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702.

First, Dr. Aaron's *curriculum vita* demonstrates that he has ample training and experience in the assessment of psychological features such as a subject's developmental maturity and diagnoses such as ADHD. According to his report, Dr. Aaron previously worked as the Director of Virginia's Commonwealth Center for Children and Adolescents, which is a state psychiatric hospital, and he is on the faculty of the University of Virginia Medical School and the University's Institute of Law, Psychiatry, & Public Policy. He lectures regularly at the Institute and has trained

investigators, lawyers, and judges around the country on topics in forensic psychology. Dr. Aaron's *vita* lists thirteen publications on various psychological topics over a 25-year academic career that began with his undergraduate training at the University of Virginia in 1993 and continued through his receipt of a Ph.D. in Psychology in 1997, and his 20 years of licensed practice thereafter since 1998. His academic resume also includes numerous lectures and presentations, including four lectures on false confessions and the recognition of factors leading to them between 2014 and 2018.

Dr. Aaron's public presentations on the subject of false confessions adequately suggest that he is a recognized expert on the topic of false confessions and the factors that may precipitate them. And as federal courts regularly have concluded, that sort of testimony would aid a jury in understanding the counter-intuitive concept that false confessions do occur, and why they occur. *E.g.*, *Hall*, 93 F.3d at 1344-45; *Shay*, 57 F.3d at 133-34.

Second, the testimony adequately is anchored in the particular facts of the case, because Dr. Aaron discussed in detail in his report how the particular factors that are recognized as increasing the risk of false confessions were present in the plaintiff's interrogation, based on his comprehensive review of the record of the criminal proceedings and his several interviews with the plaintiff comprising more than 12 hours.

Third, the record adequately suggests that Dr. Aaron's assessment is the product of reliable principles and methods that are widely accepted in the relevant scientific community. Recognizing the substantial body of academic literature that has been produced documenting the phenomenon of false confessions, the American Psychological Association published a policy resolution in 2014 espousing specific factors that are likely to produce false confessions, and making specific recommendations for the mitigation or avoidance of those factors:

APA recommends, recognizing that the risk of false confession is increased with extended interrogation times, that law enforcement agencies consider placing limits on the length of time that suspects are interrogated.

APA recommends that law enforcement agencies, prosecutors, and the courts recognize the risks of eliciting a false confession by interrogations that involve the presentation of false evidence.

APA recommends that police, prosecutors, and the courts recognize the risks of eliciting a false confession that involve minimization "themes" that communicate promises of leniency.

APA recommends that those who interrogate individuals who are young (with particular attention paid to developmental level and trauma history), cognitively impaired, those with impaired mental health functioning, or in other ways are vulnerable to manipulation receive special training regarding the risk of eliciting false confessions.

APA recommends that particularly vulnerable suspect populations, including youth, persons with developmental disabilities, and persons with mental illness, be provided special and professional protection during interrogations such as being accompanied and advised by an attorney or professional advocate.

American Psychological Association, Resolution on Interrogation of Criminal Suspects (Aug. 2014), https://www.apa.org/about/policy/interrogations. The APA's resolution recognizes that identifiable factors are associated with false confessions, and it endorses all of the specific factors that Dr. Aaron discussed in his report (youth, developmental level, history of trauma, cognitive impairment, and circumstances such as excessive length of interrogation, presentation of false evidence, and promises of leniency).

Finally, Dr. Aaron adequately has established that his analysis fit the facts to the case, because his report describes in profuse detail the extent to which each of the pertinent factors that he identified were present in the plaintiff's psychological condition and the circumstances of the interrogation to which he was subjected.

The defendants' position that there is no recognized body of research supporting Dr. Aaron's methodology is belied by the survey of the extensive academic literature cataloged in the

APA's Resolution on Interrogations cited above. Nor is the absence of "empirical studies" or documented "laboratory experiments" regarding the incidence of false confessions fatal to the admission of the testimony of an otherwise eminently qualified expert who has consistently applied recognized principles of research and analysis accepted in his discipline. *See United States v. Frazier*, 387 F.3d 1244, 1299-300 (11th Cir. 2004) (noting that "expert opinion is not inherently unreliable merely for want of empirical studies if the information is commonplace in the field and statistical methods are not invariably used in such research," and that "a trial court would most certainly abuse its discretion in many instances — like this one — by refusing to admit qualitative testimony for want of statistical support where the analytic assumptions were widely-held and relevant and probative statistical data unavailable") (citations, quotations, and footnotes omitted).

