# EXHIBIT 3

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF WAYNE

PEOPLE OF THE STATE OF MICHIGAN,

              Plaintiff,

-vs-

DAVONTAE SANFORD,

              Defendant.

Case No: 07-015018-01
Hon. Brian R. Sullivan

**RECEIVED**

MAR 0 1 2012

APPELLATE DEFENDER OFFICE

| | |
|---|---|
| Thomas M. Chambers  P32662<br>Attorney for Plaintiff<br>1441 St. Antoine<br>Detroit, MI 48226<br>(313) 224-5777 | Kim McGinnis  P67678<br>Attorney for Defendant<br>645 Griswold Street, Suite 3300<br>Detroit, MI 48226<br>(313) 256-9833 |

**OPINION AND ORDER DENYING DEFENDANT'S
MOTION TO WITHDRAW GUILTY PLEA**

At a session of said Court, held in the Frank
Murphy Hall of Justice, City of Detroit, County of
Wayne, State of Michigan, on
FEB 2 8 2012

PRESENT:   HONORABLE BRIAN R. SULLIVAN

The defendant, Davontae Sanford, seeks to withdraw his guilty plea for second

degree murder (MCL 750.317) and felony firearm (MCL 750.522(b).  Sanford contends he

is actually innocent based on three grounds:  1)  William Rice can provide an alibi; 2)  his

Sanford_NSB_000485

confession was false; and 3)  another person, Vincent Smothers, has confessed to the murders that underlie the defendant's conviction.[1]

For the reasons set forth in this Opinion, the court finds the defendant has not met his burden to show he is actually innocent by clear and convincing evidence because:  (i) Sanford's assertion of alibi is based on patently false evidence, (ii)  there is no basis in evidence to conclude Sanford's confession was false, and (iii)  Smothers' confession, standing alone, is insufficient to warrant granting defendant's motion to withdraw his plea. Accordingly, defendant's motion to withdraw his guilty plea is denied.

## I. PROCEDURAL HISTORY

Defendant was charged with four counts of first degree premeditated murder (MCL 750.316), four counts of first degree felony murder (MCL 750.316), one count of assault with intent to commit murder (MCL 750.83), one count of robbery armed (MCL 750.529) and one count of felony firearm (MCL 750.227(b).  The charges arose out of the murders of Michael Robinson, Sr., Nicole Chapman, Deangelo McNoriell and Brian Dickson, who were murdered in Robinson's house at 19740 Runyon St. (Runyon) on September 17, 2007 about 11:25 p.m.

---

[1]The defendant contended his guilty plea should be set aside based on a due process violation by the state when it did not immediately produce Smothers' confession to defendant when it was made.  The defendant knew about the confession before the prosecutor, but initially had the wrong name.  The police knew of the

Page **2** of **30**

A bench trial was held on March 17 and 18, 2008.  After the state presented its evidence, the parties announced they had reached a plea agreement.  Defendant's plea was placed on the record and accepted by the court.  Defendant agreed to plead guilty to four counts of second degree murder (MCL 750.317) and one count of felony firearm.  The parties further agreed defendant would receive a sentence within the D3 range of the sentencing guidelines grid.  The other charges were dismissed.  Defendant also agreed to provide truthful information to the authorities about the multiple homicides.  On April 4, 2008 defendant was sentenced pursuant to his plea agreement to thirty seven to ninety years imprisonment on the murder convictions and two years for felony firearm.

The defendant filed a motion to withdraw his guilty plea.  The court initially denied these motions without prejudice, but ultimately granted an evidentiary hearing.  During that hearing the defendant filed an application for leave to file a delayed appeal in the Court of Appeals.  In May, 2009, the Court of Appeals remanded the case to this court for an evidentiary hearing (which was in progress) limited to the issues raised in defendant's motion to withdraw his plea, actual innocence and due process violation.  The evidentiary hearing and other hearings on related motions were held over an extensive period of time so the parties could present witnesses.  The due process ground has been abandoned by defendant by not addressing it in its final brief filed on October 26, 2011.  *People v Small,* 120 Mich App 442 (1982).

---

confession about April 28, 2009.

Sanford_NSB_000487

## II. STANDARD OF REVIEW FOR PLEA WITHDRAWAL AFTER SENTENCING: DEFENDANT BEARS THE BURDEN BY CLEAR AND CONVINCING EVIDENCE TO DEMONSTRATE ACTUAL INNOCENCE

### A. Defendant bears the burden by clear and convincing evidence to demonstrate actual innocence.

1. Defendant's conviction is the result of his guilty plea, not his confession.

Defendant has made strenuous efforts to posture his conviction as being the result of a false confession. Defendant's conviction is the result of his guilty plea. MCR 6.310(C) controls plea withdrawal after sentencing. However, the rule does not specify the grounds or standard for governing withdrawal of a plea after sentencing. Case law has provided some guidance.[2]

2. Defendant bears the burden of proof to establish the fact of actual innocence by clear and convincing evidence.

Michigan law does not favor the change of a plea after sentencing. *People v Goldman,* 245 Mich 578 (1929); *People v Rucker,* 254 Mich 342 (1931). The focus is on the plea itself. *People v Zaleski,* 375 Mich 71 (1965). There is no absolute right to withdraw a plea. There must be an error in the plea proceedings and a showing there has

---

[2]Defendant proposes the Court of Appeals apply the law in *People v Swain,* 288 Mich App 609 (2010). *Swain* was a jury trial and does not apply to this case. Nor do the cases cited by defendant on collateral relief provide guidance, such as habeas relief. *United States v Bagley,* 473 US 667 (1985); *People v Cress,* 468 Mich 678 (2003). (Defendant's brief,p18-19).

