# EXHIBIT 15



STATE OF MICHIGAN
DEPARTMENT OF COMMUNITY HEALTH
CENTER FOR FORENSIC PSYCHIATRY

JENNIFER M. GRANHOLM
GOVERNOR

JANET OLSZEWSKI
DIRECTOR

October 26, 2009

Byron Konschuh
Prosecuting Attorney
255 Clay Street
Lapeer, Michigan 48446

L.J. Nowak
Defense Attorney
385 West Nepessing Street
Lapeer, Michigan 48446

                RE: SANFORD, Davontae
           CFP #: 919334
       Docket #: 09-1145C
       Subject: Criminal Responsibility

Dear Attorneys:

This is the third Forensic Center referral for Davontae Sanford, a criminal defendant who is charged with three counts of Assault on a Prison Employee and Habitual Offender – Second Offense under Docket Number 09-1145C in the 71-A Judicial District Court for Lapeer County. He was referred for evaluation of competency to stand trial and criminal responsibility in a court order issued by the Honorable John Connolly on June 24, 2009. This order was received at the Forensic Center on June 29, 2009 and the defendant was scheduled to be seen on September 23, 2009. At the time of the interview, Mr. Sanford reported that he was a 16-year-old, single, Black male, who was born on November 26, 1992, in Detroit, Michigan.

### PROCEDURES

In order to complete this evaluation, the following procedures were conducted: Review of the pertinent police report that was provided to the Forensic Center; an interview with the defendant; and review of relevant records that were available at the time this report was issued. Records were reviewed from the defendant's prior two Forensic Center referrals. Additional records were requested from the Wayne County Jail – Mental Health Department and the Michigan Department of Corrections.

P.O. BOX 2060 · ANN ARBOR, MICHIGAN 48106
www.michigan.gov · (734) 429-2531 · TTY (734) 944-7102
Printed by members of:


Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 2

Prior to the interview and pursuant to MCL 330.1750, the defendant was informed of the purpose of the evaluation, of the fact that a report would be issued according to legal requirements, and that the examiner might be subpoenaed to testify about the report or anything else related to the examination. The defendant conveyed an understanding of the limits on confidentiality which pertain to this court-ordered examination and participated in the interview.

## CLINICAL PRESENTATION

Mr. Sanford was interviewed at the Forensic Center on September 23, 2009. The interview lasted approximately two hours. Mr. Sanford complied with most of the procedural aspects of the evaluation process, completing a personal history questionnaire, providing authorizations to obtain relevant mental health treatment records, and answering interview questions in what appeared to be a fairly direct way. He declined to participate in psychological testing, accurately stating that he had taken these tests at the Forensic Center previously. He was encouraged to again try to take the test, but said it was frustrating for him to do this and he didn't feel he would be able to think clearly as he was under a lot of pressure these days. Generally his manner was mostly cooperative with some oppositional tendencies.

Mr. Sanford was in the custody of the Michigan Department of Corrections at the time of the interview. On arrival, he was photographed, weighed and measured by forensic security aide who reported that he weighed 212 pounds, was 5', 9" tall, and had brown eyes and black hair. It was noted he had multiple scars on his right outer forearm and a tattoo of the word "Blood" on his inner left forearm. Mr. Sanford's right eye was swollen and he explained that at approximately age eight a peer threw an egg at him damaging his eye and he required surgery and is subsequently blind in his right eye. He also has a scar on his left cheek from an oil burn from an accident when he was about 13 years old. Mr. Sanford was dressed in standard, prison-issued clothing that appeared to be clean and fit him properly. His hygiene and grooming were adequate. He displayed no bizarre or stereotypical mannerisms, and his gait and speed of movement were unremarkable. He reported that he was not prescribed or taking any psychotropic medications. He said that since being placed in the juvenile detention facility back in September of 2007 up to the present, he has been prescribed a variety of different psychotropic medications to help him "stay calm." He said he has been diagnosed with "ADHD and panic attacks." When he was last seen at the Forensic Center in March of 2008, he was at the Wayne County Juvenile Detention Facility (WJDF) and prescribed Seroquel and Concerta "for being hyper and distractible." Mr. Sanford reported that after coming to the Department of Corrections in April, 2008, he had a number of adjustments in his medications. He said he did not wish to take Seroquel presently because he read it can cause diabetes. He said that he was

