UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

                          Plaintiff,                    Case Number 17-13062
v.                                                      Honorable David M. Lawson

MICHAEL RUSSELL and JAMES TOLBERT,

                          Defendants.

_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION TO EXTEND DISCOVERY AND GRANTING PLAINTIFF'S MOTION FOR SANCTIONS

The parties are familiar with the facts in this case in which the plaintiff, Davontae Sanford, alleges that the defendants, Detroit police officers investigating a quadruple homicide, fabricated evidence implicating the plaintiff in the murders that resulted in his wrongful conviction and incarceration.  The Court entered a scheduling order early in this lawsuit that established, among other things, deadlines for identifying expert witnesses, exchanging expert witness reports, and completing discovery.  On at least three occasions, the defendants have sought to add expert witnesses to the case after the deadlines expired, over the vigorous objections of the plaintiff.  The Court denied those requests because the defendants did not demonstrate good cause to modify the scheduling order.

The defendants now have filed a fourth motion to add expert witnesses and extend discovery, this time, they say, prompted by a fortuitous contact from the Michigan State Police concerning physical evidence that actually may connect the plaintiff to the murders.  The plaintiff, skeptical that the State Police continued to investigate the four homicides that Vincent Smothers had already confessed to committing, demanded the documents that led to this supposed new DNA evidence.  The defendants' belated disclosures revealed that the new evidence did not originate

from the police at all; rather, it was generated by defense counsel's late-in-the-day attempts to work up the case.

The plaintiff now has filed a motion asking the Court to award him the costs associated with the cumulative litigation that was required to procure the disclosure by defendants' counsel of a lab report from the MSP and records of correspondence between defendants' counsel and the MSP and other entities about forensic testing of certain evidence, all of which came to light belatedly during the parties' sparring over the defendants' third (also futile) attempt to reboot the discovery in this case.

The defendants once again have not shown good cause to modify the scheduling order to allow the addition of expert and other witnesses, and they have not shown that their belated disclosures are harmless or substantially justified.  Moreover, defense counsels' conduct, including their misrepresentations, throughout the dispute over the evidence needlessly has increased the costs of litigation by multiplying the workload of the plaintiff's legal team without advancing the litigation.  The defendants' motion will be denied and the plaintiff's motion for costs will be granted.

## I.

The parties are no strangers to the facts of the case.  Plaintiff Davontae Sanford alleged in a complaint that when he was fourteen years old, he was coerced into confessing and pleading guilty to murdering four people, largely based on the misconduct of the defendants who were Detroit police officers at the time.  After Vincent Smothers confessed to the crimes and confirmed that Sanford was not involved, a State Police investigation uncovered evidence that lent substance to Sanford's claims.  Sanford's convictions of the four murders were vacated and the case against

him was dismissed, but not until he had served about nine years in prison.  He brought this case against his former accusers.

Both of the present motions focus on the potential evidentiary value of a certain pair of blue and white "Jordans" sneakers that were seized by police during their initial investigation of the murders, which presently are held in evidentiary custody by the Michigan State Police (MSP).  The sneakers were found by police inside a washing machine at the plaintiff's home in the early morning hours on September 18, 2007, when the police went to the home to seek parental consent to interview the plaintiff about his suspected involvement in the Runyon Street murders.

The defendants conspicuously highlighted in their motion a photograph of the sneakers, which they say shows a "reddish/brown substance" on the side of one shoe.  The defendants throughout their filings repeatedly suggest that this substance is or may be blood.  However, a December 7, 2018 report from the MSP Forensic Lab stated that the outside of the shoes had been subjected to a "phenolphthalein test," which "[d]id not indicate the presence of blood."  Laboratory Report dated Dec. 7, 2018, ECF No. 357-6, PageID.17811.  On January 3, 2019, MSP Lieutenant Robert Weimer sent to defendants' attorney Michael Berger a copy of this negative test result indicating that there was no blood on the shoes.  The plaintiff's lawyer, however, asserts that she never received a copy of that MSP lab report, despite her repeated formal and informal requests for supplementation of defendants' production of documents relating to the murder investigation, until it finally was disclosed by defense counsel on May 28, 2019 — after the defendants had filed a motion asking the Court to appoint a DNA examiner.  *See* Email dated May 28, 2019, ECF No. 357-7, PageID.17818.  No reference to the negative blood test result was featured anywhere in the defendants' motion for appointment of a DNA expert (filed in May 2019), or in their present motion for an extension of expert discovery (filed in June 2020).

