UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVONTAE SANFORD,

        Plaintiff,                                  Case Number 17-13062

v.                                                     Honorable David M. Lawson

MICHAEL RUSSELL and JAMES TOLBERT,

        Defendants.

_____/

## ORDER DENYING DEFENDANTS' MOTION FOR RECONSIDERATION

The Court entered an order in March of last year denying the defendants' fourth motion to extend discovery deadlines and add witnesses. The defendants have moved for reconsideration and relief from that order, arguing that the order is infected with multiple errors, correction of which would require a different result. The Court disagrees and will deny the motion for reconsideration.

I.

The parties are familiar with the facts in this case. Plaintiff Davontae Sanford alleged in a complaint that the defendants, Detroit police officers investigating a quadruple homicide, fabricated evidence implicating the plaintiff in the murders that resulted in his wrongful conviction and incarceration. After another person confessed to the crimes and confirmed that Sanford was not involved, a State Police investigation uncovered evidence that lent substance to Sanford's claims. By the time Sanford's convictions were set aside, he had served about nine years in prison.

The Court entered a scheduling order early in this lawsuit that established, among other things, deadlines for identifying expert witnesses, exchanging expert witness reports, and completing discovery. On March 30, 2021, the Court denied the defendants' fourth motion seeking an extension of expert discovery and leave to disclose new experts who allegedly would support

the defendants' theory that the plaintiff actually was guilty of the homicides for which he says he falsely was convicted. The evidence pertained to testing of the plaintiff's shoes, which the defendants said contained human blood belonging to one of the homicide victims. The Court found then that the defendants had failed to abide by the deadlines in the scheduling order, they did not offer a plausible or truthful explanation why the expert evidence could not have been developed within the ample period that was allowed for discovery in this case, and that their discovery failures were not either substantially justified or harmless. The Court also found that the defendants' delay in revealing critical information relating to the evidence amounted to misconduct that warranted sanctions.

II.

The defendants ask the Court to reconsider those rulings under Local Rule 7.1(h) and for relief from the order under Federal Rule of Civil Procedure 60(b). Under the local rule, reconsideration of non-final orders may be granted on only on limited grounds:

> (A) The court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law before the court at the time of its prior decision;
>
> (B) An intervening change in controlling law warrants a different outcome; or
>
> (C) New facts warrant a different outcome and the new facts could not have been discovered with reasonable diligence before the prior decision."

E.D. Mich. LR 7.1(h)(2) (effective Dec. 1, 2021). Under Civil Rule 60(b), "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; [or] (6) any other reason that justifies relief." Fed. R. Civ. P. 69(b)(1), (3), (6).

Rule 60(b)(1) "is intended to provide relief in only two situations: (1) when a party has made an excusable mistake or an attorney has acted without authority, or (2) when the judge has made a substantive mistake of law or fact in the final judgment or order." *United States v. Reyes*, 307 F.3d 451, 455 (6th Cir. 2002).

Rule 60(b)(3) allows the court to grant relief based on the opposing party's "fraud . . ., misrepresentation, or misconduct." Relief is appropriate where the moving party "'show[s] that the adverse party committed a deliberate act that adversely impacted the fairness of the relevant legal proceeding [in] question.'" *Info-Hold, Inc. v. Sound Merchandising, Inc.*, 538 F.3d 448, 455 (6th Cir. 2008) (quoting *Jordan v. Paccar, Inc.*, 97 F.3d 1452, 1996 WL 528950, at *6 (6th Cir. 1996) (table)). "Fraud is the knowing misrepresentation of a material fact, or concealment of the same when there is a duty to disclose, done to induce another to act to his or her detriment." *Id.* at 456. "Fraud thus includes 'deliberate omissions when a response is required by law or when the non-moving party has volunteered information that would be misleading without the omitted material.'" *Ibid.* (quoting *Jordan*, 1996 WL 528950, at *6; citing *O'Neal v. Burger Chef Sys., Inc.*, 860 F.2d 1341, 1347 (6th Cir. 1988)).