The prerequisites for admission of Dr. Aaron's testimony sufficiently are established by the record before the Court. Therefore, the defendants' motion to exclude his opinions will be denied.

### B. David Balash

David Balash is a retired police lieutenant who worked at a forensic laboratory. He testified as an expert witness at Sanford's criminal trial to rebut the state's evidence on firearm testing and gunshot residue. In this case, he produced an affidavit in which he attested that he "continue[s] to stand by [his] previous expert opinions that: (1) the presence of primer residue on Mr. Sanford's pants does not mean that he had recently fired a gun; and (2) all 19 of the 7.62 x 39 mm casings found at the scene of the Runyon Street quadruple homicide could have been fired from one AK-47 type weapon." David Balash aff. ¶ 12, ECF No. 159-7, PageID.7978. Balash stated that he based those conclusions on a review of various materials including (1) his own previously compiled expert reports and testimony from the criminal case; (2) Detroit police, Michigan State

Police, and Bureau of Alcohol, Tobacco and Firearms police reports of the Runyon Street murder investigation and crime scene analysis; and (3) a "diagram of firearms and ammunition prepared for the Michigan State Police, dated April 20, 2016." *Id.* ¶ 11, PageID.7977-78.

The defendants argue that Balash is unqualified to testify on either of the subjects of gunshot residue testing or firearms identification because he "does not have a degree in forensic science," "has no statistical training," "has never conducted the primer gunshot residue test," and only has published two articles, neither of which had anything to do with gunshot residue testing or firearm tool mark identification. The defendants also criticize the currency of Balash's qualifications because, after he retired from his work as a firearms examiner with the Michigan State Police in 1992, he has not received any further professional training, "other than work on cases."

This criticism tends to understate Balash's qualifications. According to his resume, Balash enlisted with the Michigan State Police in 1966 and rose through the ranks of the agency's Forensic Science division to eventually occupy a position at the head of the Firearms/Tool Marks/Bomb Squad Unit of the State Police's Northville Forensic Laboratory, retiring with the rank of Detective Lieutenant. His lab "provided services free of charge for over 120 police agencies in Southeast Michigan," and "was one of the first A.S.C.L.A.D. Accredited laboratories in Michigan." David Balash *curriculum vita*, ECF No. 159-3, PageID.7927. Since his retirement from the state police in 1992, Balash has worked as an Independent Firearm Examiner, performing work similar to the examinations that he conducted when he worked at the state police crime lab. Among other things, his work throughout his more than 26-year career included "[a]nalysis of gunpowder patterns and gunshot residue cases," and "[t]ool mark and physical match examinations." *Id.* at PageID.7927-28. He has offered expert testimony "on over 75 occasions" in counties around the State of

Michigan and in various other jurisdictions. *Id.* at 7978. His resume recites the numerous training courses in which he participated while working with the state police, and also notes that he "worked on thousands of cases that were submitted to the laboratory for analysis, [and] participated in hundreds of crime scene investigations." *Id.* at 7929-30.

The defendants have not pointed to anything in the record to call into any serious doubt the conclusion that Balash is highly trained and qualified to render the opinions that he offers by the extensive work in his field over a decades long career with the MSP and as an independent firearm examiner. His lack of a "degree in forensic science" does not disqualify him from testifying on matters within his practical knowledge and experience accumulated through his work. "[A]lthough a degree might be helpful in determining qualifications, since valid assumptions safely may be drawn from the general training one receives on the way to a diploma, it is neither a necessary nor a sufficient condition for qualification as an expert because the expert's education must be relevant to the opinion, and qualification may be based on knowledge, skill, experience or training as well." *Zuzula v. ABB Power T&D Co.*, 267 F. Supp. 2d 703, 713 (E.D. Mich. 2003).