Sanford_NSB_000488

been a miscarriage of justice.  See *People v Jones,* 190 Mich App 509 (1991); *People v Winegar,* 78 Mich App 764 (1977).  Defendant has not alleged any defect in the plea proceeding.[3]

*Zaleski, supra,* held that a defendant bears the formidable burden of showing the conviction is manifestly unjust[4] in order to withdraw the plea.  The legal standard defendant must meet to withdraw a guilty plea after sentencing requires defendant to establish by clear and convincing evidence that the plea should be set aside to correct a manifest injustice.  See *People v Taylor,* 383 Mich 338 (1970).  Clear and convincing evidence is:

> [that which produces] . . . in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitance, of the truth of the precise facts in issue. *In Re Martin,* 450 Mich 204, 227; 538 NW2d 399 (1995) (quoting *In Re Jobes,* 108 NJ 394, 407-408; 529 A2d 434 (1987).

The standard of proof is clear and convincing because defendant's plea of guilty conclusively establishes the fact of his guilt, a prerequisite for the imposition of any punishment by a court of law.  See *Norris v State,* 896 NDE2d 1149 (Ind,2008).  In other words, a conviction predicated upon a guilty plea is as conclusive as a verdict pronounced

---

[3]Sanford has not asserted any due process violation as a basis to withdraw his plea.  He does not claim his plea was involuntary, attributable to force, fraud, fear, ignorance, inadvertence or mistake.  See *People v Zaleski,* 375 Mich 71 (1965).

[4]Michigan law contains language to the effect that "subsequent evidence strongly suggesting defendant's innocence" is sufficient to meet the standard for vacating a guilty plea.  See *People v Mauch,* 397 Mich 646 (1976); *People v Rucker,* 254 Mich 342 (1931).  The court equates this standard with, or refined to, clear and convincing evidence, as defendant's brief seems to assert.  (Defendant's Brief,p16,19,20)

**Page 5 of 30**

Sanford_NSB_000489

by a jury. See *People v Serr,* 73 Mich App 19 at 28 (1976); *People v Ginther,* 390 Mich 436 (1973); *Kercheval v United States,* 274 US 220 (1927); *People v Wolff,* 389 Mich 398 (1973).

*United States v Brown,* 250 F3d 811 (3dCir,2001) held the defendant must have a fair and just reason for withdrawing a guilty plea. Bald assertions of innocence are insufficient to permit the withdrawal of a guilty plea, as are mere assertions, conclusions or whim. See *United States v Salgado-Ocampo,* 159 F3d 322 (7thCir,1998); *Brown, supra; Zaleski, supra; Blackledge, supra.* See also *State v Truman,* 187 Wis2d 621 (Wis App, 1994); *State v Brunton,* 203 Wis 2d 195 (Wis App, 1996); *Beck v Angelone,* 261 F3d 377 (Ca4, 2001); *In Re Martin,* 450 Mich 204 (1995). Assertions of innocence "must be buttressed by facts in the record that support a claimed defense." *Salgado-Ocampo, supra.* Under Michigan law, such facts must be established by clear and convincing evidence.

3. A plea conviction carries the presumption of verity.

The plea taking procedure is a "solemn proceeding in open court" wherein the defendant is personally addressed and personally responds to the fact of his guilt." *Serr,* at 27. A guilty plea is "… as solemn an occasion as the trial of the matter." *Serr, supra* at 27. *Serr* held:

> It is the opinion of the court where a defendant has been found guilty *by reason of his own statements as to all the elements* required to be inquired into by GCR 1963.785.7, and his attorney has also confirmed the agreement

---

Page **6** of **30**

Sanford_NSB_000490

and the defendant has been sentenced, *neither he nor his attorney will be permitted thereafter to offer their own testimony to deny the truth of their statements made to induce the court to act.  To do so would be to permit the use of its own process to create what amounts to a fraud upon the court.* This is based on public policy designed to protect the judicial process. *Serr, supra* at 28.  (emphasis supplied).

The United States Supreme Court has likewise held that solemn declarations pronounced in open court carry a strong presumption of verity. *Blackledge v Allison,* 431 US 63 (1977); *Machibroda v United States,* 368 US 487 (1962); *Price v Johnston,* 334 US 266 (1948).  Admissions during the course of the plea will not be lightly disregarded. *Taylor, supra,* at 361-362.


Michigan law and federal law require a defendant to provide sufficient reasons to explain the contradictory positions taken before the trial court in the plea and in defendant's motion to withdraw his guilty plea.  See *United States v Jones,* 979 F2d 317, 318 (3d Cir, 1992); *United States v Brown,* 250 F3d 811 (3dCir, 2001); *United States v Maher,* 108 F3d 1513 (2dCir, 1997); *People v Zaleski,* 375 Mich 71 (1965); *Ruez, supra* (concurrence).