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 3

tried on a number of different medications in prison including Remeron, Prozac, Benadryl, and Doxepine. He reported being prescribed these medications due to behavioral difficulties, aggression, acting out and depression. He said that once he arrived at the Wayne County Jail in early July of 2009, approximately two months ago, he was observed to be overly medicated and his medications were changed. Soon after this he recalled that he stopped taking his medications altogether. He stated he has not been taking medications for the past two months and does not feel he needs them. He said that "some medicines calm me down and have me mellow, but I want to learn to control myself without it." He said prior to being incarcerated at age 14 at the WCJDF he had never been prescribed psychotropic medications. He recalled that as a child people wanted to put him on Ritalin but his mother did not agree to this. Mr. Sanford reported that while housed at the Wayne County Jail for the past two months he did not see mental health clinicians on an ongoing basis. He said he was housed in isolation at the jail due to his young age and spent his time watching television, talking to inmates and playing cards. He said approximately one week ago he was transferred from the Jail back to the Thumb Correctional Facility (TCF). He believed the transfer was because he needed to be brought to this evaluation. He said at TCF he is on the behavioral management unit because of numerous prior tickets. He is in a cell alone with a television and he spends his time watching programs such as National Geographic, The History Channel, The Discovery Channel and "things about science and the universe." He also said he enjoys "First 48 and Criminal Minds and Bizarre Foods on the Food Channel." He said he has received several tickets during the past week at TCF. One was for having been found with contraband, specifically psychotropic medications from the Wayne County Jail that he had hoarded. He also said he had flooded his cell the night prior to this evaluation. He explained that he gets a thrill out of acting out and getting a rise out of the corrections officers who have to deal with his misbehavior. He said during his past 17 months in the prison system he has had numerous tickets for "assault and battery on the guards, threatening behavior, contraband," and misconduct such as damaging his cell. He said he started to have behavioral problems in prison because he was angry about the amount of time he was sentenced to that went beyond the sentencing guidelines and also for being incarcerated for something for which he was innocent. He reported a history of corrections officers taunting him about how long he would be incarcerated and also speaking about his mother in disrespectful ways. In sum, it appears that Mr. Sanford has had a very difficult time controlling his behavior since placed in the Department of Corrections in April of 2008.

Mr. Sanford was conscious and aware and knew who he was, where he was, and the current date. An informal estimate of his intelligence suggested that he was functioning in the low average to average range. This estimate is supported by his responses to selected questions from the Wechsler Adult Intelligence Scale – Third Edition (WAIS-III), his vocabulary, and his reported educational history. He stated he completed the ninth grade and then was placed in the juvenile detention facility. He said he has been working on

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 4

obtaining his GED, but has not taken any GED tests yet. He said he had a history of being placed in special education due to fighting and behavioral difficulties. He recalled that in elementary school he got excellent grades and he also was doing extremely well when a student for approximately nine months in the juvenile detention facility in 2007-08. There were no indications of gross memory impairment and Mr. Sanford was able to recall three items at intervals of five and 15 minutes as well as to provide fairly detailed chronology of his life history and to recall recent and remote events without difficulty. His speech was normal in speed, volume, and articulation, and he was able to stop speaking when asked to do so. His thoughts were goal-directed and followed a logical progression. His answers were relevant to the questions asked, and there was no evidence of current delusional beliefs or hallucinations. Likewise, there was nothing to suggest a history of these sorts of symptoms.