In their opening brief on the present motion to extend discovery, the defendants assert that the plaintiff "testified [at his 2018 deposition] that he told [defendant] Russell that any blood on the shoes would be from a dog," citing page 202 of the deposition transcript.  But that portion of the testimony discloses no such admission by the plaintiff and instead comprises only his testimony about encountering investigating officers and a K-9 unit who were canvassing the neighborhood in the hours after the shootings.  Davontae Sanford dep., ECF No. 352-2, PageID.17006.  Other cited portions of the testimony also do not reveal any such admission.  The plaintiff did testify that he gave the gym shoes to police while they were at his grandmother's house seeking consent to interview him, Sanford dep. at PageID.17011, and he also stated that during the custodial interview defendant Russell told the plaintiff that he "was lying" and that "they found blood on [his] shoes," *id.* at PageID.17012.  But there is no indication anywhere in the record of any admission by the plaintiff that he made any specific statement to police about the origin of any supposed blood on the shoes.

An April 26, 2019, report of forensic DNA testing on the shoes that was performed by the Michigan State Police stated that the "[t]he DNA profile[s] obtained from [both inside and outside swabs of the shoes] [were] not sufficient for further interpretation and analysis due to [their] complexity and number of potential contributors," and "therefore, no comparison can be made to DNA reference samples" that had been obtained from the blood of the four murder victims.  MSP Forensic Laboratory Report, ECF No. 352-12, PageID.17044.  Plaintiff's counsel asserts that this report was not disclosed by defense counsel until May 24, 2019, when it was forwarded along with an email seeking concurrence in the defendants' motion to appoint a DNA examiner, which was filed later that same day.

Notwithstanding the inconclusive results of the MSP's DNA analysis, further testing of swabs from the shoes was conducted by Cybergenetics Corp. after the MSP forwarded a digital copy of its DNA testing data.  (More on how that came to pass is discussed below.)  Reports of the Cybergenetic testing (which appears to be merely a re-analysis of digital data files from MSP's test run) stated "preliminary, unconfirmed results" featuring a "genotype match" between DNA from "item 16Ae" (a swab from the outside of the sneaker) and "victim 20e" (apparently Deangelo McNoriell).  Cybergenetics Case Packet, ECF No. 352-16, PageID.17062.  A "draft report" stating those "preliminary, unconfirmed results" was authored on January 24, 2020 by Beatriz Pujols, whom the defendants now seek to add to their trial roster as an expert witness to testify about the DNA examination.  The "final analysis" of the results further characterized the match as follows: "A match between the shoes outside (Item 16Ae) and Deangelo McNoriell (Item 20e) is [] 9.67 thousand times more probable than a coincidental match to an unrelated African-American person. . . . For a match strength of 9.67 thousand, only 1 in 91.3 thousand people would match as strongly."  Report dated Feb. 4, 2020, ECF No. 352-18, PageID.17071.  In support of their motion for further discovery, the defendants assert that "if the brownish substance on the shoes is blood or some other concentrated substance containing McNoriell's DNA, then a swab of just that area should result in a higher match rate" than the DNA correspondence detected by the Cybergenetics "preliminary" analysis.

The parties went to great lengths in their papers expounding on the timeline of interactions between counsel for the parties and between defendants' counsel and the Michigan State Police and other entities regarding the testing that was done on the shoes.  The record of correspondence presented shows that at least the following exchanges are undisputed.

On October 25, 2018, defendants' lawyer Michael Berger emailed MSP Lieutenant Robert

Weimer and wrote as follows:

> Thank you again for allowing me to inspect the property on the Sanford/Smothers case. There was one thing that I found interesting, that I needed to cross reference with DPDs files and which I would like to get your thoughts on. In the bag labeled Item #52 (DPD E24576004) there are some blue and white shoes that were collected by DPD in connection to the Runyon Street quadruple homicide. Sergeant Fellner and I inspected them and she mentioned that it looked like one of the shoes had blood on it.
>
> I just had the opportunity to cross reference my DPD homicide file and it does not look like those shoes were tested for blood (and obviously not cross referenced for DNA from the victims of the murders). Would MSP be willing/able to test those shoes for blood? According to my records, the Wayne County Medical Examiner[']s Office took DNA samples from the victims. So, if it is blood, perhaps that can be cross referenced with the victim's DNA, assuming WCMEO still has it. If MSP is able to do testing, would we be able to get a copy of the results?

Email dated Oct. 19, 2018, ECF No. 357-4, PageID.17806. That email was sent — perhaps

coincidentally — on the same day that the Court denied the defendants' second motion to extend

discovery to disclose additional experts.

On May 15, 2019, the Court issued its corrected opinion and order denying the defendants'

motion for summary judgment. Notably — again, perhaps, coincidentally — on that same date,

attorney Berger emailed Andrea Young at the MSP, asking whether any more detailed DNA

analysis could be performed to resolve the "inconclusive" results that had been indicated in the

MSP's April 2019 report. Young responded that the other form of testing that commonly would

be used was known as "TrueAllele," and that she would forward information about the entity

(Cybergenetics) that could perform such testing. The "Case Packet" from Cybergenetics included

a record of correspondence about the DNA analysis on the shoes. The earliest correspondence

noted in the file is a May 23, 2019 email from attorney Berger, in which defendants' counsel wrote

as follows:

> I am a Civil Attorney who has a case where identifying DNA on a pair of shoes could be very critical to our case. The Police Agency that has possession of the shoes swabbed the shoes and conducted a DNA comparison with potential contributors for the DNA (a PCR). However, its results came back as having too many potential contributors; I understand there are four or more. That police agency recommended I reach out to your organization to see whether your technology could compare the DNA with the potential contributors' DNA. Is this something you could help us with? If so, could you please provide me a fee schedule and advise me of what information you will need? My understanding from the police agency is that it has an E-Gram and .ssa files. Would those be sufficient?