The Sixth Circuit has held that federal courts may grant relief under Rule 60(b)(6) "only in exceptional and extraordinary circumstances, which are defined as those unusual and extreme situations where principles of equity mandate relief." *Export-Import Bank of U.S. v. Advanced Polymer Sciences, Inc.*, 604 F.3d 242, 247 (6th Cir. 2010) (quotations omitted). In addition, "something more than one of the grounds in subsections (1) through (5)" must be shown to justify relief under Rule 60(b)(6). *East Brooks Books, Inc. v. City of Memphis*, 633 F.3d 459, 465 (6th Cir. 2011).

A.

Before discussing their various factual disagreements, the defendants argue that the Court's discovery and sanctions ruling will "deprive them of a defense" to the claims in this case, and that any eventual imposition of liability on the defendants will, by operation of an indemnification clause in the Detroit Police Department's collective bargaining agreement, inflict the burden of a costly judgment on the "impoverished" taxpayers of the City. That argument is both unfounded and impertinent to resolution of the question before the Court, which is whether the prior ruling was founded on any error in the Court's construction of the record that then was before it. The City's undertaking to indemnify the defendants is a consequence of contracts entered into by the free will of those parties, not the result of any action by this Court. Any loss of evidence to the defendants was caused by their own tardiness. Moreover, none of the information presented to the Court suggests that the defendants were deprived of any meaningful factual rebuttal to the plaintiff's claims. That conclusion prevails even when considering newly proffered information that was *not* part of the record when the prior ruling was issued.

In their motion briefing, the defendants asserted that "further testing" of physical traces from the plaintiff's sneakers would bolster their position that he was present at the scene when four persons were shot to death in September 2007. While the motion was pending, the defendants apparently persuaded the Michigan State Police to complete their desired "further testing" on the shoes, and the results of that testing were submitted as a supplement to the motion record. The report of that testing, which was completed on April 27, 2021, states that seven out of eight swabs taken from the sneakers either produced no DNA profile or indicated that the results were "insufficient for comparison purposes." The report of testing on the lone swab that produced sufficient testable DNA traces stated that all of the victims present at the shooting scene were

*excluded* as possible contributors to any material found on the shoes. Laboratory Report dated Apr. 27, 2021, ECF No. 409-1, PageID.20088-90.

The Court observed in its prior order that previously obtained test results supplied no credible basis for the defendants' argument that "further testing" would produce damning evidence of the plaintiff's actual complicity in the murders. Those further results now have been obtained, and they only further extinguish the defendants' hypothesis of the plaintiff's complicity in the crimes. The defendants now ask the Court to allow even more time for even more "further testing," but their demand to delay the case yet again is substantiated by nothing more than pure speculation that something of use to them eventually may be produced by interminable rounds of re-examination. There is no factual basis in the entire record so far presented supporting the defendants' position that they have been, or will be, "deprived of a defense" by the denial of the opportunity to procure further expert evidence.

B.

The remainder of the defendants' brief focuses on their arguments that the Court made several mistakes in its construction of the record and the conclusions it reached precluding further discovery and imposing sanctions.

First, the defendants contend that the Court erred by finding that defendants' counsel was not diligent in attempting to procure DNA testing of physical traces on the shoes, because the shoes were "controlled by" the Michigan State Police, not the defendants. However, the defendants have not identified any factual error in the Court's finding that the evidentiary value of the shoes either was — or ought to have been — readily apparent to both the defendants and their counsel since long before the outset of this litigation. They still have offered no credible explanation for why they made no effort to procure expert examination of the allegedly crucial physical proofs within

the discovery period and before the deadline for expert disclosures had passed. There was no mistake in the Court's conclusion that the defendants failed to show good cause for any scheduling relief with respect to expert discovery, and that they have not shown that their failure to develop the expert record in a timely manner was the product of excusable neglect.