The criticism of Balash's lack of experience with particular testing methods or lack of formal training in "statistics" — which has no apparent relevant relationship to the analysis of firearm tool marks or gunshot residue — is not fatal to the admissibility of his testimony where he asserts that he applied methods of examination which, based on his extensive experience, are accepted in his field. *See id.* at 714 ("[The expert] arrived at his conclusions that the DD module in Unit 14 was defective by the application of general electrical and mechanical engineering principles, together with his conclusions which flowed from his investigation of the facts of the accident. He also inspected and tested the operation of the accident unit, particularly the interlocking safety mechanisms. There is no suggestion that the engineering principles utilized by

Professor Fagan in arriving at his conclusions were novel, unique, or not generally accepted by the engineering community.").

Drawing principally from the analysis of the defendants' own expert — the ATF firearm examiner who conducted the police analysis of recovered casings from the Runyon Street murder scene — the defendants also argue that Balash's opinions are inherently unreliable essentially because their expert reached a contrary conclusion that the shells were fired by different weapons rather than a single gun. However, an expert's testimony is not rendered unreliable by opposing expert testimony that contradicts it, because contradictory fact or opinion evidence merely establishes a fact dispute. *See Daubert*, 509 U.S. at 595 (noting that such matters are best reserved for "[v]igorous cross-examination" and "presentation of contrary evidence" to the jury).

The defendants argue that Balash's conclusions are unreliable because he did not conduct any experiments and did not rely on any "peer reviewed studies" for his conclusion that the differences in certain marks observed on the shell casings were due to differences in their material and coating owing to their distinctive manufacture, rather than having been fired from different guns. The defendants conclude that the testimony must be excluded due to the absence of any peer review or empirical testing of Balash's methods, his inability to postulate an error rate for his methods, and his failure to review any published literature supporting his analysis. Once again, Balash applied the methods that he used throughout his career to answer a question that had been posed to him many times. Experimentation and reliance on peer-reviewed studies are not the *sine qua non* of reliability of expert testimony. Rather, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (quoting *Kumho,* 526 U.S. at 150). Balash says that he used forensic methods of tool mark analysis and

identification customarily used in police crime laboratories. That is sufficient to establish the reliability of his approach.

The defendants also argue that Balash's opinions about the primer gunshot residue test are fatally uninformed because he admits that he has never even performed the test. But that argument is misbegotten. As Balash explained in his report, he never performed the test because it was deemed unreliable and too likely to produce misleading results:

> During my twenty years at the Michigan State Police Northville Forensic Laboratory, I never performed primer residue testing. To my knowledge, the Michigan State Police has never performed this type of test because the test can generate the false and misleading impression that someone has recently fired a gun when, in fact, it establishes nothing of the kind. In fact, there is no test today, nor has there ever been, that definitively determines whether a person did or did not fire a weapon.

Balash aff. ¶ 14, PageID.7978. The fact that an expert witness refuses to employ a method that is regarded in his field as unreliable certainly does not justify *excluding* his testimony; in fact, it suggests that his opinions are *more* reliable rather than less.

None of the arguments advanced by the defendants establish that Balash's testimony is inadmissible.

## C. Allison Redlich

Dr. Allison Redlich is a professor of criminology at George Mason University. The plaintiff intends to call her to testify about false confessions. Her report included substantial background discussion of the factors that researchers have identified as correlated with false confessions. She reviewed a substantially similar catalog of historical materials relating to the plaintiff and his criminal case as Dr. Aaron listed in his report. Dr. Redlich stated the principal conclusions of her report at the end:

> Davontae Sanford possessed characteristics, including without limitation, his youth, immaturity, emotional deficits, and learning and mental health impairments that made him particularly susceptible to falsely confessing and entering a false

guilty plea. Further, the long length of his interrogations and use of certain interrogation techniques Mr. Sanford describes (lying/bluffing about evidence, showing crime scene photos, and feeding details about the crime) are known to increase the risk and perceived credibility of false confessions. Additionally, the confession attributed to Sanford is detailed and some of the details are consistent with the facts of the crime. In this case, however, all of the accurate details in the confession were already known to investigators at the time of Mr. Sanford's interrogation and there is undisputed evidence of fact contamination in that investigators presented Sanford with an accurate sketch of the layout of the crime scene. Thus, it cannot be ruled out that the accurate details in the confession originated with the police (not Sanford). On the other hand, all other details in the confession were either false or uncorroborated. Each of these circumstances is characteristic of false confessions and it is my opinion that the confession attributed to Mr. Sanford in this case fails to demonstrate firsthand knowledge needed to corroborate guilt.