*United States v Maher,* 108 F3d 1513 (2dCir,1997) has been cited by the state as guidance because it has similar procedural facts to this case.  In *Maher* the defendant entered a plea after he sat through extensive trial testimony from numerous witnesses in the prosecution's case.  The defendant later moved to withdraw the plea.  The court held when reviewing a belated claim of innocence the court must draw all permissible inferences in favor of the government and against the defendant "especially when, as here,

**Sanford_NSB_000491**

the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing his wrongdoing and acknowledging that he could not effectively defend against the evidence." *Maher, supra* at 1530.

### B. The relief defendant seeks is predicated in part on newly discovered evidence.

The state has strenuously urged this court to hold that the defendant should be precluded from relief based on newly discovered evidence because such relief is foreclosed by the defendant's plea of guilty, as opposed to after a trial.  There is a rule in some federal circuits and in some states that a guilty plea precludes or waives the right to a new trial based on newly discovered evidence.

Other state and some federal courts have held that newly discovered evidence is relevant only where the defendant is seeking relief from a conviction after trial.  See *Majors v State,* 946 SO2d 369 (Miss App, 2006); *People v Barnslater,* 373 (Ill App3d 512, 2007); *Weeks v Bowersox,* 119 Fd3d 1342 (8thCir, 1997[Loken, J concurring]); *State v Werre,* 325 NW2d 172 (ND, 1982).  Courts have held a defendant is precluded from seeking to undermine the sanctity of his own guilty plea by challenging the facts in a post-conviction setting after declining to challenge those same facts at trial.  The Supreme Court of Illinois in *Barnslater* held:

> Independently of the foregoing analysis, and though not argued by any of the parties, we would strongly question whether a claim for relief under the Post-Conviction Hearing Act premised upon newly discovered evidence of actual innocence can suffice to raise a cognizable constitutional deprivation where

Page **8** of **30**

**Sanford_NSB_000492**

> the challenged conviction was entered pursuant to a plea of guilty.  We believe that defendant's post-conviction claim of actual innocence cannot be deemed to deprive him of his due process rights in the face of the fact that the defendant previously confessed to the commission of the crime in his plea.   ...  There must be a substantial showing that his continued incarceration in the face of such evidence would violate his rights under due process.  If a defendant claims that his guilty plea was coerced, then that coercion provides the necessary constitutional deprivation for which post-conviction relief would be appropriate, but *not where he claims actual innocence in the face of a prior, constitutionally valid confession of guilt.* (emphasis supplied).

See also *Majors v State,* 9046 SO2d 369 (Miss App 2006). *(Defendant cannot use newly discovered evidence to claim a different result on retrial because his guilty plea nullifies any argument that undiscovered evidence would prove his innocence).*


The Michigan appellate courts have not conclusively ruled on this point.  This court concludes that such a holding must be generated by a court of greater authority.  But this court declines to hold that a guilty plea is an insurmountable barrier to relief because it does not comport with justice or truth, the goal of judicial proceedings.  See i.e. MRE 102.  The integrity of the judicial process in a plea withdrawal is protected in law from conclusory and vague allegations, as well as contentions which are wholly incredible or frivolous.  See *Blackledge, supra,* at 97.  But more to the point, the state can have no interest in the punishment of a person who is innocent in fact, even if the conviction is based upon defendant's plea.  Moreover, no consideration of any procedural burden should outweigh the purpose of the criminal law, that justice be done and truth ascertained.  This proposition is so fundamental a principle to this (and every) legal system that no society willing to call itself civilized should bar redress where a miscarriage of justice can be

Page **9** of **30**

satisfactorily demonstrated by competent evidence.   Accordingly, the court holds defendant's demonstration of actual innocence by clear and convincing evidence should not be foreclosed by a plea of guilty.  The legal safeguards set forth in law are sufficient to otherwise protect the legitimate interests of finality, etc.  And, it is the interests of both parties which is at stake in a criminal case.  See *People v Marsh,* 14 Mich App 518, dissent, at 547 (1968).


### III. DEFENDANT'S GROUNDS TO WITHDRAW PLEA


**A. Defendant has failed to establish by clear and convincing evidence that the alibi supports defendant's actual innocence because the alibi is false.**

An alibi (lack of presence) is a defense based on the physical impossibility of defendant's guilt by placing the defendant in a location other than at the scene of a crime at the relevant time.  *People v Mullane,* 256 Mich 54,58 (1931); *People v McGinnis*, 402 Mich 343 (1978).


Defendant's defense of lack of presence hinges exclusively on the testimony of William Rice (Rice).


Rice Is a former Detroit Police Officer and former head of the Homicide division. He retired in 2006 and does criminal investigations.  Rice has known Sanford more than ten

Sanford_NSB_000494

years, because Sanford's aunt, Cheryl Sanford (Cheryl), is Rice's girlfriend.  On September 17, 2007 Rice was semi-living with Cheryl at 17383 Teppert, located about one half mile from Sanford's house on Beland.  Rice testified Sanford was with him (and others) at Cheryl's house when the homicides occurred.

Rice recalled the evening of September 17, 2007 because "That evening he (Sanford) was there with me at the time that the alleged crime took place." (Transcript Hearing, October 28, 2008 ('TH'),p8).