In terms of his emotional functioning, Mr. Sanford reported that he currently "couldn't be better." He attributed his good mood to the fact that "My murder case is about to get overthrown. I'm going back to court on October 21." He explained that the actual killer had confessed to the murders for which he was falsely imprisoned. Mr. Sanford explained that he had been placed in the Wayne County Jail while awaiting his "evidence hearing" several months prior to this evaluation to see about having his case overturned. Mr. Sanford was able to show a sense of humor during the evaluation and at times tried to engage the evaluator in a flirtatious manner. He also expressed feelings of anger about being falsely imprisoned and about the way he had been treated by some of the prison staff. Overall his emotional expression was normally reactive and conveyed a range of feelings. The feelings he expressed were consistent with the content of his speech. He denied current sleep and appetite problems as well as suicidal thoughts and periods of crying. He denied and/or did not manifest a variety of symptoms associated with a mood disorder, such as significant appetite changes, sleep disorder, racing thoughts, elation, and euphoria. He did describe moodiness and irritability but this appeared to result from his immaturity, poor frustration tolerance and antisocial attitudes rather than an underlying mood disorder. He denied suicidal ideation, plans and intent.

## RELEVANT PERSONAL HISTORY

### Mental Health History

As noted in the body of this report, Mr. Sanford has never been a psychiatric inpatient but recalled he was recommended to take Ritalin for ADHD in his childhood years. He reported he saw school social workers due to fighting and other behavioral difficulties as a child. He first saw mental health professionals other than school personnel when he was at the juvenile detention facility in Wayne County in September of 2007. At the youth home he was diagnosed with Attention Deficit Disorder and prescribed Seroquel and

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 5

Concerta to help him with concentration and for his temper. He continued to take these medications while in juvenile detention and since coming to the Department of Corrections he has been tried on a variety of different medications to help him remain calm and contain his behavior. He recalled that he has been prescribed Seroquel, Doxepine, Remeron, and Prozac as well was Benadryl. For the past two months he has not taken any psychotropic medications and feels he does not need them. He said they do calm him down sometimes, but he would rather control his temper without medications. There is no indication that Mr. Sanford has ever suffered from any psychotic-level disturbance or severe mood disturbance. Although he declined to participate in psychological testing at this evaluation, he was evaluated with psychological testing on his two former Forensic Center visits. In February of 2008 he took the Personality Inventory for Youth but he did not appear to be suffering from any serious mental disturbance other than general antisocial attitudes and a proclivity to act out. In October of 2007 he took another personality test, the MMPI-A, and results indicated no acute symptoms of any sort of mental disturbance but he was seen has having a proclivity for substance abuse. These results are reported in psychological reports by Lynne Schwartz, Ph.D., Consulting Forensic Examiner. His diagnosis at the department of corrections is Conduct disorder, Childhood Onset; Cannabis Dependence, Alcohol abuse, and ADHD, inattentive type.

### Substance Abuse History

Mr. Sanford acknowledged that his drug of choice is marijuana which he started to use around age 11 and was smoking two to three blunts daily prior to being locked up in September of 2007. He said he also enjoys drinking a variety of different alcohols including "Grey Goose, Patron, Hennessy, and Remy VSOP." He said he only drank occasionally and would consume "one to one and a half cups" of alcohol when he did drink. He denied abusing any other drugs. He did state that while in prison he has abused some psychotropic medications such as Seroquel. Mr. Sanford said he has never participated in any form of substance abuse treatment.

### Medical History

Mr. Sanford stated that his only serious head injury was being knocked unconscious in a fight at age 13. He went to the hospital and was released the same day. He was not sure how long he was unconscious for. As noted earlier, he is blind in his right eye after an accident at age eight when an egg was thrown at his eye.

### SUMMARY

In summary, Davontae Sanford is a criminal defendant who was referred to the Forensic Center for evaluation of competency to stand trial and criminal responsibility. His

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 6

presentation during the interview was not indicative of a current psychotic, manic, or depressive episode. It appears that Mr. Sanford has personality tendencies that include a history of antisocial acting out, behavioral difficulties, and substance abuse. He has no prior history of inpatient psychiatric care, but has been prescribed psychotropic medications since incarcerated at age 14 for attention difficulties and anxiety symptoms. At present he is not taking any psychotropic medications and appears to be functioning adequately within the prison system albeit with a fair amount of antisocial acting out and oppositional behaviors. There is no indication of a severe mood disorder or psychotic-level disturbance in his history.