Correspondence dated May 23, 2019, ECF No. 357-12, PageID.17848. On May 24, 2019, Stephanie Frisima replied to defendants' counsel with a copy of a "case submission form" and directions for submitting evidence to obtain a "free screening of your evidence data."

On that same date, the defendants filed their earlier motion (ECF No. 320) in which they asked the Court to appoint an expert DNA examiner to perform further testing on the blue and white sneakers. On June 10, 2019, attorney Berger emailed Wayne County assistant prosecutor Athina Siringas, forwarding to her copies of emails from Cybergenetics and the case submission form, and informing her that an "initial DNA screening" could be conducted at "no charge." It is unclear what may have transpired in the interim, but on June 21, 2019, the defendants withdrew their motion seeking court appointment of a DNA expert.

Subsequent correspondence in the Cybergenetices file indicates that a completed case submission form and electronic data files eventually were received by Cybergenetics from the MSP between October 24 and November 24, 2019. The "preliminary results" were discussed with MSP investigators, but it is undisputed that neither the MSP nor the Wayne County prosecutor ever requested a final report of the analysis. It is unclear who at the MSP or the prosecutor's office authorized the submission of the case files. However, an email from defendants' counsel to plaintiff's counsel on February 20, 2020, confirmed that by that time neither agency had elected to purchase the "final report" of the results from the Cybergenetics analysis. Defense counsel, in

the meantime, had contacted Cybergenetics again several times between December 30, 2019, and January 10, 2020, to inquire about purchasing a copy of the final results, which eventually was produced by Cybergenetics and sent directly to defendants' counsel.  Subsequent correspondence between counsel for the parties in this case indicates that the full "case packet" was obtained from Cybergenetics at a cost of $2,500, which was paid by the defendants.  *See* Email thread from Feb. 13, 2020 through May 28, 2020, ECF No. 357-14, PageID.18102-110.

Plaintiff's counsel asserts that none of the above correspondence between defendants' counsel and the MSP soliciting further testing on the shoes ever was disclosed to her before May 28, 2020 — once again, perhaps, coincidentally — on the same day that the court of appeals issued its opinion summarily rejecting the defendants' interlocutory appeal of the denial of their summary judgment motion.  However, the included cover sheet indicates that the "case packet" was compiled on March 17, 2020.  The plaintiff also points out that the excerpt of the "case packet" that was included as an exhibit to the defendants' present motion to reopen discovery included the entire file materials *except* the itemized record of correspondence.

The defendants' expert disclosures initially were due on August 11, 2018.  One day before that deadline, the defendants moved for a lengthy extension of the disclosure date, principally because they had not retained any experts.  The Court denied that request but granted a limited extension through September 7, 2018.  The defendants attempted to serve "reports" of their numerous experts' purported opinions by the new deadline, most of which the Court later found were wholly inadequate.  On October 19, 2018, the Court denied the defendants' second motion to extend expert deadlines but modestly extended the due date for motions challenging experts.  All of the expert witnesses that the defendants had attempted to disclose — save a handful whose opinions are not pertinent here — eventually were stricken by the Court when it issued its opinion

granting the plaintiff's motions to exclude more than 50 persons who had been identified by the defendants as potential expert witnesses for trial.  That opinion reviewed in exhaustive detail the defendants' several attempts to circumvent the discovery schedule that was established by the Court and concluded with the observation that the defendants' failure to make proper and timely disclosures of their expert witnesses could not be excused as either substantially justified or harmless.  Op. & Order, ECF No. 298, PageID.14229.

The defendants now ask the Court to allow them "to add witnesses who worked on testing Plaintiff's shoes for DNA from the victims of the Runyon Street Murders," and, further, to "allow limited discovery which would allow the parties to obtain further DNA testing" on the shoes.  The defendants assert that, as a result of certain testing on the shoes, which they represented as having been performed fortuitously by the Michigan State Police, "[t]he DNA of [murder victim] Deangelo McNoriell, one of the victims of the Runyon Street Homicides, was found on Plaintiff's shoes."  In addition, they want to expand the DNA testing to see if Vincent Smothers's DNA can be discovered, and they want to test other clothing that belonged to plaintiff Sanford.  The witnesses they propose to add would include individuals in the chain of custody for the sneakers and Cybergenetics examiner Beatriz Pujols.