Second, the defendants argue that the Court erred when it found that defendants' counsel had not been forthcoming in producing to the plaintiff or the Court results of initial testing on the shoes, which indicated that no blood was found on them. However, there was no error in the Court's reading of the record because the defendants admit that the results of the initial testing for presence of blood on the shoes were not disclosed either to the plaintiff or the Court until well after they were obtained by the defendants. Moreover, this argument, once again, "ignores the much more serious concealment here, which was the deliberate omission from all of the defendants' papers of *both* the blood test results *and* the entire record of correspondence evidencing that the 2019 and 2020 re-analysis of the trace evidence on the shoes was instigated, pursued, and paid for by the defense team in this case." Order Imposing Sanctions, ECF No. 393, PageID.19847. The defendants have not identified any error in the Court's assessment of appropriate consequences for the more serious omissions by defense counsel that justified cost-shifting sanctions. Moreover, even if the Court's "criticism" of counsel's candor throughout the litigation was too harsh, the fact remains that the defendants never have offered any good grounds for relief from the scheduling deadlines established by the Court at the outset of this case.

Third, the defendants argue that sanctions were not warranted because the plaintiff is attempting to procure a verdict based on "fraud," by opposing their efforts to develop a factual defense through "further testing" of the shoes. They contend that, if the case is allowed to go to trial and an adverse judgment is entered, then this supposed "fraud" inevitably will constitute

grounds to set aside the verdict under Rule 60(b)(3). As noted above, nothing so far produced by the repeated rounds of testing on the physical evidence substantiates that position.

Fourth, the defendants argue that the Court erred in its review of the record, which they say includes inculpatory statements by the plaintiff about how any blood might have gotten onto his shoes. The defendants concede that this "error" was "understandable" because in their previous briefing they did not cite or include as an exhibit the pertinent portion of the plaintiff's deposition. They now submit a deposition excerpt where the plaintiff testified that, while he was riding in a car with the defendants, he "got scared" and told them that if there was blood on his shoes it was from an incident where he had to break up a dog fight. The Court did not err in its review of the record then before it, since it is admitted that any such error was invited by the deficiency of the briefing on the previous motion. However, any such error is inconsequential because the Court's principal conclusion was that the potential evidentiary value of the shoes plainly was evident to the defendants and their counsel well within the time allowed for seeking expert testing of them. The fact that the plaintiff made disingenuous statements about the shoes *during his initial encounter with the defendants* in 2007 only bolsters the Court's conclusion that there was no excuse for the defendants' failure to engage in timely examination of the physical evidence.

Fifth, the defendants argue that the Court "misconstrued" their argument that no rule of civil procedure required defense counsel to disclose to the plaintiff the results of any laboratory test results that were procured by defense counsel and that never were in the personal possession of the defendants. That argument, however, overlooks the much more serious obfuscations of the record in the defendants' brief on the previously decided motion for sanctions and motion to extend discovery. For the same reasons discussed above, any such "misconstruction" of the defendants'

- 7 -

argument on this point was inconsequential in light of the undisputed and much more serious omissions that are evident from the record.

Sixth, harkening back to a decision issued by the Court more than two years ago, the defendants contend that the Court "misrepresented" alleged misrepresentations of the record then before the Court when it chided defense counsel for a false assertion that defendant Russell "never testified" at a preliminary examination in the criminal case. The defendants contend that they never suggested that Russell's testimony was not admitted at the preliminary exam hearing, and that they merely argued that absolute immunity would preclude any liability for sworn testimony given during the state court judicial proceeding.

The present argument — which cites a different page of the defendants' earlier brief than that which prompted the Court's concern — is itself yet another misconstruction of the record. The Court explicitly recognized that the defendants presented two arguments relating to Russell's testimony about the plaintiff's creation of a drawing of the crime scene: (1) that any in-court testimony was subject to absolute immunity, and (2) that no "false statements" ever were admitted at the preliminary examination. The Court rejected *both* arguments, first concluding that liability might attach for investigatory conduct notwithstanding that the defendants' acts while testifying in court would be shielded by absolute immunity. *Sanford v. Russell*, 381 F. Supp. 3d 905, 919 (E.D. Mich. 2019), *aff'd*, 815 F. App'x 856 (6th Cir. 2020) ("The defendants contend that they can avoid this lawsuit by testimonial absolute immunity. But that principle has no bearing on the fabrication of evidence claims, which involved pretrial, non-testimonial conduct that prompted the prosecutor's decisions to initiate and continue the case."). The Court *also* determined that the defendants' assertion that no "false statements" were presented to the state court was premised on misrepresentations of the evidentiary record. *Id.* at 922 ("The defendants' second argument is