Report of Dr. Allison Redlich dated July 25, 2018, ECF No. 154-2, PageID.7251.

The defendants do not mount any criticism of Dr. Redlich's qualifications in her field, but in other respects they advance all of the same arguments that they raised against Dr. Aaron's similar opinions about the factors related to false confessions that were present in the plaintiff's case. They also point out that Dr. Redlich's testimony has been excluded by several state courts — some of which employed their state law variants of the obsolete *Frye* standard for admission of expert testimony, which was abolished by *Daubert* and the subsequent amendments to Rule 702. *See Daubert*, 509 U.S. at 584 (holding that the test for admissibility of expert testimony announced by *Frye v. United States,* 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923), was "was superseded by the adoption of the Federal Rules of Evidence"). The defendants also add to this motion an argument that allowing the jury to hear "scientific" testimony that the plaintiff gave a "coerced compliant confession" would confuse the jury and cause undue prejudice to the defendants, because it would tempt the jurors to conclude that the plaintiff falsely confessed merely because Dr. Redlich said so.

For all of the same reasons discussed above with respect to Dr. Aaron's testimony, Dr. Redlich's testimony is sufficiently reliable and relevant to be admitted under Rule 702.

The defendants' main contention is that Dr. Redlich's conclusions are not substantiated by statistical or empirical studies. As noted above, though, that is not an obstacle to admissibility of an expert's opinion where her findings were derived by methods that are widely employed in the relevant disciplines of criminology and psychology. *See Zuzula*, 267 F. Supp. 2d at 714. The standard for evaluating the acceptance of certain methods is dependent on the particular field of study. Not all fields involve methods amenable to empirical analysis, as the Sixth Circuit has explained in a case involving another psychological phenomenon:

> Courts have consistently allowed expert witnesses to testify concerning domestic violence even in circumstances where the research is not supported by exhaustive statistical evidence. . . . Dr. Bonomi's testimony was based on insight gleaned from her personal experience interviewing victims of domestic abuse. Such research was published in peer-reviewed journals. Peer review is an effective way for a district court to weed out junk science. Any remaining qualms LaVictor harbored about Dr. Bonomi's research could be addressed by cross-examination and jury instructions that can be used to question the qualifications of the proffered expert, undermine the basis of the expert's theories, explain the limits of social science's validation studies and pick apart research methods.

*United States v. LaVictor*, 848 F.3d 428, 443-44 (6th Cir. 2017) (citations and quotations omitted; collecting cases).

Dr. Redlich received a Ph.D. in developmental psychology from U.C. Davis in 1999. Her academic research has focused on "legal decision making," focusing on the risks of false confessions and false guilty pleas for juvenile, mentally ill, and other vulnerable defendants in the criminal justice system. She has published numerous papers on those topics and frequently is asked to give public lectures and trainings to legal and academic bodies. She also has received substantial grants from the National Science Foundation and National Institute of Justice to conduct research on interrogations and guilty pleas. Dr. Redlich's work has been subject to scrutiny by her peers and her methods of analysis are mainstream, much like the psychologist in *LaVictor*.

The *LaVictor* panel also noted that the expert testimony would be helpful to the jury, particularly to rebut common misconceptions about rape victims, such as by explaining that an inability to recall specific details is typical for victims of physical trauma, and to rebut a defendant's assertion that a victim was unreliable because the rape was not immediately reported. The probative value of this evidence is substantial, and there is little danger of undue prejudice inuring to the defendants or confusing the jury. The same can be said about rebutting counter-intuitive or "common sense" misconceptions that may impair the jury's understanding why people may confess to crimes they did not commit.

Rule 702 and the cases that interpret it do not pose an obstacle to the admission of Dr. Redlich's opinion testimony.

### D.  James Trainum

The plaintiff proposes to call James Trainum, a retired police officer and homicide detective, to testify about proper police practices. According to his report, Trainum reviewed an extensive catalog of materials from the criminal trial and collateral proceedings, including numerous police investigation and interview reports, search warrants, trial transcripts, physical and documentary exhibits, the plaintiff's medical and educational records, transcripts and reports of interviews with Vincent Smothers, and transcripts and reports from the MSP re-investigation of the homicides. Expert Report of James Trainum dated July 30, 2018, ECF No. 158-2, PageID.7835-36.