Rice's testimony established the approximate timeline for that evening and the following morning:

> 8:30 p.m. Rice drove Sanford, his mother Tamika, and sister from their house on Beland to Cheryl's house on Teppert where they ate a late dinner.[5] Sanford was wearing "light colored pajama pants."  (TH,p10).   Sanford played on the computer in the basement all night.
>
> 11:00 p.m.  Everyone except Sanford eats dinner.[6]
>
> 11:30 p.m.  Rice tells Sanford to get ready to go home.
>
> 11:45 p.m.  Rice drives Sanford, his mother and sister home on Beland.[7]

---

[5]Rice testified he was in the kitchen with Sanford's older cousin Nathan, Tamika and Cheryl, where they discussed how to "cook a roast" for "a couple of hours." (TH,p14).

[6]Everyone but Davontae ate dinner "roughly about 11:00".

[7]About 11:30 p.m. Rice told Sanford to get dressed to go home.  Rice left Cheryl's house to take Sanford, his mother and sister back to Sanford's home on Beland about 11:45 or 11:46.  Q. Okay, so what time did you drop Davontae an[d] the others off at Davontae's house?  A.  Within minutes - - within minute, I would say 11:45, 11:46. (TH,p18). . . A.  We left the house at 11:45.  Q.  And how do you know it was 11:45 when you left the house?  A. One, there's a huge clock right there.  Two, we wanted to make sure that Davontae was in school the next day.  So, at 11:30 I was telling him to let's get dressed cause I was gonna personally take him to school the next day; and three, the time became the topic between 11:30 and 11:45.  (TH,p15).

Sanford_NSB_000495

11:46 p.m.  Rice then drives Nathaniel home to Mt. Clemens.  Rice returns to Cheryl's house on Teppert in Detroit where he remains for the balance of the night.

1:39 a.m.  Rice is awaked at Cheryl's by a call from Dale Collins about Sanford.  Rice goes back to sleep at Cheryl's house on Teppert until the next morning.  (TH,p8-18).

Detroit police Investigator Art Wimmer, an expert in cell phone forensic and cell record interpretation, examined Rice's cell phone records (admitted as Exhibit G). Wimmer's testimony established that as a general rule the cell phone makes and receives phone calls from the cell phone towers closest to the phone that is being used:

a.  Cheryl Sanford lives at 17383 Teppert, Detroit, located near cell tower 154;

b.  Rice lived at 3312 Oakman Blvd., Detroit near tower 141; and

c.  Nathaniel lived at 25 Mulligan St., Mt. Clemens, MI, near tower 308.

The distance between 19700 Beland St. (Sanford's house), Detroit and 25 Mulligan Dr., Mt. Clemens (Nathaniel's house), is between fourteen and seventeen miles, depending on the route.

Rice's cell record revealed the location and tower used by Rice's cell phone on the evening of September 17 and the morning of September 18, 2007:

Page **12** of **30**

Sanford_NSB_000496

| TIME OF CALL | DURATION | DIALED NUMBER | TOWER | DIRECTION OF CALL |
|---|---|---|---|---|
| 1. 10:52.26 p.m. | 47 sec. | 300-1294 | 193 | out |
| 2. 11:18.15 p.m. | 9 min. 41sec. | 300-1294 | 308 | out |
| 3. 11:56.44 p.m. | 19 seconds | 224-8298 | 141 | out – to Rice's wife |
| 4. 11:58.34 p.m. | 6 min. 59 sec. | 485-1298 | 141 | out – to Cheryl |
| 5. 1:44 a.m. | 6 min. 19 sec. | 485-1298 | 141 | in – from Cheryl |
| 6. 1:58 a.m. | 6 min. 16 sec. | 485-1298 | 141 | out - to Cheryl |

It is clear from Rice's own cell records Rice was in Mt. Clemens at 11:18 p.m. on a call which lasted almost ten minutes. It is physically impossible for Rice to have been at Cheryl's house on Teppert St. with Sanford waiting to drive Sanford home as Rice testified and on his phone in Mt. Clemens at the same time.

Indeed at 10:52 p.m. on the evening of September 17, Rice could not have been at Cheryl's house eating since the cell phone call that was made at that time would have been routed through cell tower 154 which services Cheryl's house. Instead, the phone call was made through cell tower 193.

It is clear from Rice's cell records that Rice did not return to, nor sleep at, Cheryl's house as he testified to under oath during the hearing, but instead went to his house on Oakman. All the calls on Rice's cell phone for the remainder of the night used tower 141,

Page **13** of **30**

Sanford_NSB_000497

the tower closest to Rice's home.  Cheryl's phone calls with Rice used tower 154 closest to her house.  So, Rice was not with Cheryl as he testified.[8]

The evidence further demonstrates that between 1:39 a.m. and 8:03 a.m. on September 18, 2009 there were nine cell phone calls between Rice and Detroit Homicide Officer Dale Collins, Rice's best friend.  All nine calls were received by Rice off tower 141.

At 1:39 a.m. Rice received a phone call from Collins on his cell phone off tower 141:

Q.  Did he awaken you from sleep?

A.  (Rice) I want to say, yes.

Q.  Where were you sleeping at the time?

A.  On Teppert.

Q.  Okay, so you're sleeping on Teppert and you, you get a call from Dale Collins - -

A.  That is correct. (TH,p43,44).

Q.  And did you have any concerns about Davontae?

A.  None.

Q.  And what happened after you talked to Investigator Collins?

A.  I went back to sleep.  (TH,p22).

Rice's testimony that he went to "back to sleep" at Cheryl's house on Teppert St.