## POLICE ACCOUNT OF THE ALLEGED OFFENSES

On Saturday, April 25, 2009, around 8:50 p.m., the defendant, who was housed in segregation, told staff he was having weird thoughts and was going to make a noose and wanted to kill himself and needed to be in a bam-bam suit. Lieutenant Harvey told the defendant he needed to be moved to an observation cell and the defendant would not cooperate with verbal orders to be handcuffed for transfer. Thus, the extraction team was brought in at 9:15 p.m. While at the defendant's cell door he was ordered to step to the door to be restrained and initially complied allowing one wrist to be cuffed by Lieutenant Harvey before pulling away. Officer Fowler then cuffed the defendant's other wrist and the defendant was ordered to lie on the bed and he refused. He was pinned to the bed with a corrections officer's shield. Mr. Sanford began to kick to prevent leg irons being applied. He kicked Officer Willyerd in the chest and then after being shackled and walked down the hall he spit at staff calling them, "bitch ass niggers" and spit several times on Lieutenant Harvey. He also kicked C.O. Vaughan during this incident. The defendant was put under observation and notes indicate he was to be referred the following day for a mental health referral at Huron Valley Center.

## DEFENDANT'S ACCOUNT OF THE ALLEGED OFFENSES

The following is as close to verbatim account of what Mr. Sanford stated occurred as this evaluator could capture. "I had been in the hole for a lot of days and it was messing with my head to not be able to hear my Mama and brother's voice. That week Lansing was there running tests and I was doing stuff to embarrass the C.O.'s like beating on the door, covering my window because I was very upset about not getting out of the hole and the C.O.'s were coming to my door and telling me I wouldn't get out. I found out Lansing was there through the grapevine and that's when I decided to do what I did, beat on the door, shout and cover my window and that made them stop all their training because I told them I had a razor blade and ERT came up, they didn't find nothing and I made them look bad and I wanted to because I felt they earned it."

"I was in the hole because a guy I was real tight with was in prison with me and when we get together we get in trouble, a lot of trouble. They put us in the same cell about a month before this. So we flooded the cell and broke out the window and then they put us both in observation, me and Dwayne Franklin, and we flooded in there and so they took us both to the hole but they let him out. The psych or someone said it was time for him to get out. He had stopped catching tickets, but I was still catching tickets in the hole, like cussing at staff. He got out, but I didn't."

"He got out a couple of days before and I was mad about that and then I learned that Lansing was there, so I tried to embarrass them by lying and saying I had contraband and I didn't and they looked bad. And two days later, they had lots of cats in there for cutting on themselves and suicides and I was laughing about that, taunting the other inmates because I know they weren't really suicidal, just wanting protection and they were fucking it up for everyone else who really is suicidal. And the lieutenant, and a nurse, hear this and tell me to shut up and I start talking smart to the nurse and the next thing I know the Lieutenant says, 'Back up.' And I jumped back and he whipped out his cufflinks and I jumped back and said, 'Fuck you!' and he called in the squad and they came to my door and the next thing I know I'm on my bed and I hear marching and I think, 'Here they go.' They coming up to my slot and told me to cuff up and I back up and then I cuff up and I refused to lie on the bed and they came in with shields and forced me to lie on the bed. I came out the room and the nurse was looking at me and I see Lieutenant Harvey and he smiled and so I spit on him because he was the main reason I was getting extracted. I don't like him. He don't want me at his prison and he wanted me to be a level five and out of his prison. People don't like how I don't take shit from them and I speak up."

Mr. Sanford elaborated that he felt that the lieutenant was "the main culprit" in having the extraction team called in. He insisted that he had said nothing about being suicidal or having weird thoughts and that the lieutenant had ordered him to be cuffed for observation knowing he would refuse so he could get the extraction team in there to jump on the defendant to punish him for having acting out while officials from Lansing were observing them. He explained that he had no regrets for spitting on the lieutenant and he also did not regret kicking Correction Officer Willyerd because he explained that this officer had frequently taunted him, said things about his mother, and taken things from his cell and then denied it. He said he regretted having kicked Correction Officer Vaughan and had apologized to him subsequently. He said he only kicked him accidentally because he was lying on his bunk and could not see who he was striking.