The defendants believe that they need only show good cause for their request under Federal Rule of Civil Procedure 16(b)(4), which they attempt to establish by pointing to purportedly tardy action by the MSP, stating that "because the Michigan State Police did not provide CyberGenetics with the DNA data until October 25, 2019 and her preliminary results were not available until December 19, [2019], and then the final results were not issued until February 4, 2020."  The defendants assert that it is imperative" that the shoes (and the plaintiff's other clothing that was seized) be tested further because "if the reddish-brownish substance on Plaintiff's shoes is blood

from McNoriell or some other high concentration of DNA from McNoriell, then if one were to swab just that area that looks like blood, then the match statistic between McNoriell's known sample of DNA and the sample of DNA from the exterior of Plaintiff's shoe would increase," and a more definitive DNA match would bolster the defendants' position that the plaintiff committed the shootings or was present when they were committed. They further contend that if any of Vincent Smothers's DNA is found on the plaintiff's shoes and clothes, then it would bolster their position that the plaintiff was an accomplice of Smothers in the murders, which would help to resolve the seeming conflict between the plaintiff's and Smothers's confessions.

## II.

The plaintiff argues that the defendants' motion is premised on the wrong rule of decision, Rule 16(b)(4), and that the proper frame of reference is supplied by Rule 37(c)(1), which specifies that exclusion of evidence not timely disclosed is "automatic and mandatory," unless the movant shows that the late disclosure was either substantially justified or harmless. He argues that the defendants' showing falls far short of that benchmark because the record of correspondence demonstrates that the defendants made no attempt to initiate the development of any such expert evidence until mid-October 2018, long after discovery had closed, and after the Court had rejected their second request to extend the time for expert disclosures. The plaintiff argues that if the proposed testimony were allowed, the Court essentially would have to reboot the entire expert discovery process and allow a full new round of motion practice to consider challenges to the reliability and relevance of the evidence, including both foundational (chain of custody) issues, and the validity of the supposed "match" expressed in the report of "preliminary, unconfirmed" results.

The Court need not resolve which rule of procedure applies to the defendants' extension request. Their excuses do not qualify under either standard.

Federal Rule of Civil Procedure 16(b)(4) states that a court may modify a case management schedule only upon a showing of "good cause." Fed. R. Civ. P. 16(b)(4). A party may show good cause by demonstrating a "reasonable justification" for its failure to complete a task within the time prescribed. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). It also may do so by advancing specific facts that describe the magnitude of the undertaking, the time available for completion, and circumstances that would prevent a reasonable person from performing within the time allowed by the Court. *United States ex rel. Kalish v. Desnick*, 765 F. Supp. 1352, 1354 (N.D. Ill. 1991). A party's regret of an unfruitful litigation strategy generally will not supply good cause for relief from scheduling deadlines. *McCurry ex rel. Turner v. Adventist Health Sys./Sunbelt, Inc.*, 298 F.3d 586, 595 (6th Cir. 2002) ("[N]either strategic miscalculations nor counsel's misinterpretation of the law warrants relief from judgment."). Moreover, "clients must be held accountable for the acts and omissions of their attorneys," *Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd.*, 507 U.S. 380, 396 (1993) (citing *Link v. Wabash R. Co.*, 370 U.S. 626, 633 (1962)), and it is well settled that parties are "bound by the mistakes of their lawyers," absent compelling circumstances, *United States v. Hall*, 979 F.3d 1107, 1124 (6th Cir. 2020).

Under Rule 37(c), when a party does not comply with the disclosure requirements, the party "'is not allowed to use' the information or person that was not disclosed 'on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.'" *Baker Hughes Inc. v. S&S Chemical, LLC*, 836 F.3d 554, 567 (6th Cir. 2016) (quoting Fed. R. Civ. P. 37(c)(1)). According to the Sixth Circuit, "Rule 37(c)(1) mandates that a trial court sanction a party for discovery violations in connection with Rule 26(a) unless the violations were harmless or were

substantially justified." *Sexton v. Uniroyal Chemical Co.*, 62 F. App'x 615, 616 n.1 (6th Cir. 2003). "'Rule 37 is written in mandatory terms, and is designed to provide a strong inducement for disclosure of Rule 26(a) material.'" *Ibid.* (quoting *Ames v. Van Dyne*, 100 F.3d 956, 1996 WL 662899, at *4 (6th Cir. Nov. 13, 1996) (Table)). The party requesting exclusion under Rule 37(c)(1) need not show prejudice; rather, the non-moving party must show that the exclusion was 'harmless' or 'substantially justified.'" *Saint Gobain Autover USA, Inc. v. Xinyi Glass North America, Inc.*, 666 F. Supp. 2d 820, 826 (N.D. Ohio 2009); *see also Roberts ex rel. Johnson v. Galen of Virginia, Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).

This is not the first time in this case that the Court has been presented with a defense request to reset the discovery schedule for no good reason other than defense counsel's lack of attentiveness to the deadlines established at the beginning of the case. Twice before, the Court has rejected the defendants' attempts to avoid the consequences of the neglect by counsel of their discovery obligations. In a third attempt, the defendants filed and then withdrew a frivolous plea for a Court-appointed expert to extract them from their dilemma. They now come before the Court with their fourth request for an extension of expert discovery. Certainly, the case has not proceeded according to the schedule originally contemplated. However, trial likely would have occurred already had the defendants not taken an interlocutory appeal of questionable merit.