more troubling. In their motion brief, counsel wrote: '[N]either Tolbert's nor Russell's false statements were introduced as exhibits into evidence at the preliminary hearing.' Defs.' Mot. for Summ. J., ECF No. 148, PageID.5934."). The argument in the present motion cites a preceding page of the defendants' motion brief where the absolute immunity argument was framed, while conveniently ignoring the plain misstatement on the following page, which was cited in the Court's summary judgment opinion, and which prompted the Court's expressed concerns about counsel's candor. The defendants have not identified any misreading of the earlier record by the Court. Moreover, the time has long since passed for reexamination of any supposed error by the Court in the 2019 summary judgment ruling.

Seventh, the defendants argue that the Court "turned a blind eye" to information suggesting that "further testing" of the shoes was warranted, and that the Court inexplicably suggested that it was "unclear" why the defendants' motion to appoint a DNA examiner was withdrawn. The defendants say that the motivation for withdrawing that motion was "very clear" because it was withdrawn after the Michigan State Police decided to commission a DNA re-analysis — according to the defendants, on the agency's own initiative. However, there was no error or omission in the Court's recitation of either the procedural history or the chronology of interactions between defense counsel, state prosecutors and investigators, and the outside laboratory testing agency, TrueAllele, which eventually performed a re-analysis of DNA traces found on the sneakers.

As the Court's prior opinion indicated, it was unclear from the record which decision maker in either the Wayne County Prosecutor's Office or the Michigan State Police authorized the submission of the shoes to TrueAllele for further testing. However, the Court assumed that some such authorization must have issued, since laboratory data from the state case files were submitted for re-analysis by TrueAllele in October and November 2019. The Court stated:

> On [May 23, 2019], the defendants filed their earlier motion (ECF No. 320) in which they asked the Court to appoint an expert DNA examiner to perform further testing on the blue and white sneakers. On June 10, 2019, attorney Berger emailed Wayne County assistant prosecutor Athina Siringas, forwarding to her copies of emails from Cybergenetics and the case submission form, and informing her that an "initial DNA screening" could be conducted at "no charge." It is unclear what may have transpired in the interim, but on June 21, 2019, the defendants withdrew their motion seeking court appointment of a DNA expert. Subsequent correspondence in the Cybergenetics file indicates that a completed case submission form and electronic data files eventually were received by Cybergenetics from the MSP between October 24 and November 24, 2019. The "preliminary results" were discussed with MSP investigators, but *it is undisputed that neither the MSP nor the Wayne County prosecutor ever requested a final report of the analysis. It is unclear who at the MSP or the prosecutor's office authorized the submission of the case files*. However, an email from defendants' counsel to plaintiff's counsel on February 20, 2020, confirmed that by that time neither agency had elected to purchase the "final report" of the results from the Cybergenetics analysis. Defense counsel, in the meantime, had contacted Cybergenetics again several times between December 30, 2019, and January 10, 2020, to inquire about purchasing a copy of the final results, which eventually was produced by Cybergenetics and sent directly to defendants' counsel.

*Sanford v. Russell*, No. 17-13062, 2021 WL 1186495, at *4 (E.D. Mich. Mar. 30, 2021) (emphasis added). That passage accurately portrays the state of the record at the time.

Moreover, any misreading of the record on this point was inconsequential to the discovery and sanctions rulings, because nothing in the record calls into question the Court's assessment that, regardless of how the testing eventually came about or by whom it was authorized within the state agencies, it was instigated in the first instance through vigorous advocacy by defendants' counsel, not as a natural or inevitable consequence of any supposed "ongoing investigation." That fact — and the concealment by defense counsel of the record of correspondence relating to the testing — amply justified the Court's conclusion that sanctions were warranted for insincere conduct by defense counsel that plainly was intended to multiply the cost of this litigation.