Trainum proposes to testify to the following conclusions, which the defendants challenge as inadmissible:

(1)    Russell's investigation of the Runyon Street murders featured several "departures from minimally acceptable police practices" including (a) failures to document (i) the circumstances surrounding the interrogation, and (ii) the circumstances surrounding the creation of the crime scene

sketch, (b) failures to investigate or to document the investigations of (i) the additional perpetrators named by Sanford in his confession and (ii) other, additional potential suspects whose involvement was suggested after the suspects named in the confession were cleared, and (c) the failure to conduct a full investigation into Vincent Smothers's and Ernest Davis's potential involvement in the crimes after Smothers's arrest and confession.

(2)     Russell should have recognized numerous "red flags" in the investigation including the facts that (a) Sanford's confession changed over several iterations of his statement and did not provide any information unknown to police that could be corroborated, (b) details in Sanford's description of the crime did not align with what the police knew from investigating the scene, (c) the other perpetrators that Sanford named were investigated and cleared, and (d) in contrast, the confession by Vincent Smothers was consistent over time and provided verifiable details that police did not previously know.

(3)     Russell should have known that his failures to document details of the investigation would prevent the defense from adequately challenging the reliability of the confession.

(4)     The close conformance of prior testimony by Russell and Tolbert about how the sketch of the crime scene was created, given years apart in time, "raises red flags" about their recent deposition testimony that they each separately "made the same mistake" in their accounts of who drew the sketch.

*Id.* at PageID.7758-59.

The defendants argue that Trainum is unqualified to opine that he would have expected blood to be found on Sanford's clothing if he was present at the murder scene, or that the gunshot residue testing performed in the case was unreliable, because Trainum admits that he has not been trained in blood evidence or gunshot residue analysis. It does not appear that the plaintiff intends to elicit opinions from Trainum on either blood or gunshot residue evidence, which is not discussed in the response. And because his qualifications do not touch on those subjects, he will not be allowed to offer testimony on them at trial.

The defendants mainly argue that Trainum's testimony about the investigative "red flags" that can lead to a false confession and whether the investigators in this case should have recognized such signals during Sanford's interrogation and after his confession is (1) unreliable, because

Trainum has not received any specific training about "false confessions . . . behavioral analysis, the guilt-presumptive process, the coercive effects of certain interrogation practices, and the contamination of confession evidence" or in "how to evaluate the psychological impact of certain situations on law enforcement personnel"; and (2) irrelevant, because testimony about cognitive biases that may have influenced investigators has no bearing on whether their conduct violated the constitutional norms that define the plaintiff's rights, and testimony suggesting that Sanford's confession was false based on an enumeration of various risk factors would improperly invade the province of the jury to determine the truthfulness of the confession and the credibility of the witnesses.

The plaintiff concedes that Trainum is not offered as an expert on the subject of dispositional or risk factors associated with false confessions. But he contends that Trainum is well-qualified as a police practices expert and his testimony is relevant for another purpose. The Court agrees.

Trainum reports that he served as a police officer in the Washington D.C. Metropolitan Police Department for 27 years, including 17 years as a homicide detective. He personally was involved in dozens of murder investigations, and from 1997 to 2010 was assigned to the "Major Case/Cold Case Unit," where he investigated unsolved and multiple-victim murders, often in collaboration with members of a task force including agents of the Federal Bureau of Investigation. In 2000 he founded his department's Violent Crime Case Review Project and was director of that initiative until he retired. He also oversaw the implementation of the department's Violent Criminal Apprehension Program (ViCAP) database. In his senior position at the Metropolitan Police Department, he was responsible for "the comprehensive review of all homicide cases over three years old, including the forensic investigation into those cases." Throughout his career

Trainum has taught numerous training courses on methods of investigation for various police and prosecutorial agencies. Trainum Report, ECF No. 158-2, PageID.7761.