---

[8]Nor was it Cheryl who left Rice alone on Teppert if she were not there as Rice said.

Page **14** of 30

**Sanford_NSB_000498**

after he spoke to Collins is false. Rice made and received several calls using his phone off tower 141 near his house, not off tower 154 near Cheryl's house.

Rice agreed to drive Sanford to school the next morning but said he did not because he received a call in the morning that Sanford was not home. Rice called Russell and left "messages that I was available and that Davontae was at the house at the time the shooting occurred." (TH,p26).

Q. Have you interfered at all in this case?

A. No.

Q. Okay. Have you been getting updates from your friends on the police force about what's going on on the case?

A. No.

Collins called Rice nine times that night (between 1:39 a.m. and 5:35 a.m.).[9] Collins spoke with Rice twice and left seven voice mail messages during the night. Rice retrieved each of the seven messages shortly after Collins called. The inference is that the messages were left for Rice by Collins about Sanford, the stated purpose of the first call. Rice knew "sometimes a witness is more than a witness." (TH,p82).

Moreover, Sanford told Collins on the night of the murders that Rice dropped him (Sanford) off before the murders, about 9:00 p.m.

---

[9]Collins called Rice at 1:39.57 a.m., 2:54.10 a.m., 2:55.58 a.m., 3:11.16 a.m., 6:26.04 a.m., 6:44.37 a.m., 7:05.42 a.m., 8:03.29 a.m. and 17:35.15 a.m.

Sanford_NSB_000499

It is clear Rice's testimony, presented by Sanford in support of his lack of presence defense is false and does not support Sanford's innocence.  Rice's testimony can only be designed to create the false impression with the court that Sanford was with Rice, the former head of the Homicide Division of the Detroit Police Department, when the murders occurred.  The only conceivable purpose of Rice's testimony is to direct the court to the false conclusion that Sanford could not have committed (or participated) in the murders because Sanford was with Rice.  This testimony is clearly false, this defense fails and does not support Sanford's claim of actual innocence.

### B.   Defendant's claim his conviction is predicated on a false confession is unsupported by clear and convincing evidence.

Defendant's second ground is for relief is based on the assertion that his "confession" is false.  Defendant claims his two [presumably written] statements to police grew "richer and more detailed" consistent with the development of the facts as they became known to the police.  Defendant asserts his (unidentified) confession was not his, but the product of police.[10]  In this motion defendant seems to blend these four statements into one under the generic term "confession" without specifically identifying the legal infirmity of each of defendant's statements, nor accounting for defendant's statement under oath at the plea.

---

[10]The trial record contains a similar declaration.  The issue was not developed in this hearing beyond the defendant's statement to the forensic examiner.

**Sanford_NSB_000500**

The defendant actually made several statements, three to the police (one of which was a confession) and one statement to the court under oath in the course of the plea. The statements relevant to this motion are :

    1.  Defendant's oral statement on Beland St. to Officer Collins on September 18, 2007, (about 1:39 a.m.);

    2.  A (first) written statement to Sgt. Russell on September 18, 2007 (4:00 a.m.);

    3.  A (second) written statement to Sgt. Russell on September 18, 2007 (9:30 a.m.);

    4.  Defendant's testimony under oath during his guilty plea;

    5.  Defendant's statement to Tillman; and

    6.  Defendant's statement to the PSIR author.


    In defendant's oral statement to Collins and first written statement to Russell, Sanford admits he knew of the plan to rob Robinson with others but abandoned the act before the murders happened.  In Sanford's oral statement to Collins[11] defendant admits:

    1.  Rice dropped Sanford off before the murders, about 9:00 p.m.

    2.  Robinson's house was a known dope house.

    3.  Sanford got in a car with others, who were planning to rob Robinson, and saw the guns.

    4.  Sanford changed his mind about participating and got out of the car.

    5.  While at home Sanford heard shots and saw a fleeing perpetrator in his

---

[11]This oral statement was testified to by Collins not Russell.  However, Russell confirmed defendant did make such a statement on the street but did not recall its content.

Sanford_NSB_000501

yard who Sanford identified as 'Tone Tone.'

6.  Sanford drove around with police to point out locations.

In Sanford's first written statement taken by Russell he named 'PBI Tone,' 'Tone Tone' and his cousin 'Carrie' all meeting to discuss a robbery of Robinson's (Milk Duds) house on Runyon.  Sanford told Tone not to steal anything identifiable from the house because such a theft could result in their apprehension ("getting caught").  Sanford saw a "chopper," "mini-14," a .38 and .45.  'Los' drove up and they all drove by Robinson's house where Sanford saw "a car in the driveway."  Sanford changed his mind and went home.  He heard shots and saw 'Tone Tone' jump the fence near defendant's yard.[12]  Sanford's mother told him she saw the police outside with a dog.  Sanford left the house and approached police on the street – "that's when I walked down the block and told you what happened."  Sanford denied "he fired a gun" or was "around anyone that was firing a gun."

In Sanford's second written statement taken by Russell Sanford admitted he participated in the murders.  Sanford's statement is a detailed narrative of the events leading up to and included the commission of the murders.

Sanford presents no evidence that this statement is not his, or that it is legally deficient.  There is no evidence that the "chopper" and/or "mini-14" do not shoot 7.62 x 39

---

[12]Rice testified Collins told him this in the phone call at 1:39.

Sanford_NSB_000502

bullets.[13]  In his first two statements, oral to Collins and written to Russell, Sanford never says four weapons were used, only that he saw four weapons.  Nor would Sanford know since he claimed to have abandoned the crime and wasn't there.

Defendant's second written statement was made to Sgt. Russell at about 9:30 a.m. on September 18.  This statement consists of a detailed narrative of the events leading up to and the perpetration of the murders.  Sanford named his accomplices as 'Tone', 'Tone Tone', 'Los' and 'Carrie.'  In this statement Sanford described the position of the four victims who were killed in the front room and drew a sketch of the room with the position of the victim's bodies.  Sanford also stated he saw and spoke to a woman in a back bedroom.

Defendant offers his own statement to the forensic examiner offered to counter his written statements.  The court cannot evaluate the credibility of a witness who does not testify. *People v Bowyer,* 108 Mich App 517 (1981).  That statement is hearsay precluded by the plain language of MRE 802 and MRE 801(d)(2).  The defendant's statement to the forensic examiner does not constitute competent evidence and cannot meet the threshold of clear and convincing evidence.  *People v Williams,* 228 Mich App 546 (1998); *In Re Martin,* 450 Mich 204 (1995) quoting *In Re Jobes,* 108 NJ 394 (1987).

Finally, in the course of his plea, defendant also confessed to taking part in the murders.  Defendant admitted that he went to 1974 Runyon St. to rob it with 'Bug,' 'T' and

---

[13]Sanford never provided a definition for what he identified as a mini 14.

Sanford_NSB_000503

'Homey.'  Defendant had a gun, a mini 14, which he shot into the house from outside.
Defendant went into the house and more shots were fired once they went inside.[14]

Robinson's house was targeted because it was a drug house.  Defendant said his
cousin 'Bug' was talking about it (the robbery) and defendant did not want anyone to die,
but just went along with the plan.  They met in front of defendant's house at 19700 Beland
before the shooting.  His cousin drove and the other persons had hand guns and long guns
including an AK.  Defendant left the scene on foot with Homey and the other two left in a
van.  Defendant admitted that he and Homey fled from the scene on the route that a
canine officer had previously tracked with his dog with respect to the route that the
perpetrators took after the murders.  Defendant watched the prosecutor display the track
with the red laser pointer up Runyon and down State Fair and admitted that was the route
he and Homey used to flee the scene.  Defendant returned the mini 14 to Homey.

In evaluating the truthfulness of these statements, it should be noted that
defendant's statements are corroborated by other evidence or facts that heavily point to
defendant's involvement in the murders.  For example, the sketch that the defendant made
of the scene of the murders at Tolbert's request is very similar to the one made by Police
Officer Lori Briggs, who arrived at the scene of the murders at 12:35 a.m., on September
18.  Sanford also accurately described the number, sex and location of the victims in the

---

[14]Compare defendant's statement in PSIR, infra, where he admits being in the house.

Sanford_NSB_000504

house. Additionally, he correctly recounted that while leaving the scene of the crime there was an exchange of gunfire with a neighbor, Jesse King. Moreover, defendant's pants tested positive for gunpowder residue, which is consistent with his being at the scene of the murders. Defendant also said he washed his gym shoes.[15]   Finally, in addition to defendant's own multiple statements placing himself at the scene, the court notes that the in-court identification of defendant's voice by the one surviving adult, Valerie Glover, also puts defendant squarely at the scene of the crime while it was occurring.   Interestingly, Glover's recollections of what was said by the perpetrators corroborate defendant's statements that the purpose of the crime at Runyon St. was robbery.

As against this, the defendant asserts that the court should disregard this confession to the police and testimony under oath in court at the plea proceedings for various factual reasons: there were inconsistencies in the various statements that he gave to the police and in his plea relative to the names of the accomplices; he did not correctly identify all the types and number of weapons that were used (although defendant did correctly describe that one of the accomplices used a .45 caliber gun); that his description of what he was wearing did not match the description provided by Reverend King, a neighbor, who witnessed and exchanged gunfire with two persons walking away from the scene of the crime; and that there were discrepancies between Glover and defendant as to

---

[15]Russell and Williams both testified to the washing of gym shoes.  Defendant told Russell he washed them. Williams retracted testimony to the effect that Rice washed Sanford's shoes.   Contrary to defendant's assertion (Defendant'sBrief,p34), Williams also retracted the statement that Smothers told him the police had the wrong person.  Williams suffered a closed head injury which affects his memory.  (TH7-13-10,p202-204).

**Sanford_NSB_000505**

what was said during the murders.  The defendant also points out that in the report issued

by the Michigan Department of Community Health concerning his competency to waive his

Miranda rights the Forensic Examiner recounted that in her interview the defendant stated

he was innocent and that his confession to Sgt. Russell was the product of being drunk

and high on marijuana.  This is not evidence.  MRE 802; MRE 801(d)(2).  Defendant

further argues that to the extent that he gave accurate details about the murders, he was

provided those by police.[16]

On this latter point the court notes a lack of any real evidence that police supplied

the defendant with any details about the murders.  Actually, the evidence reflects that the

police, in fact, did not give information to the defendant.  For example, with respect to the

sketch that the defendant made, which substantially accurately depicts the scene of the

crime, the unrebutted  testimony is that Commander Tolbert asked defendant to describe

the inside of the location.  Sgt. Russell did not suggest what the interior looked like and did

not even ask him to draw the picture.  Sgt. Russell denied that he had pictures of the

locations and denied that he showed Sanford any pictures.  If false, defendant has not

---

[16]The court is cognizant of defendant's youth, susceptibility to suggestion and immature decision making
abilities vis a vis common sense, general knowledge and experience.  These and other factors including
techniques of the questioner, can easily lead to false confessions.  The court is likewise aware that the human
tongue is as capable of uttering truths as it is of uttering falsehoods, although such a predilection is not a
function of age.  Nevertheless, defendant has not established by evidence that Russell is the real author of the
statements merely because he took them.  Nor is there any evidence Russell filled in the detail of defendant's
statement as time passed and as events unfolded during the investigation.  The scenario is possible and may
even be a documented technique of over-zealous or unconscionable police.  But defendant has presented no
evidence that any of his statements were the result of this technique.  (. . . "it is impossible to tell."
Defendant's brief).   The defendant asserts and assumes "police contamination" (which the court
acknowledges can happen) but has advanced no evidence which supports this theory.  Such an assertion is
the classic definition of "speculation."  Mere speculation cannot amount to clear and convincing evidence.
*Matter of Hulbert,* 186 Mich App 600,605 (1990). Moreover, the only contamination by 'police' is associated

Page **22** of **30**

Sanford_NSB_000506

shown it to be so.  It is mere speculation that the police might have provided the defendant

with the details and then somehow convinced him to use those details in his statements.

Mere speculation cannot amount to clear and convincing evidence.  *Matter of Hulbert,* 186

Mich App 600, 605 (1990).


It may be that there are unexplained discrepancies between the various statements

of the defendant or others involved, such as Glover and King.  Indeed, on this score, it may

be that the defendant subsequently recanted his statement while being interviewed by the

Forensic Examiner.   Nevertheless, in a candid discussion in a recorded telephone

conversation with his stepfather, Jermaine Tillman, the defendant specifically identified his

accomplices to be the same persons he identified during his plea, even correcting his

stepfather as to the name of one person:

SANFORD:  Hey . . .

TILLMAN:  Yeah.

SANFORD:  It's, it's a thing that's called a second chance, you got have things like
be 14 or 15 or whatever.  You, you only get ten years or something like that.

TILLMAN:  Well, well, you going to get back on appeal though, man.

SANFORD:  I know.

TILLMAN:  You going to get back on appeal though.  But what . . . but *give me the*

---

with the defense witness Rice.

**Sanford_NSB_000507**

*names though.*

SANFORD:  Hold on.  Hold on.  Hello?

TILLMAN:  Yeah.  Yeah.

SANFORD:  I told you.

TILLMAN:  Bernardo too?

SANFORD:  No.  No.

TILLMAN:  Nardo had nothing to do with it?

SANFORD:  No.

TILLMAN:  Okay, It was just *Bug, Breezy* and *Homie*, huh?

SANFORD:  *T*, not Breezy.

TILLMAN:  I know, I know, T Breezy.

SANFORD:  Yeah.  Yeah.

TILLMAN:  And Big Homie.

SANFORD:  Yeah.

TILLMAN:  Okay.  Who (sic) white van was that there, though?

SANFORD:  A white van?

TILLMAN:  Yeah, it wasn't no van you all was using?  There wasn't no van or nothing?

SANFORD:  Oh, yeah, yeah.  What was I saying?  Oh, no.  I, I gotta get off the phone.

TILLMAN:  Okay.


Tillman testified the conversation with defendant was about the Runyon St. murders.

His explanation of defendant's identification of the other perpetrators was that defendant

Sanford_NSB_000508

lies.

Similarly, Sanford admitted to being involved with the murders as recounted in the presentence report.   Defendant admitted he was in the house and saw the bodies.   He identified his cousin and mentions robberies:

> It wasn't me from the beginning anyway.  *It was my cousins.*  We was in the car smoking weed, drinking . . . I used to look up to my cousins as like my role model or brother.  *They used to put me on licks (robberies)* and stuff . . . I'd never do it . . . I told the police I didn't shoot one time cause I was scared. *I walked in the door and saw the bodies and got scared. I'm chasing behind my cousin, running.*  (PSIR,p4).

At best, therefore, there is conflicting evidence as to the defendant's abstract protestations of innocence and his admissions of guilt which cannot amount to clear and convincing evidence of innocence.  See for example, *Matter of McDuel,* 142 Mich App 479, 489 91985) ("the record does not reveal clear and convincing evidence that respondent is mentally ill. The evidence was, at most, conflicting on this issue.")  Taken as a whole, such discrepancies do not lead to a conclusion that the defendant is innocent, under the clear and convincing evidence standard.  Taken as a whole the various conflicting statements made by the defendant along with the physical evidence does not create in this court "a firm belief or conviction . . . [made] without hesitance," *Martin, supra,* 450 Mich at 227, that defendant is innocent.

**Sanford_NSB_000509**

## C. Smothers' confession does not provide clear and convincing evidence of defendant's innocence.

Finally, defendant maintains that his innocence is established by a statement made by another person, Vincent Smothers, who confessed to the murders that underlie the defendant's conviction.[17]

Smothers gave a statement to Sgt. Williams about the Runyon St. murders. To summarize, Smothers indicated that there were three men and possibly a woman who had been killed. He correctly identified the location of the house and the type of house. He had done the killings based on a contract he had from Leon Payne. He further stated that he used an AK-47 and that "Nemo" had used a .45 caliber pistol. While Nemo had commenced shooting into the house through a window, Smothers shot when he was inside the house. Smothers noted that a female ran from the front of the house into a rear room where she hid under a bed. Smother said she was uninjured. Smothers went into the bedroom and told her that everything was "all right" and that "she did not have anything to worry about." He also noted that there was a little boy in the house, who told Smothers he was fine.[18] At that point, Smothers did a quick search of the house, went to the basement,

---

[17]The court assumes that Smothers' statement was offered pursuant to MRE 804(B)(3) because of his unavailability on "the ground of privilege from testifying." MRE 804(a)(1): "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless the corroborating circumstances clearly indicate the trustworthiness of the statement." The corroborating circumstances are not confined to the statement but to all the circumstances. In this case the circumstances include Smothers seeking to seal the record, close the court and twice assert his 5th Amendment right not to testify on advice of two different lawyers at two different times, and all the circumstances of the statement.

[18]Smothers said he was very professional and limited his acts to his targets. Smothers said Robinson was a contract killing. Robinson sat in his house in front of a wide open door. Yet the front of the house was sprayed with bullets with no regard for who may have been inside and the lone target was visible from outside,

Sanford_NSB_000510

came back upstairs, and they left through the front door.  They walked around the corner and left in a Jeep.  Smothers took about $2,000.00 in cash and a half pound of marijuana.

In considering Smothers' statement, the court agrees with defendant that some portions of his statement do reflect a detailed depiction of the scene of the crime and a plausible version of what happened.  There is also the unexplained match in ballistics of the ".45" caliber Nemo used at Runyon St. which was seized at Promenade.  (Transcript, Smothers' Confession).  Although Smothers' statement clearly implies that only Nemo and he were present that inference is not conclusive.  To paraphrase, Judge Boggs' concurring opinion in *United States v Arthur,* 949 F2d 211, 218 (CA 6, 1991), Smothers' statement does not automatically exonerate the defendant.

Nevertheless, there are certain portions of Smothers' statement that are inconsistent with the physical evidence and Glover's testimony.  Contrary to Smothers' statement that only Nemo fired from outside, shell casings were found outside the house from not only a .45 caliber gun (April 28, 2008,p31) but also 7.62 x 39 casings.[19]

Q.  Did you go into the house?

A.  (Smothers):  Yeah.

Q.  (Sgt. Williams): - - or did you shoot them outside?

---

somewhat contrary to his own proclaimed modus operendi.

[19]The ballistics experts differed slightly as to the number of weapons the casings were fired in.  The state's expert opined at least three.  The defendant's expert said two and the balance lacked sufficient criteria to properly identify and could be one or up to thirteen.  Smothers also said: "The only incident with the AK

Page **27** of 30

Sanford_NSB_000511

A. (Mr. Smothers): Went into the house.  (4-8-08,p41).

Additionally, Smothers' testimony about his statements to Glover is inconsistent with her statements as to what was said to her.  At one point Glover testified that the person who was addressing her said, "Where's the shit?:  I'm bout to kill you."  Glover also testified the person who came into the back room also asked Mike, Jr. "Where's the shit?" and that Mike, Jr. did not respond.  Needless to say there is a large discrepancy between Smothers' claimed statement to Glover that "everything was alright" and "she had nothing to worry about" and Glovers' statement the person said, "I'm going to kill you."  Additionally, he repeated inquiries about "Where's the shit at?" demonstrates that the motive behind the killings was robbery and not a contract killing.

Glover testified that she heard movement in the basement and in Robinson's bedroom at the same time that she was talking to the person who came into the back bedroom with a gun.  Glover said that person stayed in the room with a big gun the whole time.  In other words, her testimony supports the inference that there were more than two persons committing the murders.  Smothers said he went into the basement and so he couldn't have been there.  Moreover, he said he left the AK with Nemo and didn't have a gun when he was with Glover in the bedroom.

Finally, absent from Smothers' statement is any reference to the altercation with

was Carl."  (Exhibit1,Statement of Vincent Smothers,p29)

Sanford_NSB_000512

King.[20]

Contrary to the defendant's suggestion, King's testimony does not identify anyone as the shooter.  While it may be generally more consistent with Smothers' size, it is simply not probative of identity.

Under all the circumstances, the court finds that Smothers' confession does not present clear and convincing evidence that defendant is actually innocent of the crime.

This court is aware it is bound to make a determination from the record, which is comprised from the evidence presented by the parties.

## CONCLUSION

Defendant has not adduced by clear and convincing evidence that he was actually innocent of the Runyon St. murders.  The motion is vacate his guilty plea is denied; and

---

[20]Smothers sought to extract this incriminating testimony through Smothers former lawyer Silver and an investigator which the court precluded because it was not permissible under the rules of evidence.  That issue is on appeal.  The defendant has repeatedly requested the state grant Smothers immunity, which the state

Page **29** of **30**

Sanford_NSB_000513

**IT IS SO ORDERED.**

BRIAN R. SULLIVAN
Circuit Court Judge

ISSUED:  February 28, 2012

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK

BY_____

DEPUTY CLERK

declined to do.

Page **30** of **30**

**Sanford_NSB_000514**