Asked what happened next he said, "They put me in observation and the next day a psych took me off suicide watch and put me back in the hole."

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 8

Asked when he learned there was a chance he would be exonerated on the charges he was serving, he said there had been some information in the newspapers but nothing was certain. He said, "I seen it on the news, but no guarantee and people were saying they could still charge me as an accessory." He said he thought the Detroit Police were afraid he would sue them for falsely charging him and forcing a false confession. He said, "They know they messed up and locked up a 14-year-old for no reason." He said at the time his lawyer said a writ would be coming soon to have him transferred to the Wayne County Jail to await the hearing, an evidence hearing where he would discover if the charges would be thrown out. He said he was very impatient to receive this writ and the pressure was building. He said he had been in the hole for about 25 days at the time this incident occurred and he was lashing out a lot. He said he would sleep some at night and read books during the day when he wasn't beating on his cell wall. He said he primarily had a problem with the officers on the second shift who were less experienced and "they all think they're superman." He said, "They have stupid ass competitions of who can write the most tickets in a month." Generally he described the situation where he felt that certain staff were provocative and he responded in anger by threatening, cursing, and being destructive in ways that caused problems for them. He said he felt stressed and depressed at the time and was frequently angry and agitated.

He said at the time he believes he was prescribed Prozac and something else but he could not recall the name of the medications. He also said about two hours prior to the assault he took two Seroquel that he was not prescribed in order "to get high." He said, "I like the feeling, but don't tell anyone because I don't want to get substance abuse, and that will make me look bad, right?"

Asked if he thought he would have committed these offenses if he was not "high" on Seroquel, he said, "It wouldn't have happened. I probably would have talked to the psych instead of striking out at everyone."

Asked why he had assaulted the guards, he said the guards had lied in order to have the chance to jump on him and send in the extraction team and he was mad about being disrespected by Lieutenant Harvey and Correction Officer Willyerd. He said he did not think he would receive felony charges as he had "gone off" in the past without getting charges. Mr. Sanford said he felt that the officers were keeping him in the hole to break his spirit and get him to be compliant and he was not willing to do that. He explained, "The C.O.'s generally hate me because I break the rules and don't take no shit. If they mistreated me, I said, 'When I see you, you got something coming.'" He said this was something he had said in the past to officer Willyerd.

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 9

**Relevant Collateral Information**

**Department of Corrections records**

A MDOC progress note on the day of the offenses (4-25-09) makes no note of any symptoms of psychosis including hallucinations or delusions. Mr. Sanford is noted to have said "Put me in Bam-Bam suit" and "I'm having weird thoughts"—thoughts he reportedly "refused to clarify" and then "I'm going to kill myself." He was reported to be pacing, yelling obscenities and pounding on his cell door. The next note indicates he was seen the next day by Dr. Dahl and was recommended to continue to receive outpatient services. The next incident was approximately 3 weeks later on 5-13-09 when Mr. Sanford yelled obscenities, refused to follow orders and smashed a window in his cell. Records make no indication of psychosis and his diagnosis has been Conduct Disorder-childhood onset; ADHD-inattentive type and alcohol abuse and cannabis dependence. Two days prior to the offense on 4-23-09 it is indicated that he was segregated due to making threats toward staff and has "a history of poor relations with others, impulsivity and poor modulation of his emotions, thoughts and actions." He was recommended to continue to be evaluated once weekly by a mental health professional.

## CRIMINAL RESPONSIBILITY

**Definition**

Concerning the matter of criminal responsibility, MCL 768.21a, as amended effective October 1, 1994, indicates that "An individual is legally insane if, as a result of mental illness as defined in Section 400a of the mental health code, Act No. 258 of the Public Acts of 1974, being Section 330.1400a of the Michigan Compiled Laws, or as the result of being mentally retarded as defined in Section 500(h) of the mental health code, Act No. 258 of the Public Acts of 1974, being Section 330.1500 of the Michigan Compiled Laws, that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness or being mentally retarded does not otherwise constitute a defense of legal insanity." This section also indicates that "An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances."

The definition of mental illness so indicated is "a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." The definition of mental retardation so indicated is

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 10

"significantly subaverage general intellectual functioning which originates during the developmental period and is associated with impairment in adaptive behavior."

**Opinion:**

There was nothing in Mr. Sanford's presentation or reported history to suggest that he is mentally retarded. As noted above, he appears to function in the low average to average range of intelligence and has been working on his GED while incarcerated. Since mental retardation is defined according to developmental criteria, it can be assumed that if Mr. Sanford is not mentally retarded now, he was not mentally retarded at the time of the alleged offenses.

In terms of mental illness, there is nothing to suggest that Mr. Sanford was mentally ill at the time of the instant offenses. Mr. Sanford does have a long history of oppositional defiant disorder, antisocial tendencies, and acting out behaviorally. It appears that at the time of the offenses he was agitated and angry about being unfairly incarcerated and felt he was being mistreated by guards. He had gotten into a negative cycle where his acting out provoked the guards and they in turn acted sternly with him. Although he clearly was using poor judgment and was immature and impulsive in his decision making, there was nothing to suggest he was suffering from a substantial disorder of thought or mood. Rather, he appeared to be struggling with adolescent developmental issues of being rebellious and oppositional combined with a generally antisocial attitude. He was invested in power and control struggles with the staff at the prison and in this context he used poor judgment and struck out at them. The defendant denied suicidal ideation or telling anyone he was having weird thoughts. He felt that staff said this in order to have reason to bring in the extraction team. Thus, it is my opinion that he was not mentally ill as defined by statute at the time of the offenses.

Mental illness and mental retardation aside, there is nothing to suggest that Mr. Sanford lacked substantial capacity to appreciate the nature and quality of wrongfulness of the alleged illegal behavior or to conform his conduct to the requirements of the law. In terms of appreciation of wrongfulness, Mr. Sanford was aware of the numerous rules in the prison, rules which he repeatedly chose to defy in order to provoke and upset the staff and at times to embarrass them. In terms of the instant offenses he said he spit and kicked corrections staff in retaliation for the way they were treating him. He did not claim that it was not against the rules, but rather that he wanted retaliation more than he wanted to follow the rules. Thus, it appears he appreciated the wrongfulness of the conduct. In terms of his capacity to conform his conduct to the requirements of the law, although, as noted above, Mr. Sanford acted in an impulsive and immature fashion. However, there was nothing chaotic or disorganized about his behavior. Specifically, from his account, he was angry about being kept "in the hole" and had been acting in provocative ways trying to

Byron Konschuh, Prosecuting Attorney
L.J. Nowak, Defense Attorney
RE: SANFORD, Davontae, #919334
October 26, 2009
Page 11

==provoke and punish the staff he held responsible for this.== On the day in question he described a particular lieutenant as having retaliated against him by lying and saying he was suicidal when he had not made this statement. He felt the lieutenant did this in order to have a reason to call in the extraction team. It was in the context of being extracted for no reason in the mind of Mr. Sanford, that he felt it was reasonable that he struck out and spit on the lieutenant who had initiated the call for the extraction team and two of the guards that were involved in extracting him. He said one of the guards he kicked accidentally because he could not see what he was doing and was sorry for this and the second he kicked knowingly and was glad he had as this was a guard who had mistreated him in the past. He was able to contain himself and settle down after he was placed in observation and it appears that he chose to act out aggressively in order to retaliate rather than for reasons based on any kind of severe mental illness.

In sum, it is my opinion that Mr. Sanford was neither mentally retarded nor mentally ill at the time of the alleged offenses and there is no basis for a finding of legal insanity.

Respectfully submitted,

*[signature]*

M. Judith Block, Ph.D.
Licensed Psychologist
Consulting Forensic Examiner

MJB:asw