Nonetheless, this fourth request for an enlargement of deadlines must be evaluated on its own merits, considering the reasons the defendants have put forth explaining why they should be able to develop a new line of scientific evidence nearly four years after the case was filed. Whether measured by the yardstick of substantial justification, harmlessness, or merely good cause, the defendants offer no good reason for the Court to grant the relief sought. Moreover, the case for the extension is founded on brazen misrepresentations and omissions.

-12-

The defendants want the Court to give them more time to develop supposed DNA evidence suggesting the plaintiff's presence at the crime scene on the night of the murders, which they believe would corroborate their defense that he actually committed or participated in the murders. The problem, however, is that the request comes far too late, with no good excuse for the delay. The present motion was filed more than 20 months after discovery closed in this case, and the case is now, once again, on the eve of trial, which is scheduled to begin on May 11, 2021. The Court recently advised the parties that the trial was unlikely to commence via in-person proceedings on that date, but that a virtual proceeding may yet be possible. Thus, no formal adjournment presently has been granted, and a further delay of the trial is not (yet) inevitable. Meanwhile, the defendants have mounted their fourth attempt to delay the proceedings. But they have not explained why they could not have developed the expert testimony that they now seek leave to procure within the 10 months that were allowed by the Court for full discovery on the merits of this case.

Little more remains to be said about the defendants' total failure to make any effort toward timely completion of discovery than what already has been said by the Court when it twice previously rejected the same request:

> None of the pertinent factors support the defendants' position that their disclosure violations were either substantially justified or harmless. The surprise to the plaintiff as a result of the tardy disclosure of numerous expert opinions (at long last only in any coherent fashion in the defendants' response brief) is extreme . . . . The defendants contend that the evidence is "critical" to their rebuttal of the plaintiff's presentation on damages, but they do not even attempt to offer any plausible explanation for their failure to make any adequate effort at disclosure. In fact, as discussed further below with respect to the defendants' expert Dr. Welner, it appears that the entire reason that the defendants never properly designated or disclosed their experts was simply because they assumed that they would be granted a months-long extension of the expert deadlines, and they therefore made no effort to comply with the schedule imposed by the Court. . . . The defendants previously conceded on the record that Dr. Welner did not produce a proper report on time, because they assumed that the Court would allow more time. St. Peter never produced a report apparently because the defendants never bothered to have him look at the salient exhibits until the day before discovery closed. For all of the same

-13-

reasons noted . . ., the defendants' failure cannot be excused as either substantially justified or harmless.

*Sanford v. Russell*, No. 17-13062, 2019 WL 2051986, at *5, *11 (E.D. Mich. May 9, 2019).

The defendants contend that "good cause" supports their request because, according to them, they only learned that helpful DNA evidence might exist through the "happenstance" of MSP's "ongoing investigation" of the murders.  But the record of the correspondence between defense counsel, the MSP, and Cybergenetics exposes the actual provenance of this "happy accident," which was nothing more than a brazen attempt by defendants' counsel to induce the Court to revisit the defense team's groundless requests for discovery relief, which the Court twice previously had rejected.  The motion conspicuously omits any mention of the role that defense counsel played in procuring the testing, which the defendants characterized as being instigated independently by public authorities and not by them.  But the undisputed record shows that the re-analysis of the DNA evidence on which the motion entirely is premised was instigated, pursued, and ultimately paid for by the defense.  The public authorities involved did nothing more than transmit data files to the testing provider, and they did that only after the repeated prompting and cajoling by defense counsel persuaded them to take advantage of a "free preliminary screening" of the DNA data.  When the "results" were made available, the police investigators and prosecutor showed no interest in obtaining a full report.  However, the defendants eventually did obtain the results, at their expense.  Thus, the "new evidence" on which the motion is premised is, at bottom, simply an analysis produced by experts who were engaged and compensated by the defendants, for the purpose of developing physical evidence that the defense team hoped would aid their case.  Ordinarily, such efforts are part and parcel of working up the evidence for trial.  But here the work was not completed — or even begun — until well after the deadline that the Court had set for developing this "crucial" evidence had long passed.

The defendants attempt to cast this "new evidence" as emanating from a chain of events that they had no hand in bringing about, but the undisputed record plainly shows otherwise. The omission from the motion of the record of the correspondence associated with the testing is a particularly disturbing and damning example of the defense team's dishonesty. This is not the first instance of misrepresentation of the record by defense counsel in this case. *Sanford v. Russell*, 381 F. Supp. 3d 905, 922-23 (E.D. Mich. 2019) ("[T]he assertion that Russell's falsehoods were not made part of the record at the preliminary examination is plainly contradicted by the record of that proceeding. Certainly there is a question of fact about whether Russell showed Sanford the crime scene photos — Sanford says he did, Russell says he did not. But Russell's statement that he never showed the photos indisputably was entered into evidence and was a crucial piece of testimony at the preliminary examination hearing. Regardless of the ultimate truth or falsity of the statement, the assertion that Russell's lies don't matter because they never were presented at the probable cause hearing brazenly misrepresents the record."), *aff'd*, 815 F. App'x 856 (6th Cir. 2020). It is apparent that, rather than being dissuaded from that sort of regrettable conduct by the Court's previous admonishment, defense counsel has elected instead to double down.

The truth is plain and simple: There were some shoes. Those shoes were found in the plaintiff's home on the night of the murders. He allegedly gave them to the defendants, who were investigating the crime, and admitted that they were his. During the interrogation, one of the defendants (admittedly, falsely) told the plaintiff that blood had been found on the shoes. Regardless of any other circumstance of the murders or anything else that has transpired in the long, tortured history of this case, one fact should be obvious to anyone: those shoes had significant evidentiary potential, because, if they were worn by the plaintiff when he allegedly shot four people to death, then they might retain some physical trace of that violent encounter.

The defendants, as police investigators with decades of experience, certainly immediately recognized the inculpatory potential of those shoes in September 2007 when they first were seized. Their lawyers in this case, as seasoned members of the defense bar well familiar with this brand of litigation, equally well knew from the outset of this case the potential value to the defense of such inculpatory proofs. Even the most casual fan of any police drama produced within the last thirty years immediately would have surmised the obvious: something on those shoes might show that the plaintiff was present when four people were gunned down. Knowing all that, and having known it all since 2007 — or, at the least, since the very outset of this lawsuit — the defendants now expect the Court to believe that they were "surprised" by the results of a DNA analysis of trace evidence from the shoes that was compiled in late 2019, more than a decade after the shoes were taken into evidence, and that it never before then had occurred to them that examination of those shoes could yield physical evidence that might demonstrate the plaintiff's involvement in the murders. Put simply, the defendants' assertion that they had no good reason to seek such testing before late 2019 or early 2020 is either a prevarication or an admission by both the defendants and their lawyers of inexplicable professional missteps. Either way, nothing in their presentation plausibly excuses the failure by the defense team to make any timely effort to procure the expert evidence that they now ask for leave to develop.

The defendants have offered no plausible, truthful explanation why the expert evidence that they now seek could not have been developed within the ample period that was allowed for discovery in this case. They have pointed to no credible factual basis to justify their failure to make any effort to develop the evidence they say they need within the time that was allowed. The prejudice to the plaintiff that would result from rebooting the entire expert discovery process at this late stage of this 2017 case is readily apparent and would provoke even further delay in the

proceedings than already has been caused by defense counsels' conduct.  The defendants have not demonstrated good cause for the scheduling relief that they seek, and they have made no effort to show that their discovery failures were either substantially justified or harmless.

III.

The plaintiff argues that the defendants should be sanctioned under 28 U.S.C. § 1927 for vexatiously multiplying the proceedings when they withheld from this Court and the court of appeals, and concealed from plaintiff's counsel, documents that, when finally they were disclosed, demonstrated the false basis of the defendants' request for more expert discovery.  Those documents include the MSP lab report showing that there was "no blood" on the outside of the blue and white shoes.  That report was not disclosed by the defense until after their motion to appoint a DNA expert had been filed, in which they implied that the "reddish/brown substance" on the outside of the shoes is or might be blood.  The plaintiff asserts that the blood test result was not disclosed to plaintiff's counsel until May 28, 2019, more than four months after the defense received it from the MSP.

The plaintiff also points to the record of correspondence by defense counsel with the MSP, Wayne County prosecutor, and Cybergenetics, which plaintiff's counsel says was not disclosed by the defense until May 28, 2020, more than two months after the "case packet" comprising the full results of the Cybergentics DNA analysis and correspondence about the testing apparently was compiled and delivered to defense counsel.

The plaintiff also cites the repeated claims by the defense team — before this Court and on appeal — of their urgent need to procure "further evidence" of the plaintiff's guilt, which were supported by supposed "new evidence" of a DNA match with a victim on the blue and white

sneakers, which the defendants presented as having been only recently uncovered by the MSP's independent "ongoing investigation" of the murders.

The plaintiff argues that the deliberate obfuscation of all the above cited documents was intended by the defense to bolster its position in seeking a further extension of expert discovery, which twice previously had been denied by the Court, with the obvious goal of procuring a further delay of the trial in this case. Notwithstanding the extensive presentation on the history of questionable practice by the defense, the plaintiff seeks only modest sanctions consisting of an "award[] [of] the costs and fees incurred by Plaintiff's counsel as a result of defense counsel's misconduct."

The defendants respond that they had no obligation under the Federal Rules of Civil Procedure to disclose documents that were obtained by counsel, which never were in the defendants' personal possession, custody, or control, because the documents were "not responsive" to the plaintiff's discovery requests, as formally stated. They also contend that the proceedings have not been "vexatiously multiplied" by the defendants' conduct, and sanctions would be inappropriate because defense counsel did not act in "bad faith."

"[T]he Federal Rules of Civil Procedure provide that a district court may order a party to pay attorney's fees 'caused by' discovery misconduct, Rule 37(b)(2)(C), or 'directly resulting from' misrepresentations in pleadings, motions, and other papers, Rule 11(c)(4). And under 28 U.S.C. § 1927, a court may require an attorney who unreasonably multiplies proceedings to pay attorney's fees incurred 'because of' that misconduct." *Goodyear Tire & Rubber Co. v. Haeger*, --- U.S. ---, 137 S. Ct. 1178, 1186 n.5 (2017). "Federal Rule of Civil Procedure 26(g) requires an attorney or the party personally to certify that discovery responses and objections are supported by nonfrivolous argument and are not aimed to harass, cause delay, or drive up litigation costs. The

-18-

rule requires a court to impose sanctions for any violation without 'substantial justification.'" *Jones v. Illinois Cent. R. Co.*, 617 F.3d 843, 854 (6th Cir. 2010) (quoting Fed. R. Civ. P. 26(g)). "Reasonable attorney's fees and expenses are available under Rule 16(f), Rule 26(g), Rule 37(b), and Rule 37(d)" for various species of discovery misconduct. *Laukus v. Rio Brands, Inc.*, 292 F.R.D. 485, 514 (N.D. Ohio 2013). Rule 37(b)(2)(C) authorizes the Court to award reasonable expenses, including attorney's fees, "caused by the failure" properly to respond to discovery requests, "'unless the failure was substantially justified or other circumstances make an award of expenses unjust.'"

"Federal courts [also] possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear*, 137 S. Ct. at 1186 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-631 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Ibid.* "[O]ne permissible sanction is an 'assessment of attorney's fees' . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Ibid.* (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991)). However, the Supreme Court "has made clear that such a sanction, when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature." *Ibid.* "That means, pretty much by definition, that the court can shift only those attorney's fees incurred because of the misconduct at issue. . . . Hence the need for a court, when using its inherent sanctioning authority (and civil procedures), to establish a causal link — between the litigant's misbehavior and legal fees paid by the opposing party." *Ibid.* Thus, "[t]he complaining party . . . may recover 'only the portion of his fees that he would not have paid but for' the misconduct." *Id.* at 1187 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)).

It is well settled, by decisions that the defendants themselves principally cite, that where a party or its counsel "needlessly increase[] the costs of litigation [by] increasing the work on the other party without advancing the litigation . . . sanctions [are] justified under § 1927, the court's inherent authority, or both." *Red Carpet Studios Div. of Source Advantage, Ltd. v. Sater*, 465 F.3d 642, 647 (6th Cir. 2006). Based on the record discussed above, there is plain and undisputed evidence that defense counsel needlessly increased the legal expenses incurred by the plaintiff, without advancing this litigation, both by the filing of the defendants' fourth request to extend expert discovery, and by deceptively concealing from the Court the facts that expose the false premise behind that request. Defendants' counsel has offered no credible excuse for that unfortunate and dilatory conduct.

Defense counsels' argument that he had no obligation to disclose lab results from the MSP indicating that there was "no blood" on the shoes relies on a pedantic misconstruction of the plaintiff's Rule 34 discovery demands, which defense counsel believes were directed only to those papers within the personal custody or control of their clients, not documents that separately were obtained by counsel. But that position ignores the much more serious concealment here, which was the deliberate omission from all of the defendants' papers of *both* the blood test results *and* the entire record of correspondence evidencing that the 2019 and 2020 re-analysis of the trace evidence on the shoes was instigated, pursued, and paid for by the defense team in this case. Those wholesale obfuscations of the record quite apparently were undertaken with the goal of misleading the Court into endorsing a defense request to allow further discovery, which was premised entirely on supposedly "new evidence" that arose "out of the blue" due to an independent "ongoing investigation" of the murders by the Michigan State Police.

In fact, it is apparent from the undisputed record discussed above that (1) in January 2019 the defense team had evidence that severely undermined their implication that the substance on the shoes is or may be blood, and (2) in mid-March 2020 the defense team also had in hand a record of the thoroughly documented history of correspondence between defense counsel and the MSP and Cybergenetics, which (a) was not produced to plaintiff's counsel until two months later, (b) entirely was omitted from the defendants' papers, and (c) plainly proves that the supposed "new evidence" was the product of an expert examination that was prompted, pursued, and paid for by the defense in this case, well after the disclosure deadlines had expired.  The withholding of those records and the omission of them from the defendants' motion papers plainly was a calculated deception to advance the defendants' fourth effort to secure a discovery extension, after all of their prior efforts had failed.

Notably, as discussed above, this is not a first offense of a misrepresentation of the record by defendants' counsel in this case.  The defendants' attorneys previously misrepresented the factual record in an attempt to bolster the arguments raised in their motion for summary judgment. *See Sanford*, 381 F. Supp. 3d at 922-23 (opinion denying defense motion for summary judgment). Rather than taking that warning as an admonishment against repetition of such questionable practice, defendants' counsel instead opted for more of the same, and undertook even more serious misrepresentations, in pursing their discovery motion.

The record also documents prior instances of the defendants' litigation strategy that plainly has been calculated, time and again, to procure delay for the sake of delay in these proceedings. The present discovery motion is only the most recent example.  The defendants previously raised again and again, forcing the plaintiff's counsel to brief, again and again, and the Court to rule on, again and again, the same frivolous legal and factual defenses that previously had been rejected by

the Court. *E.g.*, *Sanford*, 381 F. Supp. 3d at 924 ("The defendants' questionable position that the plaintiff is 'judicially estopped' from disputing his innocence has no foundation in the law. For one thing, as the Court previously ruled on the application of this principle to other issues, the plaintiff certainly did not gain any 'advantage' as a result of anything he did during the criminal trial, which ended with his conviction. Also, the state court certainly did not make any determination on any of the principal factual issues that are before this Court; in particular, it never was called on even to consider whether the prosecution of the plaintiff was instigated by lies and fabrications. Moreover, the judgment of conviction was vacated by the stipulation of the parties after evidence of the plaintiff's innocence came to light, so it no longer has any preclusive effect on anything, regardless of what determinations it rested upon."). It is clear that the present discovery motion, which obviously was calculated to secure even further delay of the proceedings, is cut from the same cloth.

"Section 1927 sanctions are warranted when an attorney objectively 'falls short of the obligations owed by a member of the bar to the court and which, as a result, causes additional expense to the opposing party.'" *Red Carpet Studios*, 465 F.3d at 646. "The purpose [of such sanctions] is to deter dilatory litigation practices and to punish aggressive tactics that far exceed zealous advocacy." *Ibid.* There is bright a line between zealous advocacy and cheating. Defendants' counsel have crossed that line more than once in this case. The frivolous attempts by defense counsel to evade the consequences of their discovery obligation breaches readily qualifies as sanctionable under section 1927. *See ibid.* ("[Plaintiff's] continuous attempts to circumvent the district court's injunction by prosecuting the California case literally and unnecessarily multiplied the proceedings."); *see also* Order Denying Defs.' Mot. for Reconsideration re: Opinion Granting Plf.'s Mot. to Strike Expert Witnesses), ECF No. 321, PageID.15891 ("The remainder of the

motion consists of nothing more than the defendants' futile attempts to reargue points already addressed by the Court, or pleas for the Court simply to overlook the unexcused failures by defendants' counsel to abide by the discovery deadlines that were set in this matter, which, the Court notes, are not without precedent. *See Green v. City of Southfield, Michigan*, 925 F.3d 281, 286 (6th Cir. 2019).").

The defendants' attorneys, not their clients, rightly should be ordered to pay the costs of the contumacious conduct in this instance, which the record suggests was undertaken largely or entirely at counsels' own initiative. *Red Carpet Studios*, 465 F.3d at 646 ("A sanctioned attorney is thus required to personally satisfy the excess costs attributable to his misconduct."). The sanction sought by the plaintiff is quite modest, considering the record of misbehavior that is presented here. The plaintiff asks to recover only those cumulative costs of the litigation that were incurred due to the obstinate refusal by defense counsel to make timely, unprompted disclosures of the several documents discussed above. "The court's fundamental job [when assessing the amount of an appropriate sanction under section 1927] is to determine whether a given legal fee . . . would or would not have been incurred in the absence of the sanctioned conduct," but "trial courts undertaking that task need not, and indeed should not, become green-eyeshade accountants." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1187 (2017) (quotations and citations omitted). "The essential goal in shifting fees is to do rough justice, not to achieve auditing perfection." *Ibid.* The expense that justly ought to be shifted here readily and roughly may be approximated by the hours of attorney labor expended by plaintiff's counsel in preparing and briefing the plaintiff's motion for sanctions and opposing the motion to extend discovery.

IV.

The defendants' motion to extend discovery and add witnesses, including expert witnesses, is based on false premises and inaccurate information, and they have not shown good cause or that their disclosure failures were harmless or substantially justified.  Defense counsels' conduct in pursuit of those goals needlessly has increased the legal expenses incurred by the plaintiff, without advancing this litigation.

Accordingly, it is **ORDERED** that the defendants' motion to extend discovery and add witnesses (ECF No. 352) is **DENIED**.

It is further **ORDERED** that the plaintiff's motion for sanctions (ECF No. 338) is **GRANTED**.  Plaintiff's counsel may submit a bill of costs **on or before April 13, 2021**, that documents fees and expenses that are related to the defense of the motions to appoint a DNA expert and the motion to extend discovery and add witnesses.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   March 30, 2021