Eighth, the defendants argue that the Court mistakenly criticized them for failing to seek DNA testing of the shoes during the criminal investigation, while overlooking the circumstance that no such testing was warranted at that time because "the plaintiff had confessed." The Court

- 10 -

did not err in its assessment of the litigation history, which focused on the fact that, despite having undisputed and plainly apparent basis to seek expert examination of the shoes *at the latest from the date when the complaint in this case was filed*, the defendants and their counsel never made any serious effort to procure such an examination until it was far too late to do so. The Court stated:

> The truth is plain and simple: There were some shoes. Those shoes were found in the plaintiff's home on the night of the murders. He allegedly gave them to the defendants, who were investigating the crime, and admitted that they were his. During the interrogation, one of the defendants (admittedly, falsely) told the plaintiff that blood had been found on the shoes. Regardless of any other circumstance of the murders or anything else that has transpired in the long, tortured history of this case, one fact should be obvious to anyone: those shoes had significant evidentiary potential, because, if they were worn by the plaintiff when he allegedly shot four people to death, then they might retain some physical trace of that violent encounter. . . . Even the most casual fan of any police drama produced within the last thirty years immediately would have surmised the obvious: something on those shoes might show that the plaintiff was present when four people were gunned down. Knowing all that, and having known it all since 2007 — or, at the least, since the very outset of this lawsuit — the defendants now expect the Court to believe that they were 'surprised' by the results of a DNA analysis of trace evidence from the shoes that was compiled in late 2019, more than a decade after the shoes were taken into evidence, and that it never before then had occurred to them that examination of those shoes could yield physical evidence that might demonstrate the plaintiff's involvement in the murders. Put simply, the defendants' assertion that they had no good reason to seek such testing before late 2019 or early 2020 is either a prevarication or an admission by both the defendants and their lawyers of inexplicable professional missteps. Either way, nothing in their presentation plausibly excuses the failure by the defense team to make any timely effort to procure the expert evidence that they now ask for leave to develop.

*Sanford v. Russell*, No. 17-13062, 2021 WL 1186495, at *8 (E.D. Mich. Mar. 30, 2021). The defendants have not identified any error in that determination.

Ninth, the defendants argue that the Court erred when it was "critical of defense counsel for referring to stains on the shoes as blood." However, as discussed above, the focus of the Court's criticism of counsel's conduct was on the fact that counsel admittedly presented to the Court the plain suggestion that a substance on the sneakers was blood, while simultaneously

- 11 -

concealing from both the Court and the plaintiff results of laboratory tests that equally plainly negated that assertion. The Court concluded that such prevarication bolstered an inference that the entire course of the defendants' serial attempts to relitigate the expert discovery dispute was motivated at best by a desire to increase the delay and cost of the litigation, and at worst by a disingenuous intent to mislead the Court into revising a conclusive and extensively litigated discovery ruling from which the defendants repeatedly had failed to secure relief.

Finally, the defendants have not identified any "fraud" by the plaintiff by which the previous discovery and sanctions ruling was procured. They also have not identified any manifest injustice that would result or any general principles of equity that would be compromised by allowing the previous ruling to stand.

III.

The plaintiff recently filed a second motion to supplement the motion record. However, further supplementation would serve no purpose under the governing rule of decision, because the Court's consideration of the motion for reconsideration is limited to examination of whether there was any error in the Court's conclusions based on the record then before the Court when the prior ruling was issued. E.D. Mich. LR 7.1(h)(2)(A). The motion to supplement the record therefore will be denied.

IV.

For all the reasons discussed above, the defendants once again have failed to identify any plausible basis for a finding that good cause justifies the scheduling relief they seek. The defendants have failed to identify any mistake of fact or law that would change the outcome of the Court's prior decision. They also have not established that any circumstance of fraud, mistake, or

- 13 -

excusable neglect warrants relief from the discovery and sanctions ruling, or that any inequitable or unjust outcome will result from allowing the ruling to stand.

Accordingly, it is **ORDERED** that the defendants' motion for reconsideration (ECF No. 396) is **DENIED**.

It is further **ORDERED** that the plaintiff's second motion for leave to supplement the record (ECF No. 412) is **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated:   January 31, 2022