Testimony by police practices experts routinely is admitted in civil rights litigation for its bearing on such matters as (1) whether an officer's repeated deviations from accepted standard of police practices suggests that his conduct was intentional or pursued recklessly in disregard of the plaintiff's rights; or (2) as pertinent to the question of qualified immunity, to the extent that the expert's descriptions of the defendants' practices are inconsistent with constitutional requirements, to show that a reasonable officer in the defendants' positions would have been aware that his conduct was unconstitutional. Other federal courts readily have affirmed the admissibility of exactly the sort of police practices testimony that is offered here as relevant to the question of intentionality. *See Restivo v. Hessemann*, 846 F.3d 547, 579-80 (2d Cir. 2017) (holding that expert testimony about "minimally accepted police practices, [which are] a baseline type of behavior or protocols that law enforcement officers follow," are relevant "to help evaluate whether a defendant's deviations from those standards were merely negligent or were so severe or persistent as to support an inference of intentional or reckless conduct that violated a plaintiff's constitutional rights") (citations and quotations omitted); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908-09 (6th Cir. 2004) ("Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact. Because Alpert had considerable experience in the field of criminology and because he was testifying concerning a discrete area of police practices about which he had specialized knowledge . . . the district court did not abuse its . . . discretion in admitting [the] testimony." (citations omitted)).

The defendants contend that Trainum's conclusions cannot be trusted merely because he has not published articles about them or subjected them to "peer review" or "empirical studies." Those challenges are not well taken; opinions about industry practices and customs are not unreliable simply because they have not been "subjected to the crucible of peer review, or . . . their validity has not been confirmed through empirical analysis." *Barreto*, 268 F.3d at 334. And such testimony has been recognized as helpful to the jury in cases where police misconduct must be assessed. "In cases involving law-enforcement experts, [the Sixth Circuit has] interpreted [Rule 702's relevance requirement] to mean that the district court, in performing its gatekeeping role, must assess whether, 'without expert testimony, the average juror is unlikely to understand' the material about which the expert proposes to testify." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Trainum's comprehensive accounting of accepted police investigative techniques and the defendants' many specific deviations from them certainly embrace matters which the average person is unlikely to have any experience or understanding of from their own background.

On one point, however, Trainum's testimony is not helpful. He opines that the close correspondence of prior testimony by Russell and Tolbert about how the sketch of the crime scene was created, given years apart in time, "raises red flags" about their recent deposition testimony that they each separately "made the same mistake" in their accounts of who drew the sketch. That is nothing more than a common-sense conclusion that the credibility of two witnesses is suspect because they gave narratives that were disturbingly aligned, despite their assertions that they innocently and entirely separately misremembered the events. The jury certainly does not need Trainum's assistance to evaluate the impact of that suspicious correlation of the statements by the individual defendants in order to judge their credibility. He will not be permitted to share that opinion with the jury.

## III.

The proposed testimony by psychologist Jeffrey Aaron concerning the psychological harm that the plaintiff suffered and the factors associated with false confessions, and similar testimony by criminologist Allison Redlich, satisfy the requirements of Evidence Rule 702, and is relevant to material issues in the case. The proposed testimony by David Balash on the subject of gunshot residue and firearms identification likewise satisfies Rule 702's requirements. The proposed testimony by James Trainum on proper police practices also is admissible under Rule 702 and relevant to material issues in the case, but not his opinion on the credibility of the defendants' explanation explaining the source of the sketch of the murder scene.

Accordingly, it is **ORDERED** that the defendant's motion to limit testimony of Dr. Jeffrey Aaron (ECF No. 130) is **DENIED**.

It is further **ORDERED** that the defendants' motion to exclude testimony of David Balash (ECF No. 132) is **DENIED**.

It is further **ORDERED** that the defendants' motion to exclude testimony of Dr. Allison Redlich (ECF No. 134) is **DENIED**.

It is further **ORDERED** that the defendants' motion to exclude testimony of James Trainum (ECF No. 138) is **GRANTED IN PART AND DENIED IN PART**. The plaintiff may not elicit from this witness an opinion on whether the suspicious correlation of the defendants' narratives relating to their recollection of how the crime scene was created renders them less credible. The motion is **DENIED** in all other respects.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date: May 16, 2019

**<u>PROOF OF SERVICE</u>**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on May 16, 2019.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI